**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) BRIDGET NICOLE REVILLA, | ) |
| (2) ALMA MCCAFFREY, as Personal | ) |
|     Representative of the Estate of | ) |
|     GREGORY BROWN, deceased, | ) |
| (3) CHRISTINE WRIGHT, as Special | ) |
|     Administrator of the Estate of | ) |
|     LISA SALGADO, deceased, and | ) |
| (4) DEBORAH YOUNG, as Special | ) |
|     Administrator of the Estate of | ) |
|     GWENDOLYN YOUNG, deceased, | ) |
| | ) |
|       Plaintiffs, | ) |
| | ) |
| v. | ) Case No.: 13-CV-315-JED-TLW |
| | ) |
| (1) STANLEY GLANZ, SHERIFF OF TULSA | ) |
|     COUNTY, in His Individual and Official | ) |
|     Capacities; | ) ATTORNEY LIEN CLAIMED |
| (2) CORRECTIONAL HEALTHCARE | ) JURY TRIAL DEMANDED |
|     MANAGEMENT OF OKLAHOMA, INC.; | ) |
| (3) CORRECTIONAL HEALTHCARE | ) |
|     MANAGEMENT, INC. | ) |
| (4) CORRECTIONAL HEALTHCARE | ) |
|     COMPANIES, INC., | ) |
| (5) ANDREW ADUSEI, M.D., | ) |
| (6) PHILLIP WASHBURN, M.D., and | ) |
| (7) CHRISTINA ROGERS, R.N., | ) |
| | ) |
|       Defendants. | ) |

## AMENDED COMPLAINT

**COME NOW** the Plaintiffs, Bridget Nicole Revilla ("Ms. Revilla"), Alma

McCaffrey ("Plaintiff McCaffrey"), as Personal Representative of the Estate of Gregory

Brown ("Mr. Brown"), deceased, Christine Wright ("Plaintiff Wright"), as Special

Administrator of the Estate of Lisa Salgado ("Ms. Salgado"), deceased, Deborah Young

("Plaintiff Young"), as Special Administrator of the Estate of Gwendolyn Young ("Ms.

Young"), deceased, (hereinafter, collectively referred to as "Plaintiffs"), by and through

1

their attorneys of record, and for their causes of action against the Defendants, allege and state as follows:

## INTRODUCTORY STATEMENT

1.  As detailed herein, Ms. Revilla, Mr. Brown, Ms. Salgado and Ms. Young were all subjected to grossly deficient treatment amounting to deliberate indifference to their serious medical needs.  Mr. Brown, Ms. Salgado and Ms. Young all needlessly died after responsible medical staff at the David L. Moss Criminal Justice Center ("Tulsa County Jail") disregarded known and substantial risks to their health and safety.  Ms. Revilla only narrowly escaped death, while suffering unnecessarily due to the utterly inadequate care provided to inmates at the Jail.  The deaths of Mr. Brown, Ms. Salgado and Ms. Young and mistreatment Ms. Young are all symptomatic of the Jail's abysmal health services system.   There is a well-established, well-documented and prevailing attitude of indifference to the health and safety of inmates at the Tulsa County Jail.  For many years, Correctional Healthcare Companies, Inc. ("CHC"), Correctional Healthcare Management, Inc. ("CHM"), Correctional Healthcare Management of Oklahoma, Inc. ("CHMO") and Defendant Sheriff Stanley Glanz ("Sheriff Glanz") have been repeatedly and continuously put on notice, by multiple credible sources, of the serious, grave and systemic deficiencies in the delivery of health care -- including mental health care -- to inmates at the Tulsa County Jail. Even after multiple preventable deaths and negative medical outcomes, these Defendants failed and refused to correct the identified deficiencies, choosing to maintain their defective and unconstitutional health care delivery system.  This broken system failed Plaintiffs and was the moving force behind their injuries and/or deaths and damages alleged herein.

2

## JURISDICTION AND VENUE

2.  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth Amendment and Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

3.  The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

4.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

5.  Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

6.  Plaintiff, Bridget Nicole Revilla ("Ms. Revilla"), is a resident of Tulsa County, Oklahoma.

7.  Plaintiff Alma McCaffrey ("Plaintiff McCaffrey"), is a resident of Sequoyah County, Oklahoma, and the duly-appointed Personal Representative of the Tulsa County Estate of Gregory Dean Brown ("Mr. Brown").  The survival causes of action in this matter are based on violations of Mr. Brown's rights under the Eighth and/or Fourteenth Amendments and Oklahoma State Law.

3

8.  Plaintiff, Christine Wright ("Plaintiff Wright"), is a resident of Tulsa County, Oklahoma, and the duly-appointed Special Administrator of the Estate of Lisa Salgado ("Ms. Salgado").  The survival causes of action in this matter are based on violations of Ms. Salgado's rights under the Eighth and/or Fourteenth Amendments and Oklahoma State Law.

9.  Plaintiff, Deborah Young ("Plaintiff Young"), is a resident of Tulsa County, Oklahoma, and the duly-appointed Special Administrator of the Estate of Gwendolyn Young ("Ms. Young"), deceased.  The survival causes of action in this matter are based on violations of Ms. Young's rights under the Eighth and/or Fourteenth Amendments and Oklahoma State Law.

10. Defendant Stanley Glanz ("Sheriff Glanz" or "Defendant Glanz") is, and was at all times relevant hereto, the Sheriff of Tulsa County, Oklahoma, residing in Tulsa County, Oklahoma and acting under color of state law.  Defendant Glanz, as Sheriff and the head of the Tulsa County Sheriff's Office ("TCSO"), was, at all times relevant hereto, responsible for ensuring the safety and well-being of inmates detained and housed at the Tulsa County Jail, including the provision of appropriate medical and mental health care and treatment to inmates in need of such care, pursuant to 57 O.S. § 47.  In addition, Defendant Glanz is, and was at all times pertinent hereto, responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of TCSO and Tulsa County Jail, including the policies, practices, procedures, and/or customs that violated Ms. Revilla, Mr. Brown, Ms. Salgado and Ms. Young's rights as set forth in this Amended Complaint.  Defendant Glanz is sued in his individual and official capacities.

11. Defendant Correctional Healthcare Management of Oklahoma, Inc. ("CHMO") is a foreign corporation doing business in Tulsa County, Oklahoma and was at all times relevant hereto responsible, in part, for providing medical services and medication to Ms. Revilla, Mr. Brown, Ms. Salgado and Ms. Young while they were in the custody of TCSO.  CHMO was additionally responsible, in part, for creating and implementing policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail, and for training and supervising its employees. CHMO was, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such that CHMO became an agency or instrumentality of the State and subject to its constitutional limitations.

12. Defendant Correctional Healthcare Companies, Inc. ("CHC") is a foreign corporation doing business in Tulsa County, Oklahoma and was at all times relevant hereto responsible, in part, for providing medical services and medication to Ms. Revilla, Mr. Brown, Ms. Salgado and Ms. Young while they were in the custody of TCSO.  CHC was additionally responsible, in part, for creating and implementing policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail, and for training and supervising its employees.  CHC was, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such that CHC became an agency or instrumentality of the State and subject to its constitutional limitations.

13. Defendant Correctional Healthcare Management, Inc. ("CHM") is a foreign corporation doing business in Tulsa County, Oklahoma and was at all times relevant hereto responsible, in part, for providing medical services and medication to Ms. Revilla,

Mr. Brown, Ms. Salgado and Ms. Young while they was in the custody of TCSO.  CHM was additionally responsible, in part, for creating and implementing policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail, and for training and supervising its employees.  CHM was, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such that CHM became an agency or instrumentality of the State and subject to its constitutional limitations.

14. Defendant Andrew Adusei, M.D. ("Dr. Adusei") was at all time relevant hereto, an employee and/or agent of CHC/CHM/CHMO, who was, in part, responsible for overseeing and treating Ms. Revilla, Mr. Brown and Ms. Young's health and well-being, and assuring that Ms. Revilla, Mr. Brown and Ms. Young's medical needs were met, during the time they were in the custody of TCSO.   In particular, Dr. Adusei was CHC/CHM/CHMO's Medical Director at the Jail.  Dr. Andrew Adusei is being sued in his individual capacity.

15. Defendant Phillip Washburn, M.D. ("Defendant Washburn" or "Dr. Washburn") was at all time relevant hereto, an employee and/or agent of CHC/CHM/CHMO, who was, in part, responsible for overseeing Ms. Salgado's health and well-being, and assuring that Ms. Salgado's medical needs were met, during the time she was in the custody of TCSO. In particular, Dr. Washburn was CHC/CHM/CHMO's Medical Director at the Jail.  Dr. Washburn is being sued in his individual capacity.

16. Defendant Christina Rogers, R.N. ("Defendant Rogers" or "HSA Rogers") was at all time relevant hereto, an employee and/or agent of CHC/CHM/CHMO, and acting under color of state law.  Particularly, Defendant Rogers served as CHC/CHM/CHMO's

Health Services Administrator ("HSA") at the Jail.  As HSA, Defendant Rogers was CHC/CHM/CHMO's foremost supervisor on site.  Defendant Rogers was in part, responsible for overseeing Ms. Revilla, Mr. Brown, Ms. Salgado and Ms. Young's health and well-being, and assuring that their medical needs were met, during the time they were in the custody of TCSO. Defendant Rogers is being sued in her individual capacity.

## FACTUAL ALLEGATIONS

17. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 16, as though fully set forth herein.

### A.  Facts Specific to Mr. Brown

18. On or about February 18, 2012, Mr. Brown underwent an intake health review at the Tulsa County with CHC/CHM/CHMO employee Kimberly Hughes, LPN. Despite his extensive medical needs (known to TCSO and CHC/CHM/CHMO from Mr. Brown's existing Jail medical records), Mr. Brown was initially placed in a general population cell.

19. On information and belief, Mr. Brown made requests for medical assessment and to be seen by a physician; but was not seen by a physician and went untreated for a period of approximately four (4) days.

20. On February 21, 2012, a nurse reported to CHC/CHM/CHMO's Director of Nursing ("DON"), Tammy Harrington, RN ("Director Harrington"), that Dr. Adusei had shown up at work with a strong odor of alcohol on his breath.  In turn, Director Harrington reported the alcohol issue to Defendant Rogers.

21.  In the early morning hours of February 22, 2012, CMHO/CHC/CHM personnel called a medical emergency on Mr. Brown because his blood pressure dropped

dramatically, his pulse rate dropped dramatically, his respiratory rate plummeted and he had been vomiting all night.

22.  Later in the day on February 22, 2012, Mr. Brown finally had an initial consult and examination with a physician, and informed Dr. Adusei of his medical history of perforated gastric ulcers with prior laparotomy and gastrectomy.  Notwithstanding the clear and obvious link between Mr. Brown's medical history and current disease course, Dr. Adusei, apparently ignoring Mr. Brown's medical history, diagnosed renal colic (pain caused by kidney stones) and calculi (kidney stones).  Dr. Adusei ordered that several medications and intravenous fluids be administered to Mr. Brown.

23.  On February 23, 2012, Dr. Adusei noted right upper and right low flank tenderness and "exquisite major" pain.  Dr. Adusei continued treating Mr. Brown for renal colic.

24.  A February 27, 2012 late entry in the medical records by Dr. Adusei, purporting to be from a February 24, 2012 examination, notes that Mr. Brown continued to experience abdominal and flank pain and that nursing noted a drop in blood pressure and O2 sats overnight.

25.  On February 27, 2012, Dr. Adusei started Mr. Brown on oxygen via nasal cannula with O2 sats at 98%.  Mr. Brown appeared "toxic" with a soft abdomen and flank with lower quadrant tenderness.  Dr. Adusei continued to treat Mr. Brown for renal calculi.

26.  Dr. Adusei reported to Defendant HSA Rogers that he would send Mr. Brown to the hospital after he got a nasogastric "N/G" tube down Mr. Brown's throat.

27.  Later in the evening on February 27, 2012, Dr. Adusei documented Mr. Brown's abdomen as distended and tympanitic with hypoactive bowel sounds and tenderness to the back and flanks.  Dr. Adusei, inexplicably, revised his diagnosis opining that Mr. Brown's renal calculi were resolving and that Mr. Brown had symptoms of small bowel obstruction.  Dr. Adusei suctioned 450 cc's of black tarry fluid from Mr. Brown's stomach through an N/G tube.  Dr. Adusei ordered ulcer prophylaxis medication and a complete blood count to be drawn.

28.  Despite Dr. Aduesi's earlier report that he would send Mr. Brown to the hospital after getting the N/G tube down, he refused to do so.

29.  On February 28, 2012, still at the Jail, Mr. Brown's condition further deteriorated.  A CHC/CHM/CHMO nurse, and a Tulsa County Detention Officer both observed Mr. Brown's black urine.  Director Harrington requested multiple times that Mr. Brown be transported to the emergency room ("ER"), but Dr. Adusei callously refused.  Director Harrington made further requests for Mr. Brown's transport to both HSA Rogers and to Dr. Adusei.  Dr. Adusei insisted that Mr. Brown was not to go to the ER.  Notwithstanding the clear and present danger created by Dr. Adusei's medical neglect, HSA Rogers allowed Dr. Adusei's order to stand, preventing Mr. Brown's transport to the ER.

30. In the afternoon of February 28, 2012, Dr. Adusei repeated his diagnoses of resolved renal colic with ensuing small bowel obstruction.  Dr. Adusei noted that he would only consider an ER transfer if Mr. Brown did not improve remarkably within the next couple days.

31.  On the morning of February 29, 2012, Mr. Brown had a fever of 102.9 degrees, was in severe respiratory distress, continued to void dark tea colored urine, and discharge dark brown/black fluid through his N/G tube.  Now in immediate danger of becoming another Jail death, CHC/CHM/CHMO called EMSA to transport Mr. Brown to Hillcrest so that he would not die on the premises.

32.  On presentation at Hillcrest Mr. Brown was septic, malnourished and dehydrated.  Hillcrest surgeon Dr. Mark Birdsong took Mr. Brown emergently to surgery where an exploratory laparotomy showed bowel perforation and peritonitis.  Peritonitis is an inflammation of the tissue lining the inner wall of the abdomen and those tissues covering and supporting most of the abdominal organs.  Left untreated, peritonitis spreads into the blood and organs, causing multiple organ failure and death.

33.  Due to prolonged neglect Mr. Brown's perforation and extensive peritonitis rendered Dr. Birdsong's surgery futile.

34.  Post-surgery, Dr. Birdsong admitted Mr. Brown to ICU in critical condition.  Physicians placed him on mechanical ventilation, total parenteral nutrition, hemodynamic support, and vasopressor medications.  He languished in ICU until his death on March 8, 2012.

35.  Defendants HSA Rogers and Dr. Adusei were fully aware of Mr. Brown's serious medical condition and deliberately denied him medical treatment he obviously and desperately needed. In addition, prior to Mr. Brown's admission to the Jail's medical unit, HSA Rogers knew of other reported instances wherein Dr. Adusei had denied or delayed treatment to inmates with serious medical needs.  Director Harrington and other personnel had repeatedly reported to HSA Rogers that Dr. Adusei displayed indifference

and contempt for inmates, disregarding their healthcare needs.   Nevertheless, HSA Rogers concealed and covered Dr. Adusei's risk to inmate health and safety.

36. On the morning that Mr. Brown was sent to HMC, Director Harrington called CHC/CHM/CHMO corporate and reported Dr. Adusei for his repeated failures to provide adequate care to inmates at the Jail.  Still, CHC/CHM/CHMO ignored those reports and took no remedial action.

37. As a direct result of CHC/CHM/CHMO's, HSA Rogers', and Dr. Adusei's wanton, neglectful, and callous disregard for Mr. Brown's obvious medical needs, he deteriorated and died.

38. Defendants Sheriff Glanz, CHC/CHM/CHMO, HSA Rogers, and Dr. Adusei failed to provide adequate or timely evaluation and treatment, even as Mr. Brown's known medical condition deteriorated and he had specifically requested medical attention while in TCSO's custody. CHC/CHM/CHMO, HSA Rogers, and Dr. Adusei failed to reasonably diagnose and treat Mr. Brown's serious medical condition, and prevented his timely transfer to a medical facility for proper care.

39. Defendants Sheriff Glanz's, CHC/CHM/CHMO's, HSA Rogers', and Dr. Adusei's failures to provide prompt and adequate care in the face of known and substantial risks to Mr. Brown's health and well being include, inter alia: a failure to conduct appropriate medical assessments; a failure to create and implement appropriate medical treatment plans; a failure to promptly evaluate Mr. Brown's physical health; a failure to properly monitor Mr. Brown's physical health; a failure to provide access to medical personnel capable of, and willing to, properly evaluate and treat his serious

health needs;  and a failure to take precautions to prevent further medical injury to Mr. Brown.

### B. Facts Specific to Ms. Salgado

40. Ms. Salgado was arrested on June 24, 2011 and due to her serious medical conditions, was taken to St. John Medical Center for a cardiac workup to be cleared for incarceration at the Tulsa County Jail. She was booked into Tulsa County Jail on June 25, 2011, where she died approximately three (3) days later. During this period of custody, Ms. Salgado notified Defendants Sheriff Glanz, CHC/CHM/CHMO, HSA Rogers and Dr. Washburn  (and/or Defendants were otherwise on notice) of each of her prescribed medications and health issues. As a result of her extensive medical needs, Ms. Salgado was housed in the medical unit.

41. Ms. Salgado presented at the Jail with several serious, and potentially life-threatening, medical problems, including coronary artery disease, hypertension, alcohol abuse (potential withdrawal), diabetes and pancreatitis. Ms. Salgado's medical conditions required daily monitoring, as well as daily medication.  Defendants Sheriff Glanz, CHC/CHM/CHMO, HSA Rogers and Dr. Washburn were plainly put on notice of Ms. Salgado's health conditions due to her clearance from St. John before being booked at the Tulsa County Jail.

42. On or about June 25, 2011, Ms. Salgado began complaining of chest and abdominal pain.   Ms. Salgado repeatedly told the detention officers and medical personnel (including Nurse Karen Metcalf ("Nurse Metcalf") (and other medical staff)) that she was experiencing stomach and chest pain.

43. Defendant Washburn purportedly saw Ms. Salgado on or about June 26, 2011. Dr. Washburn's purported assessment was wholly inadequate and improper. Despite the known, obvious and substantial risks to her health, Dr. Washburn either provided Ms. Salgado with no treatment whatsoever or provided inadequate treatment. Dr. Washburn knew of the severity of Ms. Salgado's condition, but did nothing to ensure that she received the treatment she needed. Dr. Washburn did not provide Ms. Salgado with access to medical personnel capable of evaluating and treating her serious health needs. On the contrary, he merely left Ms. Salgado in the hands of Nurse Metcalf, who CHC/CHM/CHMO knew to be incompetent and incapable of caring for an inmate with serious medical needs (like Ms. Salgado).

44. On or about June 28, 2011, Nurse Paul Wallace arrived at the Jail for his shift and asked Nurse Metcalf about the status of the inmates under her care. Nurse Metcalf indicated that all of the inmates under her care, including Ms. Salgado, were "okay".

45. After this brief conversation with Nurse Metcalf, Nurse Wallace walked down the hall in the medical unit and discovered that Ms. Salgado was unresponsive, without pulse or respiration. He began loudly calling out for help. However, it was far too late. Ms. Salgado had been dead for *at least four (4) to six (6) hours* before Nurse Wallace "discovered" her. The time of death is evinced by the fact that rigor mortis had set it.

46. Nurse Metcalf utterly failed to provide Ms. Salgado with even the most basic supervision or assessment. She never took Ms. Salgado's vital signs. Nurse Metcalf clearly did not monitor Ms. Salgado's medical condition. Nurse Metcalf failed to recognize that an inmate under her care had been dead for hours. This, in and of itself, is evidence of extreme neglect amounting to deliberate indifference.

13

47. Though Ms. Salgado was clearly dead when Nurse Wallace found her, personnel purportedly made vain attempts at CPR, and called EMSA to provide life support. Defendants further falsified documentation to make it appear Ms. Salgado passed away after being taken from the Jail by ambulance.  This was in keeping with TCSO and CHC/CHM/CHMO's unconscionable policy or custom of attempting to resuscitate patients who are clearly deceased in hopes that the inmates will not be declared dead at the Jail.  There are two reasons for this policy or custom.  First, Defendants wish to avoid Jail deaths being counted towards the Tulsa County Jail's "death in custody" statistics. Second, if inmates are pronounced dead outside the Jail, then the staff is not required to conduct the investigation that is mandated when an inmate dies in custody.

48. Defendants Sheriff Glanz, CHC/CHM/CHMO, HSA Rogers and Dr. Washburn failed to conduct regular or adequate medical assessments and failed to provide adequate and necessary medical care to Ms. Salgado.  Ms. Salgado died of a heart attack, which could have been prevented had the Defendants not acted with neglect and deliberate indifference to her serious medical needs.

49. Moreover, after Ms. Salgado died, HSA Rogers instructed her staff to falsify Ms. Salgado's medical chart to make it appear that she was given thorough medical assessments when in fact, her vital signs had not been checked in days.  The falsification of Ms. Salgado's medical chart is consistent with Sheriff Glanz and CHC/CHM/CHMO's policy, practice and/or custom of altering medical records in an effort to cover up and conceal poor inmate medical care.  This policy, practice and/or custom establishes that Defendants are far more concerned with creating a deceptive image of adequate inmate

medical care than they are with the actual health and well-being of the inmates under their care.

50. Prior to Ms. Salgado's death, Nurse Metcalf had been counseled several times for providing poor care.  One nurse, Nurse Mary Hudson, had previously reported to HSA Rogers that Nurse Metcalf should be turned over to the Nursing Board for serious medication administration errors that put inmates at risk of harm.  However, rather than take action to alleviate the known risks posed by Nurse Metcalf, HSA Rogers lashed out at Nurse Hudson, threatening to fire her if she reported Metcalf to the Nursing Board. Nurse Metcalf should have been prohibited from caring for and supervising inmates with serious or complex conditions, like Ms. Salgado.  The very fact that Nurse Metcalf was assigned with the supervision and care for Ms. Salgado is evidence of Sheriff Glanz, CHC/CHMCMO, Defendant Rogers and Dr. Wasburn's deliberate indifference.

51. Defendants Sheriff Glanz, CHC/CHMCMO, Defendant Rogers and Dr. Wasburn's failures to provide prompt and adequate care in the face of known and substantial risks to Ms. Salgado's health and well being include, *inter alia*: a failure to conduct appropriate medical assessments; a failure to create and implement appropriate medical treatment plans; a failure to promptly evaluate Ms. Salgado's physical health; a failure to properly monitor Ms. Salgado's physical health; a failure to provide access to medical personnel capable of evaluating and treating her serious health needs;  and a failure to take precautions to protect Ms. Salgado from further injury.

### C.  Facts Specific to Ms. Young

52. Ms. Young was booked into Tulsa County Jail on or around October 16, 2012 with serious and known pre-existing medical and mental health conditions that required

prescription medication and routine medical and mental health evaluations. She remained in the Jail until the day that she died of a heart attack, February 8, 2013. During this period of custody, Ms. Young notified Defendants Sheriff Glanz, CHC/CHM/CHMO, HSA Rogers and Dr. Adusei (and/or Defendants otherwise had knowledge of) her prescribed medications and serious medical needs.

53. These Defendants knew (either through actual or constructive notice) of Ms. Young's serious health issues, including diabetes, a prior history of cardiovascular problems (including stroke), hypertension, and hyperlipidemia. Defendants knew that Ms. Young's health was fragile from the moment she presented at Jail, and that her condition was likely to deteriorate due, in part, to the stress and anxiety related to her recent criminal conviction. Ms. Young was at a heightened risk of cardiac arrest and should have been treated with the utmost care and precaution.

54. Nonetheless, during the time period Ms. Young was in custody of TCSO, her health condition was not adequately monitored and she did not receive proper medical assessments.

55. On information and belief, Dr. Adusei falsified documents regarding when he visited Ms. Young.

56. Ms. Young repeatedly told Jail and CHMO/CHC/CHM personnel that she was having lower back and abdominal pain, nausea and vomiting; yet, Ms. Young was not furnished with the medical care she needed. Due to her fragile heath and known and substantial health risks, Ms. Young' complaints should have put the detention and medical staff on high alert.

57. On the contrary, Defendants failed to conduct regular medical assessments and failed to provide adequate medical care to Ms. Young and she died of a heart attack, which could have been prevented had the Defendant not acted with deliberate indifference to Ms. Young's serious medical condition and need for care and treatment.

58. Upon information and belief, Ms. Young suffered additional physical injury while in defendants' custody.

59. Upon information and belief, Ms. Young also required medical attention for mental health conditions (such as anxiety disorder), which had a likelihood of exacerbating her heart condition. Still, mental health assessments and evaluations were not adequately provided and Ms. Young did not receive sufficient treatment for these conditions.

60. When the Tulsa Fire Department and EMSA arrived at the Jail on February 8, 2013, Ms. Young was already dead due to cardiac arrest.  It was reported that Ms. Young complained earlier that morning of nausea, vomiting, lower back and abdominal pain. However, medical staff did little, if anything, to assess or treat Ms. Young's deteriorating condition.   By the time EMSA arrived at approximately 10:20 am, Ms. Young was unconscious and unresponsive.  She had no pulse and no respirations.

61. Though Ms. Young clearly died at the Jail, personnel purportedly made vain attempts at CPR, and called EMSA to attempt to resuscitate her.  Defendants further falsified documentation to make it *appear* Ms. Young passed away after being taken from the Jail by ambulance, even issuing a press release that falsely claims that Ms. Young died at an area hospital.  This was in keeping with TCSO and CHC/CHM/CHMO's unconscionable policy or custom of attempting to resuscitate patients who are clearly

17

deceased in hopes that the inmates will not be declared dead at the Jail.  There are two reasons for this policy or custom.  First, Defendants wish to avoid the Jail deaths being counted towards the Tulsa County Jail's "death in custody" statistics. Second, if inmates are pronounced dead outside the Jail, then the staff is not required to conduct the investigation that is mandated when an inmate dies in custody.

62. Defendants failed to provide adequate or timely evaluation and treatment, even as Ms. Young's known medical condition deteriorated and she had specifically requested medical attention while in Defendants' custody.

63. Defendants' failures to provide prompt and adequate care in the face of known and substantial risks to Ms. Young's health and well being include, *inter alia*: a failure to conduct appropriate medical and mental health assessments; a failure to create and implement appropriate medical and mental health treatment plans; a failure to promptly evaluate Ms. Young's physical and mental health; a failure to properly monitor Ms. Young's physical and mental health; a failure to provide access to medical personnel capable of evaluating and treating her serious health needs;  and a failure to take precautions to protect Ms. Young from further injury.

**D.  Facts Specific to Ms. Revilla**

64. On June 19, 2012, Ms. Revilla entered the custody of the TCSO at the Tulsa County Jail.  During this period of custody, Ms. Revilla notified the booking nurse and/or staff of all of her prescribed medications (including diabetes, anti-seizure, anti-psychotic and psychoactive medication) and her serious health conditions, including diabetes, epilepsy (seizure disorder) and schizophrenia. She stressed to the nurse and/or staff that

she could not go without her daily medication. As a result of her extensive medical needs, Ms. Revilla was housed in the medical unit.

65. The following day, June 20, 2012, Ms. Revilla was not given *any* of her prescribed medication nor was her blood sugar checked. Ms. Revilla is a Type 1 diabetic and it is imperative her blood sugar is monitored daily.

66. As a result of Defendants' failure to give Ms. Revilla her prescribed medication or monitor her blood sugar, Ms. Revilla suffered multiple seizures in her cell. Detention Officer Miller found Ms. Revilla seizing and called for assistance. Two nurses were also present, Nurse Eugene and Nurse Deena (last names unknown).

67. Ms. Revilla was taken to the hospital where she was given her seizure medication, Dilantin. She was then returned to the Tulsa County Jail and once again placed under Defendants' care in the medical unit. Still, Defendants failed to provide Ms. Revilla with all of her prescribed and medically necessary medications.  Moreover, while medical staff did provide Ms. Revilla with Dilantin, they administered the wrong dosage.  Specifically, medical staff provided Ms. Revilla with double the prescribed dosage of Dilantin, which had disastrous consequences.

68. The overdose of Dilantin given to the Ms. Revilla caused her to feel "drunk". She was unable to walk normally, speak normally or think normally. Ms. Revilla reported this drastic change in her condition to Nurse Eugene, D.O. Julie, D.O. Monique, Nurse Deena and John Bell (a "mental health professional" employed by CHC/CHM/CHMO).  Ms. Revilla believes she made these reports on June 22, 2012. Nevertheless, the medical and detention staff utterly failed to respond Ms. Revilla's complaints. She continued to feel incoherent and became suicidal on or around June 23, 2012.

69. On the evening of June 23, 2012, after repeatedly notifying medical and detention staff that her mental and physical condition was deteriorating, and after receiving no medical or mental health evaluation, Ms. Revilla hung herself in her cell with a bed sheet. Medical and detention personnel failed to check on the Ms. Revilla for a period of hours. This is consistent with Defendants' policy, practice and/or custom of inadequate medical and mental health care, inadequate response time and lack of timely or appropriate medical or mental health evaluations.

70. D.O. Monique finally discovered Ms. Revilla hanging in her cell and called for assistance. Again, Ms. Revilla was revived and transported to the hospital.

71. Ms. Revilla was released from the hospital for the second time on June 27, 2012 and returned to Defendants' care. Upon her return to the Jail, Ms. Revilla was placed on suicide watch. However, she was never once seen by a physician, and for six (6) days and nights, she was not given her prescribed medications.

72. At the conclusion of her suicide watch, Ms. Revilla was moved to a cell which Ms. Revilla believes was in the medical unit.  Yet again, Ms. Revilla was not properly monitored, evaluated or supervised.   Ms. Revilla attempted suicide a second time by hanging herself while in Defendants' custody and care.

73. After this second suicide attempt, Ms. Revilla was transported to the hospital *for the third time* and then again released back to the Defendants' custody. After this third trip to the hospital, Ms. Revilla remained in the Tulsa County Jail through August 2012, where she was not seen by a physician, not provided with her prescribed medication, and not provided with proper or adequate mental health care.

74. In deliberate indifference to Ms. Revilla's serious medical and mental health needs, Defendants, and the non-party medical staff under their supervision and control as described herein, failed to provide adequate or timely evaluation and treatment, even as Ms. Revilla's known medical condition deteriorated and she had specifically requested medication and attempted suicide while in Defendants' custody.

75. The failures to provide prompt and adequate care in the face of known and substantial risks to Ms. Revilla's health and well being include, *inter alia*: a failure to conduct appropriate medical and mental health assessments; a failure to create and implement appropriate medical and mental health treatment plans; a failure to promptly evaluate Ms. Revilla's physical and mental health; a failure to properly monitor Ms. Revilla's physical and mental health; a failure to provide medically necessary medications; a failure to provide medically necessary medications in the correct dosage; a failure to provide access to medical personnel capable of evaluating and treating her serious health needs; and a failure to take precautions to protect Ms. Revilla from further injury.

76. Dr. Adusei specifically failed to supervise the medical staff under his clinical supervision and failed to assure that medical staff was providing appropriate care (including medication in the proper dosage) to Ms. Revilla in deliberate indifference to her known and serious medical needs.

**E. A Policy or Custom of Deficient Care (Factual Allegations Common to All Plaintiffs)**

77. The deliberate indifference to Mr. Brown, Ms. Salgado, Ms. Young and Ms. Revilla's serious medical needs, as summarized *supra*, was in furtherance of and consistent with: (a) policies, customs and/or practices which Sheriff Glanz promulgated,

created, implemented or possessed responsibility for the continued operation of; and (b) policies, customs and/or practices which CHC/CHM/CHMO had responsibility for implementing and which CHC/CHM/CHMO assisted in developing.

78.   There are longstanding, systemic deficiencies in the medical and mental health care provided to inmates at the Tulsa County Jail.  Sheriff Glanz and CHC/CHM/CHMO have long known of these systemic deficiencies and the substantial risks to inmates like Plaintiffs, but have failed to take reasonable steps to alleviate those deficiencies and risks.

79.   For instance, in 2007, the National Commission on Correctional Health Care ("NCCHC"), a corrections health accreditation body, conducted an on-site audit of the Jail's health services program.  At the conclusion of the audit, NCCHC auditors reported serious and systemic deficiencies in the care provided to inmates, including failure to perform mental health screenings, failure to fully complete mental health treatment plans, failure to triage sick calls, failure to conduct quality assurance studies and failure to address health needs in a timely manner.  NCCHC made these findings of deficient care despite CHC/CHM/CHMO and Sheriff Glanz's efforts to defraud the auditors by concealing information and falsifying medical records and charts.

80.   Sheriff Glanz and CHC/CHM/CHMO failed to change or improve any health care policies or practices in response to the NCCHC's findings.

81. An August 2009 investigation of the suicide death of an inmate conducted by the Oklahoma Department of Health uncovered several violations of the Oklahoma Jail Standards.  Specifically, the Department of Health found: (a) "The inmate indicated a form of mental illness on his screening yet it appeared that the proper steps as required in the Jail Standards were not taken"; (b) the amount of time that the Jail allows for a mental

health evaluation is in direct conflict with the Jail Standards; (c) the inmate was not properly segregated from the general population; (d) the inmate received an inappropriate medical evaluation; and (e) the inmate was not, but should have been, housed in an area for more frequent observations. *See* Oklahoma State Department of Health Report on Death Investigation (Jernegan), 8/3/09.

82. As with the NCCHC findings in 2007, the Department of Health findings in 2009 strongly signaled that inmates with mental health problems were being put at excessive risk by inadequate assessments and untimely treatment. However, Sheriff Glanz and CHC/CHM/CHMO failed to take reasonable steps to alleviate the known and excessive risks.

83. NCCHC conducted a second audit of the Jail's health services program in 2010. After the audit was completed, the NCCHC placed the Tulsa County Jail on probation.

84. During the 2010 NCCHC audit process, CHC's Vice President of Accreditation orchestrated -- and was directly involved in -- the falsification of records and doctoring of files at the Tulsa County Jail for the purpose of defrauding the NCCHC auditors.

85. Despite CHC/CHM/CHMO's efforts to defraud the auditors, the NCCHC once again found numerous serious deficiencies with the health services program.  As part of the final 2010 Report, NCCHC found, *inter alia*, as follows: "The [Quality Assurance] multidisciplinary committee does not identify problems, implement and monitor corrective action, nor study its effectiveness"; "There have been several inmate deaths in the past year…. The clinical mortality reviews were poorly performed"; "The responsible physician does not document his review of the RN's health assessments"; "the responsible physician does not conduct clinical chart reviews to determine if clinically

appropriate care is ordered and implemented by attending health staff"; "…diagnostic tests and specialty consultations are not completed in a timely manner and are not ordered by the physician"; "if changes in treatment are indicated, the changes are not implemented…"; "When a patient returns from an emergency room, the physician does not see the patient, does not review the ER discharge orders, and does not issue follow-up orders as clinically needed"; and "… potentially suicidal inmates [are not] checked irregularly, not to exceed 15 minutes between checks.  Training for custody staff has been limited.  Follow up with the suicidal inmate has been poor."  2010 NCCHC Report (emphasis added).

86. Sheriff Glanz only read the first two or three pages of the 2010 NCCHC Report. Sheriff Glanz is unaware of any policies or practices changing at the Jail since the 2010 NCCHC Report was issued.  While CHC/CHM/CHMO submitted written corrective action plans in response to the 2010 NCCHC Report, CHC/CHM/CHMO had no intention of actually following the corrective action plans, and did not take the corrective measures necessary to alleviate the obvious and substantial risks to inmate health identified by the NCCHC.

87. Importantly, *the "physician"/"responsible physician" referred to in the 2010 NCCHC Report was Dr. Adusei.*  Thus, Defendants long knew that Dr. Adusei posed substantial risks to the health and safety of inmates with serious medical needs.

88. Over a period of many years, Tammy Harrington, R.N. ("Director Harrington") CHC/CHM/CHMO's former Director of Nursing ("DON") at the Jail, observed and documented many concerning deficiencies in the delivery of health care services to inmates.   The deficiencies observed and documented by Director Harrington include:

chronic failure to triage inmates' requests for medical and mental health assistance; doctors (particularly, Dr. Adusei and Dr. Washburn) refusing/failing to see inmates with life-threatening conditions; CHC/CHM/CHMO's Health Services Administrator ("HSA") repeatedly instructing staff to alter and falsify medical records; a chronic lack of supervision of clinical staff; and repeated failures of CHC/CHM/CHMO to alleviate known and significant deficiencies in the health services program at the Jail.  Director Harrington reported the deficiencies to CHC/CHM/CHMO, but CHC/CHM/CHMO took no meaningful action to correct the deficiencies.

89. Robin Mason ("Nurse Mason"), a registered nurse, and graduate of the University of Texas School of Nursing, resigned from her employment at the Jail on October 19, 2010 after making repeated complaints to CHC/CHM/CHMO, of delays in inmate care due to the incompetence and indifference of certain medical personnel.  Nurse Mason's complaints fell on deaf ears, as CHC/CHM/CHMO made no effort to alleviate the deficient care provided at the Jail.

90. On or about June 28, 2011, Ms. Salgado, died at the Jail due grossly deficient medical care.

91. On September 29, 2011, U.S. Immigration and Customs Enforcement ("ICE") and U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") reported their findings in connection with an audit of the Jail's medical system as follows: ***"CRCL found a <u>prevailing</u> <u>attitude</u> among clinic staff of <u>indifference</u>…."***; "*Nurses are undertrained*. Not documenting or evaluating patients properly."; "Found one case clearly demonstrates a lack of training, perforated appendix due to *lack of training and supervision*"; "Found two … detainees with clear mental/medical problems

that have not seen a doctor."; "[Detainee] has not received his medication despite the fact that detainee stated was on meds at intake"; "TCSO medical clinic is using a homegrown system of records that 'fails to utilize what we have learned in the past 20 years". "ICE-CRCL Report, 9/29/11 (emphasis added).

92. Director Harrington did not observe any meaningful changes in health care policies or practices at the Jail after the ICE-CRCL Report was issued.

93. On the contrary, less than 30 days after the ICE-CRCL Report was issued, on October 27, 2011, another inmate, Elliott Earl Williams, died at the Jail as a result of truly inhumane treatment and reckless medical neglect which defies any standard of human decency.

94. After Mr. Williams died, Director Harrington provided CHC/CHM/CHMO with documentation of systemic deficiencies within the Jail's medical program that likely contributed to his death, including chronic delays in responding to inmates' serious medical and mental health needs.   However, neither CHC/CHM/CHMO nor Sheriff Glanz made any meaningful improvements to the medical system.   This is evidenced by the fact that yet another inmate, Mr. Brown, died due to grossly deficient care just months after Mr. Williams.

95. On November 18, 2011, AMS-Roemer, the Jail's own retained medical auditor, issued its Report to Sheriff Glanz finding multiple deficiencies with the Jail's medical delivery system, including "[documented] deviations [from protocols which] increase the potential for preventable morbidity and mortality" and issues with "nurses acting beyond their scope of practice [which] increases the potential for preventable bad medical outcomes."   AMS-Roemer Report, 11/8/11 (Ex. 25) at CHM0171-72.   AMS-Roemer

specifically commented on no less than six (6) inmate deaths (including the death of Mr. Jernegan), finding deficiencies in the care provided to each. *Id.* at CHM0168-69; 0171.

96. It is clear that Sheriff Glanz and CHC/CHM/CHMO did little, if anything, to address the systemic problems identified in the November 2011 AMS-Roemer Report, as AMS-Roemer continued to find serious deficiencies in the delivery of care at the Jail. For instance, as part of a 2012 Corrective Action Review, AMS-Roemer found "[d]elays for medical staff and providers to get access to inmates," "[n]o sense of urgency attitude to see patients, or have patients seen by providers," failure to follow NCCHC and CHC policies "to get patients to providers," and "[n]ot enough training or supervision of nursing staff." Corrective Action Review at CHM1935 – 1938. During an April 2012 audit, Dr. Roemer found that nurses were not providing timely triage of mental health requests and that they needed "education in mental health sick call triage…." Ltr. frm. Herr to Roemer, 6/13/12 at CHM1973 – 1975.

97. There is a longstanding policy, practice or custom at the Jail of CHC/CHM/CHMO and TCSO refusing to send inmates with emergent needs to the hospital for purely financial purposes.

98. There is a well-established policy, practice and/or custom of understaffing the Jail's medical unit.

99. Sheriff Glanz has continued to retain CHC/CHM/CHMO as the Jail's medical provider, even after Mr. Brown, Ms. Salgado and Ms. Young's deaths, Ms. Revilla's injuries and the many other serious deficiencies with the Jail's medical program have repeatedly been brought to light.

100. As alleged herein, there are deep-seated and well-known policies, practices and/or customs of systemic, dangerous and unconstitutional failures to provide adequate medical and mental health care to inmates at the Tulsa County Jail.  This system of deficient care -- which evinces fundamental failures to train and supervise medical and detention personnel -- created substantial, known and obvious risks to the health and safety of inmates like Plaintiffs.  Still, Sheriff Glanz and CHC/CHM/CHMO failed to take reasonable steps to alleviate the substantial risks to inmate health and safety, in deliberate indifference to Plaintiffs' serious medical needs.

## CLAIMS FOR RELIEF

**A.      Ms. Revilla's Statement of Claims**

### MS. REVILLA'S FIRST CLAIM FOR RELIEF

**Cruel and Unusual Punishment in Violation of the Eighth
and Fourteenth Amendments to the Constitution of the United States
(42 U.S.C. § 1983)**

**Allegations Applicable to Defendants Sheriff Glanz, CHC/CHM/CHMO and Dr. Adusei**

101.      Ms. Revilla re-alleges and incorporates by reference paragraphs 1 through 100, as though fully set forth herein.

102.      Defendants Glanz, CHC/CHM/CHMO and Dr. Adusei knew (either through actual or constructive knowledge) that Ms. Revilla had serious medical and mental health needs.

103.      Defendants Glanz, CHC/CHM/CHMO and Dr. Adusei, and the non-party medical and detention staff under their supervision and control, failed to provide an adequate physical and mental health evaluation on a number of occasions, and failed to

provide timely or adequate treatment for Ms. Revilla while she was placed at the Tulsa County Jail.

104.    The acts and/or omissions of indifference as alleged herein, include but are not limited to the failure to treat Mr. Revilla's serious medical and mental health condition properly; failure to conduct appropriate medical and mental health assessments; failure to create and implement appropriate medical and mental health treatment plans; failure to promptly evaluate Ms. Revilla's physical and mental health; failure to properly monitor Plaintiff's physical and mental health; failure to provide access to medical and mental health personnel capable of evaluating and treating her serious health needs; and a failure to take precautions to prevent Plaintiff from further injury.

105.    Defendants Glanz, CHC/CHM/CHMO and Dr. Adusei, and the non-party medical and detention staff under their supervision and control, knew of (either through direct knowledge or constructive knowledge) and disregarded substantial risks to Ms. Revilla's health and safety.

106.    As a direct and proximate result of Defendants Glanz, CHC/CHM/CHMO and Dr. Adusei's (and the non-party medical and detention staff under their supervision and control conduct), Ms. Revilla experienced physical pain, severe emotional distress, mental anguish, permanent impairment and the damages alleged herein.

107.    The aforementioned acts and/or omissions of the individually named Defendants were malicious, reckless and/or accomplished with a conscious disregard of Plaintiff's rights thereby entitling Ms. Revilla to an award of exemplary and punitive damages according to proof.

**Supervisor Liability and Official Capacity Liability (Sheriff Glanz)**

108.     Ms. Revilla re-alleges and incorporates by reference paragraphs 1 through 107, as though fully set forth herein.

109.     There is an affirmative causal link between the aforementioned deliberate indifference to Ms. Revilla's serious medical needs, health and safety (and violations of Ms. Revilla's civil rights) and the policies, practices and/or customs described herein which Sheriff Glanz promulgated, created, implemented and/or possessed responsibility for.

110.     Sheriff Glanz knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Ms. Revilla.  Nevertheless, Sheriff Glanz failed to take reasonable steps to alleviate those risks in deliberate indifference to inmates', including Ms. Revilla's, serious medical needs.

111.     Sheriff Glanz tacitly encouraged, ratified, and/or approved of the unconstitutional acts and/or omissions alleged herein.

112.     There is an affirmative causal link between aforementioned policies, practices and/or customs and Ms. Revilla's injuries and damages as alleged herein.

**Municipal Liability (CHC/CHM/CHMO)**

113. Ms. Revilla re-alleges and incorporates by reference paragraphs 1 through 112, as though fully set forth herein.

114. CHC/CHM/CHMO are "persons" for purposes of 42 U.S.C. § 1983.

115. At all times pertinent hereto, CHC/CHM/CHMO were acting under color of state law.

116. CHC/CHM/CHMO were endowed by Tulsa County with powers or functions governmental in nature, such that CHC/CHM/CHMO became an instrumentality of the State and subject to its constitutional limitations.

117. CHC/CHM/CHMO were charged with implementing and assisting in developing the policies of TCSO with respect to the medical and mental health care of inmates at the Tulsa County Jail and have shared responsibility to adequately train and supervise their employees.

118. There is an affirmative causal link between the aforementioned deliberate indifference to Ms. Revilla's serious medical needs, health, and safety, and violations Ms. Revilla's civil rights, and the above-described customs, policies, and/or practices carried out by CHC/CHM/CHMO.

119. CHC/CHM/CHMO knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Ms. Revilla. Nevertheless, CHC/CHM/CHMO failed to take reasonable steps to alleviate those risks in deliberate indifference to inmates', including Ms. Revilla's, serious medical needs.

120. CHC/CHM/CHMO tacitly encouraged, ratified, and/or approved of the unconstitutional acts and/or omissions alleged herein.

121. There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Ms. Revilla's injuries and damages as alleged herein.

### MS. REVILLA'S SECOND CLAIM FOR RELIEF

### Negligence

31

**(Defendants CHC, CHM, CHMO and Adusei)[1]**

122.      Plaintiff re-alleges and incorporates by reference paragraphs 1 through 121, as though fully set forth herein.

123.       CHC/CHM/CHMO and Dr. Adusei owed a duty to Ms. Revilla, and all other inmates in custody, to use reasonable care to provide inmates in need of medical attention with appropriate treatment.

124.      CHC/CHM/CHMO and Dr. Adusei breached that duty by failing to provide Ms. Revilla with prompt and adequate medical treatment despite repeated requests and obvious need.

125.      CHC/CHM/CHMO and Dr. Adusei's breaches of the duty of care include, *inter alia*: failure to treat Ms. Revilla's serious medical and mental health condition properly; failure to conduct appropriate medical and mental health assessments; failure to create and implement appropriate medical and mental health treatment plans; failure to promptly evaluate Ms. Revilla's physical and mental health; failure to properly monitor Ms. Revilla's physical and mental health; failure to provide access to medical and mental health personnel capable of evaluating and treating her serious health needs; and a failure to take precautions to prevent Ms. Revilla from further injury.

_____

All Plaintiffs' tort claims are properly brought against CHMO/CHM/CHC and its employees or agents.  The Oklahoma Supreme Court held in *Sullins v. American Medical Response of Oklahoma, Inc.,* 23 P.3d 259, 264 (Okla. 2001), that a private entity such as CHMO/CHM/CHC is not an "entity designated to act in behalf of the State or political subdivision [which includes a public trust]" for the purposes of the exemption under 51 Okla. Stat. § 152(2), merely because it contracts with a public trust to provide services which the public trust is authorized to provide.  *See also Arnold v. Cornell Companies, Inc.,* 2008 WL 4816507 (W.D.Okla., Oct. 29, 2008).

126.     As a direct and proximate cause of CHC/CHM/CHMO and Dr. Adusei's negligence, Plaintiff experienced physical pain, severe emotional distress, mental anguish, permanent impairment and the damages alleged herein.

127.     As a direct and proximate cause Defendants' negligence, Plaintiff has suffered real and actual damages, including medical expenses, mental and physical pain and suffering, emotional distress, lost wages and other damages in excess of $75,000.00.

128.     CHC/CHM/CHMO are vicariously liable for the negligence of their employees and agents, including Dr. Adusei.

129.     CHC/CHM/CHMO are also directly liable for their own negligence.

### THIRD CLAIM FOR RELIEF

### Violation of Article II § 9 and Article II § 7 of the
### Constitution of the State of Oklahoma

130.      Ms. Revilla re-alleges and incorporates by reference paragraphs 1 through 129, as though fully set forth herein.

131.     Article II § 9 of the Oklahoma Constitution prohibits the infliction of cruel and unusual punishment.   Under the Oklahoma Constitution's Due Process Clause, Article II § 7, the right to be free from cruel and unusual punishment extends to pre-trial detainees who have yet to be convicted of a crime (in addition to convicted prisoners who are clearly protected under Article II § 9).[2]

132.     The Constitution of the State of Oklahoma, under Article II § 9 and Article II § 7, provides a private right of action for Mr. Revilla to be free from cruel and unusual

---

[2]     It is clearly established, as a matter of federal law, that pretrial detainees, who have not been convicted of a crime, have a constitutional right to medical and psychiatric care under the Due Process Clause of the Fourteenth Amendment at least as protective as for convicted prisoners. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Martin v. Bd. of County Com'rs of County of Pueblo,* 909 F.2d 402, 406 (10th Cir. 1990).

punishment, which includes protection from the denial of needed medical care while in custody.

133.     As described herein, Ms. Revilla, while in the custody of TCSO in the Tulsa County Jail -- under the care of Sheriff Glanz and CHC/CHM/CHMO -- was denied necessary medical treatment. Defendants Sheriff Glanz, CHC/CHM/CHMO and Dr. Adusei violated Ms. Revilla's rights by failing to provide her with prompt and adequate medical assessment, evaluation, treatment and supervision despite the obvious need.

134.     At all times relevant, the Jail personnel described in this Complaint, including Dr. Adusei, were acting within the scope of their employment and under the supervision of CHC/CHM/CHMO and ultimate control of Defendant Glanz, the Sheriff of Tulsa County.

135.     Defendants Sheriff Glanz, CHC/CHM/CHMO and Dr. Adusei's denial of medical care and treatment to Ms. Revilla violated Article II §§ 7 and 9 of the Constitution of the State of Oklahoma and was a direct and proximate cause of Ms. Revilla's injuries and all other damages alleged herein.

136.     Sheriff Glanz and CHC/CHM/CHMO are vicariously liable for the violations of the Oklahoma Constitution by employees and agents acting within the scope of their employment.

WHEREFORE, based on the foregoing, Ms. Revilla prays that this Court grant her the relief sought including, but not limited to, actual damages and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from date of filing of suit, punitive damages in excess of Seventy-Five

Thousand Dollars ($75,000.00), reasonable attorney fees, and all other relief deemed appropriate by this Court.

**B.      Plaintiff McCaffrey's Statement of Claims**

**PLAINTIFF McCAFFREY'S FIRST CLAIM FOR RELIEF**

**Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments to the Constitution of the United States (42 U.S.C. § 1983)**

**Allegations Applicable to Defendants Sheriff Glanz, CHC/CHM/CHMO, HSA Rogers and Dr. Adusei**

137.      Plaintiff McCaffrey re-alleges and incorporates by reference paragraphs 1 through 136, as though fully set forth herein.

138.      Defendants Sheriff Glanz, CHC/CHM/CHMO, HSA Rogers, and Dr. Adusei knew (either through actual or constructive knowledge) that there was a strong likelihood that Mr. Brown was in danger of serious injury and harm, as made known by Mr. Brown through his reported medical condition, symptoms and requests for medical treatment, and the prevailing conditions of medical care at the Jail.  In addition, such Defendants were put on notice of Mr. Brown's need for emergent care and treatment by other medical and detention staff, as well by his severe and obvious physical symptoms.

139.      Defendants CHC/CHM/CHMO, HSA Rogers, and Dr. Adusei failed to provide an adequate physical evaluation on a number of occasions, and failed to provide timely or adequate treatment for Mr. Brown while he was placed at the Tulsa County Jail. Defendant Sheriff Glanz, together with CHC/CHM/CHMO, HSA Rogers, and Dr. Adusei, despite repeated notice, failed to implement policies, procedures, and protocols, that would have avoided the wonton, willful, and gross neglect suffered by Mr. Brown.

140.     The acts and/or omissions of indifference as alleged herein, include but are not limited to: the failure to treat Mr. Brown's serious medical condition properly; failure to conduct appropriate medical assessments; failure to create and implement appropriate medical treatment plans; failure to promptly evaluate Mr. Brown's physical health; failure to properly monitor Mr. Brown's physical health; failure to provide access to medical personnel capable of evaluating and treating his serious health needs;  and a failure to take precautions to prevent further injury to Mr. Brown.

141.     Defendants Sheriff Glanz, CHC/CHM/CHMO, HSA Rogers, and Dr. Adusei knew of (either through direct knowledge or constructive knowledge) and disregarded substantial risks to Mr. Brown's health and safety.

142.     As a direct and proximate result of Defendants Sheriff Glanz, CHC/CHM/CHMO, HSA Rogers, and Dr. Adusei's conduct, Mr. Brown experienced physical pain, severe emotional distress, mental anguish, death, and the damages alleged herein.

143.     The aforementioned acts and/or omissions of these individually named Defendants were malicious, reckless and/or accomplished with a conscious disregard of Mr. Brown's rights thereby entitling Plaintiff McCaffrey to an award of exemplary and punitive damages according to proof.

**Supervisor Liability and Official Capacity Liability (Sheriff Glanz)**

144.     Plaintiff McCaffrey re-alleges and incorporates by reference paragraphs 1 through 143, as though fully set forth herein.

145.     Sheriff Glanz knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices and/or customs posed substantial risks to the

36

health and safety of inmates like Mr. Brown.  Further, Sheriff Glanz failed to take reasonable steps to alleviate those risks with deliberate indifference to inmate's serious medical needs, including Mr. Brown's serious medical needs.

146.     Sheriff Glanz tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein, knew that such conduct was unjustified and would result in violations of constitutional rights, and evinced deliberate indifference to prisoners' serious medical needs.

147.     There is an affirmative causal link between the aforementioned acts and/or omissions in being deliberatively indifferent to Mr. Brown's serious medical needs, health and safety and violating Mr. Brown's civil rights, and the policies, practices and/or customs described herein which Sheriff Glanz promulgated, created, implemented and/or possessed, and Mr. Brown's injuries and damages as alleged herein.

**Municipal Liability (CHC/CHM/CHMO)**

148.     Plaintiff McCaffrey re-alleges and incorporates by reference paragraphs 1 through 147, as though fully set forth herein.

149.     CHC/CHM/CHMO are "persons" for purposes of 42 U.S.C. § 1983.

150.     At all times pertinent hereto, CHC/CHM/CHMO were acting under color of state law.

151.     CHC/CHM/CHMO were endowed by Tulsa County with powers or functions governmental in nature, such that CHC/CHM/CHMO became an instrumentality of the State and subject to its constitutional limitations.

152.     CHC/CHM/CHMO are charged with implementing and assisting in developing the policies of TCSO with respect to the medical care of inmates at the Jail and has shared responsibility to adequately train and supervise its employees.

153.     There is an affirmative causal link between the aforementioned acts and/or omissions in being deliberately indifferent to Mr. Brown's serious medical needs, health, and safety, and violating Mr. Brown's civil rights, and above-described customs, policies, and/or practices carried out by CHC/CHM/CHMO.

154.     CHC/CHM/CHMO knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Mr. Brown.  Nevertheless, CHC/CHM/CHMO failed to take reasonable steps to alleviate those risks in deliberate indifference to inmates', including Mr. Brown's, serious medical needs.

155.     CHC/CHM/CHMO tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein, knew that such conduct was unjustified and would result in violations of constitutional rights, and evinced deliberate indifference to prisoners' serious medical needs.

156.     There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Mr. Brown's injuries and damages as alleged herein.

## PLAINTIFF McCAFFREY'S SECOND CLAIM FOR RELIEF

### Negligence/Wrongful Death
### (CHC, CHM, CHMO, Rogers and Adusei)

157.     Plaintiff McCaffrey re-alleges and incorporates by reference paragraphs 1 through 156, as though fully set forth herein.

158.    Defendants CHC/CHM/CHMO, HSA Rogers and Dr. Adusei owed a duty to Mr. Brown, and all other inmates in custody, to use reasonable care to provide inmates in need of medical attention with appropriate treatment.

159.    Defendants CHC/CHM/CHMO, HSA Rogers and Dr. Adusei breached that duty by wholly failing to provide Mr. Brown with prompt and adequate medical treatment despite repeated requests and obvious need.

160.    Defendants CHC/CHM/CHMO's, HSA Rogers' and Dr. Adusei's breaches of the duty of care include, *inter alia:* failure to treat Mr. Brown's serious medical condition properly; failure to conduct appropriate medical assessments; failure to create and implement appropriate medical treatment plans; failure to promptly evaluate Mr. Brown's physical health; failure to properly monitor Mr. Brown's physical health; failure to provide access to medical personnel capable of evaluating and treating his serious health needs; and a failure to take precautions to prevent Mr. Brown from further injury.

161.    As a direct and proximate cause of Defendants CHC/CHM/CHMO's, HSA Rogers' and Dr. Adusei's negligence, Mr. Brown experienced physical pain, severe emotional distress, mental anguish, death, and the damages alleged herein.

162.    As a direct and proximate cause Defendants' negligence, Plaintiff McCaffrey has suffered real and actual damages, including medical expenses, mental and physical pain and suffering, emotional distress, lost wages and other damages in excess of $75,000.00.

163.    CHC/CHM/CHMO are vicariously liable for the negligence of their employees and agents, including Defendant Rogers and Dr. Adusei.

164.      CHC/CHM/CHMO are also directly liable for their own negligence.

## PLAINTIFF McCAFFREY'S THIRD CLAIM FOR RELIEF

### Violation of Article II § 9 and Article II § 7 of the
### Constitution of the State of Oklahoma

165.      Plaintiff McCaffrey re-alleges and incorporates by reference paragraphs 1 through 164, as though fully set forth herein.

166.       Article II § 9 of the Oklahoma Constitution prohibits the infliction of cruel and unusual punishment.  Under the Oklahoma Constitution's Due Process Clause, Article II § 7, the right to be free from cruel and unusual punishment extends to pre-trial detainees who have yet to be convicted of a crime (in addition to convicted prisoners who are clearly protected under Article II § 9).

167.      The Constitution of the State of Oklahoma, under Article II § 9 and Article II § 7, provides a private right of action for Mr. Brown to be free from cruel and unusual punishment, which includes protection from the denial of needed medical care while in custody.

168.      As described herein, Mr. Brown, while in the custody of TCSO in the Jail under the care of Sheriff Glanz and CHC/CHM/CHMO, Mr. Brown was denied necessary medical treatment. Defendants violated the rights of Mr. Brown by failing to provide him with prompt and adequate medical assessment, evaluation, treatment and supervision despite the obvious need.

169.      At all times relevant, the Jail personnel described in this Complaint, including Defendants Dr. Adusei and HSA Rogers, were acting within the scope of their employment and under the supervision of CHC/CHM/CHMO and ultimate control of Defendant Sheriff Glanz.

170.     Defendants HSA Rogers' and Dr. Adusei's denial of medical care and treatment to Mr. Brown in violating Article II §§ 7 and 9 of the Constitution of the State of Oklahoma was a direct and proximate cause of Mr. Brown's death and all other damages alleged herein.

171.     Sheriff Glanz and CHC/CHM/CHMO are vicariously liable for the violations of the Oklahoma Constitution by employees and agents acting within the scope of their employment.

WHEREFORE, based on the foregoing, Plaintiff McCaffrey prays that this Court grant her the relief sought including, but not limited to, actual damages, including, inter alia, all damages permitted under 12 Okla. Stat. §1053, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from date of filing of suit, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney fees, and all other relief deemed appropriate by this Court.

**C.     Plaintiff Wright's Statement of Claims**

### PLAINTIFF WRIGHT'S FIRST CLAIM FOR RELIEF

**Cruel and Unusual Punishment in Violation of the Eighth
and Fourteenth Amendments to the Constitution of the United States
(42 U.S.C. § 1983)**

**Allegations Applicable to Defendants Sheriff Glanz, CHC/CHM/CHMO,
Washburn and Rogers**

172.     Plaintiff Wright re-alleges and incorporates by reference paragraphs 1 through 171, as though fully set forth herein.

173.     Defendants Glanz, CHC/CHM/CHMO, Dr. Wasburn and HSA Rogers, and the medical personnel under their supervision and control (including Nurse Metcalf), knew (either through direct or constructive knowledge) that there was a strong likelihood

that Ms. Salgado was in danger of serious injury and harm, as made known through Ms. Salgado's admission at St. John, and her reported medical condition, symptoms and requests for medical treatment.   In addition, Defendants were put on notice of Ms. Salgado's need for emergent care and treatment by other medical and detention staff, as well by her severe and obvious physical symptoms.

174.     Defendants Glanz, CHC/CHM/CHMO, Dr. Wasburn and HSA Rogers, and the medical personnel under their supervision and control (including Nurse Metcalf), failed to provide an adequate physical evaluation on a number of occasions, and failed to provide timely or adequate treatment for Ms. Salgado while she was placed at the Tulsa County Jail.

175.     The acts and/or omissions of indifference as alleged herein, include but are not limited to: failure to treat Ms. Salgado's serious medical condition properly; failure to conduct appropriate medical assessments; failure to create and implement appropriate medical treatment plans; failure to promptly evaluate Ms. Salgado's physical health; failure to properly monitor Ms. Salgado's physical health; failure to provide access to medical personnel capable of evaluating and treating her serious health needs; and a failure to take precautions to prevent Ms. Salgado from further injury.

176.     Defendants Glanz, CHC/CHM/CHMO, Dr. Wasburn and HSA Rogers, and the medical personnel under their supervision and control (including Nurse Metcalf), knew of (either through direct knowledge or constructive knowledge) and disregarded substantial risks to Ms. Salgado's health and safety.

177.      As a direct and proximate result of Defendants' conduct, Ms. Salgado experienced physical pain, severe emotional distress, mental anguish, death, and the damages alleged herein.

178.      The aforementioned acts and/or omissions of the individually named Defendants were malicious, reckless and/or accomplished with a conscious disregard of Ms. Salgado's rights thereby entitling Plaintiff Wright to an award of exemplary and punitive damages according to proof.

**Supervisor Liability and Official Capacity Liability (Sheriff Glanz)**

179.      Plaintiff Wright re-alleges and incorporates by reference paragraphs 1 through 178, as though fully set forth herein.

180.      There is an affirmative causal link between the aforementioned acts and/or omissions of Defendants in being deliberatively indifferent to Ms. Salgado's serious medical needs, health and safety (and violating Ms. Salgado's civil rights) and the policies, practices and/or customs described herein which Sheriff Glanz promulgated, created, implemented and/or possessed responsibility for.

181.      Sheriff Glanz knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Ms. Salgado.  Nevertheless, Sheriff Glanz failed to take reasonable steps to alleviate those risks in deliberate indifference to inmates', including Ms. Salgado's, serious medical needs.

182.      Sheriff Glanz tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

183.     There is an affirmative causal link between aforementioned policies, practices and/or customs and Ms. Salgado's injuries and damages as alleged herein.

**Municipal Liability (CHC/CHM/CHMO)**

184. Plaintiff Wright re-alleges and incorporates by reference paragraphs 1 through 183, as though fully set forth herein.

185. CHC/CHM/CHMO  are "persons" for purposes of 42 U.S.C. § 1983.

186. At all times pertinent hereto, CHC/CHM/CHMO were acting under color of state law.

187. CHC/CHM/CHMO was endowed by Tulsa County with powers or functions governmental in nature, such that CHC/CHM/CHMO became an instrumentality of the State and subject to its constitutional limitations.

188.     CHC/CHM/CHMO is charged with implementing and assisting in developing the policies of TCSO with respect to the medical care of inmates at the Tulsa County Jail and have shared responsibility to adequately train and supervise its employees.

189.     There is an affirmative causal link between the aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Ms. Salgado's serious medical needs, health, and safety, and violating Ms. Salgado's civil rights and above-described customs, policies, and/or practices carried out by CHC/CHM/CHMO.

190.     CHC/CHM/CHMO knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Ms. Salgado.  Nevertheless,

CHC/CHM/CHMO failed to take reasonable steps to alleviate those risks in deliberate indifference to inmates', including Ms. Salgado's, serious medical needs.

191.     CHC/CHM/CHMO tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

192.     There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Ms. Salgado's injuries and damages as alleged herein.

## PLAINTIFF WRIGHT'S SECOND CLAIM FOR RELIEF

### Negligence/Wrongful Death
### (Defendants CHC, CHM, CHMO, Rogers and Washburn)

193.     Plaintiff Wright re-alleges and incorporates by reference paragraphs 1 through 192, as though fully set forth herein.

194.     Defendants CHC/CHM/CHMO, Rogers and Washburn owed a duty to Ms. Salgado, and all other inmates in custody, to use reasonable care to provide inmates in need of medical attention with appropriate treatment.

195.     Defendants CHC/CHM/CHMO, Rogers and Washburn breached that duty by failing to provide Ms. Salgado with prompt and adequate medical treatment despite repeated requests and obvious need.

196.     Defendants CHC/CHM/CHMO, Rogers and Washburn's breaches of the duty of care include, *inter alia*: failure to treat Ms. Salgado's serious medical condition properly; failure to conduct appropriate medical assessments; failure to create and implement appropriate medical treatment plans; failure to promptly evaluate Ms. Salgado's physical health; failure to properly monitor Ms. Salgado's physical health; failure to provide access to medical personnel capable of evaluating and treating her

serious health needs; and a failure to take precautions to prevent Ms. Salgado from further injury.

197.     As a direct and proximate cause of Defendants CHC/CHM/CHMO, Rogers and Washburn's negligence, Ms. Salgado experienced physical pain, severe emotional distress, mental anguish, death, and the damages alleged herein.

198.     As a direct and proximate cause Defendants CHC/CHM/CHMO, Rogers and Washburn's negligence, Plaintiff Wright has suffered real and actual damages, including medical expenses, mental and physical pain and suffering, emotional distress, lost wages and other damages in excess of $75,000.00.

199.     CHC/CHM/CHMO are vicariously liable for the negligence of their employees and agents, including Defendant Rogers, Dr. Washburn and Nurse Metcalf.

200.     CHC/CHM/CHMO are also directly liable for their own negligence.

## PLAINTIFF WRIGHT'S THIRD CLAIM FOR RELIEF

### Violation of Article II § 9 and Article II § 7 of the
### Constitution of the State of Oklahoma

201.     Plaintiff Wright re-alleges and incorporates by reference paragraphs 1 through 200, as though fully set forth herein.

202.     Article II § 9 of the Oklahoma Constitution prohibits the infliction of cruel and unusual punishment.  Under the Oklahoma Constitution's Due Process Clause, Article II § 7, the right to be free from cruel and unusual punishment extends to pre-trial detainees who have yet to be convicted of a crime (in addition to convicted prisoners who are clearly protected under Article II § 9).

203.     The Constitution of the State of Oklahoma, under Article II § 9 and Article II § 7, provides a private right of action for Ms. Salgado to be free from cruel and unusual

46

punishment, which includes protection from the denial of needed medical care while in custody.

204.    As described herein, Ms. Salgado, while in the custody of TCSO in the Jail under the care of Sheriff Glanz and CHC/CHM/CHMO, Ms. Salgado was denied necessary medical treatment. Defendants violated the rights of Ms. Salgado by failing to provide her with prompt and adequate medical assessment, evaluation, treatment and supervision despite the obvious need.

205.    At all times relevant, the Jail personnel described in this Complaint, including Defendants Dr. Washburn, HSA Rogers and Nurse Metcalf were acting within the scope of their employment and under the supervision of CHC/CHM/CHMO and ultimate control of Defendant Sheriff Glanz.

206.    Defendants Dr. Washburn, HSA Rogers and Nurse Metcalf's denial of medical care and treatment to Ms. Salgado in violating Article II §§ 7 and 9 of the Constitution of the State of Oklahoma was a direct and proximate cause of Ms. Salgado's death and all other damages alleged herein.

207.    Sheriff Glanz and CHC/CHM/CHMO are vicariously liable for the violations of the Oklahoma Constitution by employees and agents acting within the scope of their employment.

WHEREFORE, based on the foregoing, Plaintiff Wright prays that this Court grant her the relief sought including, but not limited to, actual damages, including, *inter alia*, all damages permitted under 12 Okla. Stat. §1053, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from date of filing of suit, punitive

damages in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney fees, and all other relief deemed appropriate by this Court.

**D.      Plaintiff Young's Statement of Claims**

## PLAINTIFF YOUNG'S FIRST CLAIM FOR RELIEF

**Cruel and Unusual Punishment in Violation of the Eighth
and Fourteenth Amendments to the Constitution of the United States
(42 U.S.C. § 1983)**

**Allegations Applicable to all Defendants Glanz, CHC/CHM/CHMO, Rogers and Adusei**

208.     Plaintiff Young re-alleges and incorporates by reference paragraphs 1 through 207, as though fully set forth herein.

209.     Defendants Glanz, CHC/CHM/CHMO, Rogers and Adusei and the medical staff under their supervision and control, knew (either through actual or constructive knowledge) that Ms. Young had serious medical and mental health needs.

210.     Defendants Glanz, CHC/CHM/CHMO, Rogers and Adusei and the medical staff under their supervision and control, failed to provide an adequate physical and mental health evaluation on a number of occasions, and failed to provide timely or adequate treatment for Ms. Young while she was placed at the Tulsa County Jail.

211.     The acts and/or omissions of indifference as alleged herein, include but are not limited to: the failure to treat Ms. Young's serious medical and mental health condition properly; failure to conduct appropriate medical and mental health assessments; failure to create and implement appropriate medical and mental health treatment plans; failure to promptly evaluate Ms. Young's physical and mental health; failure to properly monitor Ms. Young's physical and mental health; failure to provide access to medical and

48

mental health personnel capable of evaluating and treating her serious health needs; and a failure to take precautions to prevent Ms. Young from further injury.

212.     Defendants Glanz, CHC/CHM/CHMO, Rogers and Adusei and the medical staff under their supervision and control, knew of (either through direct knowledge or constructive knowledge) and disregarded substantial risks to Ms. Young's health and safety.

213.     As a direct and proximate result of Defendants' conduct, Ms. Young experienced physical pain, severe emotional distress, mental anguish, death, and the damages alleged herein.

214.     The aforementioned acts and/or omissions of the individually named Defendants were malicious, reckless and/or accomplished with a conscious disregard of Ms. Young's rights thereby entitling Plaintiff Young to an award of exemplary and punitive damages according to proof.

**Supervisor Liability and Official Capacity Liability (Sheriff Glanz)**

215.     Plaintiff Young re-alleges and incorporates by reference paragraphs 1 through 214, as though fully set forth herein.

216.     There is an affirmative causal link between the aforementioned acts and/or omissions in being deliberatively indifferent to Ms. Young's serious medical needs, health and safety (and violating Ms. Young's civil rights) and the policies, practices and/or customs described herein which Sheriff Glanz promulgated, created, implemented and/or possessed responsibility for.

217.     Sheriff Glanz knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices and/or customs posed substantial risks to the

health and safety of inmates like Ms. Young.  Nevertheless, Sheriff Glanz failed to take reasonable steps to alleviate those risks in deliberate indifference to inmates', including Ms. Young's, serious medical needs.

218.　　Sheriff Glanz tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

219.　　There is an affirmative causal link between aforementioned policies, practices and/or customs and Ms. Young's injuries and damages as alleged herein.

**Municipal Liability (CHC/CHM/CHMO)**

220.  Plaintiff Young re-alleges and incorporates by reference paragraphs 1 through 219, as though fully set forth herein.

221.  CHC/CHM/CHMO  are "persons" for purposes of 42 U.S.C. § 1983.

222.  At all times pertinent hereto, CHC/CHM/CHMO were acting under color of state law.

223.  CHC/CHM/CHMO were endowed by Tulsa County with powers or functions governmental in nature, such that CHC/CHM/CHMO became an instrumentality of the State and subject to its constitutional limitations.

224.　　CHC/CHM/CHMO are charged with implementing and assisting in developing the policies of TCSO with respect to the medical and mental health care of inmates at the Tulsa County Jail and have shared responsibility to adequately train and supervise its employees.

225.　　There is an affirmative causal link between the aforementioned acts and/or omissions in being deliberately indifferent to Ms. Young's serious medical needs, health,

and safety, and violating Ms. Young's civil rights and above-described customs, policies, and/or practices carried out by CHC/CHM/CHMO.

226.     CHC/CHM/CHMO knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Ms. Young.  Nevertheless, CHC/CHM/CHMO failed to take reasonable steps to alleviate those risks in deliberate indifference to inmates', including Ms. Young's, serious medical needs.

227.     CHC/CHM/CHMO tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

228.     There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Ms. Young's injuries and damages as alleged herein.

### PLAINTIFF YOUNG'S SECOND CLAIM FOR RELIEF

#### Negligence/Wrongful Death
#### (Defendants CHC, CHM, CHMO, Rogers and Adusei)

229.     Plaintiff Young re-alleges and incorporates by reference paragraphs 1 through 228, as though fully set forth herein.

230.     Defendants CHC/CHM/CHMO, Rogers and Adusei owed a duty to Ms. Young, and all other inmates in custody, to use reasonable care to provide inmates in need of medical attention with appropriate treatment.

231.     Defendants CHC/CHM/CHMO, Rogers and Adusei breached that duty by failing to provide Ms. Young with prompt and adequate medical treatment despite repeated requests and obvious need.

232.     Defendants CHC/CHM/CHMO, Rogers and Adusei's breaches of the duty of care include, *inter alia*: failure to treat Ms. Young's serious medical and mental health

condition properly; failure to conduct appropriate medical and mental health assessments; failure to create and implement appropriate medical and mental health treatment plans; failure to promptly evaluate Ms. Young's physical and mental health; failure to properly monitor Ms. Young's physical and mental health; failure to provide access to medical and mental health personnel capable of evaluating and treating her serious health needs; and a failure to take precautions to prevent Ms. Young from further injury.

233.     As a direct and proximate cause of Defendants' negligence, Ms. Young experienced physical pain, severe emotional distress, mental anguish, death, and the damages alleged herein.

234.     As a direct and proximate cause Defendants' negligence, Plaintiff Young has suffered real and actual damages, including medical expenses, mental and physical pain and suffering, emotional distress, lost wages and other damages in excess of $75,000.00.

235.     CHC/CHM/CHMO are vicariously liable for the negligence of their employees and agents, including Defendant Rogers and Dr. Adusei.

236.     CHC/CHM/CHMO are also directly liable for their own negligence.

### PLAINTIFF YOUNG'S THIRD CLAIM FOR RELIEF

#### Violation of Article II § 9 and Article II § 7 of the
#### Constitution of the State of Oklahoma

237.     Plaintiff Wright re-alleges and incorporates by reference paragraphs 1 through 236, as though fully set forth herein.

238.     Article II § 9 of the Oklahoma Constitution prohibits the infliction of cruel and unusual punishment.  Under the Oklahoma Constitution's Due Process Clause, Article II § 7, the right to be free from cruel and unusual punishment extends to pre-trial

detainees who have yet to be convicted of a crime (in addition to convicted prisoners who are clearly protected under Article II § 9).

239.     The Constitution of the State of Oklahoma, under Article II § 9 and Article II § 7, provides a private right of action for Ms. Young to be free from cruel and unusual punishment, which includes protection from the denial of needed medical care while in custody.

240.     As described herein, Ms. Young, while in the custody of TCSO in the Jail under the care of Sheriff Glanz and CHC/CHM/CHMO, Ms. Young was denied necessary medical treatment. Defendants violated the rights of Ms. Young by failing to provide her with prompt and adequate medical assessment, evaluation, treatment and supervision despite the obvious need.

241.     At all times relevant, the Jail personnel described in this Complaint, including Defendants HSA Rogers and Dr. Adusei were acting within the scope of their employment and under the supervision of CHC/CHM/CHMO and ultimate control of Defendant Sheriff Glanz.

242.     Defendants HSA Rogers and Dr. Adusei's denial of medical care and treatment to Ms. Salgado in violating Article II §§ 7 and 9 of the Constitution of the State of Oklahoma was a direct and proximate cause of Ms. Salgado's death and all other damages alleged herein.

243.     Sheriff Glanz and CHC/CHM/CHMO are vicariously liable for the violations of the Oklahoma Constitution by employees and agents acting within the scope of their employment.

WHEREFORE, based on the foregoing, Plaintiff Young prays that this Court grant her the relief sought including, but not limited to, actual damages, including, *inter alia*, all damages permitted under 12 Okla. Stat. §1053, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from date of filing of suit, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney fees, and all other relief deemed appropriate by this Court.

Respectfully submitted,

Smolen, Smolen & Roytman, PLLC

/s/ Daniel E. Smolen
Donald E. Smolen, OBA #19944
donaldsmolen@ssrok.com
Daniel E. Smolen, OBA #19943
danielsmolen@ssrok.com
Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
Lauren G. Lambright, OBA #22300
laurenlambright@ssrok.com
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone:  (918) 585-2667
Fax:  (918) 585-2669

**ATTORNEYS FOR PLAINTIFFS**

Daniel B. Graves, OBA #16656
dan@gravesmclain.com
William C. McLain, OBA #19349
chad@gravesmclain.com
Rachel E. Gusman, OBA #22161
rachel@gravesmclain.com
GRAVES MCLAIN PLLC
Boulder Towers, Suite 1010
1437 South Boulder Avenue
Tulsa, Oklahoma 74119
Phone:  (918) 359-6600
Fax:      (918) 359-6605

**ATTORNEYS FOR PLAINTIFF ALMA McCAFFREY**