UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| BRIDGET NICOLE REVILLA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 13-CV-315-JED-TLW |
| | ) | |
| STANLEY GLANZ, SHERIFF OF TULSA | ) | |
| COUNTY, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the Court are the Motions to Dismiss and Sever (Doc. 21), filed by defendants, Correctional Healthcare Companies, Inc. ("CHC"), Andrew Adusei, M.D., Phillip Washburn, M.D., and Christina Rogers, R.N. (collectively the "Healthcare Defendants"). Plaintiffs responded (Doc. 34), and the Healthcare Defendants have replied (Doc. 38).

**I.     Motion to Sever**

The Healthcare Defendants argue that the plaintiffs are mis-joined and that the Court should sever the plaintiffs. The Court previously addressed the same arguments, which were asserted in Sheriff Glanz's dismissal motion. (*See* Doc. 42 at 3-5). For the same reasons set forth in that Opinion and Order, the Healthcare Defendants' Motion to Sever is denied at this time, without prejudice to any party reasserting a request for severance prior to trial.

**II.    Motion to Dismiss for Failure to State a Claim**

    *A.     Under Color of Law*

The Healthcare Defendants assert that the Amended Complaint does not allege facts sufficient to show that they acted under color of law. They argue that the Amended Complaint does not show that they exerted influence over a state entity, substituted their judgment for a

state entity, or participated in the decisions leading to the alleged deprivations of constitutional rights.  (*See* Doc. 21 at 6-8).

In *West v. Atkins*, 487 U.S. 42 (1988), an inmate brought an action under 42 U.S.C. § 1983, alleging that he was given constitutionally deficient medical care in violation of the Eighth Amendment.   The district court granted summary judgment to the physician on that court's determination that the physician was not acting under color of state law when he treated the inmate's injury.  487 U.S. at 45-46.  The Fourth Circuit Court of Appeals, en banc, affirmed the district court's dismissal of the inmate's complaint.  That determination conflicted with Eleventh Circuit decisions, which had concluded that "a physician who contracts with the State to provide medical care to prison inmates, even if employed by a private entity, acts under color of state law for purposes of § 1983."  *See id.* at 47.  In light of the conflict, the Supreme Court granted certiorari to resolve the conflict between the Circuits.  The Supreme Court reversed the Fourth Circuit's en banc determination in *West*, concluding that the physician acted under color of law:

> We now make explicit what was implicit in our holding in *Estelle [v. Gamble*, 429 U.S. 97 (1976)]*: Respondent, as a physician employed by North Carolina to provide medical services to state prison inmates, acted under color of state law for purposes of § 1983 when undertaking his duties in treating petitioner's injury. Such conduct is fairly attributable to the State.

> The Court recognized in *Estelle:* "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." 429 U.S., at 103, 97 S.Ct., at 290. In light of this, the Court held that the State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated. *Id.,* at 104, 97 S.Ct., at 291. . . .  It is only those physicians authorized by the State to whom the inmate may turn. Under state law, the only medical care West could receive for his injury was that provided by the State. If Doctor Atkins misused his power by demonstrating deliberate indifference to West's serious medical needs, the resultant deprivation was caused, in the sense relevant for state-action inquiry, by the State's exercise of its right to punish West by incarceration and to deny him a venue independent of the State to obtain needed medical care. . . . [W]e conclude that respondent's delivery of medical treatment to West was state action fairly

> attributable to the State, and that respondent therefore acted under color of state law for purposes of § 1983.

487 U.S. at 54-57 (internal footnotes omitted).  The Tenth Circuit has applied the reasoning in *West* in determining that a doctor under contract with the State was acting under color of law in a § 1983 equal protection and free expression case.  *Nieto v. Kapoor*, 268 F.3d 1208, 1216 (10th Cir. 2001).

*West* seems to be directly on point, and plaintiffs cite the case in their Response, yet the Healthcare Defendants do not mention, much less attempt to distinguish, the case, its holding, or its analysis.  Rather, they argue only generally that the plaintiffs' Amended Complaint does not adequately allege that the defendants "exerted influence over a state entity, substituted their judgment for a state entity, or participated in the decisions leading to the alleged deprivations of rights."  (Doc. 38 at 3).  The Court disagrees, and finds that the plaintiffs have plausibly averred "conduct [by each of the Healthcare Defendants that] is fairly attributable to the State" for purposes of § 1983.  *See West*, 487 U.S. at 54.  For example, plaintiffs expressly allege that CHC was "acting under color of state law," was "endowed by Tulsa County with powers or functions governmental in nature, such that CHC . . . became an instrumentality of the State and subject to its constitutional limitations."  (Doc. 4 at ¶¶ 114-116, 149-151, 185-187, 222-224).  They also allege that CHC was responsible for providing medical services at the Jail and responsible, in part, for "creating and implementing policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail, and for training and supervising its employees."  (*Id.* at ¶ 12).  As to the individual Healthcare Defendants, plaintiffs assert that each was an employee or agent of CHC and each assumed some "responsib[ility] for overseeing and treating" one or more of the plaintiffs during the time that they were incarcerated at the Jail. (*Id.* at ¶¶ 14-16).  It is asserted that Drs. Adusei and Washburn were at relevant times

the "Medical Director at the Jail" (*id.* at ¶¶ 14-15), and that nurse Rogers was the Health Services Administrator at the Jail (*id.* at ¶ 16).  These allegations of the Amended Complaint plausibly allege that each of the Healthcare Defendants was acting under color of state law in providing medical care to Jail inmates.

### B.      Municipal Liability Theory as to CHC

CHC also argues that plaintiffs cannot maintain a § 1983 claim against CHC under a municipal liability theory.  (Doc. 21 at 8).  Municipal employers cannot be held liable under § 1983 on a *respondeat superior* theory.  *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691-92 (1978).  To establish municipal liability, a plaintiff must demonstrate (1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. that "there is a direct causal link between the policy or custom and the injury alleged").  *Id.* at 694-95; *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).  Thus, when a state actor deprives a person of a constitutional right, municipal liability may be found when "the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002) (quoting *Monell*, 436 U.S. at 690).  A municipal entity may be liable where its policy is the moving force behind the denial of a constitutional right, *see Monell*, 436 U.S. at 694, or for an action by an authority with final policymaking authority, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 482-83 (1986) (plurality opinion).  *See also Seamons v. Snow*, 206 F.3d 1021, 1029 (to establish municipal liability, plaintiff must show "that the unconstitutional actions of an employee were

4

representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action").

The Tenth Circuit has described several types of actions which may constitute a municipal policy or custom:

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson*, 627 F.3d at 788 (citations omitted).

While the Supreme Court has only applied *Monell* to municipalities, the Circuit Courts of Appeal have applied *Monell* to private entities, acting under color of law, that are sued under 42 U.S.C. § 1983.  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216, n.13 (10th Cir. 2003).  Thus, private corporations may not be held liable under § 1983 based upon *respondeat superior*, but may only be held liable where their policies caused a constitutional violation.  *See Dubbs*, 336 F.3d at 1216.

The Seventh Circuit, very recently, called into question the reasoning behind applying *Monell* to private corporations.  In that case, *Shields v. Illinois Dept. of Corrections*, ___ F.3d ___, 2014 WL 949950 (7th Cir. Mar. 12, 2014), an inmate was lifting weights and ruptured a tendon in his shoulder.  He did not receive the prompt medical attention needed for the injury, which resulted in a serious and permanent impairment that could have been avoided.  He sued a number of defendants, including Wexford Health Sources, a private company that provides medical care to Illinois prisoners under contract with the Illinois Department of Corrections.  The

district court granted summary judgment to the defendants because, among other things, the plaintiff could not identify who was responsible for treating him in a timely manner.  On appeal, the court noted problems with the "often arbitrary gaps in the legal remedies under § 1983 for violations of federal constitutional rights."  *Id.* at *1.  In addition, the Seventh Circuit recognized issues with applying *Monell* to private corporations like Wexford:

> The problem Shields faces also raises a serious question about how we should evaluate the responsibility of a private corporation like Wexford for violations of constitutional rights.  The question is whether a private corporation should be able to take advantage of the holding of *Monell* . . ., which requires a plaintiff suing a local government under § 1983 to show that the violation of his constitutional rights was caused by a government policy, practice, or custom.  Our prior cases hold, but without persuasive explanations, that the *Monell* standard extends from local governments to private corporations.  As we explain below, however, that conclusion is not self-evident.  We may need to reconsider it if and when we are asked to do so.  As state and local governments expand the privatization of government functions, the importance of the question is growing. . . .

*Id.* at *2.

The court in *Shields* provided a thorough analysis of the history behind *Monell* and reasons why *Monell* should not be extended to private corporations, so that private entities could be held vicariously liable for their employees' violations of constitutional rights.  *Id.* at **2-11.  Characterizing *Monell* as "best understood as simply having crafted a compromise rule that protected the budgets of local governments from automatic liability for their employees' wrongs, driven by a concern about public budgets and the potential extent of taxpayer liability," the court noted such reasoning would not apply to private corporations.  *See id.* at *8.  For example, the court observed that

> Private prison employees and prison medical providers have frequent opportunities, through their positions, to violate inmates' constitutional rights.  It is also generally cheaper to provide substandard care than it is to provide adequate care.  Private prisons and prison medical providers are subject to market pressures.  Their employees have financial incentives to save money at the expense of inmates' well-being and constitutional rights.  The unavailability of

6

> qualified immunity for these employees is a deterrent against such conduct, but *respondeat superior* liability for the [private] employer itself is likely to be more effective at deterring such actions.   Insulating private corporations from *respondeat superior* liability significantly reduces their incentives to control their employees' tortious behavior and to ensure respect for prisoners' rights.   The results of the current legal approach [affording private corporations the protections of *Monell*] are increased profits for the corporation and substandard services for both prisoners and the public.

*Id.* at 10.  Notwithstanding its reservations, the court applied *Monell* to Wexford, noting that Shields had not asked the court to overrule its prior precedents on that issue.  *Id.* at *11.  The court signaled that it may take up the issue on a petition for rehearing en banc, but indicated that it had not yet been asked to do so.  *See id.*

The reasoning of *Shields*, and its thorough analysis of Supreme Court precedent, provides potent arguments for *not* extending *Monell* to private corporations like CHC.  However, this Court is bound to follow Tenth Circuit precedent, and the settled law in all Circuits to have decided the issue is that *Monell* extends to private corporations and thus they cannot be held liable on a *respondeat superior* basis for their employees' conduct.  Accordingly, in order to state a § 1983 claim against CHC, plaintiffs must satisfy *Monell* and must allege facts to show the existence of a CHC policy or custom by which each plaintiff was denied a constitutional right and that there is a direct causal link between the policy or custom and the injury alleged.  *See Bryson*, 627 F.3d at 788.

The Amended Complaint asserts that CHC "was . . . responsible, in part, for providing medical services and medication to [plaintiffs] while they were in the custody of the TCSO. CHC was additionally responsible, in part, for creating and implementing policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail, and for training and supervising its employees." (Doc. 4. at ¶ 12).  Plaintiffs also allege that "[t]he deliberate indifference to [each of the plaintiff's] serious medical needs . . . was

7

in furtherance of and consistent with . . . policies, customs, and/or practices which CHC . . . had responsibility for implementing and which [it] assisted in developing." (*Id.* at ¶ 77). Those alleged policies, customs, and/or practices include: maintaining "longstanding, systemic deficiencies in the medical and mental health care provided inmates at the Tulsa County Jail" (*id.* at ¶ 78); "refusing to send inmates with emergent needs to the hospital for purely financial purposes" (*id.* at ¶ 97); "understaffing the Jail's medical unit" (*id.* at ¶ 98); and a "system of deficient care - - which evinces fundamental failures to train and supervise medical and detention personnel – created substantial, known and obvious risks to the health and safety of inmates like Plaintiffs" (*id.* at ¶ 100).

Plaintiffs also allege specific notice to CHC from 2007-2011 of findings, in audit reports by the National Commission on Correctional Health Care, the Oklahoma Department of Health, the United States Department of Homeland Security's Office of Civil Rights and Civil Liberties (CRCL), and the Jail's own medical auditor, which found significant problems with the system of medical care provided at the Jail. (Doc. 4 at ¶¶ 77-100). According to the assertions in the Amended Complaint, notice of those problems allegedly included findings that Dr. Adusei "posed substantial risks to the health and safety of inmates with serious medical needs," deficiencies documented by the Director of Nursing regarding the alleged refusal/failure of Drs. Adusei and Washburn to see inmates with life-threatening conditions, and a September, 2011 finding by the CRCL that there was a "prevailing attitude among clinic staff of indifference." (*Id.*). Plaintiffs contend that there is a direct causal link between CHC's maintenance of a systemic, dangerous, and unconstitutionally deficient medical care system and the deaths and/or injuries to each of the plaintiffs. (*See id.* at ¶¶ 118, 153, 189, 225). These allegations assert a

plausible § 1983 claim against CHC based upon its alleged policies, customs, or practices under *Monell* and its progeny.

### C.      Punitive Damages Claim Against CHC

CHC argues that, even though it is a private corporation, it should be afforded the immunity from punitive damages that is afforded to municipalities.  It cites no authority that is directly on point, instead relying upon Tenth Circuit authorities which generally hold that *Monell* principles apply to private corporations who are considered to be state actors for purposes of § 1983.  *Monell* does not address the specific issue of punitive damages, and the Tenth Circuit authorities cited by CHC also do not determine the specific issue of whether punitive damages may be recovered in a § 1983 suit against a private entity.   In response, plaintiffs cite a handful of authorities in which courts have determined that punitive damages may be recovered under § 1983 against private corporations.

In *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), the Supreme Court held that local governments are immune from punitive damages under § 1983.  That holding was based, in part, on considerations uniquely applicable to governments.  For example, the Court observed that the purposes of retribution and deterrence would not be satisfied because "punitive damages imposed on a municipality . . . are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill" and "[n]either reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers."  453 U.S. at 267-70.  In addition, "[t]o add the burden of exposure for the malicious conduct of individual government employees may create a serious risk to the financial integrity of these governmental entities."  *Id.* at 270.  "[T]he unlimited taxing power of a municipality may have a prejudicial impact on the jury, in effect encouraging it to impose a sizable award. . .

and we are sensitive to the possible strain on local treasuries and therefore on services available to the public at large." *Id.* at 270-71.

The specific question presented by CHC's argument is whether the Court's holding in *City of Newport* should be extended to preclude recovery of punitive damages against a private entity such as CHC. As noted, CHC has presented no legal authority directly on point, and plaintiffs cite a few authorities in which district courts determined that punitive damages may be recovered against a private entity in a § 1983 suit. In *Segler v. Clark County*, 142 F. Supp. 2d 1264 (D. Nev. 2001), the court determined that EMSA, a private corporation acting under color of law, could be subjected to punitive damages under § 1983. The court reasoned that, as a private corporation,

> EMSA does not fit the requirements for a municipality set out . . . in the *City of Newport* case. Although EMSA is a state actor through its contract [with the police department], the award of punitive damages against EMSA would not punish taxpayers in the way such a decision would affect a municipality. Instead, punitive damages would be assessed against EMSA which would bear the burden of payment as a private corporation. Also the deterrence effect of an award of punitive damages would impact EMSA as a private corporation influencing the possible future actions by EMSA or its employees.

*Segler*, 142 F. Supp. 2d at 1269. Applying *Segler*, the court in *Lawes v. Las Vegas Metro. Police Dept.*, No. 2:12-CV-1523, 2013 WL 3433150 (D. Nev. 2013), denied a motion to dismiss an inmate's punitive damages claim under § 1983 against a private entity providing medical care in a detention center. Similarly, in *Gee v. Bloomington Hospital*, No. 1:06-cv-94-TWP-TAB, 2012 WL 639517 (S.D. Ind. Feb. 27, 2012), the court determined that a private hospital, which contracted with a sheriff to provide medical care to jail inmates, was not entitled to immunity from punitive damages because "municipal immunity from punitive damages does not extend to private organizations that contract with the municipality to perform a function previously

performed by the municipality." *Id.* at * 12 (quoting 2 Punitive Damages: Law and Prac., § 15:23).

Without providing any specific legal analysis of whether a private entity is entitled to immunity from punitive damages, the Seventh Circuit upheld a $1.5 million punitive damages award against Correctional Medical Services (CMS) in a § 1983 suit by the estate of a pretrial detainee who committed suicide in a county jail. *Woodward v. Correctional Med. Serv. of Illinois, Inc.*, 368 F.3d 917, 930 (7th Cir. 2004). In *Woodward*, the district court denied CMS's request for remittitur, and the Seventh Circuit noted that "there is ample evidence for the jury to conclude that CMS was deliberately indifferent to the risk of suicide within the jail" by virtue of a "routine disregard for policies and procedures which was condoned by CMS management." *Id.* The court also remarked that the evidence reflected that "[n]urses were not properly trained" and that CMS's regional director and its health services administrator "refused to refer ill patients to the hospital in order to save money." *Id.* According to the Seventh Circuit, all of the evidence "established a corporation that had little regard for the inmates whose care it was charged with," supporting a punitive damages award against CMS. *Id.* The Seventh Circuit upheld the punitive damages award against the private corporation, even though it applied *Monell's* municipality requirements to CMS.

Based upon all of these authorities, the Court is unable to apply the punitive damages immunity afforded municipalities under the *City of Newport* case to CHC, which is a private corporation. The reasoning of *City of Newport* seems largely hinged upon the fact that the traditional purposes of punitive damages (punishment and deterrence) would not be served by imposing punitive damages upon local governments, because taxpayers would foot the bill, governments would likely have to increase taxes or reduce public services, and such an award

would place the local government's financial integrity in serious risk.  *See City of Newport*, 453 U.S. at 267-70.  Those same purposes do not apply to a private corporation.  Accordingly, CHC's motion to dismiss the punitive damages claim is denied at this time.

> **D.**      ***Claims Under the Oklahoma Constitution***

The Healthcare Defendants argue that the Oklahoma Constitution's prohibition of cruel and unusual punishment applies only to those convicted of a crime and that it is not extended to pretrial detainees, requiring dismissal of plaintiffs' claims under Article II, §§ 7 and 9 of the Oklahoma Constitution.  The Court has previously rejected this argument in ruling on Sheriff's Glanz's motion to dismiss.  (Doc. 42 at 14-15).  For the same reasons set forth in that Opinion and Order, the Healthcare Defendants' motion to dismiss the state constitutional claims is denied.

> **E.**      ***Tort Immunity Under the Governmental Tort Claims Act***

The Healthcare Defendants assert that the negligence claims brought against each of them must be dismissed because they are immune under § 152(7)(b)(7) of the Governmental Tort Claims Act.  That section provides:

> For the purpose of The Governmental Tort Claims Act, the following are employees of this state, regardless of the place in this state where duties as employees are performed: . . . (7) *licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies*. . . .

*Okla. Stat.* tit. 51, § 152(7)(b)(7) (emphasis added).  Thus, the Healthcare Defendants argue that they are immune from suit under *Okla. Stat.* tit. 51, § 152.1, which generally provides that "[t]he state, its political subdivisions, and all of their employees acting within the scope of their employment . . . shall be immune from liability for torts."

In response, plaintiffs argue that the individual Healthcare Defendants are not themselves "under contract with . . . [the] county" such that they could be considered employees of the state or a political subdivision under § 152(7)(b)(7).  According to plaintiffs, the individual Healthcare Defendants do not contract with the county.  Instead, as alleged in the Amended Complaint, they are employed by or are agents for one or more private entities – CHC, CHMO, or CHM.  In addition, plaintiffs assert that CHC itself is not considered a political subdivision of the state, even though it may be under contract to provide services for the county.  Plaintiffs also contend that CHC is not a "licensed medical professional" such that it could be defined as an employee within the meaning of § 152(7)(b)(7).

The Healthcare Defendants reply that plaintiffs' assertions "are without merit," because the statute "is clearly meant to include a correctional healthcare provider such as CHC and its employees and/or agents who are licensed medical professionals."  (Doc. 38 at 6).  The Healthcare Defendants did not provide any specific information or argument in response to plaintiffs' contentions.  For example, they have *not* (1) provided any information to show that the individuals have contracts with Tulsa County (or to explain the specific relationship of the individuals with CHC such that they may be considered "under contract" with Tulsa County), (2) identified any legal authority to show that the individual licensed medical professionals may be considered to have contractual privity with Tulsa County, (3) described in what manner CHC itself could be considered to be a "licensed medical professional" under the statute, or (4) provided any statutory construction argument or analysis to support their position.  In fact, CHC did not provide any information as to the specific employment status of the individual Healthcare Defendants at all, except to point out the plaintiffs' allegations that they are "employees or agents" of CHC.  That reliance only upon the allegations of the Amended Complaint makes

sense, given that, at the pleading stage, the Court will confine its review to the pleadings.  But it also points to a conclusion that it is premature at this stage for the Court to dismiss the negligence claims against the Healthcare Defendants.  *See, e.g., Briggs v. Okla. Dept. of Human Servs.*, 472 F. Supp. 2d 1294, 1299 (W.D. Okla. 2007) ("Absent proof of the facts deemed relevant by the parties, the status of EO Youth Services and Bonner as employees or as an independent contractor and the employee of an independent contractor, respectively, cannot be decided at this stage of the litigation [under the OGTCA]. . . . the Court finds that until these defendants' status is resolved that discussion of the immunity provided by the OGTCA . . . to employees is premature").

At this time, the Court does not have enough information to determine whether the individual Healthcare Defendants fall within the definition of § 152(7)(b)(7) such that they will be immune from plaintiffs' negligence claims pursuant to § 152(7)(b)(7).  Moreover, even if the individual defendants who are licensed medical professionals are determined to be covered by that statute, the Court is not convinced that CHC would gain immunity under the Oklahoma Governmental Tort Claims Act because it is not a licensed medical professional.  Accordingly, without complete factual information and in the absence of any legal authority that dictates the application of § 152(7)(b)(7) to the individual Healthcare Defendants (or to CHC) despite the issues noted above, the Court finds that it is premature to determine whether § 152(7)(b)(7) covers CHC's employees and/or CHC.

### F.  *Compliance with the Prison Litigation Reform Act*

The Healthcare Defendants argue that "Ms. Revilla fails to allege that she exhausted all available administrative remedies before bringing this lawsuit" and that she therefore "fails to state a claim upon which relief can be granted and her claims . . . must be dismissed" for failure

to comply with the PLRA.  (Doc. 21 at 13-16).  There are two problems with this argument. First, "a plaintiff who seeks to bring suit about prison life after he has been released and is no longer a prisoner does not have to satisfy the PLRA's exhaustion requirements before bringing suit."  *Norton v. City of Marietta, Okla.*, 432 F.3d 1145, 1150 (10th Cir. 2005) (citing and agreeing with decisions of other Circuits).  Plaintiffs assert that Ms. Revilla was not in custody at the time the Amended Complaint was filed and the PLRA therefore does not apply.  Defendants did not reply to that assertion.  Pursuant to *Norton* and the plain language of the PLRA, in the absence of evidence that Ms. Revilla was a "prisoner confined in a jail" at the time she brought suit, the Court finds that she was not required to comply with the exhaustion requirements of the PLRA.  Second, assuming that Ms. Revilla was required to exhaust under the PLRA before bringing suit, dismissal is not appropriate for a failure to plead such exhaustion.  *Jones v. Bock*, 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.").  Defendants did not cite *Jones* or provide any argument as to why the case should not apply.

### III.   Conclusion

For the foregoing reasons, the Healthcare Defendants' Motion to Dismiss and Motion to Sever are **denied**.

SO ORDERED this 25th day of March, 2014.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE