**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| DEBORAH YOUNG, | ) |
| as Special Administrator of the Estate of | ) |
| GWENDOLYN YOUNG, deceased | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No.: 13-CV-315-JED-JFJ |
| | ) |
| STANLEY GLANZ, *et al.,* | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO CHC**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**ON ALL CLAIMS OF PLAINTIFF DEBORAH YOUNG (DKT. #468)**

Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
Daniel E. Smolen, OBA # 19943
danielsmolen@ssrock.com
SMOLEN, SMOLEN & ROYTMAN, PLLC
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
Telephone:      (918) 585-2667
Facsimile:      (918) 585-2669

*Attorneys for Plaintiff*

October 18, 2017

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Authorities...............…..………………...………….…...........................ii

Introductory Statement.......................…………………….…………......................1

LCvR 56.1(c) Statement of Facts……………..…...............................……...............2

A.     Counter-Statement of Facts to Defendants' "Statement of Material Facts Not in Dispute"..............…..……………..……………………..……………………....…1

B.     Additional Facts Precluding Summary Judgment...........................…........……....25

ARGUMENT……………..……………..………………..……….……….…...............35

I.     CHC is *Not* Entitled to Summary Judgment on Plaintiff's Constitutional Claims …………………..…………..………..……………………..……..…..35

        A.     CHC May Properly be Held Liable Under a Municipal Liability Theory.........……..……….……...................…..………35

             1.     There is Abundant Evidence of "Underlying Violations" of Ms. Young's Constitutional Rights.............…….............38

             2.     Plaintiff Has Identified Official Policies and/or Customs That Were the "Moving Force" Behind the Constitutional Deprivations and Presented Sufficient Evidence of a Culpable "State of Mind"……..………..….……………….48

II.     CHC Is Not Entitled to Summary Judgment on Plaintiff's Negligence Claim….49

# <u>TABLE OF AUTHORITIES</u>

*Page*

## *CASES*

*Alejo v. Gonzalez,* 203 F.3d 834, 2000 WL 64317 at *1 (10th Cir. 2000).......................49

*Ancata v. Prison Health Services,* 769 F.2d 700 (11th Cir. 1985)...................................35

*Arnold v. Cornell Companies, Inc.,* 2008 WL 4816507 (W.D.Okla., Oct. 29, 2008).......50

*Askins v. Doe No. 1,* 727 F.3d.248, 253 (2d Cir.2013)......................................................38

*Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir. 1998)........................................37, 49

*Bell v. Wolfish,* 441 U.S. 520, 545 (1979)..........................................................................38

*Birdwell v. Glanz,* No. 15-CV-304-TCK-FHM, 2016 WL 2726929, at *6
(N.D. Okla. May 6, 2016)....................................................................................................38

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)..............................36, 37

*Burke v. Glanz,* No. 11-CV-720-JED-PJC, 2016 WL 3951364
(N.D. Okla. July 20, 2016)............................................................................................32, 48

*Castro v. Cty. of Los Angeles,* 833 F.3d 1060, 1076 (9th Cir. 2016)................................37

*City of Canton v. Harris*, 489 U.S. 378, 385 (1989)..........................................................36

*DeSpain v. Uphoff,* 264 F.3d 965, 975 (10th Cir. 2001)....................................................40

*Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216, n. 13 (10th Cir. 2003)....................35, 36

*Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).................................................................38

*Evans v. Newton,* 382 U.S. 296, 299 (1966)......................................................................35

*Farmer v. Brennan,* 511 U.S. 825, 842 (1994)..................................................................40

*Gayton v. McCoy,* 593 F.3d 610, 619 (7th Cir. 2010)........................................................46

*George v. Sonoma Cty. Sheriff's Dep't,* 732 F. Supp. 2d 922, 937 (N.D. Cal. 2010)........45

*Martin v. Bd. of County Com'rs of County of Pueblo,* 909 F.2d 402, 406
(10th Cir. 1990)...................................................................................................................38

*Mata v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005)......................................................*passim*

*McKellips v. Saint Francis Hosp., Inc.,* 1987 OK 69, 741 P.2d 467, 471........................50

*Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658 (1977).......................36, 38

*Nat'l Aviation Underwriters v. Altus Flying Serv.,* 555 F.2d 778, 784
(10th Cir.1977)..............................................................................................................3, 16

*Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1317–18 (10th Cir. 2002).....................38, 39

*Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 482–83, 106 S.Ct. 1292, 89
L.Ed.2d 452 (1986)..............................................................................................................38

*Revilla v. Glanz,* 8 F. Supp. 3d 1336, 1339 (N.D. Okla. 2014)........................................38

*Rife v. Oklahoma Dep't of Pub. Safety,* 854 F.3d 637, 647 (10th Cir. 2017) *cert. denied
sub nom. Dale v. Rife,* No. 17-310, 2017 WL 3731208 (U.S. Oct. 16, 2017)............40, 46

*Sealock v. Colorado,* 218 F.3d 1205, 1211 (10th Cir. 2000)................................16, 39, 44

*Self v. Crum,* 439 F.3d 1227, 1230 (10th Cir. 2006)........................................................39

*Schneider v. City of Grand Junction Police Dep't,* 717 F.3d 760, 769-671
(10th Cir. 2013)...........................................................................................................37, 49

*Sorrentino v. IRS,* 383 F.3d 1187, 1198 (10th Cir. 2004)..............................................3, 16

*Sullins v. American Medical Response of Oklahoma, Inc.,* 23 P.3d 259, 264
(Okla. 2001)........................................................................................................................50

*Tafoya v. Salazar,* 516 F.3d 912, 919 (10th Cir. 2008.................................................36, 39

*Thomas v. Arevalo,* 1998 WL 427623, at *9 (S.D.N.Y. July 28, 1998)..........................45

*Thompson v. Gibson,* 289 F.3d 1218, 1222 (10th Cir. 2002)..........................................43

*United States v. Ferber,* 966 F. Supp. 90, 97-98 (D. Mass. 1997)...................................15

*United States v. Santos,* 65 F. Supp. 2d 802, 825 (N.D. Ill. 1999)..................................15

*Walker v. Benjamin,* 293 F.3d 1030, 1040 (7th Cir. 2002)..............................................45

*Ware v. Jackson County, Mo.,* 150 F.3d 873, 882 (8th Cir. 1998)...................................36

*West v. Atkins,* 487 U.S. 42, 57 (1988)...........................................................................35

*Wilson v. Town of Mendon,* 294 F.3d 1, 7 (1st Cir. 2002)................................................38

**COMES NOW** the Plaintiff, Plaintiff, Deborah Young ("Plaintiff"), as Special Administrator of the Estate of Gwendolyn Young ("Ms. Young"), and respectfully submits her Response in Opposition to the CHC Defendants' Motion for Summary Judgment (Dkt. #468) as follows:

<u>**Introductory Statement**</u>

While housed at the Tulsa County Jail, Ms. Young was subjected to grossly deficient treatment amounting to deliberate indifference to -- and reckless neglect of -- her serious medical needs. Ms. Young needlessly suffered and died after responsible medical staff employed by Correctional Health Companies, Inc. ("CHC") disregarded known and substantial risks to her health and safety.

Beginning in early February 2013, Ms. Young began to complain of serious stomach pain, only to be told that Jail medical staff could not help her. On February 6, 2017, Ms. Young first complained to the detention staff in the Segregated Housing Unit ("SHU") that she was ***throwing up blood***. Her complaint was disregarded, and not even documented. After vomiting for a period of several days, which rendered her unable to eat or take her life sustaining medications, Ms. Young's condition rapidly deteriorated. She became lethargic, dizzy and unsteady on her feet. When she was seen by nursing staff, her complaints were not taken seriously. By the early morning of February 8, Ms. Young's condition had reached a crisis level. Ms. Young began to suffer shortness of breath and showed signs of dehydration. She was begging to be sent to the hospital. As TCSO Sergeant Billie Byrd observed at the time, ***"something [wa]s wrong with inmate Young…"*** Incident Report (Ex. 3) at GLANZ-Revilla 12269 (emphasis added). Still, responsible medical and detention staff flatly refused to send her out.

1

At approximately 7:05am on February 8, Ms. Young "collapsed" and "fell to the ground" after nurses attempted to get her off the floor and onto her feet. By 8:10am, Ms. Young had become *"incoherent"* and was *"not responsive"*, but **Nurse Nicole White "repeatedly stated that [Ms. Young] was _faking_**" her illness. *See* LCvR 56.1(c) Statement(A)(51-53), *infra*. TCSO Sergeant Bob Darby insisted that Ms. Young would not be sent to the hospital, per CHC, and she was left in her cell.

Approximately two hours later, Ms. Young was found lifeless in her cell. She was never even seen by Defendant Andrew Adusei, M.D. ("Dr. Adusei"), the Jail's Medical Director, until after her death. Due to the callous indifference to her obvious and substantial medical needs, Ms. Young had needlessly died from a subdural hematoma. Plaintiff subsequently filed suit on behalf of Ms. Young's Estate.

Plaintiff brings her constitutional claims against CHC under a municipal liability/*Monell* theory. All of Plaintiff's § 1983 claims against CHC stem from its promulgation, implementation, and/or maintenance of policies, practices and/or customs that deprived Ms. Young of her federally protected rights. As demonstrated herein, those claims are well-supported. For many years, CHC knowingly maintained a systemically deficient medical delivery program at the Jail. And that unconstitutional system was a "moving force" behind Ms. Young's pain, suffering and death.

The CHC Defendants' Motion for Summary Judgment (Dkt. #468) should be denied.

<u>**LCvR 56.1(c) Statement of Facts**</u>

**A.    Counter-Statement of Facts to Defendants' "Statement of Material Facts Not in Dispute"**

2

1.      The nature of the criminal charges against Ms. Young is entirely irrelevant and inadmissible. *See, e.g.,* F.R.E. 401, 402, 403, 404 and 609.

2.      At the time of intake on October 16, 2012, it was known by CHC Jail medical staff, including Dr. Adusei, that Ms. Young suffered from several chronic medical conditions, including hypertension (high blood pressure), diabetes mellitus, hyperlipidemia (high blood lipid levels, a risk for heart disease and stroke), and prior cerebrovascular accidents or "CVA's", also known as strokes. *See, e.g.,* CHC Medical Records (Ex. 1) at GLANZ-Revilla 05056 and 05065; Allen (Verified) Report (Ex. 2) at 4. With respect to the intake medical screening Ms. Young received on October 16, Scott Allen, M.D. ("Dr. Allen"), Plaintiff's correctional medicine expert, has observed: (A) "[t]here is no indication that a physician or nurse practitioner ever reviewed the receiving screening"; (B) "[t]he initial medical screening does not note or address chronic medical illness" and (C) "[t]he physical exam [wa]s brief and incomplete." Allen (Verified) Report (Ex. 2) at 4.

3.      Nurse Walker's self-serving testimony regarding the purported reasons that Ms. Young refused medications provides no basis for summary judgment. *See, e.g., Nat'l Aviation Underwriters v. Altus Flying Serv.,* 555 F.2d 778, 784 (10th Cir.1977) (ruling that summary judgment should not be based on the deposition or affidavit of an interested party as to facts known only to him "where the demeanor evidence might serve as real evidence to persuade the trier of fact to reject his testimony"); *Sorrentino v. IRS,* 383 F.3d 1187, 1198 (10th Cir. 2004) ("The self-serving quality of the testimony goes to its credibility, which is to be judged by the trier of fact. Credibility determinations are not to be made at summary judgment ...."). In truth,

the evidence is that Ms. Young was not taking her medication because she was ill, for days, and kept throwing her medication up. *See, e.g.,* Incident Report (Ex. 3) at GLANZ-Revilla 12269.

**4-6.** Plaintiff agrees that Ms. Young's kidney problems did not "cause" her death. Nevertheless, there are other events in October and November 2012 which provide relevant background. On October 19, 2012, there was a handwritten "Treatment Plan" signed by Kathy McGee, RN ("Nurse McGee") briefly noting Ms. Young's chronic medical conditions, including "DM" or diabetes mellitus, "HTN" or hypertension, "CVA" or stroke, and history of "UTI's" or urinary tract infections. CHC Records (Ex. 1) at GLANZ-Revilla05167. Chronic Disease Clinic was recommended both for diabetes and hypertension and an appointment date for the clinic was set for November 15, 2012. *Id.* Nonetheless, there is no evidence on the record that Ms. Young was ever seen for this appointment, nor in any chronic disease clinic; indeed, there is no evidence that Ms. Young was ever seen by any physician or nurse practitioner at the Jail prior to her final fatal collapse on February 8, 2013. *See generally* CHC Records (Ex.1); *see also* Allen (Verified) Report (Ex. 2) at 4-5.

On October 21, 2012 Ms. Young went to the medical unit "wanting [her] blood pressure checked" and "need[ing] [her] meds verified", per a note of Sharon Gammill. *See* CHC Records (Ex. 1) at GLANZ-Revilla05060; Allen (Verified) Report (Ex. 2) at 5. At the time of this visit, Ms. Young's blood pressure was elevated at 146/90. *Id.* However, no blood pressure medications were initiated. *Id.* Ms. Young was not referred to nor seen by a physician or nurse practitioner. *Id.*

4

As observed by Dr. Allen: "Between October 24 and December 1, 2012 [Ms. Young's] blood pressure [wa]s recorded without any further assessment or comment." Allen (Verified) Report (Ex. 2) at 5; *see also* CHC Records (Ex. 1) at GLANZ-Revilla05050-53. Of the seven (7) recorded blood pressures during that period, all but one was elevated. *Id.* Still, there is "no documentation" to reflect that, beyond recording the number, "anyone [at the Jail] was concerned that [Ms. Young's] blood pressure was high" or that the information was communicated to a physician or nurse practitioner. *Id.*

**7-9.**   There are other events in December 2012, which Defendants fail to mention in the MSJ, which are pertinent to Plaintiff's claims. For instance, on December 3, 2012, Ms. Young woke up in the Jail's special housing unit ("SHU") and communicated to the detention officer on duty that she wanted to "talk to someone about why she [wa]s in Jail and that ***she was not going to make it in Jail a year….***" Jail Shift Report (Ex. 4) at GLANZ-Revilla 10474 (emphasis added). Ms. Young predicted that she would die at the Jail. *Id.* Unfortunately, her prediction proved to be prophetic.

On December 9, 2012, Ms. Young received a "Pre-Seg Health Assessment" by Nurse Raymond Stiles. *See* CHC Records (Ex. 1) at GLANZ-Revilla05180. Her blood pressure was recorded as 179/100, which is elevated. *See id.*; and Allen (Verified) Report (Ex. 2) at 6. "There is no notation to reflect any concern over this high blood pressure, and no evidence that this screening form was ever reviewed by a nurse practitioner or physician." *Id.*

On December 31, 2012, at approximately 3:25pm, Ms. Young complained to a detention officer in the special housing unit ("SHU") that she did not feel well, and that her blood sugar had not been taken because ***medical staff "continually [] skip the shu***

5

during the afternoon….” Jail Shift Report (Ex. 4) at GLANZ-Revilla 10614. Around five

and one half (5 ½) hours later, Ms. Young complained again that her blood sugar was low

and that “Nurse Howard never showed up to take it”, even though Ms. Young was on the

blood sugar “finger stick” list. *Id.* at 10615.

**10-13.** Defendants fail to mention that during the January 6, 2013 sick call, Ms.

Young complained to medical staff at the Jail that she had been experiencing significant

***“chest pressure” for two (2) weeks.*** *See* CHC Records (Ex. 1) at GLANZ-Revilla05060.

Ms. Young also reported shortness of breath (*i.e.,* “SOB”) and burping a lot. *Id.* Her past

medical history of previous strokes and high blood lipids were noted. *Id.* A “Chest Pain

Protocol” form was completed by Heather Ross RN. *Id.* at 5080-84. Nurse Ross

documented Ms. Young’s known history of cardiac disease, hypertension, diabetes and

lipid elevation. *Id.* at 5083. She further documents Ms. Young’s present complaints of

two (2) weeks of ***“continuous” chest pain*** (at a pain level of 8 on a scale of 1 to 10),

shortness of breath, chest wall tenderness and joint pain. *Id.* However, in violation of

CHC’s Chest Pain Protocol, Nurse Ross did not record any vital signs. *Id.* at 5083-84; *See*

*also* CHC Protocol F01 (Ex. 5) at 1 of 2. Despite her serious symptoms, Ms. Young was

not seen by a physician or nurse practitioner, nor was she sent to an outside Urgent Care

or Emergency Room. *Id.*; *see also* Allen (Verified) Report (Ex. 2) at 6. Rather, she was

returned to the segregation unit with no further evaluation. *See* CHC Records (Ex. 1) at

GLANZ-Revilla05060.

**14-15.** On January 10, 2013, Defendant Andrew Adusei, M.D. (“Dr. Adusei”)

recorded his first entry in Ms. Young’s medical chart for the pertinent period of

incarceration. *See* CHC Records (Ex. 1) at GLANZ-Revilla05056. Dr. Adusei merely

noted that he "just reviewed this patient's labs, and it appears that she has hypertriglyceridemia; I will initiate this patient on niacin and add aspirin and Benadryl for possible flushing response." *Id.* There is no indication that he actually saw Ms. Young. *Id.* "There is no evidence that [Dr. Adusei] met with the patient to obtain informed consent for the new medications, nor that he provided proper education to the patient for the new medications." Allen (Verified) Report (Ex. 2) at 7; *see also* CHC Records (Ex. 1) at GLANZ-Revilla05056. Dr. Adusei made no comment about any of Ms. Young's other serious chronic medical issues, and provided no note of her recent episode of chest pressure. *Id.*

The next day, on January 11, 2013, Ms. Young complained to detention staff in the SHU that her kidneys were "LOCKING UP" and that she needed to go to the medical unit. Jail Shift Report (Ex. 4) at GLANZ-Revilla 10668. It does not appear that detention staff reported this complaint to medical personnel or took Ms. Young to the medical unit. *Id.*

**16-17.** At approximately 8:39pm on January 12, 2013, detention staff in the SHU documented that Ms. Young was taken to the medical unit with complaints of "CHEST PAIN". Jail Shift Report (Ex. 4) at GLANZ-Revilla 10673. Nevertheless, upon Ms. Young's arrival in the medical unit, Nurse Chinaka Nzubechi ("Nurse Chinaka") failed to document the complaint of chest pain or initiate the Chest Pain Protocol, in violation of policy. *See* CHC Records (Ex. 1) at GLANZ-Revilla05059-60; CHC Protocol F01 (Ex. 5). For instance, no vital signs or physical exam were recorded. *Id.* Instead, Ms. Young was "given one dose of Maalox and sent away without further assessment o[r] a follow up plan." Allen (Verified) Report (Ex. 2) at 7.

**18-20.**   On January 28, 2013, a "low blood pressure of 99/71 [wa]s recorded without further notation." Allen (Verified) Report (Ex. 2) at 7; *see also* CHC Records (Ex. 1) at GLANZ-Revilla05047. The following day, January 29, 2013, Nurse Amanda Bowman noted that Ms. Young refused her diet tray because it upset her stomach. CHC Records (Ex. 1) at GLANZ-Revilla05059. An Abdominal Pain Protocol form is filled out by Nurse Bowman. *Id.* at 5076-80. However, in violation of the Protocol, no vital signs were recorded. *Id.*; *see also* CHC Protocol H01 (Ex. 5). The only notation Nurse Bowman made with respect to a physical exam was that bowel sounds were "present." *Id.* at 5079.

As observed by Dr. Allen, "[t]here is no evidence that the patient [wa]s ever evaluated by a physician or nurse practitioner." Allen (Verified) Report (Ex. 2) at 7.

**21.**   According to TCSO's own "Jail Shift Report", on February 3, 2013, Ms. Young was again "COMPLAINING OF STOMACH PAIN" and "MEDICAL [was] NOTIFIED."  Jail Shift Report (Ex. 4) at GLANZ-Revilla10776. However, there is no record of this in Ms. Young's medical chart. *See, generally,* CHC Records (Ex. 1).

"On February 4, 2013, a *very low blood pressure* of 80/64 and a fast heart rate at 106 [we]re recorded without further comment." Allen (Verified) Report (Ex. 2) at 7 (emphasis added); *see also* CHC Records (Ex. 1) at GLANZ-Revilla05047. Also on February 4, another inmate in the SHU, Mica Shoate ("Ms. Shoate"), observed that Ms. Young complained of stomach pain to "D.O. Dunn". *See* Shoate Depo. II (Ex. 6) at 6:6-24, 7:14 – 9:2, 12:5-17; *see also* Shoate Notes (Ex. 7). D.O. Dunn responded to Ms. Young that "she couldn't do anything about it." *Id.* at 12:5-17; *see also* Incident Report (Ex. 3) at GLANZ-Revilla12269 ("I asked [Ms. Young] why she had waiting so long to

tell someone that she was sick. She said that she did tell someone about it, Detention Officer Dunn had call medical and was told that … *the[re] was nothing that they could do."*) (emphasis added). Ms. Young's February 4 complaint of stomach pain was not documented in TCSO's Jail Shift Report, CHC's medical records, or anywhere else. *See, generally,* CHC Records (Ex. 1); Jail Shift Report (Ex. 4).

On February 5, 2013, at 5:34am, TCSO detention staff notes that Ms. Young *"REFUSED MEDS…."* Jail Shift Report (Ex. 4) at GLANZ-Revilla10781. Later, at 4:37pm, TCSO documents that Ms. Young *refused her medications a second time. Id.* at 10782. However, this is not documented anywhere in the CHC medical records. *See, generally,* CHC Records (Ex. 1).

Also, on February 5, Ms. Young complained to detention staff, for the third day in a row, about stomach pain. *See* Shoate Depo. II (Ex. 6) at 13:17-25; and Shoate Notes (Ex. 7); *see also* Jail Shift Report (Ex. 4) at GLANZ-Revilla10781. This time, Ms. Young indicated that the pain was worsening. *Id.* The detention officers responded that they would "inform" medical staff, but that *medical would not do anything about it. Id.* Ms. Young's February 5 complaint of worsening stomach pain was not documented in TCSO's Jail Shift Report, CHC's medical records, or anywhere else. *See, generally,* CHC Records (Ex. 1); Jail Shift Report (Ex. 4).

On February 6, 2017, at approximately 1:11pm, Ms. Young complained to the detention staff in the SHU that she was *throwing up blood*. *See, e.g.,* Shoate Depo. (Ex. 6) at 17:21 – 19:21; Shoate Notes (Ex. 7); Jail Shift Report (Ex. 4) at GLANZ-Revilla10785. CHC medical staff was alerted concerning Ms. Young's complaints of throwing up blood. *See* Jail Shift Report (Ex. 4) at GLANZ-Revilla10785. Nonetheless,

upon viewing Ms. Young's vomit in the cell, Jail staff in the SHU told Ms. Young that there was **"not enough blood"** and that the vomit looked like "Kool-Aide." *See, e.g.,* Shoate Depo. (Ex. 6) at 17:21 – 19:21. And there is no record of Ms. Young's February 6 complaint in the CHC medical chart. *See, generally,* CHC Records (Ex. 1).

At around 3:54 on February 6, SHU detention staff reported that Ms. Young, once again, **refused her medication** (which was the third time in two days). *See* Jail Shift Report (Ex. 4) at GLANZ-Revilla10786. Nurse Paul Wallace was on the unit when she refused her medications. *Id.* However, Ms. Young's refusal of medications on February 6 is not recorded or noted anywhere in the CHC medical chart. *See, generally,* CHC Records (Ex. 1).

**22-24.** In light of all the surrounding facts, it was unreasonable and reckless for medical staff to assume that Ms. Young was "faking" or malingering. *See, e.g.,* Allen (Verified) Report (Ex. 2) at 14-15. Moreover, according to Dr. Allen, "faking of medical complaints is actually fairly rare…." Allen Depo. (Ex. 8) at 180:19 – 181:5.

**25-28.** At 8:13am on February 7, 2013, CHC's Nurse Nicole White charted a detention staff report that Ms. Young "was complaining of vomiting blood for 3 days and ha[d] not eaten in 3 days." CHC Records (Ex. 1) at GLANZ-Revilla05059. Nurse White disregarded Ms. Young's complaints. Specifically, while acknowledging that Ms. Young had been vomiting for three days, Nurse White found that the vomiting was "without blood" and that "paperwork" revealed that she had been eating at appropriate times. *Id.* Nurse White did not record any vital signs or physical examination and did not contact a physician. *Id.*; *see also* Allen (Verified) Report (Ex. 2) at 8. **Nurse White provided no medical care whatsoever.** *Id.* As stated above, there was, in fact, evidence that Ms.

Young was throwing up blood. *See, e.g.,* Shoate Depo. (Ex. 6) at 17:21 – 19:21. In addition, Nurse White's cursory finding that Ms. Young was eating at appropriate times ignored the obvious problem that she had been throwing up everything she tried to eat. As stated by Detention Officer ("D.O.") Carmelita Norris:

> On 2/7/2013 I call[ed] medical because Ms. Young was complaining that she was not feeling well. She stated that she had been like this *for the last three days.* She also stated that she had been throwing up, and that she had *not eaten anything <u>because</u> of her throwing it all back up.* I asked her why she had wait[ed] so long to tell someone that she was sick. She said that she did tell someone about it, Detention Officer Dunn had call medical and was told that she needed to put in a sick call, and *the[re] was nothing that they could do.* Ms. Young complained of […] *nausea, dizz[iness], and throwing up.*

Incident Report (Ex. 3) at GLANZ-Revilla 12269 (emphasis added).

Later, on the night of February 7, Ms. Young continued to complain to detention staff in the SHU that she was ill, weak and had been vomiting for days. *See, e.g.,* Shoate Depo. (Ex. 6) at 32:21 – 34:11; Shoate Notes (Ex. 7). In addition, on the night of February 7, Ms. Young ended up *on the floor of her cell. Id.* At approximately 11:55pm on February 7, housing Sergeant Billie Byrd was called to the SHU and informed, by D.O. Norris, that Ms. Young "ha[d] not eaten *or drank* anything in three days" and that "she ha[d] been *throwing up everything."* Incident Report (Ex. 3) at GLANZ-Revilla 12269 (emphasis added); *see also* Byrd Depo. (Ex. 9) at 15:4-17. Sergeant Byrd escorted Ms. Young to the medical unit and informed Nurse Chinaka what had been happening with Ms. Young. Incident Report (Ex. 3) at GLANZ-Revilla 12269. Nurse Chinaka checked Ms. Young and told Sergeant Byrd that Ms. Young *probably had the flu* and that the "symptoms she was showing [we]re flu like symptoms." *Id.* Nevertheless, there is no indication that Nurse Chinaka provided any medical attention to Ms. Young during

11

this encounter. *Id.* On the contrary, despite a finding that Ms. Young likely had the flu, Nurse Chinaka instructed Sergeant Byrd to take Ms. Young back to the SHU. *Id.*

29.     Again, the evidence is that Ms. Young could not eat for a period of several days "***because [she kept] throwing it everything up.***"   Incident Report (Ex. 3) at GLANZ-Revilla 12269 (emphasis added).

30.     Nurse White did not "verify" anything; her findings were contrary to the clear evidence and her failure to provide Ms. Young with any medical treatment on February 7 was reckless and constitutes deliberate indifference. *See, e.g.,* LCvR 56.1(c) Statement of Facts(A)(25-29), *supra.*

31-32.  *See, e.g.,* LCvR 56.1(c) Statement of Facts(A)(25-29), *supra.*

33.     The note from Nurse Chinaka relied on by CHC was entered at 6:31am on February 8, 2013, *over six (6) hours after* Sergeant Byrd escorted Ms. Young to the medical unit. *Compare* CHC Records (Ex. 1) at GLANZ-Revilla05059 *with* Incident Report (Ex. 3) at GLANZ-Revilla 12269. And Nurse Chinaka failed to note her finding that Ms. Young probably had the flu. *Id.* While Nurse Chinaka charted that Ms. Young's "vitale [sic] signs" were "stable", Dr. Allen opines that Ms. Young's pulse rate at the time was actually "high", a ***"possible sign of dehydration"*** and ***"neither normal nor 'stable.'"*** Allen (Verified) Report (Ex. 2) at 8 (emphasis added); *see also* CHC Records (Ex. 1) at GLANZ-Revilla05047. This serious and concerning sign was clearly ignored by Nurse Chinaka.

34.     Regardless of whether Ms. Young outwardly complained about her neck or head, as Dr. Allen observes, "[t]he record describes a ***clear deterioration in the patient's health over the last 8 days of her life"***, including a decline of neurologic

functioning, without any physician visit or even an attempt to diagnose the cause. *See* Allen (Verified) Report (Ex. 2) at 7-15 (emphasis added).

35. As Defendants admit, in the early hours of February 8, 2013, when Ms. Young returned to her cell (from the medical unit), she reported to Ms. Shoate that she "didn't feel good." MSJ at 6 (quoting Dkt. #468-12 at 75:16 – 76:3).

36. *See, e.g.,* LCvR 56.1(c) Statement of Facts(A)(25-28; 33), *supra.*

37. As noted above, and contrary to Nurse Chinaka's note, Dr. Allen opines that Ms. Young's pulse rate of 112 in the early hours of February 8 was actually "high", a "possible sign of dehydration" and "neither normal nor 'stable.'" Allen (Verified) Report (Ex. 2) at 8; *see also* Allen Depo. (Ex. 8) at 106:12-20.

38-43. At approximately 6:48am on February 8, Ms. Young was "banging on the glass of her cell stating that she was having difficult[y] breathing." Incident Report (Ex. 3) at GLANZ-Revilla at 12269. D.O. Norris called the medical unit. *Id.* At approximately 6:50am, CHC Nurse Karen Metcalf arrived at the SHU. *Id.* Ms. Young told Nurse Metcalf that she was *"wanting to go to the hospital." Id.* (emphasis added). Nurse Metcalf replied that Ms. Young was "ok" and that she did not need to go to the hospital. *Id.* Nurse Metcalf told Ms. Young to take her medicine and then left her in her cell. *Id.* Nurse Metcalf *failed* to document this encounter with Ms. Young in the medical record. *See, generally,* CHC Records (Ex. 1).

Mere minutes after Nurse Metcalf unceremoniously left Ms. Young in her cell, D.O. Norris checked on Ms. Young and she was ***"on the floor"*** of her cell. Incident Report (Ex. 3) at GLANZ-Revilla 12269 (emphasis added). D.O. Norris called a "medical emergency" for Ms. Young at approximately 6:59am. *Id.* Sergeant Byrd

responded to the medical emergency with Nurse Wallace. *Id.* When she arrived, two other nurses were already in the cell with Ms. Young. *Id.* Sergeant Byrd observed that Ms. Young was ***still lying on the floor*** of her cell. *Id.* Sergeant Byrd informed Nurse Gammil that Ms. Young had ***"not eaten or [had] anything to dr[i]nk for three days, because she keeps throwing everything up."*** *Id.* (emphasis added). Nurse Gammil noted that Ms. Young had not been taking her medication, either. *Id.* Sergeant Byrd said, "maybe that's because everything she eats or dr[inks] she thr[ows] back up." *Id.* Sergeant Byrd told the nurse in no uncertain terms, ***"something is wrong with inmate Young beside her not taking her medication, because if it was just the medication she wouldn't be laying in the floor she would be cussing you and calling you everything name in the book."*** *Id.* (emphasis added). Indeed, it was ***"obvious"*** to Sergeant Byrd that something was wrong with Ms. Young. Byrd Depo. (Ex. 9) at 58:14 – 59:8 (emphasis added). *See also* LCvR 56.1(c) Statement of Facts(A)(34), *supra*.

Another officer, D.O. Corrie King, observed that Ms. Young was not responding to the nurses' questions. Incident Report (Ex. 3) at GLANZ-Revilla 12278. According to D.O. King, when Ms. Young would not move off of the floor and to the gurney, ***"NURSE WALLACE GRABBED AHOLD OF HER ARMS AND STARTED TO DRAG HER ACROSS THE FLOOR OF THE CELL."*** *Id.* (emphasis added).

D.O. Shirlene Claude reported that at approximately 7:05am on February 8, Ms. Young ***"collapsed"*** after nurses attempted to get her off the floor and onto her feet. *See* Incident Report (Ex. 3) at GLANZ-Revilla at 12275 (emphasis added). D.O. Claude admits that while Ms. Young was waiting for medical staff to "put stretcher down", ***"[s]he fell to the ground."*** Claude Depo. (Ex. 10) at 133:23 – 134:2 (emphasis added).

14

Ms. Shoate also witnessed Ms. Young's fall. *See* Shoate Depo. II (Ex. 6) at 34:14-19. After Ms. Young fell to the ground, TCSO Sergeant Hinshaw: (A) stated, ***"we don't have time for that shit"***; (B) insisted that Ms. Young *"wasn't going to the hospital"*; and (C) opined that Ms. Young just "wants to go to the hospital." Shoate Notes (Ex. 7) at 2 (emphasis added).[1]

At around 7:20am, Ms. Young was successfully placed on the gurney and taken to the medical unit. *See* Incident Report (Ex. 3) at GLANZ-Revilla12273.

**44-46.** Defendants mischaracterize the evidence by implying that the first medical emergency was "[i]n response to Ms. Young's complaint of lower back pain…." MSJ at 7. D.O. Norris plainly called the medical emergency because she found Ms. Young on the floor of her cell, after her complaints of shortness of breath. *See* Incident Report (Ex. 3) at GLANZ-Revilla at 12269.

At 6:56am, Nurse White noted that she responded to the first medical emergency and found Ms. Young was "LAYING ON FLOOR STATING IN PAIN…." CHC Records (Ex. 1) at GLANZ-Revilla05059. Nurse White claimed that she contacted "CLEMMER"[2] who ordered that Ms. Young receive "PRILOSEC 20 MG". *Id.* Nurse White further claimed that Ms. Young's vital signs were "STABLE AND WITHIN NORMAL LIMITS." *Id.* However, as observed by Dr. Allen, *no vital signs were*

---

[1]     As Ms. Shoate testified, she kept these notes contemporaneously as she observed the events. *See, e.g.,* Shoate Depo. II (Ex. 6) at 6:6 – 7:13. Such notes are admissible under the "present sense impression" hearsay exception. *See United States v. Santos,* 65 F. Supp. 2d 802, 825 (N.D. Ill. 1999) (allowing admission of handwritten notes of conversation as present sense impression); *United States v. Ferber,* 966 F. Supp. 90, 97-98 (D. Mass. 1997) (allowing contemporaneous handwritten meeting notes into evidence through present sense impression).

[2]     Defendants assert, without evidentiary support, that Clemmer is a Nurse Practitioner. MSJ at 7.

*recorded* in the chart. Allen (Verified) Report (Ex. 2) at 8. Nurse White then retuned Ms. Young to the SHU. *See* CHC Records (Ex. 1) at GLANZ-Revilla05059.

47.     Nurse Metcalf's "witness statement" should be disregarded. *After* Ms. Young died, Nurse Metcalf drafted a witness statement in which she conveniently purports to have taken Ms. Young's vitals at 7:01am on February 8. *See* Dkt. #468-16. These vital signs are not recorded anywhere in the CHC medical chart. *See, generally,* CHC Records (Ex. 1). Defendants' own expert testified that he would probably: (A) question Nurse Metcalf's reports; and (B) ***not*** accept her notes at face value. *See* Kassabian Depo. (Ex. 11) at 102:19 – 103:12. Further, there are repeated documented instances of Nurse Metcalf falsifying records. *See* Metcalf Disciplinary File (Ex. 12). Under this backdrop, a reasonable jury could, and should, disregard Nurse Metcalf's post-mortem witness statement.

48.     There is evidence that Ms. Young returned to her pod (after the first medical emergency of February 8) at around 8:05am. *See, e.g.,* Incident Report (Ex. 3) at GLANZ-Revilla12274.

49.     Nurse White's self-serving and post-mortem "witness statement" provides no basis for summary judgment. *See, e.g., Nat'l Aviation Underwriters,* 555 F.2d at 784; *Sorrentino,* 383 F.3d at 1198. Nurse White's post-mortem assertion that Young was able to grab her hand and lift herself up into a sitting position is not documented anywhere in the contemporaneous medical records. *See, generally,* CHC Records (Ex. 1).

50.     The fact that nurses were providing Ms. Young with *some* treatment is immaterial in the face of evidence of deliberate indifference to a serious medical need. *See, e.g., Sealock v. Colorado,* 218 F.3d 1205, 1211 (10th Cir. 2000) (deliberate

indifference may be established where there is evidence that "medical professional … fail[s] to treat a serious medical condition properly.").

**51-53.** At around 8:05am on February 8, 2013, TCSO Corporal Roland D'Souza[3] heard Sergeant Hinshaw call for assistance in the SHU. *See* Incident Report (Ex. 3) GLANZ-Revilla 12274. "Knowing that *staffing levels were short*," Corporal D'Souza went to the SHU to render assistance. *Id.* (emphasis added). As Corporal D'Souza testified, at the time of Ms. Young's pertinent incarceration staffing levels were low throughout the facility. *See* D'Souza Depo. (Ex. 13) at 31:4-14. A few minutes after Corporal D'Souza arrived at the SHU, Sergeant Hinshaw, Sergeant Bob Darby and Nurse White showed up with Ms. Young on a gurney. *See* Incident Report (Ex. 3) GLANZ-Revilla 12274. Ms. Young appeared **"incoherent"**, but **Nurse White "repeatedly stated that [Ms. Young] was _faking_ her actions."** *Id.* (emphasis added). As Corporal D'Souza remembers, Ms. Young was *"not responsive"*; she "wasn't responding to our verbal orders as to get out of the gurney or _any_ kind of response as a normal awake person would give."* D'Souza Depo. (Ex. 13) at 32:7-14 (emphasis added). Corporal D'Souza was concerned that something was wrong with Ms. Young, but deferred to the "higher ranking" officers (*i.e.,* Darby and Hinshaw). *Id.* at 32:15-35:21.

Similarly, D.O. Aaron Sherman observed that Ms. Young was "not talking or complying" and that "Nurse White made the comment that she is *faking an injury and is trying to get attention."* *See* Incident Report (Ex. 3) GLANZ-Revilla12276-77 (emphasis added). Sergeant Darby stated to Ms. Young, "I'M IN CHARGE, AND MEDICAL STATED TO ME THAT YOU ARE NOT GOING TO THE HOSPITAL." *Id.* at 12278.

---

[3]      *See* D'Souza Depo. (Ex. 13) at 6:13-20.

Corporal D'Souza and D.O. King assisted in moving Ms. Young from the gurney to her bunk, and D'Souza, King, Darby, Hinshaw and Nurse White left Ms. Young in her cell at around 8:16am. *See* Incident Report (Ex. 3) GLANZ-Revilla 12274, 12277; and Jail Shift Report (Ex. 4) at GLANZ-Revilla10792.

Per CHC's own written Clinical Protocols, Ms. Young's unresponsive state, especially in light of her quickly deteriorating condition, should have been treated as an emergent/urgent condition, requiring immediate IV liquids, "man down" procedures and transfer to a hospital. *See* CHC Clinical Protocols A17 (Ex. 5) at 1 of 1; CHC Clinical Protocols A12 (Ex. 5) at 1 of 1. In addition, the Clinical Protocols provide that when there is a change in behavior, particularly in a patient with serious chronic health problems like Ms. Young, medical staff must "***not*** assume [it] is a psychiatric problem ***until the patient has been medically cleared.***" CHC Clinical Protocols K01 (Ex. 5) at 1 of 1 (emphasis added). Defendants' own expert witness, Dr. Kassabian, testified that it is ***"unprofessional"*** to say a patient is "faking" and that even if a medical professional suspects malingering, he/she ***must "investigate the medical cause"*** and not simply "assume they [a]re faking." Kassabian Depo. (Ex. 11) at 235:9-22 (emphasis added).

Nurse White's assumption that Ms. Young was "faking" was a clear violation of CHC's Clinical Protocols, a violation of accepted standards of care and constitutes deliberate indifference to Ms. Young's serious and obvious health needs. And Sergeant Hinshaw and Sergeant Darby's failure to call an ambulance also constitutes deliberate indifference.

There is also video (from outside of Ms. Young's cell) from the last hours and minutes of her life on the morning of February 8, 2013. *See* Young Video (Ex. 14).

According to Dr. Allen, the video demonstrates Ms. Young's respiratory rate was elevated such that she was experiencing "tachypnea, a basic sign of ***respiratory distress.***" Allen (Verified) Report (Ex. 2) at 10-11 (emphasis added). As Dr. Allen opines: respiratory rate/tachypnea "is a basic vital sign, and a ***major indication that [Ms. Young] warrant[ed] immediate transfer to an acute care setting such as an emergency room.***" *Id.* at 11 (emphasis added).

However, as noted above, she was not transferred to an acute care setting, but was left to die in her cell.

**54.** Consistent with all other evidence in this case, Ms. Shoate's contemporaneous notes indicate Ms. Young remained unresponsive after she returned to her cell for the last time on February 8. *See, e.g.,* Shoate Notes (Ex. 7) at 3-4. To the extent that she testified otherwise, such testimony is inconsistent with her contemporaneous notes, as well as her testimony that she did not hear Ms. Young after she returned to her cell. *See id.* and Shoate Depo. II (Ex. 6) at 39:7-14.

**55.** The fact that Ms. Young was "responsive" until February 7 only underscores the deliberate indifference to the stark change in her behavior first observed in the early morning hours of February 8, 2013. *See also* LCvR 56.1(c) Statement of Facts(A)(33-43), *supra.*

**56.** Nurse Moore testified that it was "callous" for Nurse White to assume that Ms. Young was "faking". *See* Moore Depo. (Ex. 15) at 179:1-4.[4]

---

[4]   Plaintiff does not intend on calling Nurse Moore to testify at trial. During her deposition, despite her attempts to prepare, Nurse Moore was clearly overwhelmed by the amount of material and repeatedly confused facts from the different cases she was asked to opine on.

57.     Despite the previous medical emergency being called, the complaints of vomiting and pain over an extended period, concerns expressed by detention staff that "something was wrong", Ms. Young's collapse, obvious signs of respiratory distress and sudden and drastic changes in behavior (including incoherence/unresponsiveness), no one checked on Ms. Young in her cell from approximately 8:16 to 10:03am. *See* Jail Shift Report (Ex. 4) at 10792.   Predictably, when Nurse White finally entered Ms. Young's cell sometime between 10:03 and 10:21am on February 8, Ms. Young was ***unresponsive with no pulse or respiration.*** *See* CHC Records (Ex. 1) at GLANZ-Revilla05059. It was only after Ms. Young was found without a pulse that Dr. Adusei, the Jail's Medical Director, actually saw Ms. Young, at around 11:39am. *Id.* at 5055. As Dr. Allen notes, ***"[i]n nearly four months***, in spite of serious chronic conditions and significant evidence of acute illness, she [wa]s ***never seen by a physician*** until she [wa]s in full cardiopulmonary arrest." Allen (Verified) Report at (Ex. 2) 15 (emphasis added). After examining Ms. Young, Dr. Adusei found that she was "unresponsive", had ***"already expired"*** and noted that "[g]iven our resources [attempts to resuscitate were] ***futile at best."*** *See* CHC Records (Ex. 1) at GLANZ-Revilla05055 (emphasis added).

58.     It is Dr. Allen's opinion that Ms. Young should have been transferred to a hospital prior to 8:10am on February 8 when she was exhibiting obvious signs of respiratory distress. *See* Allen (Verified) Report (Ex. 2) at 10-11. More broadly, Dr. Allen opines as follows: "There are numerous individual and systemic deficiencies in the medical care demonstrated by this case. Her initial health screen is incomplete. She is never seen … in chronic care clinic for her multiple significant medical conditions. ***Abnormal physical findings*** are charted and then ***ignored***. Witness accounts report that

at the point where her health has ***seriously deteriorated*** and she is ***near death***, medical staff declares that she is ***faking*** her symptoms. In nearly four months, in spite of serious chronic conditions and significant evidence of acute illness, she is never seen by a physician until she is in full cardiopulmonary arrest. The record describes a ***clear deterioration in the patient's health over the last 8 days of her life.*** At multiple points during that decline, she should have been evaluated by a physician, but she was not. In the final hours to days, it is clear from the witness accounts of many observers that her neurologic function is deteriorating, yet there is no effort to assess or diagnose the cause. The cause, identified post-mortem, would have been treatable and could have been diagnosed and treated had the medical staff followed a reasonable standard of care or shown ***even minimal concern*** for the health and safety of their patient. It is my professional opinion that the ***inadequate care*** provided to Ms. Young by the Tulsa County Jail contributed to and more probably than not was the ***cause of her death.***" Allen (Verified) Report (Ex. 2) at 14-15.

**59-63.** *See* LCvR 56.1(c) Statement of Facts(A)(57-58), *supra.*

**64.** Nurse Moore made it clear during her deposition that she is not offering any opinions on medical causation. *See, e.g.* Moore Depo. (Ex. 15) at 108:16-20. Nor could she, as she is not a physician.

**65-66.** This lawsuit was filed before the medical examiner's report was issued. At the time that the lawsuit was filed, it was believed that Ms. Young died from a heart attack. Indeed, Dr. Adusei himself opined that Ms. Young died from a "probable acute coronary event…." CHC Records (Ex. 1) at GLANZ-Revilla05055. Plaintiff also alleged in the Amended Complaint that: (A) "[u]pon information and belief, Ms. Young suffered

additional physical injury while in defendants' custody"; (B) "Defendants … fail[ed] to provide prompt and adequate care in the face of known and substantial risks to Ms. Young's health and well being"; and (C) "[a]s a direct and proximate result of Defendants' conduct, Ms. Young experienced physical pain, severe emotional distress, mental anguish, death, and the damages alleged herein." Dkt. #4.

In Responses to Defendants' discovery requests, Plaintiff asserted that "[s]ome time prior to February 8, Ms. Young either fell or was pushed and suffered a severe head injury" and that "[t]he Medical Examiner found that Ms. Young died from blunt head trauma, and that she had a 'history of fall (Per report).'" Young CHC Discovery Responses (Ex. 16) at 9-10.

**67-71.** According to the medical examiner, Dr. Alex John, the symptoms of subdural hemorrhage include gait abnormalities, sluggishness in walking, difficulty walking, difficulty talking, disorientation, confusion, nausea, vomiting and respiratory distress. *See* John Depo. (Ex. 17) at 61:23-62:7. As demonstrated herein, Ms. Young demonstrated all of these symptoms, and her symptoms were disregarded by the medical and detention staff. The Medical Examiner determined that Ms. Young died from blunt head trauma, and that she had a "[h]istory of fall (Per report)." Medical Examiner's Report (Ex. 18) at GLANZ-Revilla05252.

As Dr. Allen opines, the head trauma "would have been treatable and could have been diagnosed and treated had the medical staff followed a reasonable standard of care or shown *even minimal concern* for the health and safety of their patient" and "the *inadequate care* provided to Ms. Young by the Tulsa County Jail contributed to and

more probably than not was the ***cause of her death."*** Allen (Verified) Report (Ex. 2) at 14-15 (emphasis added).

**72-77.** Dr. Allen testified that Ms. Young's preexisting medical conditions could have caused her to fall and hit her head. *See* Allen Depo. (Ex. 8) at 81:24 – 83:1. In other words, Ms. Young was at a heightened risk of falling and injuring herself.

**78-79.** Dr. Allen's opinions as to medical "possibilities" are irrelevant to the issue of causation.

**80.** Admit.

**81-102.** *See* LCvR 56.1(c) Statement of Facts(A)(57-58, 67-71), *supra.*

**103.** There are instances when Ms. Young asked for medical attention and was told there was nothing that medical staff could do. *See* LCvR 56.1(c) Statement of Facts(A)(21, 25-28), *supra.* In addition, overall, Ms. Young's obvious and serious medical needs were repeatedly disregarded by medical and detention staff alike. *Id.* at (21, 25-28, 38-46, 51-53, 57-58), *supra.*

**104.** The fact that no one at the Jail specifically diagnosed, or had the capacity to specifically diagnose subdural hematoma, is precisely why Ms. Young should have been transferred to a hospital, or at least seen by a physician, once she began to exhibit obvious signs of a serious and emergent condition. *See, e.g.,* Allen Depo. (Ex. 8) at 182:23 – 183:18; Allen (Verified) Report (Ex. 2) at 10-15.

**105-06.** Again, it is Dr. Allen's opinion that the "inadequate care provided to Ms. Young by the Tulsa County Jail contributed to and more probably than not was the cause of her death." Allen (Verified) Report (Ex. 2) at 15.

**107-08.** Dr. Adusei admits that CHC hired him to serve at the Jail's Medical Director, and that he held that position from December 2011 through March of 2013. *See* Adusei Depo. (Ex. 19) at 28:7-17. CHC provided training to Dr. Adusei, supervised him and ultimately terminated him. *Id.* at 19:6-21; 30:2 -31:2

**109.**   As discussed more fully, *infra*, there is significant evidence of failure to train, which was manifested in this case by Nurse White's failure to follow CHC Clinical Protocols. *See* LCvR 56.1(c) Statement of Facts(A)(18-20, 51-53), *supra*.

**110.**   Plaintiff is not required to provide expert testimony regarding "training", "policy" or "custom", and the CHC Defendants cite to no authority supporting any other conclusion.

**111.**   There is ample evidence of an unconstitutional policy or custom as discussed more fully, *infra*.

**112.**   The mere "existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced." *Ware v. Jackson County, Mo.,* 150 F.3d 873, 882 (8th Cir. 1998).

**113.**   Plaintiff is not required to provide expert testimony that a "policy" or "custom" caused Ms. Young's injuries and death, and the CHC Defendants cite to no authority supporting any other conclusion.

**114-15.**     As established *infra*, CHC's was given contractual authority to establish, maintain and/or implement policy for Tulsa County/TCSO.

**116-17.**     Nurse Harrington's knowledge of Ms. Young, or lack thereof, is not material as she is offered to testify concerning CHC policies and customs.

**B.**     **Additional Facts Precluding Summary Judgment**

**1.**     Dr. Adusei had a documented and known history of serious and concerning problems that rendered him a danger to inmates like Ms. Young. Before taking the job as the Jail's Medical Director, Dr. Adusei was terminated from, or failed, his surgical residency program. *See* Adusei Memo (8-14-12) (Ex. 20); Rogers Depo. (Ex. 21) at 139:25 – 140:25.

Several nurses observed Dr. Adusei ***intoxicated at work*** on multiple occasions. *See, e.g.,* Stiles Depo. (Ex. 22) at 36:13 – 38:12; Gamill Depo. (Ex. 23) at 19:21 – 21:12; Rogers Depo. (Ex. 21) at 154:9-20. The nurses reported these observations of intoxication to their supervisors at the Jail. *Id.* Dr. Adusei would actually attempt to treat patients while drunk. *See, e.g.,* Stiles Depo. (Ex. 22) at 36:13 – 38:12.

It was reported to Chief Deputy Robinette that Dr. Adusei: (A) had been giving inmates ***injections of saltwater (placebo) in their jugular veins***; (B) was giving a pregnant inmate methadone; and (C) had taken an inmate off of suicide watch without consulting the Jail's psychiatrist. *See* Adusei Memo (8-14-12) (Ex. 20).

The Jail's Director of Nursing, Nurse Harrington, observed that Dr. Adusei "repeatedly failed to provide adequate care for inmates, or supervision for the nursing staff." *See* Harrington Aff. (Ex. 24) at ¶ 5. On January 2, 2012, upon a mental health request to see an inmate housed in medical for suicide watch with deep lacerations in both wrists that had been sutured at a hospital prior to intake in jail, Dr. Adusei stated, "I won't see him unless he is septic". *Id.* at ¶ 25. This was reported to the Medical Director, but no action was taken. *Id.*

In 2013, ***Dr. Adusei admitted to forging another physician's signature on a prescription pad and thereby fraudulently obtaining controlled substances.*** *See* Adusei Licensure Order (CASE NO. 13-08-4799) (Ex. 25). As a result, Dr. Adusei was publicly reprimanded by the Medical Licensure Board, ordered to complete 100 hours of community service and to complete a remedial prescribing course. *Id.*

 **2.** The National Commission on Correctional Health Care ("NCCHC"), a corrections health accreditation body, conducted an on-site audit of the Jail's health services program in 2007. *See, e.g.,* Harrison Depo. (Cox) (Ex. 26) at 7:9-16; 36:1-10. The NCCHC standards are not "best practices" but are merely standards for an "appropriate healthcare delivery system for correctional facilities." *Id.* at 115:4-19. Part of the rationale behind the NCCHC mental health standards is to alleviate or reduce risks to inmate health and safety. *Id.* at 64:8-19. The Tulsa County Sheriff's Office is ***required***, under a Settlement Order with the Department of Justice, to maintain compliance with NCCHC standards. *See* Settlement Order (Ex. 27) at 19; and Signature Pages (Ex. 28). The Settlement Order is, itself, evidence of long standing, and serious, problems with TCSO's delivery of medical care to inmates.

 **3.** Sheriff Glanz relied exclusively on NCCHC accreditation as evidence that his medical system is adequate. *See* Glanz Depo. (Cox) (Ex. 29) at 83:25 – 84:13. Before the NCCHC auditors arrived, Sheriff Glanz had a meeting with the department heads at the Jail. *See* Maloy Depo. (Cox) (Ex. 30) at 122:18 – 123:5. During this meeting, Sheriff Glanz emphasized the importance of the NCCHC audit and stated that CHC would lose the contract with TCSO if the Jail failed the audit. *Id.* Sheriff Glanz and Chief Deputy Tim Albin told the department heads to keep any "problem" medical charts away from

the NCCHC auditors. *Id.* at 188:9 – 189:3. Diane Maloy, medical records supervisor at the Jail, was instructed by CHC and TCSO to hide and falsify medical records and charts. *Id.* at 117:10 – 120:22; 189:22-24. Specifically, Ms. Maloy and nursing staff were instructed to create "dummy charts" by removing unaddressed sick calls from medical records, concealing charts of inmates who were ill and altering records after the fact. *Id.* CHC representative Pam Hoisington would go through the charts and remove portions she felt were "damning". *Id.* at 192:9-21. These "dummy charts" were created by CHC for the specific purpose of passing the NCCHC audit. *Id.* at 120:23 – 121:1. When the NCCHC auditors arrived, CHC and TCSO provided the auditors with baskets of the doctored "dummy" charts in hopes that the auditors would review the dummy charts and the Jail would pass the audit. *Id.* at 121:2 – 122:18. During the audit process, TCSO actually moved certain inmates around the Jail, and even off the premises, so that they could not speak with the auditors. *Id.* at 189:4-18.

4.     Despite CHC and TCSO's efforts to defraud the auditors, an early report (spring of 2007) from NCCHC documented incomplete health assessments, failure to perform mental health screenings, failure to fully complete mental health treatment plans, failure to triage sick calls and failure to conduct quality assurance studies. *See* "NCCHC Action Plans", 4/17/07 (Ex. 31). Despite the efforts to conceal and alter the facts, the Tulsa County Jail failed the 2007 NCCHC audit. *See, e.g.,* Maloy Depo. (Ex. 30) at 123:15-18. A September 1, 2007 email from Dennis Hughes, an officer at CHC, expressed "disappointment with the audit results", acknowledging that CHC had "let our staff down, our client down, and to a **lesser extent** our patients." Email from Hughes to Payas, 9/1/07 (Ex. 32) (emphasis added).

27

5.      NCCHC issued its final audit report for the 2007 accreditation period on November 9, 2007. See Harrison Depo. (Ex. 26) at 48:6-7; 49:7-13. The final 2007 NCCHC report included the following findings: (A) "*health needs identified during receiving screening are not addressed in a timely manner*"; (B) "the follow up of inmates with mental health needs is not of sufficient frequency to meet their needs"; (C) "there was a noted delay in responding to routine mental health-related requests submitted by the inmates". *Id.* at 50:17-23; 52:8-20; 62:4-17 (emphasis added).

6.      Despite the serious deficiencies found by the NCCHC as part of the 2007 audit process, Sheriff Glanz cannot point to a single mental health policy or practice that has changed at the Jail since 2007. *See* Glanz Depo. (Cox) (Ex. 29) at 163:2-9. Similarly, CHC is unaware of a *single practice* that CHC changed as a result of the 2007 NCCHC audit. *See* Jordan Depo. (Ex. 33) at 176:14-17.

7.      After failing the 2007 NCCHC audit, the NCCHC only required that CHC and TCSO formulate written action plans to address how the identified deficiencies would be corrected. *See* Maloy Depo. (Ex. 30) at 123:25 – 124:10. Pam Hoisington, by this time Health Services Administrator ("HSA") at the Jail, drafted the written action plans. *Id.* at 123:25 – 124:22. While Ms. Hoisington wrote out the plans of correction, those plans were never implemented. *Id.* NCCHC never followed up to ensure that the action plans were being implemented and followed. Harrison Depo. (Ex. 26) at 54:9-16.

8.      In August of 2009, the American Correctional Association ("ACA") conducted a "mock audit" of the Jail. *See* Gondles Report (Ex. 34) at 007. The ACA's mock audit revealed that the Jail was non-compliant with "mandatory health standards" and "substantial changes" were suggested. *Id.* Based on these identified and known

"deficiencies" in the health delivery system at the Jail, the Jail Administrator sought input and recommendations from Elizabeth Gondles, Ph.D. ("Dr. Gondles"). *Id.* at 1 and 7. Dr. Gondles was associated with the ACA as its medical director or medical liaison. *See* Robinette Depo. (Ex. 35) at 35:10-21. After reviewing pertinent documents, touring the Jail and interviewing medical and correctional personnel, on October 9, 2009, Dr. Gondles generated a Report, entitled "Health Care Delivery Technical Assistance" (hereinafter, "Gondles Report"). *See* Gondles Report (Ex. 34). The Gondles Report was provided to the Jail Administrator, Michelle Robinette. *Id.* at 001; Robinette Depo. (Ex. 35) at 48:9-16. As part of her Report, Dr. Gondles identified numerous "issues" with the Jail's health care system, as implemented by ***Defendant CHM***.[5] *See, e.g.,* Gondles Report (Ex. 34) at 007, 10-19. After receiving the Gondles Report, Chief Robinette held a conference -- to discuss the Report -- with the Undersheriff, Administrative Captain ***and CHC/CHM.*** Robinette Depo. (Ex. 35) at 50:20-24.

9.      Among the issues identified by Dr. Gondles, as outlined in her Report, were: (a) *understaffing* of medical personnel due to CHM misreporting the average daily inmate population; (b) deficiencies in "doctor/PA coverage"; (c) a *lack of health services oversight and* <u>*supervision*</u>; (d) *failure to provide new health staff with formal training*; (e) *delays* in inmates receiving necessary medication; (g) nurses failing to document the delivery of health services; (h) *systemic nursing shortages*; (h) failure to provide timely health appraisals to inmates; and (i) 313 health-related grievances within the past 12 months. *See, e.g.,* Gondles Report (Ex. 34) at 007, 10-19. Dr. Gondles concluded that "[m]any of the health service delivery issues outlined in this report are a result of the ***lack***

---

[5]      CHM is a subsidiary of CHC.

*of understanding of correctional healthcare issues by jail administration* and contract oversight and monitoring of the private provider." *Id.* at 22. Based on her findings, Dr. Gondles "strongly suggest[ed] that the Jail Administrator establish a central Office Bureau of Health Services" to be staffed by a TCSO-employed Health Services Director ("HSD"). *Id.* According to Dr. Gondles, without such an HSD in place, TCSO could not properly monitor the competency of the Jail's health staff or the adequacy of the health care delivery system. *Id.*

10.     Nonetheless, the Jail's leadership chose *not* to follow Dr. Gondles' recommendations. *See, e.g.,* Robinette Depo. (Ex. 35) at 71:20 – 72:7; Weigel Depo. (Ex. 36) at 53:6 – 54:14. TCSO did *not* establish a central Office Bureau of Health Services nor hire the "HSD" as recommended. *Id.*

11.     On October 28, 2010, Assistant District Attorney Andrea Wyrick wrote an email to Josh Turley, TCSO's "Risk Manager". *See* Wyrick Email (Ex. 37). In the email, Ms. Wyrick voiced concerns about whether the Jail's medical provider, Defendant *CHMO, a subsidiary of CHC*, was complying with its contract. *Id.* Ms. Wyrick further made an ominous prognosis: "This is very serious, especially in light of the three cases we have now — what else will be coming? It is one thing to say we have a contract ... to cover medical services and they are indemnifying us … It is another issue to ***ignore any and all signs we receive of possible [medical] issues*** or violations of our agreement with [CHC] for [health] services in the jail. The bottom line is, *the Sheriff is statutorily … obligated to provide medical services." Id.* (emphasis added).

12.     NCCHC conducted a second audit of the Jail's health services program in 2010. *See* 2010 NCCHC Report, 11/12/10 (Ex. 38) at Glanz.02 00069-89. After the audit

30

was completed, the NCCHC placed the Tulsa County Jail on probation. *Id.* at 00069.

13.     The NCCHC once again found numerous serious deficiencies with the health services program at the Jail. *See, e.g.,* 2010 NCCHC Report, 11/12/10 (Ex. 38). As part of the final 2010 Report, NCCHC found, *inter alia*, as follows: "The [Quality Assurance] multidisciplinary committee does not identify problems, implement and monitor corrective action, nor study its effectiveness"; "There have been several inmate deaths in the past year…. The clinical mortality reviews were poorly performed"; "The responsible physician does not document his review of the RN's health assessments"; "the responsible physician does not conduct clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff"; "…diagnostic tests and specialty consultations are not completed in a timely manner and are not ordered by the physician"; "if changes in treatment are indicated, the changes are not implemented…"; and "When a patient returns from an emergency room, the physician does not see the patient, does not review the ER discharge orders, and does not issue follow-up orders as clinically needed." *Id.* at Glanz.02 00074, 00076, 00080, 00083, 00084, 00086. The parallels between the deficiencies found by NCCHC and the inadequate care provided to Ms. Young are obvious. During the auditing process, CHC again attempted to defraud NCCHC by removing unacceptable medical charts from the Jail. *See also* Harrington Aff. (Ex. 24) at ¶ 8.

14.     Sheriff Glanz only read the first two or three pages of the 2010 NCCHC. *See* Glanz Depo. (Ex. 29) at 140:16 – 141:8. Sheriff Glanz and CHC's former Director of Nursing are unaware of any policies or practices changing at the Jail since the 2010 NCCHC Report was issued, other than the retention of an auditor. *Id.* at 162:25 – 163:13;

Harrington Aff. (Ex. 24) at ¶ 9 ("Overall, CHC/CHM/CHMO communicated no real concern about improving the deficient care being provided to the inmates.").

15.    On September 29, 2011, the Immigration and Customs Enforcement ("ICE") reported U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties' ("CRCL") findings in connection with an audit of the Jail's medical system as follows: ***"CRCL found a <u>prevailing</u> <u>attitude</u> among clinic staff of <u>indifference</u>...."***; "*Nurses are undertrained.* Not documenting or evaluating patients properly."; "Found two ICE detainees with clear mental/medical problems that have not seen a doctor."; and "TCSO nurse documented mental issues during intake but failed to refer to a provider*". ICE-CRCL Report, 9/29/11, (Ex. 39) at Glanz.02 00066 (emphasis added); *See also* Memo from Lillard to Edwards, 9/26/11 and CHC Attachment (Ex. 40).

16.    Sheriff Glanz saw the ICE-CRCL Audit Report. *See* Glanz Depo. (Ex. 29) at 153:16-23. Nonetheless, it is unclear what, if any, policies or practices changed at the Jail since the ICE-CRCL Report was issued. *Id.* at 162:25 – 163:13. And CHC/CHM/CHMO never conveyed any intention to actually do anything to improve the medical care provided to inmates at the Jail. *See* Harrington Aff. (Ex. 24) at ¶ 22.

17.    An inmate named Elliott Williams died in the Jail, due to deliberate indifference to his serious medical needs, less than thirty (30) days after the ICE-CRCL Report was issued. *See, e.g., Burke v. Glanz,* No. 11-CV-720-JED-PJC, 2016 WL 3951364 (N.D. Okla. July 20, 2016). Similar to Ms. Young, Mr. Williams was accused of faking his injuries despite exhibiting obvious symptoms of serious, and emergent, health care needs. *Id.* After a full trial on the merits of *Burke/*Williams claims, a federal jury entered a verdict against the Defendants, and the Court subsequently entered Judgment,

in essence, finding that the Jail's medical delivery system, as it existed in October of 2011, was unconstitutional. *See Burke* Verdict Form (Ex. 41); *Burke* Judgment (Ex. 42).

18.     On November 18, 2011, Advanced Medical Systems ("AMS")/Howard Roemer, M.D. ("Roemer" or "Dr. Roemer"), the Jail's retained medical auditor, issued its Report to Sheriff Glanz finding multiple deficiencies with the Jail's medical delivery system, including "[documented] deviations [from protocols which] ***increase the potential for preventable morbidity and mortality"*** and issues with "nurses acting beyond their scope of practice [which] increases the potential for preventable bad medical outcomes." AMS/Roemer Report, 11/8/11 (Ex. 43) at GLANZ-EW3053-54. AMS/Roemer specifically commented on no less than six (6) inmate deaths, spanning ***from 2009 through December 2010***, finding deficiencies in the care provided to each. *Id.* at GLANZ-EW3050-51, 3053. Once again, there is no evidence that any specific practices or policies changed at the Jail as a result of AMS/Roemer's findings. *See, e.g.,* Glanz Depo. (Ex. 29) at 182:13 – 183:10.

19.     As part of its ongoing auditing function, Roemer continued to find serious deficiencies in the delivery of care at the Jail. *See, e.g.,* Corrective Action Review (Ex. 44) at CHM1935 – 1941; Response to 2012 Audit (Ex. 45) at CHM1969 – 1971. For instance, AMS/Roemer found "[d]elays for medical staff and providers to get access to inmates", ***"[n]o sense of urgency attitude to see patients, or have patients seen by providers"***, failure to follow NCCHC and CHC policies "to get patients to providers", and ***"[n]ot enough training or supervision of nursing staff"***. Corrective Action Review (Ex. 44) at CHM1935 – 1938. After conducting an audit on April 16, 2012, Dr. Roemer found "deficiencies in meeting [the] majority of action plans … [of which] [s]everal …

are of *major concern as they involve high risk issues*." Response to 2012 Audit (Ex. 45) at CHM1971 (emphasis added).

20.     The former Director of Nursing at the Jail, Tammy Harrington, R.N., has stated that the provision of quality care to the inmates was simply not a priority at the Jail and rates the care provided as three (3) on a scale from one (1) to ten (10), one being the lowest. Harrington Aff. (Ex. 24) at ¶ 6. During her years working at the Jail for *CHC*, Nurse Harrington observed, *inter alia*: (a) a chronic failure to triage inmates' requests for medical and mental health assistance; (b) a "check the box" intake/booking process that did not provide true medical and mental health screening and put inmates at substantial risk; (c) *doctors refusing/failing to see inmates with life-threatening conditions*; (d) CHC's Health Services Administrator ("HSA"), Defendant Chris Rogers, repeatedly instructing staff to doctor and falsify medical records; (e) a *chronic lack of supervision* of clinical staff; and (g) repeated failures to alleviate known and significant deficiencies in the health services program at the Jail. *See generally* Harrington Aff. (Ex. 24). *See also* Mason Aff. (Ex. 46).

21.     Sheriff Glanz and TCSO took over operations of the Jail on July 1, 2005. Glanz Depo. (Cox) (Ex. 29) at 13:4-7. The CHC Defendants were under contract to provide medical and mental health care services to inmates at the Jail at all pertinent time periods. *See, e.g.,* Health Services Contract (Ex. 47) at CHM000153-163.

22.     Two additional inmates, Greg Brown and Lisa Salgado, who are also subjects of this consolidated action, died as a result of Jail personnel's deliberate indifference. *See* Dkt. ##315 and 388.

23.     BOCC and TCSO continued to contract with CHC even after Mr. Brown's

and Mr. Williams' deaths and after many other serious deficiencies with the Jail's medical program had repeatedly been brought to light. See, e.g., Resolution, 6-25-12 (Ex. 48). Despite his knowledge of the many identified problems with the Jail's health services program, Sheriff Glanz rated CHC, as a medical provider, as a nine (9) on a scale from one to ten (10), with ten being the best. See Glanz Depo. (Cox) (29) at 17:11-16.

## ARGUMENT

I.    **CHC IS *NOT* ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CONSTITUTIONAL CLAIMS**

A.    **CHC May Properly be Held Liable Under a Municipal Liability Theory**

Plaintiff has brought her Constitutional claims against CHC, pursuant to 42 U.S.C. § 1983, under a municipal liability -- or "*Monell*" -- theory. It is well-established that "when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Evans v. Newton,* 382 U.S. 296, 299 (1966). As the Tenth Circuit has reasoned, where a corporate defendant acts "for the government in carrying out a government program in accordance with government regulations, [the corporate defendant is] a person 'acting under color of state law.'" *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216, n. 13 (10th Cir. 2003). The United States Supreme Court has specifically held that a private physician treating prisoners under a contract with state prison authorities acted under color of state law for purposes of the Eighth Amendment. *West v. Atkins,* 487 U.S. 42, 57 (1988); *see also Ancata v. Prison Health Services,* 769 F.2d 700 (11th Cir. 1985) (medical services corporation acting on behalf of a county is a "person" for the purposes of § 1983).

Further, "[a]lthough the Supreme Court's interpretation of § 1983 in" *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658 (1977) "applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits *has extended the Monell doctrine to private § 1983 defendants." Dubbs,* 336 F.3d 1216 (citations omitted) (emphasis added).

To hold a municipality liable under § 1983, a plaintiff must demonstrate (1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. "whether there is a direct causal link between [the] policy or custom and the alleged constitutional deprivation"). *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694; *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

A municipal policy or custom may take the form of:

(1) a formal regulation or policy statement;[6] (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; *or* (5) the failure to adequately train or

---

[6]    CHC argues that it cannot be held liable because its written policies and protocols are adequate and comply with industry standards. MSJ at 25. This is a superficial argument that cannot withstand even minimal scrutiny. *See, e.g., Ware v. Jackson County, Mo.,* 150 F.3d 873, 882 (8th Cir. 1998) ("[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced."); *Tafoya v. Salazar,* 516 F.3d 912, 919 (10th Cir. 2008) ("[t]he knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference."). Here, there are numerous examples of failures to follow CHC's written medical policies/protocols in this case, and evidence that such violations were routine.

> supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City,* 627 F.3d 784, 788 (10th Cir. 2010) (emphasis added) (internal quotation marks omitted).

The Tenth Circuit also requires that a plaintiff prove the requisite "state of mind." *See, e.g., Schneider v. City of Grand Junction Police Dep't,* 717 F.3d 760, 769-671 (10th Cir. 2013). As recently observed by the Ninth Circuit, the "state of mind" required for municipal liability cannot be a subjective standard, "for the practical reason that government entities, unlike individuals, do not themselves have states of mind." *Castro v. Cty. of Los Angeles,* 833 F.3d 1060, 1076 (9th Cir. 2016), *cert. denied sub nom. Los Angeles Cty., Cal. v. Castro,* 137 S. Ct. 831, 197 L. Ed. 2d 69 (2017)). In any event, the Tenth Circuit imposes a requirement that the plaintiff prove "deliberate indifference". In the municipal liability context, "[t]he deliberate indifference standard may be satisfied when the municipality has actual *or constructive notice* that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir. 1998) (emphasis added). "'In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]'" *Schneider,* 717 F.3d at 771 (quoting *Barney,* 143 F.3d at 1307).

37

Here, as discussed *infra*, there is ample evidence of policies or customs, carried out by CHC, that were the moving force behind Ms. Young's Constitutional injuries.[7] As such, CHC is not entitled to summary judgment.

> **1.    There is Abundant Evidence of "Underlying Violations" of Ms. Young's Constitutional Rights**

Typically, courts will not hold a municipality liable without proof of an "underlying constitutional violation by [one] of its officers." *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1317–18 (10th Cir. 2002).[8]  In this case, there is substantial evidence of underlying violations of Ms. Young's constitutional rights, such that summary judgment is inappropriate. Under the Eighth Amendment, prisoners possess a constitutional right to medical care, and that right is violated when doctors or officials are deliberately indifferent to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). Pretrial detainees, like Ms. Young, who have not been convicted of a crime, have a constitutional right to medical and psychiatric care under the Due Process Clause of the Fourteenth Amendment with the standard for deliberate indifference at least as protective as for convicted prisoners. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Martin v. Bd. of*

---

[7]    CHC also argues that it cannot be held liable because it is not a final policymaker for Tulsa County. MSJ at 25-28. However, as this Court has previously recognized, "[a] municipal entity may be liable where its policy is the moving force behind the denial of a constitutional right, *see Monell,* 436 U.S. at 694, 98 S.Ct. 2018, *or* for an action by an authority with final policymaking authority, *see Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)" *Revilla v. Glanz,* 8 F. Supp. 3d 1336, 1339 (N.D. Okla. 2014) (emphasis added). Because Plaintiff is proceeding pursuant to *Monell*, she need not establish that CHC has final policymaking authority for Tulsa County. *See also Birdwell v. Glanz,* No. 15-CV-304-TCK-FHM, 2016 WL 2726929, at *6 (N.D. Okla. May 6, 2016). The issue here is whether the policies or customs CHC carried out were a moving force behind the Constitutional injuries.

[8]    CHC avers that, in order to hold CHC liable under a municipal liability theory, Plaintiff must sue each individual CHC agent or employee who allegedly violated Ms. Young's constitutional rights. This is not the law. *See, e.g., Askins v. Doe No. 1,* 727 F.3d.248, 253 (2d Cir.2013); *Wilson v. Town of Mendon,* 294 F.3d 1, 7 (1st Cir. 2002).

*County Com'rs of County of Pueblo,* 909 F.2d 402, 406 (10th Cir. 1990).

In the cruel and unusual punishment context, "[d]eliberate indifference involves both an objective and subjective component." *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1315 (10th Cir. 2002) (quoting *Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir. 2000)) (internal quotation marks omitted). To satisfy the objective component, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Self v. Crum,* 439 F.3d 1227, 1230 (10th Cir. 2006). The subjective component requires evidence that the official "knows of and disregards an excessive risk to inmate health or safety." *Mata v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005). A civil rights defendant is deliberately indifferent where he "has knowledge of a substantial risk of serious harm to inmates . . . [and] fails to take reasonable steps to alleviate that risk." *Tafoya v. Salazar,* 516 F.3d 912, 916 (10th Cir. 2008).

The Tenth Circuit recognizes two types of conduct constituting deliberate indifference in the medical context. *See Sealock,* 218 F.3d at 1211. "First, a medical professional may fail to treat a serious medical condition properly.... The second type of deliberate indifference occurs when … officials ***prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment.*** *Id.* Further, "[a] prisoner may satisfy the subjective component by showing that defendants' ***delay*** in providing medical treatment caused either ***unnecessary pain or a worsening of [her] condition. Even a brief delay may be unconstitutional.*** *Mata,* 427 F.3d at 755 (emphasis added). [9]

---

[9]    Though CHC claims that Plaintiff must prove a "total denial of care" to establish deliberate indifference (*see* MSJ at 34), that is simply not consistent with current Tenth Circuit law. *See, e.g., Sealock* and *Mata.*

"Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence." *DeSpain v. Uphoff,* 264 F.3d 965, 975 (10th Cir. 2001). For instance, "the existence of an obvious risk to health or safety may indicate awareness of the risk." *Rife v. Oklahoma Dep't of Pub. Safety,* 854 F.3d 637, 647 (10th Cir. 2017), *cert. denied sub nom. Dale v. Rife,* No. 17-310, 2017 WL 3731208 (U.S. Oct. 16, 2017), and *cert. denied sub nom. Jefferson v. Rife,* No. 17-314, 2017 WL 3731324 (U.S. Oct. 16, 2017) (citing *Farmer v. Brennan,* 511 U.S. 825, 842 (1994)). "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk ... for reasons personal to [her] *or because all prisoners in [her] situation face such a risk." Farmer,* 511 U.S. at 843.[10]

**First,** the evidence easily establishes the "objective" prong. CHC argues that Plaintiff cannot satisfy the objective component, citing language, out of context, from the Tenth Circuit's decision in *Mata.* MSJ at 36. As the *Mata* Court clarified, the test for the objective component applies to "the alleged harm to the prisoner" rather than "the prisoner's symptoms at the time of the prison employee's actions." *Mata,* 427 F.3d at 753. There is no doubt that the harm to Ms. Young (*i.e.*, prolonged pain and death from head trauma, as well as respiratory distress) is sufficiently serious to satisfy the objective component.

**Second**, despite CHC's arguments to the contrary, Plaintiff has presented ample evidence to satisfy the subjective component. CHC spends pages and pages of its Motion

---

[10]    CHC argues that it cannot be held responsible for the conduct of Dr. Adusei because Dr. Adusei was not a CHC employee. MSJ at 22-23. At the very least, there are disputed issues of fact as to Dr. Adusei's status as an agent or employee of CHC. *See* LCvR 56.1(c) Statement of Facts(A)(107-08), *supra.*

rehashing the purported "undisputed" facts[11] in a labored, unorganized and ineffective attempt to demonstrate a lack of deliberate indifference. However, as shown in Plaintiff's LCvR 56.1(c) Statement of Facts *supra*, there are numerous genuine disputed issues of fact in this matter. While it may be true that Jail medical personnel treated *some* of Ms. Young's symptoms, there is evidence, sufficient to defeat summary judgment, that her most dire and life-threatening symptoms, were repeatedly, and recklessly, disregarded.

**Ms. Young's symptoms of a serious and life-threatening condition, including signs of respiratory distress, days of vomiting and not eating, changes in mental status, dizziness, unresponsiveness, lethargy, unsteady gait, difficulty walking and falling, were not taken seriously, and were disregarded.** For instance, in early February, Ms. Young began to repeatedly complain, over a series of days, about stomach pain, only to be told by detention staff that there was nothing CHC medical personnel would do to help her. *See, e.g.,* LCvR 56.1(c) Statement(A)(21), *supra.* On February 4, 2013, a ***very low blood pressure*** of 80/64 and a fast heart rate at 106 were recorded, and then completely disregarded. *Id.*

On February 5, 2013, TCSO detention staff noted that Ms. Young had twice refused her medications. *See, e.g.,* LCvR 56.1(c) Statement(A)(21), *supra.* However, CHC medical staff did not even bother to document this concerning development in the medical records. *Id.*

On February 6, 2017, Ms. Young first complained to detention staff in the SHU that she was ***throwing up blood***. *See, e.g.,* LCvR 56.1(c) Statement(A)(21), *supra.* CHC

---

[11] Plaintiff primarily responds to CHC's "fact"-based arguments in the LCvR 56.1(c) Statement, *supra.* Thus, Plaintiff does not waste space in the Argument section with a repetitive "back and forth" regarding the disputed facts.

was notified. Upon viewing Ms. Young's vomit in the cell, Jail staff in the SHU told Ms. Young that there was **"not enough blood"** and that the vomit looked like "Kool-Aide." *Id.* On February 6, detention staff reported that Ms. Young, once again, **refused her medication** (which was the third time in two days). *See, e.g.,* LCvR 56.1(c) Statement(A)(21), *supra.* However, again, Ms. Young's refusal of medication was not recorded or noted anywhere in the CHC medical chart. *Id.*

On the morning of February 7, Nurse White charted that Ms. Young "was complaining of vomiting blood for 3 days and [had] not eaten in 3 days." *See, e.g.,* LCvR 56.1(c) Statement(A)(25-28), *supra.* And while Defendants assert that Nurse White "investigated" Ms. Young's complaints, she disregarded them. Her dismissive findings were contrary to the facts. In further disregard for Ms. Young, Nurse White did not record any vital signs or physical examination and did not contact a physician. **Nurse White provided no medical care whatsoever.** *Id.*

Later, on the night of February 7, Ms. Young continued to complain to detention staff in the SHU that she was ill, weak and had been vomiting for days. *See, e.g.,* LCvR 56.1(c) Statement(A)(25-28), *supra.* In addition, on the night of February 7, Ms. Young ended up **on the floor of her cell.** *Id.* At approximately 11:55pm on February 7, housing Sergeant Billie Byrd was called to the SHU and informed, by D.O. Norris, that Ms. Young "ha[d] not eaten **or drank** anything in three days" and that "she ha[d] been **throwing up everything."** *Id.* Sergeant Byrd escorted Ms. Young to the medical unit and informed Nurse Chinaka what had been happening with Ms. Young. Despite a finding that Ms. Young likely had the flu, Nurse Chinaka merely instructed Sergeant Byrd to take Ms. Young back to the SHU. *Id.*

On the morning of February 9, Nurse Chinaka charted that Ms. Young's "vitale [sic] signs" were "stable", but Ms. Young's pulse rate at the time was actually "high", a ***"possible sign of dehydration"*** and ***"neither normal nor 'stable.'"*** *See* LCvR 56.1(c) Statement(A)(33), *supra.* This serious and concerning sign was clearly ignored by Nurse Chinaka.

At approximately 6:48am on February 8, Ms. Young was "banging on the glass of her cell stating that she was having difficult[y] breathing." *See* LCvR 56.1(c) Statement(A)(38-43), *supra.* Ms. Young told Nurse Metcalf that she was *"wanting to go to the hospital." Id.* Nurse Metcalf refused to transfer Ms. Young to the hospital and *failed* even to document her encounter with Ms. Young. *Id.* Minutes after Nurse Metcalf unceremoniously left Ms. Young in her cell, Ms. Young was found ***"on the floor"*** of her cell. *Id.* A "medical emergency" was called at approximately 6:59am. *Id.* Sergeant Byrd informed CHC's Nurse Gammill that Ms. Young had ***"not eaten or [had] anything to dr[i]nk for three days, because she keeps throwing everything up."*** *Id.* (emphasis added). Sergeant Byrd told the nurse in no uncertain terms, ***"something is wrong with inmate Young*** *beside her not taking her medication, because if it was just the medication she wouldn't be laying in the floor she would be cussing you and calling you everything name in the book." Id.* (emphasis added). Indeed, it was ***"obvious"*** to Sergeant Byrd that something was wrong with Ms. Young. *Id.*

Thus, by this point, at the latest, it was obvious, even to a layperson, that Ms. Young needed the attention of a physician. *See, Mata,* 427 F.3d at 751; *Thompson v. Gibson,* 289 F.3d 1218, 1222 (10th Cir. 2002). The nursing staff's failure to secure needed care and their denial of access to medical personnel capable of evaluating the

need for treatment constitutes deliberate indifference. *See, e.g., Sealock,* 218 F.3d at 1211.

Ms. Young was so weak and unsteady that she was incapable of getting on the gurney. *See* LCvR 56.1(c) Statement(A)(38-43), *supra.* She was *not responding* to questions. A nurse attempted to drag Ms. Young by her arm across the cell floor. At approximately 7:05am on February 8, Ms. Young **"collapsed"** and **"fell to the ground"** after nurses attempted to get her off the floor and onto her feet. After Ms. Young fell to the ground, TCSO Sergeant Hinshaw: (A) stated, **"we don't have time for that shit"**; (B) insisted that Ms. Young *"wasn't going to the hospital"*; and (C) opined that Ms. Young just "want[ed] to go to the hospital." *Id.*

The flat refusal to send Ms. Young to the hospital, and apathy to her symptoms and worsening condition, was blatant disregard for obvious and substantial risks of harm. *See, e.g., Mata,* 427 F.3d at 751.

Nurse White claimed that Ms. Young's vital signs were stable, without recording them, and sent Ms. Young back to the SHU. *See* LCvR 56.1(c) Statement(A)(38-43), *supra.* During this entire period, Ms. Young exhibited **obvious signs of respiratory distress**, which were utterly ignored by Nurse White and the other medical staff. *Id.* at (51-53).

After Ms. Young was returned to her cell, at around 8:10am on February 8, Corporal D'Souza observed that Ms. Young was *"incoherent"* and *"not responsive"*, but **Nurse White "repeatedly stated that [Ms. Young] was <u>faking</u> her actions."** *See* LCvR 56.1(c) Statement(A)(51-53), *supra.* Defendants' own expert witness, Dr. Kassabian, testified that it is **"unprofessional"** to say a patient is "faking" and that even if a medical

professional suspects malingering, he/she **must *"investigate the medical cause"*** and not simply "assume they [a]re faking." Kassabian Depo. (Ex. 11) at 325:9-22 (emphasis added). Nurse White did not investigate. And Sergeant Darby insisted that Ms. Young would not be sent to the hospital, per CHC. She was left to die in her cell.

"Suspicions of malingering may … be considered an indication of an ulterior motive whereby a defendant failed to take a plaintiff's condition seriously and thus acted recklessly in failing to provide proper care." *George v. Sonoma Cty. Sheriff's Dep't,* 732 F. Supp. 2d 922, 937 (N.D. Cal. 2010) (citing *Thomas v. Arevalo,* 1998 WL 427623, at *9 (S.D.N.Y. July 28, 1998); and *Walker v. Benjamin,* 293 F.3d 1030, 1040 (7th Cir. 2002)). Nurse White's insistence that Ms. Young was faking was reckless, unwarranted and even hostile. At a minimum, it was deliberate indifference.

In addition, as highlighted *supra*, Nurse White's callous disregard for Ms. Young's deteriorating health violated numerous Clinical Protocols. *See* LCvR 56.1(c) Statement(A)(51-53), *supra.* While published requirements for health care do not create constitutional rights, violation of such protocols constitutes circumstantial evidence of deliberate indifference. *See, e.g., Mata,* 427 F.3d at 757.

Approximately two hours after Ms. Young was returned to the SHU, she was found lifeless in her cell. She had expired from a subdural hematoma. And Dr. Adusei, in deliberate indifference to Ms. Young's obvious and serious medical needs, did not even lay eyes on her until after her death.

Taken together, this is evidence that medical staff and detention staff (Nurse White, Nurse Metcalf, Dr. Adusei, Sgt. Hinshaw and Sgt. Darby, in particular) disregarded "excessive risk[s] to [Ms. Young's] health or safety" (*Mata,* 427 F.3d at

45

751), "prevent[ed] [Ms. Young] from receiving treatment [and] den[ied] h[er] access to medical personnel capable of evaluating the need for treatment" (*Sealock*, 218 F.3d at 1211); and caused "delay in [the provision] of medical treatment [resulting in] unnecessary pain or a worsening of [her] condition." (*Mata*, 427 F.3d at 755). This is evidence of deliberate indifference.

Defendants argue that "Plaintiff cannot refute the fact that not one single person knew, or should have known, that Ms. Young had a head injury prior to her death." MSJ at 46.[12] But this impermissibly narrows the standard. Indeed, in the § 1983 context, Plaintiff is not even required to submit evidence of the exact cause of death. *See, e.g., Gayton v. McCoy,* 593 F.3d 610, 619 (7th Cir. 2010) ("[G]iven that none of the medical experts in this case can determine the ***exact*** cause of Taylor's untimely death, aside from ***non-specific heart failure***, the jury should hear testimony, backed by accepted medical science, about factors that could have exacerbated her heart condition.") (emphasis added). The pertinent issues are whether Ms. Young's "need for medical attention was obvious" and whether Jail medical staff exhibited a "conscious disregard of a substantial health risk." *Rife,* 854 F.3d at 648. In *Rife*, the Tenth Circuit reversed the lower court's grant of summary judgment for an Oklahoma Highway Patrol Trooper where the plaintiff presented evidence that "could lead a reasonable factfinder to infer that Trooper Jefferson had recognized the need for medical attention" and failed to secure that

---

[12]    In this regard, CHC gleefully notes that Plaintiff alleges, in the Amended Complaint, that Ms. Young died of a heart attack. This issue is addressed in *See* LCvR 56.1(c) Statement(A)(65-66), *supra*. The "heart attack" allegation provides no basis for summary judgment. Defendants have long known of the nature of the evidence in this case, and the fact that Ms. Young died from head trauma as opposed to a heart attack does not alter the validity of the allegations and evidence that medical and detention staff were deliberately indifference to Ms. Young's serious and obvious medical needs.

medical attention for the plaintiff, Mr. Rife. *Id.* Specifically, rather than take Mr. Rife to a hospital, despite numerous signs that he was injured, Trooper Jefferson arrested Mr. Rife for public intoxication and transported him to the McCurtain County Jail. Similarly, in reversing summary judgment for the McCurtain County jailer defendants, the Court pointed to evidence that "Mr. Rife was repeatedly moaning in pain and complaining of stomach pain when entering the holding cell" and reasoned that "[t]his evidence could lead a reasonable factfinder to infer (1) an obvious need for medical attention and (2) [the jailer's] awareness of a substantial risk to Mr. Rife's health." *Id.* at 652.

As the *Rife* Court noted, "[a]uthorities ***later learned*** that Mr. Rife had … ***suffered a head injury*** in a motorcycle accident." *Id.* at 641 (emphasis added). As such, in *Rife,* it was never suggested that the defendants had, or were required to have, specific knowledge that Mr. Rife had suffered a head injury. And, here, Plaintiff does not allege that any of the medical staff or detention staff knew, specifically, that Ms. Young had suffered a subdural hematoma. On the contrary, Plaintiff asserts that there were numerous facts, as discussed above, that put the medical and detention staff on notice that something was obviously very wrong with Ms. Young, that she was at substantial risk of harm, that her condition was deteriorating and that she needed emergent "access to medical personnel capable of evaluating the need for treatment…" *Sealock,* 218 F.3d at 1211. By refusing to send Ms. Young to the hospital, or even provide her with an evaluation by a physician, the medical staff and detention staff (Nurse White, Nurse Metcalf, Dr. Adusei, Sgt. Hinshaw and Sgt. Darby, in particular) were deliberately indifferent to her serious medical needs.

**2.      Plaintiff Has Identified Official Policies and/or Customs That Were the "Moving Force" Behind the Constitutional Deprivations and Presented Sufficient Evidence of a Culpable "State of Mind"**

The evidence of unconstitutional policies or customs, as fostered by CHC, is overwhelming. *See* LCvR 56.1(c) Statement(B), *supra.* As this Court previously determined in a related case, *Burke v. Glanz,* No. 11-CV-720-JED-PJC, 2016 WL 3951364, at *23 (N.D. Okla. July 20, 2016):

> [B]ased on the record evidence construed in plaintiff's favor, a reasonable jury could find that, in the years prior to Mr. Williams's death in 2011, then-Sheriff Glanz was responsible for knowingly continuing the operation of a ***policy or established practice of providing constitutionally deficient medical care*** in deliberate indifference to the serious medical needs of Jail inmates like Mr. Williams.

(emphasis added). Of course, this "constitutionally deficient medical care" was delivered by ***CHC***, as the Jail's contract medical provider. The Court specifically found evidence of a policy or custom of "failing to provide medical care in response to serious medical needs of Jail inmates, failing to provide Jail staff with proper training and supervision regarding inmate medical needs, and continuing to adhere to a constitutionally deficient system of care for detainees with serious medical needs." *Burke,* 2016 WL 3951364, at *27. With respect to causation, the *Burke* Court determined that "[t]he record … supports a finding that the foregoing practices were the 'moving force' behind the violations of Mr. Williams's constitutional rights" and that "[t]he jury could also find that the County, via the former Sheriff and other TCSO officials, was on notice as to the problems with the Jail's medical care system and, had they taken any timely remedial steps to abate the resulting risks, Mr. Williams's condition would not have deteriorated and his death would have been avoided." *Id.* at *28.

48

Plaintiff has presented much of the same evidence of a "constitutionally deficient system of care" here as Ms. Burke presented in her case. *See* LCvR 56.1(c) Statement(B), *supra.* It is noteworthy that Mr. Williams' death preceded Ms. Young's death by well over a year. There are undeniable parallels between the two cases. Most significantly, in both cases, medical and detention staff recklessly chose to believe that the patient was malingering or faking injury or illness, without first ruling out a medical cause. In both cases, the patient had suffered a severe and life-threatening injury that went untreated, despite the obvious need for emergent care. Ms. Young's suffering and death, in February 2013, tends to prove that the systemic deficiencies that led to Mr. Williams death were not alleviated by CHC in a timely manner and that the failure to alleviate those deficiencies was a moving force behind the Constitutional injuries here. As to the "culpable state of mind", the evidence summarized in LCvR 56.1(c) Statement(B) coupled with the mistreatment of Ms. Young is sufficient to establish that CHC had "constructive notice that its action or failure to act was substantially certain to result in a constitutional violation, and it consciously or deliberately cho[se] to disregard the risk of harm." *Barney,* 143 F.3d at 1307; *see also Schneider,* 717 F.3d at 771.

The Court should have little difficulty in affirming that the evidence here, which is virtually identical to the evidence presented in *Burke*, is sufficient to establish genuine disputed facts as to the presence of an unconstitutional policy or custom which was a moving force behind Ms. Young's suffering and death.

## II.   CHC IS *NOT* ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S NEGLIGENCE CLAIM

"To establish deliberate indifference, a prisoner must demonstrate more than mere negligence…." *Alejo v. Gonzalez,* 203 F.3d 834, 2000 WL 64317 at *1 (10th Cir. 2000).

As shown herein, CHC is not entitled to summary judgment on Plaintiff's claims that they were deliberately indifferent to Ms. Young's serious medical needs. Thus, it is axiomatic that CHC is *not* entitled to summary judgment on Plaintiff's negligence claim. Nevertheless, the CHC Defendants argue to the contrary.

First, CHC claims, without citing any authority, that Dr. Allen, provides no opinion testimony as to causation. This is demonstrably contrary to the record. As Dr. Allen unambiguously opines, the head trauma "would have been treatable and could have been diagnosed and treated had the medical staff followed a reasonable standard of care or shown ***even minimal concern*** for the health and safety of their patient" and "the ***inadequate care*** provided to Ms. Young by the Tulsa County Jail contributed to and more ***probably than not was the cause of her death.***" Allen (Verified) Report (Ex. 2) at 14-15 (emphasis added). This is more than sufficient expert testimony on causation to survive summary judgment. *See, e.g., McKellips v. Saint Francis Hosp., Inc.,* 1987 OK 69, 741 P.2d 467, 471.

Lastly, the CHC Defendants assert that they are immune from tort liability under the Oklahoma Governmental Tort Claims Act ("GTCA"). *See* MSJ at 51-52. However, as private contractors, the CHC Defendants (and their employees) are not protected by the GTCA as a matter of Oklahoma law. *See, e.g., Sullins v. American Medical Response of Oklahoma, Inc.,* 23 P.3d 259, 264 (Okla. 2001); *Arnold v. Cornell Companies, Inc.,* 2008 WL 4816507 (W.D.Okla., Oct. 29, 2008).

WHEREFORE, premises considered, Plaintiff respectfully requests that this Court deny CHC's Motion for Summary Judgment (Dkt. #468).

Respectfully,

/s/ Robert M. Blakemore
Daniel Smolen, OBA #19943
Donald E. Smolen, II, OBA #19944
Robert M. Blakemore, OBA #18656
Smolen Smolen & Roytman
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone:  (918) 585-2667
Fax:  (918) 585-2669


***Attorneys for Plaintiff***


## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of October 2017, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

/s/ Robert M. Blakemore