**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| DEBORAH YOUNG, | ) | |
| as Special Administrator of the Estate of | ) | |
| GWENDOLYN YOUNG, deceased | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 13-CV-315-JED-JFJ |
| | ) | |
| STANLEY GLANZ, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS**
**STANLEY GLANZ AND VIC REGALADO'S MOTION FOR SUMMARY**
**JUDGMENT OF PLAINTIFF DEBORAH YOUNG'S CLAIMS (DKT. #469)**

Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
Daniel E. Smolen, OBA # 19943
danielsmolen@ssrock.com
SMOLEN, SMOLEN & ROYTMAN, PLLC
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
Telephone:     (918) 585-2667
Facsimile:     (918) 585-2669

*Attorneys for Plaintiff*

October 18, 2017

# TABLE OF CONTENTS

Page

Table of Authorities.................….…………….…………….....................ii

Introductory Statement...............................…………….…………….....................1

LCvR 56.1(c) Statement of Facts……………..…....................................…………..................3

A.　Ms. Young's Final Days at the Tulsa County Jail………..……………….....1

B.　The Jail's Deficient Medical Delivery System.................................……......18

ARGUMENT……………….……..…………….…………….……….…………..................18

I.　FORMER SHERIFF GLANZ AND SHERIFF REGALADO ARE *NOT*
ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
CONSTITUTIONAL CLAIMS.....……..…………….…………..…………..…..18

　　A.　There is Substantial Evidence That Sheriff Regalado is Liable in
His Official Capacity (Under a *Monell* Theory) and Former Sheriff
Glanz is Liable in His Individual Capacity (Under A Supervisory
Liability Theory)……….....................................…………….............…..…..18

　　　　1.　The TCSO Defendants Possessed Responsibility for
Unconstitutional Policies or Customs That Caused the
Constitutional Injuries………..………….....................……..........…20

　　　　2.　Plaintiff Has Presented Significant Evidence of the TCSO
Defendants' (and Their Subordinates') Deliberate
Indifference…...………….............…......................................…23

　　B.　Plaintiff was Not Required to Name Each Underlying Tortfeasor in the
Complaint………..…………….…………..………………………….32

II.　FORMER SHERIFF GLANZ IS *NOT* ENTITLED TO QUALIFIED
IMMUNITY……………..………….…………………………………..…..……33

III.　THE TCSO DEFENDANTS ARE NOT ENTITLED TO SUMMARY
JUDGMENT ON PLAINTIFF'S STATE CONSTITUTIONAL CLAIM…....…..35

## **TABLE OF AUTHORITIES**

*Page*

### *CASES*

*Anderson v. Creighton, supra,* at 640, 107 S.Ct. 3034.......................................34

*Askins v. Doe No. 1,* 727 F.3d.248, 253 (2d Cir.2013).......................................33

*Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir. 1998).............................19

*Bledsoe v. Jefferson Cty., Kansas,* No. 16-2296-DDC-GLR, 2017 WL 3334641,
at *14 (D. Kan. Aug. 4, 2017)...............................................................................33

*Bell v. Wolfish*, 441 U.S. 520, 545 (1979)...........................................................23

*Bosh v. Cherokee Building Authority,* 2013 OK 9, 305 P.3d 994.....................35

*Brown v. Montoya*, 662 F.3d 1152, 1165 (10th Cir. 2011)................................32

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)....................20

*Burke v. Glanz,* No. 11-CV-720-JED-PJC, 2016 WL 3951364
(N.D. Okla. July 20, 2016)....................................................................................21

*City of Canton v. Harris*, 489 U.S. 378, 385 (1989)..........................................19

*DeSpain v. Uphoff,* 264 F.3d 965, 975 (10th Cir. 2001)...................................24

*Dodds v. Richardson,* 614 F.3d 1185, 1207 (10th Cir. 2010).....................*passim*

*Estate of Booker,* 745 F.3d at 411........................................................................33

*Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)............................................23, 35

*Farmer v. Brennan,* 511 U.S. 825, 842 (1994)..............................................17, 25

*Gayton v. McCoy,* 593 F.3d 610, 619 (7th Cir. 2010)........................................30

*George v. Sonoma Cty. Sheriff's Dep't,* 732 F. Supp. 2d 922, 937 (N.D. Cal. 2010).......29

*Gray v. University of Colo. Hosp. Auth.*, 672 F.3d 909, 921-11, n. 9 (10th Cir. 2012)....32

*Henderson v. Glanz,* 813 F.3d 938, 952 (10th Cir. 2015)...............................33

*Hope v. Pelzer,* 536 U.S. 730, 739–42 (2002)..................................................................34

*Kentucky v. Graham,* 473 U.S. 159, 166 (1985)..............................................................19

*Martin v. Bd. of County Com'rs of County of Pueblo,* 909 F.2d 402, 406
(10th Cir. 1990)..............................................................................................................23

*Mata v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005)......................................................*passim*

*McInerney v. King,* 791 F.3d 1224, 1236-37 (10th Cir. 2015)........................................34

*Menotti v. City of Seattle,* 409 F.3d 1113, 1151 (9th Cir. 2005)....................................32

*Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658 (1977)...........................19

*Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1317–18 (10th Cir. 2002)....................23, 24

*Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010)...................................................19

*Robbins v. Oklahoma,* 519 F.3d 1242, 1250 (10th Cir. 2008)..........................................33

*Saucier v. Katz,* 533 U.S. 194, 201-02 (2001)..................................................................33

*Sealock v. Colorado,* 218 F.3d 1205, 1211 (10th Cir. 2000)......................................24, 32

*Self v. Crum,* 439 F.3d 1227, 1230 (10th Cir. 2006)........................................................24

*Schneider v. City of Grand Junction Police Dep't,* 717 F.3d 760, 769-671
(10th Cir. 2013)..........................................................................................................19, 23

*Tafoya v. Salazar,* 516 F.3d 912, 919 (10th Cir. 2008......................................................24

*Thomas v. Arevalo,* 1998 WL 427623, at *9 (S.D.N.Y. July 28, 1998)...........................29

*Thompson v. Gibson,* 289 F.3d 1218, 1222 (10th Cir. 2002)...........................................28

*United States v. Ferber,* 966 F. Supp. 90, 97-98 (D. Mass. 1997)...................................11

*United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)....34

*United States v. Santos,* 65 F. Supp. 2d 802, 825 (N.D. Ill. 1999)..................................11

*Walker v. Benjamin,* 293 F.3d 1030, 1040 (7th Cir. 2002)..............................................29

*White v. Pauly,* 137 S. Ct. 548, 552 (2017)......................................................................34

**COMES NOW** the Plaintiff, Plaintiff, Deborah Young ("Plaintiff"), as Special Administrator of the Estate of Gwendolyn Young ("Ms. Young"), and respectfully submits her Response in Opposition to the Defendants Stanley Glanz ("Former Sheriff Glanz" or "Glanz") and Vic Regalado's ("Sheriff Regalado") (hereinafter, collectively referred to as the "TCSO Defendants") Motion for Summary Judgment (Dkt. #469) as follows:

<u>**Introductory Statement**</u>

While housed at the Tulsa County Jail, Ms. Young was subjected to grossly deficient treatment amounting to deliberate indifference to -- and reckless neglect of -- her serious medical needs. Ms. Young needlessly suffered and died after responsible medical staff employed by Correctional Health Companies, Inc. ("CHC") and detention staff employed by the Tulsa County Sheriff's Office ("TCSO") disregarded known and substantial risks to her health and safety.

Beginning in early February 2013, Ms. Young began to complain of serious stomach pain, only to be told that Jail medical staff could not help her. On February 6, 2017, Ms. Young first complained to the detention staff in the Segregated Housing Unit ("SHU") that she was ***throwing up blood***. Her complaint was disregarded, and not even documented. After vomiting for a period of several days, which rendered her unable to eat or take her life sustaining medications, Ms. Young's condition rapidly deteriorated. She became lethargic, dizzy and unsteady on her feet. When she was seen by nursing staff, her complaints were not taken seriously. By the early morning of February 8, Ms. Young's condition had reached a crisis level. Ms. Young began to suffer shortness of breath and showed signs of dehydration. She was begging to be sent to the hospital. As

1

TCSO Sergeant Billie Byrd observed at the time, **"something [wa]s wrong with inmate Young…"** Incident Report (Ex. 3) at GLANZ-Revilla 12269 (emphasis added). Still, responsible medical and detention staff flatly refused to send her out.

At approximately 7:05am on February 8, Ms. Young "collapsed" and "fell to the ground" after nurses attempted to get her off the floor and onto her feet.  By 8:10am, Ms. Young had become *"incoherent"* and was *"not responsive"*, but **Nurse Nicole White "repeatedly stated that [Ms. Young] was _faking_**" her illness.  *See* LCvR 56.1(c) Statement(A)(24), *infra.* TCSO Sergeant Bob Darby insisted that Ms. Young would not be sent to the hospital, per CHC, and she was left in the SHU.

Approximately two hours later, Ms. Young was found lifeless in her cell.  She was never even seen by Defendant Andrew Adusei, M.D. ("Dr. Adusei"), the Jail's Medical Director, until after her death.  Due to the callous indifference to her obvious and substantial medical needs, Ms. Young had needlessly died from a subdural hematoma.  Plaintiff subsequently filed suit on behalf of Ms. Young's Estate.

The mistreatment of Ms. Young was no freak accident.  On the contrary, it was as foreseeable as it was preventable.  For many years, Defendant Stanley Glanz was *repeatedly and continuously put on notice, by multiple credible sources, of serious, grave and systemic deficiencies in the medical and mental health treatment provided* to inmates at the Jail.   Former Sheriff Glanz ignored explicit and dire warnings that his medical system was broken, taking either no remedial action whatsoever, or taking insincere half-measures intended only to temporarily placate auditors and accreditation agencies.   Through their established policies, practices, and customs, Former Sheriff

Glanz and the TCSO disregarded known and substantial risks to the health and safety of inmates like Ms. Revilla.

The TCSO Defendants' Motion for Summary Judgment (Dkt. #469) should be denied.

## LCvR 56.1(c) Statement of Facts[1]

### A.    Ms. Young's Final Days at the Tulsa County Jail

**1.**    Ms. Young was booked into the Jail on October 16, 2012. *See* Dfts' Fact #1. The nature of the criminal charges against Ms. Young is entirely irrelevant and inadmissible. *See, e.g.,* F.R.E. 401, 402, 403, 404 and 609.

**2.**    At the time of intake on October 16, 2012, it was known by CHC Jail medical staff, including Dr. Adusei, that Ms. Young suffered from several chronic medical conditions, including hypertension (high blood pressure), diabetes mellitus, hyperlipidemia (high blood lipid levels, a risk for heart disease and stroke), and prior cerebrovascular accidents or "CVA's", also known as strokes. *See, e.g.,* Ex. 1 at GLANZ-Revilla 05056 and 05065; Ex. 2 at 4.

**3.**    As observed by Plaintiff's correctional medicine expert, Scott Allen, M.D. ("Dr. Allen"): "Between October 24 and December 1, 2012 [Ms. Young's] blood pressure [wa]s recorded without any further assessment or comment."  Allen (Verified)

---

[1]    Under LCvR56.1(c), "[t]he response brief in opposition to a motion for summary judgment … shall begin with a section which contains a concise statement of material facts to which the party asserts genuine issues of fact exist."  The Rule further provides that "[e]ach fact in dispute shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies and, *if applicable*, shall state the number of the movant's facts that is disputed." *Id.* (emphasis added).  The TCSO Defendants' "Statement of Material Facts Not in Dispute" is not stated in chronological order. *See* MSJ at 4-12.  This approach creates confusion.  Thus, Plaintiff provides her LCvR 56.1(c) in chronological order, only referencing the TCSO's numbered "Facts" as necessary.

Report (Ex. 2) at 5; *see also* CHC Records (Ex. 1) at GLANZ-Revilla05050-53.  Of the seven (7) recorded blood pressures during that period, all but one was elevated. *Id.*  Still, there is "no documentation" to reflect that, beyond recording the number, "anyone [at the Jail] was concerned that [Ms. Young's] blood pressure was high" or that the information was communicated to a physician or nurse practitioner. *Id.*

4.      On December 3, 2012, Ms. Young woke up in the Jail's special housing unit ("SHU") and communicated to the detention officer on duty that she wanted to "talk to someone about why she [wa]s in Jail and that ***she was not going to make it in Jail a year….*" Jail Shift Report (Ex. 3) at GLANZ-Revilla 10474 (emphasis added).  Ms. Young predicted that she would die at the Jail. *Id.*

5.      During a January 6, 2013 sick call, Ms. Young complained to medical staff at the Jail that she had been experiencing significant ***"chest pressure" for two (2) weeks.*** *See* CHC Records (Ex. 1) at GLANZ-Revilla05060.  Ms. Young also reported shortness of breath (*i.e.,* "SOB"). *Id.*  A "Chest Pain Protocol" form was completed by Heather Ross RN. *Id.* at 5080-84. Nurse Ross documented Ms. Young's known history of cardiac disease, hypertension, diabetes and lipid elevation. *Id.* at 5083.  She further noted Ms. Young's present complaints of two (2) weeks of ***"continuous" chest pain*** (at a pain level of 8 on a scale of 1 to 10), shortness of breath, chest wall tenderness and joint pain. *Id.*  However, in violation of CHC's Chest Pain Protocol, Nurse Ross did not record any vital signs. *Id.* at 5083-84; *See also* CHC Protocol F01 (Ex. 4) at 1 of 2.  Despite her serious symptoms, Ms. Young was not seen by a physician or nurse practitioner, nor was she sent to an outside Urgent Care or Emergency Room. *Id.*; *see also* Ex. 2 at 6.  Rather, she was returned to the segregation unit with no further evaluation. *See* Ex. 1 at GLANZ-

4

Revilla05060.

6.      On January 10, 2013, Dr. Adusei recorded his first entry in Ms. Young's medical chart for the pertinent period of incarceration. *See* Ex. 1 at GLANZ-Revilla05056.  Dr. Adusei merely noted that he "just reviewed this patient's labs, and it appears that she has hypertriglyceridemia" and that he would "initiate this patient on niacin and add aspirin and Benadryl for possible flushing response."  *Id.* There is no indication that he actually saw Ms. Young. *Id.*; Ex. 2 at 7; Ex. 1 at GLANZ-Revilla05056. Dr. Adusei made no comment about any of Ms. Young's other serious chronic medical issues, and provided no note of her recent episode of chest pressure. *Id.*

7.      The next day, on January 11, 2013, Ms. Young complained to detention staff in the SHU that her kidneys were "LOCKING UP" and that she needed to go to the medical unit. Jail Shift Report (Ex. 3) at GLANZ-Revilla 10668.

8.      At approximately 8:39pm on January 12, 2013, detention staff in the SHU documented that Ms. Young was taken to the medical unit with complaints of "CHEST PAIN". Ex. 3 at GLANZ-Revilla 10673.  Nevertheless, upon Ms. Young's arrival in the medical unit, Nurse Chinaka Nzubechi ("Nurse Chinaka") failed to document the complaint of chest pain or initiate the Chest Pain Protocol, in violation of policy. *See* Ex. 1 at GLANZ-Revilla05059-60; CHC Protocol F01 (Ex. 4).  For instance, no vital signs or physical exam were recorded. *Id.*  Instead, Ms. Young was "given one dose of Maalox and sent away without further assessment o[r] a follow up plan." Ex. 2 at 7.

9.      On January 28, 2013, a "low blood pressure of 99/71 [wa]s recorded without further notation." Allen (Verified) Report (Ex. 2) at 7; *see also* CHC Records (Ex. 1) at GLANZ-Revilla05047.  The following day, January 29, 2013, Nurse Amanda

Bowman noted that Ms. Young refused her diet tray because it upset her stomach. Ex. 1 at GLANZ-Revilla05059. An Abdominal Pain Protocol form was filled out by Nurse Bowman. *Id.* at 5076-80.   However, in violation of the Protocol, no vital signs were recorded. *Id.*; *see also* CHC Protocol H01 (Ex. 4). "There is no evidence that the patient [wa]s ever evaluated by a physician or nurse practitioner." Ex. 2 at 7.

10. According to TCSO's own "Jail Shift Report", on February 3, 2013, Ms. Young was again "COMPLAINING OF STOMACH PAIN" and "MEDICAL [was] NOTIFIED." Ex. 3 at GLANZ-Revilla10776.  However, there is no record of this in Ms. Young's medical chart. *See, generally,* CHC Records (Ex. 1).

11. "On February 4, 2013, a ***very low blood pressure*** of 80/64 and a fast heart rate at 106 [we]re recorded without further comment." Allen (Verified) Report (Ex. 2) at 7 (emphasis added); *see also* CHC Records (Ex. 1) at GLANZ-Revilla05047.  Also on February 4, another inmate in the SHU, Mica Shoate ("Ms. Shoate"), observed that Ms. Young complained of stomach pain to "D.O. Dunn". *See* Shoate Depo. II (Ex. 5) at 6:6-24, 7:14 – 9:2, 12:5-17; *see also* Shoate Notes (Ex. 6).  D.O. Dunn responded to Ms. Young that "she couldn't do anything about it." *Id.* at 12:5-17; *see also* Incident Report (Ex. 7) at GLANZ-Revilla12269.  Ms. Young's February 4 complaint of stomach pain was not documented in TCSO's Jail Shift Report, CHC's medical records, or anywhere else. *See, generally,* CHC Records (Ex.1); Jail Shift Report (Ex. 3).

12. On February 5, 2013, at 5:34am, TCSO detention staff noted that Ms. Young *"REFUSED MEDS...."* Ex. 3 at GLANZ-Revilla10781.  Later, at 4:37pm, Ms. Young **refused her medications a second time.** *Id.* at 10782.  However, this was not documented anywhere in the CHC medical records. *See, generally,* CHC Records (Ex. 1).

Also, on February 5, Ms. Young complained to detention staff, for the third day in a row, about stomach pain. *See* Ex. 5 at 13:17-25; and Ex. 6; *see also* Ex. 3 at GLANZ-Revilla10781. This time, Ms. Young indicated that the pain was worsening. *Id.* Detention officers responded that they would "inform" medical staff, but that *medical would not do anything about it. Id.* Ms. Young's February 5 complaint of worsening stomach pain was not documented in TCSO's Jail Shift Report, CHC's medical records, or anywhere else. *See, generally,* CHC Records (Ex. 1); Jail Shift Report (Ex. 3).

13.     On February 6, 2017, at approximately 1:11pm, Ms. Young complained to the detention staff in the SHU that she was ***throwing up blood***. *See, e.g.,* Ex. 5 at 17:21 – 19:21; Ex. 6; Ex. 3 at GLANZ-Revilla10785. CHC medical staff was alerted concerning Ms. Young's complaints of throwing up blood. *See* Ex. 3 at GLANZ-Revilla10785. Nonetheless, upon viewing Ms. Young's vomit in the cell, Jail staff in the SHU told Ms. Young that there was ***"not enough blood"*** and that the vomit looked like "Kool-Aide." *See, e.g.,* Ex. 5 at 17:21 – 19:21. There is no record of Ms. Young's February 6 complaint in the CHC medical chart. *See, generally,* CHC Records (Ex. 1).

14.     At around 3:54 on February 6, SHU detention staff reported that Ms. Young, once again, ***refused her medication*** (which was the third time in two days). *See* Ex. 3 at GLANZ-Revilla10786. Yet again, Ms. Young's refusal of medications was not recorded or noted anywhere in the CHC medical chart. *See, generally,* Ex. 1.

15.     At 8:13am on February 7, 2013, CHC's Nurse Nicole White charted that Ms. Young "was complaining of vomiting blood for 3 days and ha[d] not eaten in 3 days." Ex. 1 at GLANZ-Revilla05059. Nurse White disregarded Ms. Young's complaints. Specifically, while acknowledging that Ms. Young had been vomiting for

three days, Nurse White found that the vomiting was "without blood" and that "paperwork" revealed that she had been eating at appropriate times. *Id.*  Nurse White did not record any vital signs or physical examination and did not contact a physician. *Id.*; *see also* Ex. 2 at 8.  ***Nurse White provided no medical care whatsoever.*** *Id.* As stated above, there was, in fact, evidence that Ms. Young was throwing up blood. *See, e.g.,* Shoate Depo. (Ex. 5) at 17:21 – 19:21.  In addition, Nurse White's cursory finding that Ms. Young was eating at appropriate times ignored the obvious problem that she had been throwing up everything she tried to eat.  As stated by Detention Officer ("D.O.") Carmelita Norris:

> On 2/7/2013 I call[ed] medical because Ms. Young was complaining that she was not feeling well. She stated that she had been like this ***for the last three days***. She also stated that she had been throwing up, and that she had ***not eaten anything <u>because</u> of her throwing it all back up.*** I asked her why she had wait[ed] so long to tell someone that she was sick. She said that she did tell someone about it, Detention Officer Dunn had call medical and was told that she needed to put in a sick call, and ***the[re] was nothing that they could do.*** Ms. Young complained of […] ***nausea, dizz[iness], and throwing up.***

Incident Report (Ex. 7) at GLANZ-Revilla 12269 (emphasis added).

**16.**     Later, on the night of February 7, Ms. Young continued to complain to detention staff in the SHU that she was ill, weak and had been vomiting for days.  *See, e.g.,* Ex. 5 at 32:21 – 34:11; Ex. 6.  In addition, on the night of February 7, Ms. Young ended up ***on the floor of her cell.*** *Id.*  At approximately 11:55pm on February 7, housing Sergeant Billie Byrd was called to the SHU and was informed, by D.O. Norris, that Ms. Young "ha[d] not eaten ***or drank*** anything in three days" and that "she ha[d] been ***throwing up everything.***" Ex. 7 at GLANZ-Revilla 12269 (emphasis added); *see also* Byrd Depo. (Ex. 8) at 15:4-17.  Sergeant Byrd escorted Ms. Young to the medical unit

and informed Nurse Chinaka what had been happening with Ms. Young. Ex. 7 at GLANZ-Revilla 12269.  Nurse Chinaka checked Ms. Young and told Sergeant Byrd that Ms. Young **probably had the flu** and that the "symptoms she was showing [we]re flu like symptoms." *Id.*  Nevertheless, there is no indication that Nurse Chinaka provided any medical attention to Ms. Young during this encounter. *Id.*  On the contrary, despite a finding that Ms. Young likely had the flu, Nurse Chinaka instructed Sergeant Byrd to take Ms. Young back to the SHU. *Id.*

17.   Nurse Chinaka did not enter a note in the medical chart until 6:31am on February 8, 2013, *over six (6) hours after* Sergeant Byrd escorted Ms. Young to the medical unit. *Compare* Ex. 1 at GLANZ-Revilla05059 *with* Ex. 7 at GLANZ-Revilla 12269.  And Nurse Chinaka failed to note her finding that Ms. Young probably had the flu. *Id.*  While Nurse Chinaka charted that Ms. Young's "vitale [sic] signs" were "stable", Dr. Allen notes that Ms. Young's pulse rate at the time was actually "high", a **"possible sign of dehydration"** and **"neither normal nor 'stable.'"** Ex. 2 at 8 (emphasis added); *see also* Ex. 1 at GLANZ-Revilla05047.  This serious and concerning sign was clearly ignored by Nurse Chinaka.

18.   Regardless of whether Ms. Young outwardly complained about her neck or head, as Dr. Allen observes, "[t]he record describes a **clear deterioration in the patient's health over the last 8 days of her life"**, including a decline of neurologic functioning, without any physician visit or even an attempt to diagnose the cause. *See* Ex. 2 at 7-15 (emphasis added).

**19.**     In the early hours of February 8, 2013, when Ms. Young returned to her cell (from the medical unit), she told Ms. Shoate that she "didn't feel good." *See* Dkt. #468-12 at 75:16 – 76:3.

**20.**     At approximately 6:48am on February 8, Ms. Young was "banging on the glass of her cell stating that she was having difficult[y] breathing." Ex. 7 at GLANZ-Revilla at 12269.   D.O. Norris called the medical unit. *Id.* At approximately 6:50am, CHC Nurse Karen Metcalf arrived at the SHU.  *Id.*  Ms. Young told Nurse Metcalf that she was *"wanting to go to the hospital." Id.* (emphasis added).   Nurse Metcalf replied that Ms. Young was "ok" and that she did not need to go to the hospital. *Id.*   Nurse Metcalf told Ms. Young to take her medicine and then left her in her cell. *Id.*   Nurse Metcalf *failed* to document this encounter with Ms. Young in the medical record. *See, generally,* CHC Records (Ex. 1).

**21.**     Mere minutes after Nurse Metcalf unceremoniously left Ms. Young in her cell, D.O. Norris checked on Ms. Young and she was ***"on the floor"*** of her cell. Ex. 7 at GLANZ-Revilla 12269 (emphasis added).  D.O. Norris called a "medical emergency" for Ms. Young at approximately 6:59am. *Id.*   Sergeant Byrd responded to the medical emergency with Nurse Wallace. *Id.*  When she arrived, two other nurses were already in the cell with Ms. Young. *Id.*   Sergeant Byrd observed that Ms. Young was ***still lying on the floor*** of her cell. *Id.*   Sergeant Byrd informed Nurse Gammil that Ms. Young had ***"not eaten or [had] anything to dr[i]nk for three days, because she ke[pt] throwing everything up." Id.*** (emphasis added). Nurse Gammil noted that Ms. Young had not been taking her medication, either. *Id.* Sergeant Byrd said, "maybe that's because everything she eats or dr[inks] she thr[ows] back up." *Id.* Sergeant Byrd told the nurse in no

uncertain terms, *"something is wrong with inmate Young beside her not taking her medication, because if it was just the medication she wouldn't be laying in the floor she would be cussing you and calling you everything name in the book." Id.* (emphasis added). Indeed, it was *"obvious"* to Sergeant Byrd that something was wrong with Ms. Young. Byrd Depo. (Ex. 8) at 58:14 – 59:8 (emphasis added).

Another officer, D.O. Corrie King, observed that Ms. Young was not responding to the nurses' questions. Ex. 7 at GLANZ-Revilla 12278. According to D.O. King, when Ms. Young would not move off the cell the floor to the gurney, *"NURSE WALLACE GRABBED AHOLD OF HER ARMS AND STARTED TO DRAG HER ACROSS THE FLOOR OF THE CELL." Id.* (emphasis added).

D.O. Shirlene Claude reported that at approximately 7:05am on February 8, Ms. Young *"collapsed"* after nurses attempted to get her off the floor and onto her feet. *See* Ex. 7 at GLANZ-Revilla at 12275 (emphasis added). D.O. Claude acknowledges that while Ms. Young was waiting for medical staff to "put stretcher down", *"[s]he fell to the ground."* Ex. 9 at 133:23 – 134:2 (emphasis added). Ms. Shoate also witnessed Ms. Young's fall. *See* Ex. 5 at 34:14-19. After Ms. Young fell to the ground, TCSO Sergeant Hinshaw: (A) stated, *"we don't have time for that shit"*; and (B) insisted that Ms. Young *"wasn't going to the hospital."* Ex. 6 at 2 (emphasis added).[2] Because medical and detention staff directly observed Ms. Young fall to the ground, the fact that she did not "report" that she had fallen is immaterial. *See* Dfts' Fact #13.

---

[2]    As Ms. Shoate testified, she kept these notes contemporaneously as she observed the events. *See, e.g.,* Shoate Depo. II (Ex. 6) at 6:6 – 7:13. Such notes are admissible under the "present sense impression" hearsay exception. *See United States v. Santos,* 65 F. Supp. 2d 802, 825 (N.D. Ill. 1999); *United States v. Ferber,* 966 F. Supp. 90, 97-98 (D. Mass. 1997).

At around 7:20am on February 8, Ms. Young was successfully placed on the gurney and taken to the medical unit. *See* Incident Report (Ex. 7) at GLANZ-Revilla12273.

22.   At 6:56am on February 8, Nurse White noted that she responded to the first medical emergency and found Ms. Young was "LAYING ON FLOOR STATING IN PAIN…." CHC Records (Ex. 1) at GLANZ-Revilla05059. Nurse White claimed that she contacted "CLEMMER" who ordered that Ms. Young receive "PRILOSEC 20 MG". *Id.* Nurse White further claimed that Ms. Young's vital signs were "STABLE AND WITHIN NORMAL LIMITS." *Id.*   However, as observed by Dr. Allen, ***no vital signs were recorded*** in the chart. Allen (Verified) Report (Ex. 2) at 8.   Nurse White then retuned Ms. Young to the SHU. *See* CHC Records (Ex. 1) at GLANZ-Revilla05059.

23.   The TCSO Defendants rely on the "witness statement" of Nurse Metcalf. *See* Dfts' Fact #39. Nurse Metcalf's "witness statement" should be disregarded.   *After* Ms. Young died, Nurse Metcalf drafted a witness statement in which she conveniently purports to have taken Ms. Young's vitals at 7:01am on February 8. *See* Dkt. #469-16. These vital signs are not recorded anywhere in the CHC medical chart. *See, generally,* CHC Records (Ex. 1).   The CHC Defendants' own expert testified that he would probably: (A) question Nurse Metcalf's reports; and (B) ***not*** accept her notes at face value. *See* Kassabian Depo. (Ex. 10) at 102:19 – 103:12.   Further, there are repeated documented instances of Nurse Metcalf falsifying records. *See* Metcalf Disciplinary File (Ex. 11).   Under this backdrop, a reasonable jury could, and should, disregard Nurse Metcalf's post-mortem witness statement.

**24.**     At around 8:05am on February 8, 2013, TCSO Corporal Roland D'Souza[3] heard Sergeant Hinshaw call for assistance in the SHU. *See* Incident Report (Ex. 7) GLANZ-Revilla 12274.  "Knowing that ***staffing levels were short***," Corporal D'Souza went to the SHU to render assistance. *Id.* (emphasis added).   As Corporal D'Souza testified, at the time of Ms. Young's pertinent incarceration staffing levels were low throughout the facility. *See* D'Souza Depo. (Ex. 12) at 31:4-14. A few minutes after Corporal D'Souza arrived at the SHU, Sergeant Hinshaw, Sergeant Bob Darby and Nurse White showed up with Ms. Young on a gurney. *See* Incident Report (Ex. 7) GLANZ-Revilla 12274.  Ms. Young appeared ***"incoherent"***, but ***Nurse White "repeatedly stated that [Ms. Young] was <u>faking</u> her actions."*** *Id.* (emphasis added).   As Corporal D'Souza remembers, Ms. Young was *"not responsive"*; she "wasn't responding to our verbal orders as to get out of the gurney or <u>*any*</u> *kind of response as a normal awake person would give."* D'Souza Depo. (Ex. 12) at 32:7-14 (emphasis added).   Corporal D'Souza was concerned that something was wrong with Ms. Young, but deferred to the "higher ranking" officers (*i.e.,* Darby and Hinshaw). *Id.* at 32:15-35:21.

Similarly, D.O. Aaron Sherman observed that Ms. Young was "not talking or complying" and that "Nurse White made the comment that she is ***faking an injury and is trying to get attention."*** *See* Incident Report (Ex. 7) GLANZ-Revilla12276-77 (emphasis added).   Sergeant Darby stated to Ms. Young, ***"I'M IN CHARGE, AND MEDICAL STATED TO ME THAT YOU ARE NOT GOING TO THE HOSPITAL."*** *Id.* at 12278 (emphasis added).

---

[3]     *See* D'Souza Depo. (Ex. 12) at 6:13-20.

Corporal D'Souza and D.O. King assisted in moving Ms. Young from the gurney to her bunk, and D'Souza, King, Darby, Hinshaw and Nurse White left Ms. Young in her cell at around 8:16am. *See* Incident Report (Ex. 7) GLANZ-Revilla 12274, 12277; and Jail Shift Report (Ex. 3) at GLANZ-Revilla10792.

**25.**     Per CHC's own written Clinical Protocols, Ms. Young's unresponsive state, especially in light of her quickly deteriorating condition, should have been treated as an emergent/urgent condition, requiring immediate IV liquids, "man down" procedures and/or transfer to a hospital. *See* CHC Clinical Protocols A17 (Ex. 4) at 1 of 1; CHC Clinical Protocols A12 (Ex. 4) at 1 of 1.  In addition, the Clinical Protocols provide that when there is a change in behavior, particularly in a patient with serious chronic health problems like Ms. Young, medical staff must "***not*** assume [it] is a psychiatric problem ***until the patient has been medically cleared.***" CHC Clinical Protocols K01 (Ex. 4) at 1 of 1 (emphasis added).  Defendants' own expert witness, Dr. Kassabian, testified that it is ***"unprofessional"*** to say a patient is "faking" and that even if a medical professional suspects malingering, he/she ***must "investigate the medical cause"*** and not simply "assume they [a]re faking." Kassabian Depo. (Ex. 10) at 235:9-22 (emphasis added). Nurse White's assumption that Ms. Young was "faking" was a clear violation of CHC's Clinical Protocols, a violation of accepted standards of care and constitutes deliberate indifference to Ms. Young's serious and obvious health needs.  And Sergeant Hinshaw and Sergeant Darby's failure to call an ambulance also constitutes deliberate indifference.

**26.**     There is also video (from outside of Ms. Young's cell) from the last hours and minutes of her life on the morning of February 8, 2013. *See* Young Video (Ex. 13). According to Dr. Allen, the video demonstrates Ms. Young's respiratory rate was

14

elevated such that she was experiencing "tachypnea, a basic sign of ***respiratory distress.***" Allen (Verified) Report (Ex. 2) at 10-11 (emphasis added).   As Dr. Allen opines: respiratory rate/tachypnea "is a basic vital sign, and a ***major indication that [Ms. Young] warrant[ed] immediate transfer to an acute care setting such as an emergency room.***" *Id.* at 11 (emphasis added).  However, as noted above, she was not transferred to an acute care setting, but was left to die in her cell.

27.     Despite the previous medical emergency being called, the complaints of vomiting and pain over an extended period, concerns expressed by detention staff that "something was wrong", Ms. Young's collapse, obvious signs of respiratory distress and sudden and drastic changes in behavior (including incoherence/unresponsiveness), no one checked on Ms. Young in her cell from approximately 8:16 to 10:03am. *See* Jail Shift Report (Ex. 3) at 10792.    Predictably, when Nurse White finally entered Ms. Young's cell sometime between 10:03 and 10:21am on February 8, Ms. Young was ***unresponsive with no pulse or respiration. See*** CHC Records (Ex. 1) at GLANZ-Revilla05059.[4]  It was only after Ms. Young was found without a pulse that Dr. Adusei, the Jail's Medical Director, actually saw Ms. Young, at around 11:39am. *Id.* at 5055.  As Dr. Allen notes, ***"[i]n nearly four months***, in spite of serious chronic conditions and significant evidence of acute illness, she [wa]s ***never seen by a physician*** until she [wa]s in full cardiopulmonary arrest." Allen (Verfied) Report at (Ex. 2) at 15 (emphasis added).  After examining Ms. Young, Dr. Adusei found that she was "unresponsive", had ***"already***

---

[4]     The TCSO Defendants state that Ms. Young had received treatment two hours before -- and been observed breathing normally 25 minutes before -- she was found unresponsive in her cell. Dfts' Fact #2.  However, the Exhibits cited by Defendants do not support either of those statements. *See* Dkt. #469-2 and 469-3.

*expired"* and noted that "[g]iven our resources [attempts to resuscitate were] *futile at best."* *See* CHC Records (Ex. 1) at GLANZ-Revilla05055 (emphasis added).

28.     The Medical Examiner determined that Ms. Young died from blunt head trauma, and that she had a "[h]istory of fall (Per report)." Medical Examiner's Report (Ex. 14) at GLANZ-Revilla05252.  According to the medical examiner, Dr. Alex John, the symptoms of subdural hemorrhage include gait abnormalities, sluggishness in walking, difficulty walking, difficulty talking, disorientation, confusion, nausea, vomiting and respiratory distress. *See* John Depo. (Ex. 15) at 61:23-62:7.  As demonstrated herein, Ms. Young exhibited all of these symptoms, and her symptoms were disregarded by the medical and detention staff.

29.     It is Dr. Allen's opinion that Ms. Young should have been transferred to a hospital prior to 8:10am on February 8 when she was exhibiting obvious signs of respiratory distress. *See* Allen (Verified) Report (Ex. 2) at 10-11.  More broadly, Dr. Allen opines as follows:

> There are numerous individual and systemic deficiencies in the medical care demonstrated by this case. … *Abnormal physical findings* are charted and then *ignored*. Witness accounts report that at the point where her health has *seriously deteriorated* and she was *near death*, medical staff declare that she is *faking* her symptoms.  In nearly four months, in spite of serious chronic conditions and significant evidence of acute illness, she is never seen by a physician until she is in full cardiopulmonary arrest. The record describes a *clear deterioration in the patient's health over the last 8 days of her life.* At multiple points during that decline, she should have been evaluated by a physician, but she was not. In the final hours to days, it is clear from the witness accounts of many observers that her neurologic function is deteriorating, yet there is no effort to assess or diagnose the cause. The cause, identified post-mortem, would have been treatable and could have been diagnosed and treated had the medical staff followed a reasonable standard of care or shown *even minimal concern* for the health and safety of their patient. It is my professional opinion that the *inadequate care* provided to Ms. Young by the Tulsa County Jail contributed to and more probably than not

was the ***cause of her death.***

Allen (Verified) Report (Ex. 2) at 14-15 (emphasis added).[5]

**30.**     This lawsuit was filed before the medical examiner's report was issued. At the time that the lawsuit was filed, it was believed that Ms. Young died from a heart attack.  Indeed, Dr. Adusei himself opined that Ms. Young died from a "probable acute coronary event…." CHC Records (Ex. 1) at GLANZ-Revilla05055.  Plaintiff also alleged in the Amended Complaint that: (A) "[u]pon information and belief, Ms. Young suffered additional physical injury while in defendants' custody"; (B) "Defendants … fail[ed] to provide prompt and adequate care in the face of known and substantial risks to Ms. Young's health and well being"; and (C) "[a]s a direct and proximate result of Defendants' conduct, Ms. Young experienced physical pain, severe emotional distress, mental anguish, death, and the damages alleged herein." Dkt. #4.

In Responses to Defendants' discovery requests, Plaintiff asserted that "[s]ome time prior to February 8, Ms. Young either fell or was pushed and suffered a severe head injury" and that "[t]he Medical Examiner found that Ms. Young died from blunt head trauma, and that she had a 'history of fall (Per report).'" Young CHC Discovery Responses (Ex. 16) at 9-10.

**31.**     The fact that Ms. Young had no direct contact with Former Sheriff Glanz is irrelevant as a matter of law. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 842-43 (1994). (Responsive to Dfts' Facts ##51-52).

---

[5]     These aspects of Dr. Allen's opinion are responsive to the TCSO Defendants' Facts ##6-13.

**32.** TCSO's "Triple Crown" status -- and history of NCCHC accreditation -- is dubious at best. *See* LCvR 56.1(c) Statement of Facts(B), *infra*. (Responsive to Dfts' Facts ##53-55).

**33.** While CHC clearly had significant responsibilities in carrying out the Jail's medical delivery system, Glanz and TCSO were ultimately responsible for inmate healthcare. *See, e.g.,* Glanz Depo. (Williams) (Ex.17) at 38:22-25**.**

**B.     The Jail's Deficient Medical Delivery System**

Plaintiff adopts and incorporates herein the LCvR 56.1(c) Statement of Facts(B) as set forth in her Response to the CHC Defendants Motion for Summary Judgment (Dkt. #491), as well as Exhibits 20-48 attached thereto as evidence of a policy or custom.

<u>Argument</u>

**I.     FORMER SHERIFF GLANZ AND SHERIFF REGALADO ARE *NOT* ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CONSTITUTIONAL CLAIMS**

**A.     There is Substantial Evidence That Sheriff Regalado is Liable in His Official Capacity (Under a *Monell* Theory) and Former Sheriff Glanz is Liable in His Individual Capacity (Under A Supervisory Liability Theory)**

It is well-established that officials, such as Former Sheriff Glanz, "may be held *<u>individually</u> liable for <u>policies</u> they promulgate, implement, or maintain that deprive persons of their federally protected rights." Dodds v. Richardson,* 614 F.3d 1185, 1207 (10th Cir. 2010) (emphasis added).  To establish a claim of supervisory liability under § 1983, a plaintiff must plead and prove that "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds,* 614 F.3d at 1199.

18

A claim against a state actor in his official capacity, such as Sheriff Regalado, "is essentially another way of pleading an action against the county or municipality" he represents and is considered under the standard applicable to § 1983 claims against municipalities or counties. *Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010). *See also see Kentucky v. Graham,* 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). To hold a county liable under § 1983, a plaintiff must demonstrate (1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. "whether there is a direct causal link between [the] policy or custom and the alleged constitutional deprivation"). *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

The Tenth Circuit also requires that a plaintiff prove the requisite "state of mind" to establish *Monell* liability. *See, e.g., Schneider v. City of Grand Junction Police Dep't,* 717 F.3d 760, 769-671 (10th Cir. 2013). In the municipal liability context, "[t]he deliberate indifference standard may be satisfied when the municipality has actual *or constructive notice* that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir. 1998) (emphasis added).

An unconstitutional policy may be established by proof of "an informal custom amounting to a *widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or*

*usage* with the force of law….” *Bryson v. City of Okla. City,* 627 F.3d 784, 788 (10th Cir. 2010) (emphasis added).   Plaintiff may also establish the TCSO Defendants' liability through evidence of a "failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused." *Bryson,* 627 F.3d at 788.

The *Dodds* Court, while recognizing the difference between supervisory liability and municipal liability, acknowledged the similarities between the standards. *Dodds,* 614 F.3d at n. 10. Under both standards, the plaintiff must plead and prove the existence of a municipal policy or custom and an affirmative causal nexus between the policy or custom and the constitutional injury. *Dodds,* 614 F .3d at 1202.

1.      **The TCSO Defendants Possessed Responsibility for Unconstitutional Policies or Customs That Caused the Constitutional Injuries**

Tellingly, the TCSO Defendants do very little to challenge the existence of an unconstitutional policy or custom in this case.   Rather, they simply point to the Tulsa County Jail's "Triple Crown" accreditation and hiring of Dr. Howard Roemer as proof that there was no unconstitutional custom of constitutionally deficient health care at the Jail. *See* Dkt. #469 at 27.   The TCSO Defendants raised similar arguments in *Burke v. Glanz,* No. 11-CV-720-JED-PJC.   Those arguments were rejected by this Court in denying summary judgment and by the jury in rendering its verdict in favor of Mr. Williams' Estate.   Overall, the evidence presented by Plaintiff concerning the NCCHC, including evidence that Sheriff Glanz actively sought to cover up and conceal pertinent medical information from the auditors, neutralizes the "Triple Crown" evidence. *See, e.g.,* Dkt. # 491 (Stat. of Facts(B)). Further, the mere retention of Dr. Roemer cannot erase years of inadequate care, inaction by Former Sheriff Glanz and attempts to cover up

20

deficiencies in the medical system.  Moreover, the evidence, which is well-known to this Court, establishes that Sheriff Glanz did little, if anything, to alleviate the continuing systemic problems identified by Dr. Roemer.[6]  In any event, the significance of the TCSO Defendants' failure to meaningfully challenge the existence of an unconstitutional policy or custom cannot be overstated.  As discussed *supra*, the presence of a policy or custom is vital to Plaintiff's claims against the TCSO Defendants. And Plaintiff's evidence in this regard is overwhelming. *See, e.g.,* Dkt. # 491 (Stat. of Facts(B)).

As this Court previously determined in *Burke v. Glanz,* No. 11-CV-720-JED-PJC, 2016 WL 3951364, at *23 (N.D. Okla. July 20, 2016):

> [B]ased on the record evidence construed in plaintiff's favor, a reasonable jury could find that, in the years prior to Mr. Williams's death in 2011, then-Sheriff Glanz was responsible for knowingly continuing the operation of a ***policy or established practice of providing constitutionally deficient medical care*** in deliberate indifference to the serious medical needs of Jail inmates like Mr. Williams.

(emphasis added).  The Court specifically found evidence of a policy or custom of "failing to provide medical care in response to serious medical needs of Jail inmates, failing to provide Jail staff with proper training and supervision regarding inmate medical needs, and continuing to adhere to a constitutionally deficient system of care for detainees with serious medical needs." *Burke,* 2016 WL 3951364, at *27.  With respect to causation, the *Burke* Court determined that "[t]he record … supports a finding that the foregoing practices were the 'moving force' behind the violations of Mr. Williams' constitutional rights" and that "[t]he jury could also find that the County, via the former Sheriff and other TCSO officials, was on notice as to the problems with the Jail's medical

---

[6]    The TCSO Defendants additionally assert there can be no supervisory or official capacity liability because Ms. Young did not suffer any underlying deprivation of her constitutional rights.  As discussed in detail *infra,* there is ample evidence of an underlying violation of Ms. Young's constitutional rights.

care system and, had they taken any timely remedial steps to abate the resulting risks, Mr. Williams' condition would not have deteriorated and his death would have been avoided." *Id.* at *28.

And, in March of 2017, after a trial on the merits of plaintiff's claims in *Burke*, a "reasonable jury" ***did*** find that Former Sheriff Glanz and Sheriff Regalado (in his official capacity) were responsible for knowingly continuing the operation of a policy or established practice of providing constitutionally deficient medical and mental health care. *See Burke* Verdict Form (Dkt. #435-38); *Burke* Judgment (Ex. 435-39). This, in and of itself, establishes the existence of an unconstitutional policy or custom.

Plaintiff has presented much of the same evidence of a "constitutionally deficient system of care" here as Ms. Burke presented in her case. *See* Dkt. #491 (LCvR 56.1(c) Statement(B)). It is noteworthy that Mr. Williams' death preceded Ms. Young's death by well over one year. There are undeniable parallels between the two cases. Most significantly, in both cases, medical and detention staff recklessly chose to believe that the patient was malingering or faking injury or illness, without first ruling out a medical cause. In both cases, the patient had suffered a severe and life-threatening injury that went untreated, despite the obvious need for emergent care. Ms. Young's suffering and death, in February 2013, tends to prove the systemic deficiencies that led to Mr. Williams death, were not alleviated by Sheriff Glanz/TCSO in a timely manner, and that the failure to alleviate those deficiencies was a moving force behind the Constitutional injuries here. As to the "culpable state of mind", the evidence summarized in Dkt. #491 (LCvR 56.1(c) Statement(B)) coupled with the mistreatment of Ms. Young is sufficient to establish that the TCSO Defendants had "constructive notice that its action or failure to act was

22

substantially certain to result in a constitutional violation, and it consciously or deliberately cho[se] to disregard the risk of harm." *Barney,* 143 F.3d at 1307; *see also Schneider,* 717 F.3d at 771.

The Court should have little difficulty in affirming that the evidence here, which is virtually identical to the evidence presented in *Burke*, is sufficient to establish genuine disputed facts as to the presence of an unconstitutional policy or custom which was a moving force behind Ms. Young's suffering and death.

### 2. Plaintiff Has Presented Significant Evidence of the TCSO Defendants' (and Their Subordinates') Deliberate Indifference[7]

Typically, courts will not hold a municipality or supervisor liable without proof of an "underlying constitutional violation by [one] of its officers." *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1317–18 (10th Cir. 2002).  In this case, there is substantial evidence of underlying violations of Ms. Young's constitutional rights, such that summary judgment is inappropriate.  Under the Eighth Amendment, prisoners possess a constitutional right to medical care, and that right is violated when doctors or officials are deliberately indifferent to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).  Pretrial detainees, who have not been convicted of a crime, have a constitutional right to medical and psychiatric care under the Due Process Clause of the Fourteenth Amendment with the standard for deliberate indifference at least as protective as for convicted prisoners. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Martin v. Bd. of County Com'rs of County of Pueblo,* 909 F.2d 402, 406 (10th Cir. 1990).

---

[7]      Defendants appear to argue that Plaintiff's State "medical negligence" claim against CHC somehow preempts her federal claims under the United States Constitution. MSJ at 24-25.  There is no support for this argument, particularly in light of the evidence of deliberate indifference in this case.

In the cruel and unusual punishment context, "[d]eliberate indifference involves both an objective and subjective component." *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1315 (10th Cir. 2002) (quoting *Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir. 2000)) (internal quotation marks omitted).   To satisfy the objective component, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Self v. Crum,* 439 F.3d 1227, 1230 (10th Cir. 2006).   The subjective component requires evidence that the official "knows of and disregards an excessive risk to inmate health or safety." *Mata v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005).   A civil rights defendant is deliberately indifferent where he "has knowledge of a substantial risk of serious harm to inmates . . . [and] fails to take reasonable steps to alleviate that risk." *Tafoya v. Salazar,* 516 F.3d 912, 916 (10th Cir. 2008).

The Tenth Circuit recognizes two types of conduct constituting deliberate indifference in the medical context. *See Sealock,* 218 F.3d at 1211. "First, a medical professional may fail to treat a serious medical condition properly.... The second type of deliberate indifference occurs when … officials ***prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment.***" *Id.* Further, "[a] prisoner may satisfy the subjective component by showing that defendants' ***delay*** in providing medical treatment caused either ***unnecessary pain or a worsening of [her] condition. Even a brief delay may be unconstitutional.***" *Mata,* 427 F.3d at 755 (emphasis added).

"Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence." *DeSpain v. Uphoff,* 264 F.3d 965, 975 (10th Cir. 2001).   For instance, "the existence of

an obvious risk to health or safety may indicate awareness of the risk." *Rife v. Oklahoma Dep't of Pub. Safety,* 854 F.3d 637, 647 (10th Cir. 2017), *cert. denied sub nom. Dale v. Rife,* No. 17-310, 2017 WL 3731208 (U.S. Oct. 16, 2017), and *cert. denied sub nom. Jefferson v. Rife,* No. 17-314, 2017 WL 3731324 (U.S. Oct. 16, 2017) (citing *Farmer v. Brennan,* 511 U.S. 825, 842 (1994)). "[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk ... for reasons personal to h[er] *or because all prisoners in h[er] situation face such a risk." Farmer,* 511 U.S. at 843.

**First,** the evidence easily establishes the "objective" prong. Indeed, the TCSO do not appear to challenge that the evidence establishes the objective component. As the *Mata* Court clarified, the test for the objective component applies to "the alleged harm to the prisoner" rather than "the prisoner's symptoms at the time of the prison employee's actions." *Mata,* 427 F.3d at 753. There is no doubt that the harm to Ms. Young (*i.e.*, prolonged pain and death from head trauma, as well as respiratory distress) is sufficiently serious to satisfy the objective component.

**Second**, despite the TCSO Defendants' arguments to the contrary, Plaintiff has presented ample evidence to satisfy the subjective component. As shown in Plaintiff's LCvR 56.1(c) Statement of Facts *supra*, there are numerous genuine disputed issues of fact in this matter. While it may be true that Jail medical personnel treated *some* of Ms. Young's symptoms, there is evidence, sufficient to defeat summary judgment, that her most dire and life-threatening symptoms, were repeatedly, and recklessly, disregarded.

**Ms. Young's symptoms of a serious and life-threatening condition, including signs of respiratory distress, days of vomiting and not eating, changes in mental**

**status, dizziness, unresponsiveness, dehydration, lethargy, unsteady gait, difficulty walking and falling, were not taken seriously, and were disregarded.**  For instance, in early February, Ms. Young began to repeatedly complain, over a series of days, about stomach pain, only to be told by detention staff that there was nothing CHC medical personnel would do to help her. *See, e.g.,* LCvR 56.1(c) Statement(A)(10-11), *supra.*  On February 4, 2013, a ***very low blood pressure*** of 80/64 and a fast heart rate at 106 were recorded, and then completely disregarded. *Id.*

On February 5, 2013, TCSO detention staff noted that Ms. Young had twice refused her medications. *See, e.g.,* LCvR 56.1(c) Statement(A)(12), *supra.*  However, CHC medical staff did not even bother to document this concerning development in the medical records. *Id.*

On February 6, 2017, Ms. Young first complained to detention staff in the SHU that she was ***throwing up blood***. *See, e.g.,* LCvR 56.1(c) Statement(A)(13), *supra.* CHC was notified.  Upon viewing Ms. Young's vomit in the cell, Jail staff in the SHU told Ms. Young that there was ***"not enough blood"*** and that the vomit looked like "Kool-Aide." *Id.*  On February 6, detention staff reported that Ms. Young, once again, ***refused her medication*** (which was the third time in two days). *See, e.g.,* LCvR 56.1(c) Statement(A)(14), *supra.* However, again, Ms. Young's refusal of medication was not recorded or noted anywhere in the CHC medical chart. *Id.*

On the morning of February 7, Nurse White charted that Ms. Young "was complaining of vomiting blood for 3 days and [had] not eaten in 3 days." *See, e.g.,* LCvR 56.1(c) Statement(A)(15), *supra.* And while Defendants assert that Nurse White "investigated" Ms. Young's complaints, she disregarded them. Her dismissive findings

were contrary to the facts. In further disregard for Ms. Young, Nurse White did not record any vital signs or physical examination and did not contact a physician. ***Nurse White provided no medical care whatsoever.*** *Id.*

Later, on the night of February 7, Ms. Young continued to complain to detention staff in the SHU that she was ill, weak and had been vomiting for days. *See, e.g.,* LCvR 56.1(c) Statement(A)(16), *supra.* In addition, on the night of February 7, Ms. Young ended up ***on the floor of her cell.*** *Id.* At approximately 11:55pm on February 7, housing Sergeant Billie Byrd was called to the SHU and informed, by D.O. Norris, that Ms. Young "ha[d] not eaten ***or drank*** anything in three days" and that "she ha[d] been ***throwing up everything.***" *Id.* Sergeant Byrd escorted Ms. Young to the medical unit and informed Nurse Chinaka what had been happening with Ms. Young. Despite a finding that Ms. Young likely had the flu, Nurse Chinaka merely instructed Sergeant Byrd to take Ms. Young back to the SHU. *Id.*

On the morning of February 9, Nurse Chinaka charted that Ms. Young's "vitale [sic] signs" were "stable", but Ms. Young's pulse rate at the time was actually "high", a ***"possible sign of dehydration"*** and ***"neither normal nor 'stable.'"*** *See* LCvR 56.1(c) Statement(A)(17), *supra.* This serious and concerning sign was clearly ignored by Nurse Chinaka.

At approximately 6:48am on February 8, Ms. Young was "banging on the glass of her cell stating that she was having difficult[y] breathing." *See* LCvR 56.1(c) Statement(A)(20), *supra.* Ms. Young told Nurse Metcalf that she was *"wanting to go to the hospital." Id.* Nurse Metcalf refused to transfer Ms. Young to the hospital and *failed* even to document her encounter with Ms. Young. *Id.* Minutes after Nurse Metcalf

unceremoniously left Ms. Young in her cell, Ms. Young was found *"on the floor"* of her cell. *Id.* A "medical emergency" was called at approximately 6:59am. *Id.* Sergeant Byrd informed CHC's Nurse Gammil that Ms. Young had *"not eaten or [had] anything to dr[i]nk for three days, because she keeps throwing everything up."* *Id.* (emphasis added). Sergeant Byrd told the nurse in no uncertain terms, *"something is wrong with inmate Young beside her not taking her medication, because if it was just the medication she wouldn't be laying in the floor she would be cussing you and calling you everything name in the book."* *Id.* (emphasis added). Indeed, it was *"obvious"* to Sergeant Byrd that something was wrong with Ms. Young. *Id.*

Thus, by this point, at the latest, it was obvious, even to a layperson, that Ms. Young needed the attention of a physician. *See, Mata,* 427 F.3d at 751; *Thompson v. Gibson,* 289 F.3d 1218, 1222 (10th Cir. 2002). The nursing staff's failure to secure needed care and denial of access to medical personnel capable of evaluating the need for treatment constitutes deliberate indifference. *See, e.g., Sealock,* 218 F.3d at 1211.

Ms. Young was so weak and unsteady that she was incapable of getting on the gurney. *See* LCvR 56.1(c) Statement(A)(21), *supra.* She was *not responding* to questions. A nurse attempted to drag Ms. Young by her arm across the cell floor. At approximately 7:05am on February 8, Ms. Young *"collapsed"* and *"fell to the ground"* after nurses attempted to get her off the floor and onto her feet. After Ms. Young fell to the ground, TCSO Sergeant Hinshaw: (A) stated, *"we don't have time for that shit"*; (B) insisted that Ms. Young *"wasn't going to the hospital"*; and (C) opined that Ms. Young just "want[ed] to go to the hospital." *Id.*

The flat refusal to send Ms. Young to the hospital, and apathy to her symptoms

and worsening condition, was in blatant disregard for obvious and substantial risks to her health and safety. *See, e.g., Mata,* 427 F.3d at 751.

Nurse White claimed that Ms. Young's vital signs were stable, without recording them, and sent Ms. Young back to the SHU. *See* LCvR 56.1(c) Statement(A)(22), *supra.* During this entire period, Ms. Young exhibited **obvious signs of respiratory distress**, which were utterly ignored by Nurse White and the other medical staff. *Id.* at (26).

After Ms. Young was returned to her cell, at around 8:10am on February 8, Corporal D'Souza observed that Ms. Young was *"incoherent"* and *"not responsive"*, but **Nurse White "repeatedly stated that [Ms. Young] was <u>faking</u> her actions."** *See* LCvR 56.1(c) Statement(A)(24), *supra.* Defendants' own expert witness, Dr. Kassabian, testified that it is **"unprofessional"** to say a patient is "faking" and that even if a medical professional suspects malingering, he/she **must "investigate the medical cause"** and not simply "assume they [a]re faking." Kassabian Depo. (Ex. 11) at 225:9-22 (emphasis added). Nurse White did not investigate. And Sergeant Darby insisted that Ms. Young would not be sent to the hospital, per CHC. She was left to die in her cell.

"Suspicions of malingering may … be considered an indication of an ulterior motive whereby a defendant failed to take a plaintiff's condition seriously and thus acted recklessly in failing to provide proper care." *George v. Sonoma Cty. Sheriff's Dep't,* 732 F. Supp. 2d 922, 937 (N.D. Cal. 2010) (citing *Thomas v. Arevalo,* 1998 WL 427623, at *9 (S.D.N.Y. July 28, 1998); and *Walker v. Benjamin,* 293 F.3d 1030, 1040 (7th Cir. 2002)). Nurse White's insistence that Ms. Young was faking was reckless, unwarranted and even hostile. At a minimum, it was deliberate indifference.

In addition, as highlighted *supra*, Nurse White's callous disregard for Ms. Young's deteriorating health violated numerous Clinical Protocols. *See* LCvR 56.1(c) Statement(A)(25), *supra.*  While published requirements for health care do not create constitutional rights, violation of such protocols constitutes circumstantial evidence of deliberate indifference. *See, e.g., Mata,* 427 F.3d at 757.

Approximately two hours after Ms. Young was returned to the SHU, she was found lifeless in her cell.  She had expired from a subdural hematoma.  And Dr. Adusei, in deliberate indifference to Ms. Young's obvious and serious medical needs, did not even lay eyes on her until after her death.

Taken together, this is evidence that medical staff and detention staff (Nurse White, Nurse Metcalf, Nurse Chinaka, Dr. Adusei, Sgt. Hinshaw and Sgt. Darby, in particular) disregarded "excessive risk[s] to [Ms. Young's] health or safety" (*Mata,* 427 F.3d at 751), "prevent[ed] [Ms. Young] from receiving treatment [and] den[ied] h[er] access to medical personnel capable of evaluating the need for treatment" (*Sealock,* 218 F.3d at 1211); and caused "delay in [the provision] of medical treatment [resulting in] unnecessary pain or a worsening of [her] condition." (*Mata,* 427 F.3d at 755).  This is evidence of deliberate indifference.

The TCSO Defendants argue that Plaintiff cannot establish an underlying violation because "[n]o individual knew that Young sustained a head injury, yet disregarded the risk to her health or safety." MSJ at 22. But this impermissibly narrows the standard.  Indeed, in the § 1983 context, Plaintiff is not even required to submit evidence of the exact cause of death. *See, e.g., Gayton v. McCoy,* 593 F.3d 610, 619 (7th Cir. 2010).  The pertinent issues are whether Ms. Young's "need for medical attention

was obvious" and whether Jail medical and/or detention staff exhibited a "conscious disregard of a substantial health risk." *Rife,* 854 F.3d at 648.  In *Rife*, the Tenth Circuit reversed the lower court's grant of summary judgment in favor of an Oklahoma Highway Patrol Trooper where the plaintiff presented evidence that "could lead a reasonable factfinder to infer that Trooper Jefferson had recognized the need for medical attention" and failed to secure that medical attention for the plaintiff, Mr. Rife. *Id.*  Specifically, rather than take Mr. Rife to a hospital, despite numerous signs that he was injured, Trooper Jefferson arrested Mr. Rife for public intoxication and transported him to the McCurtain County Jail.  Similarly, in reversing summary judgment for the McCurtain County jailer defendants, the Court pointed to evidence that "Mr. Rife was repeatedly moaning in pain and complaining of stomach pain when entering the holding cell" and reasoned that "[t]his evidence could lead a reasonable factfinder to infer (1) an obvious need for medical attention and (2) [the jailer's] awareness of a substantial risk to Mr. Rife's health." *Id.* at 652.

As the *Rife* Court noted, "[a]uthorities ***later learned*** that Mr. Rife had … ***suffered a <u>head</u> <u>injury</u>*** in a motorcycle accident." *Id.* at 641 (emphasis added).  As such, in *Rife,* it was never suggested that the defendants had, or were required to have, specific knowledge that Mr. Rife had suffered a head injury.  And, here, Plaintiff does not allege that any of the medical staff or detention staff knew, specifically, that Ms. Young had suffered a subdural hematoma. On the contrary, Plaintiff presents evidence of numerous facts, as discussed above, that put medical and detention staff (Nurse White, Nurse Metcalf, Nurse Chinaka, Dr. Adusei, Sgt. Hinshaw and Sgt. Darby, in particular) on notice that something was obviously wrong with Ms. Young, that she was at substantial

risk of harm, that her condition was deteriorating and that she needed emergent "access to medical personnel capable of evaluating the need for treatment…" *Sealock,* 218 F.3d at 1211. By refusing to send Ms. Young to the hospital, or even provide her with an evaluation by a physician, the medical staff and detention staff were deliberately indifferent to her serious medical needs. Plaintiff has presented evidence of underlying violations.

### B. Plaintiff was Not Required to Name Each Underlying Tortfeasor in the Complaint

Defendants also argue that "Plaintiff's enigmatic claims do not make 'clear exactly *who* is alleged to have done *what* to *whom* to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations.'" MSJ at 19 (quoting *Gray v. University of Colo. Hosp. Auth.*, 672 F.3d 909, 921-11, n. 9 (10th Cir. 2012)). However, Plaintiff has consistently only brought "claims" against two County Defendants, Former Sheriff Glanz and the Tulsa County Sheriff (now Sheriff Regalado) in his official capacity. As Defendants well know, these claims in this case are predicated on whether a County policy or custom was the moving force behind Ms. Young's injuries. *See, e.g., Dodds*, 614 F.3d at 1207; *Monell,* 436 U.S. at 694 (1978). Thus, by alleging and providing evidence of specific policies or customs that proximately caused the Constitutional violations, Plaintiff has set forth "individualized allegations" against each Defendant. *Brown v. Montoya*, 662 F.3d 1152, 1165 (10th Cir. 2011). Liability under such theories may lie even where the plaintiff cannot name or identify any specific officer who committed the allegedly unconstitutional act(s). *See, e.g., Menotti v. City of Seattle,* 409 F.3d 1113, 1151 (9th Cir. 2005). And Plaintiff was certainly not required to name every individual agent, officer, nurse or physician who allegedly

32

violated Ms. Revilla's Constitutional rights. *See Askins v. Doe No. 1,* 727 F.3d 248, 253 (2nd Cir. 2013). Nevertheless, through the Complaint, discovery and this Response, Plaintiff has identified multiple individuals at the Jail who committed underlying violations of Ms. Young's Constitutional rights.   Further, it is permissible to use the collective term, "Defendants", so long as allegations make a "distinction as to what acts are attributable to whom…." *Robbins v. Oklahoma,* 519 F.3d 1242, 1250 (10th Cir. 2008). *See also Bledsoe v. Jefferson Cty., Kansas,* No. 16-2296-DDC-GLR, 2017 WL 3334641, at *14 (D. Kan. Aug. 4, 2017) ("[T]he Tenth Circuit never has adopted blanket prohibition against collective allegations.").   No reasonable person could confuse the allegations against the TCSO Defendants, which stem from policies and/or customs, with the allegations that medical and detention staff in the Jail were deliberately indifferent to Ms. Young's serious medical needs.  Summary judgment on the § 1983 claims is inappropriate.

## II.   FORMER SHERIFF GLANZ IS *NOT* ENTITLED TO QUALIFIED IMMUNITY

"When the defendant has moved for summary judgment based on qualified immunity, [courts] still view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor." *Henderson v. Glanz,* 813 F.3d 938, 952 (10th Cir. 2015) (citing *Estate of Booker v. Gomez,* 745 F.3d 405, 411 (10th Cir. 2014)).  "At the summary judgment stage, courts will grant qualified immunity unless "the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Estate of Booker,* 745 F.3d at 411 (citing *Saucier v. Katz,* 533 U.S. 194, 201-02 (2001)).  First, as shown *supra*, Plaintiff has, at the very least, shown that a

reasonable jury could find facts supporting a violation of a constitutional right in this case.  Second, the constitutional rights violated were "clearly established" at the time of Sheriff Glanz's conduct. In the Tenth Circuit, to show that a right is clearly established, the plaintiff must point to "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Estate of Booker,* 745 F.3d at 427; *see also McInerney v. King,* 791 F.3d 1224, 1236-37 (10th Cir. 2015). The law is also clearly established if the conduct is so obviously improper that any reasonable officer would know it was illegal. *See Hope v. Pelzer,* 536 U.S. 730, 739–42 (2002). As the Supreme Court recently observed, "'general statements of the law are not inherently incapable of giving fair and clear warning' to officers, *United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), but 'in the light of pre-existing law the unlawfulness must be apparent,' *Anderson v. Creighton, supra,* at 640, 107 S.Ct. 3034." *White v. Pauly,* 137 S. Ct. 548, 552 (2017).

Here, there are Supreme Court or Tenth Circuit decisions on point and general statements of the law giving fair and clear warning that the conduct was unlawful. Most importantly, the supervisory liability standard articulated in *Dodds v. Richardson* was established at the time Ms. Young's death.   It was "***clearly established*** by 2007 that officials" such as Sheriff Glanz, "may be held _individually_ liable for _policies_ they *promulgate, implement, or maintain that deprive persons of their federally protected rights." Dodds,* 614 F.3d at 1207 (emphasis added). The *Dodds* Court found facts sufficient to satisfy the first prong of the qualified immunity test where the summary judgment evidence tended to show that the defendant there "may have deliberately

enforced or actively maintained the policies" which caused the alleged Constitutional deprivation at issue. *Dodds,* 614 F .3d at 1203-04.  Sheriff Glanz knew by his continuing failure to alleviate -- and efforts to cover-up -- known and long-standing deficiencies in his healthcare care delivery system, he was subjecting himself to constitutional liability. Thus, the law, pertinent to Plaintiff's theory for Glanz's liability, was clearly established. It is Plaintiff's position the Court need only determine whether the supervisory liability claim was clearly established.   However, to the extent that the Court delves into the underlying constitutional right, such right was clearly established, as well.

An inmate's rights to adequate medical care and to be free from deliberate indifference have been clearly established for decades. *See, e.g., Estelle*, 429 U.S. at 103-04.  "[T]here is little doubt that deliberate indifference to an inmate's serious medical need [violates] a clearly established constitutional right." *Mata,* 427 F.3d at 749. It has been held, on numerous occasions, that a medical professional's failure to provide timely and necessary health care services for an inmate with obvious symptoms of an emergent and life-threatening condition violates the Constitution. *See Sealock,* 218 F.3d at 1211–12; *Mata,* 427 F.3d at 758–59. Former Sheriff Glanz is not entitled to qualified immunity.

## III.   THE TCSO DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S STATE CONSTITUTIONAL CLAIM

Plaintiff's State law claims are brought against all Defendants under the Oklahoma Constitution, pursuant to *Bosh v. Cherokee Building Authority,* 2013 OK 9, 305 P.3d 994.  More specifically, Plaintiff brings her State law claim for violation of Article II §§ 7 and 9 of the Oklahoma Constitution, which prohibit the infliction of cruel and unusual punishment of pretrial detainees.  The TCSO Defendants argue that they are entitled to summary judgment because Revilla was not denied medical attention during

her stay at the jail in the medical unit. MSJ at 30.  As established herein, however, there were numerous violations of Ms. Revilla's Constitutional rights such that the *Bosh* claim survives summary judgment.

WHEREFORE, premises considered, Plaintiff respectfully requests that this Court deny Defendants Stanley Glanz and Vic Regalado's Motion for Summary Judgment (Dkt. #469).

Respectfully,

/s/ Robert M. Blakemore
Daniel Smolen, OBA #19943
Donald E. Smolen, II, OBA #19944
Robert M. Blakemore, OBA #18656
Smolen Smolen & Roytman
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone: (918) 585-2667
Fax:    (918) 585-2669

**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of October 2017, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

/s/ Robert M. Blakemore