UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

CHRISTINE WRIGHT, as Special )
Administrator of the Estate of Lisa )
Salgado, deceased, et al., )
)
       Plaintiffs, )
) Case No. 13-CV-315-JED-JFJ
v. )
)
STANLEY GLANZ, et al., )
)
       Defendants. )

## **OPINION AND ORDER**

Before the Court are the summary judgment motions of defendants Phillip Washburn, M.D. (Doc. 246) and Correctional Healthcare Companies, Inc. (CHC) (Doc. 244) as to the claims of plaintiff, Christine Wright (now known as Christine Hamilton). Ms. Wright responded (Doc. 315, 318), and the defendants replied (Doc. 343, 344). The Court has also considered supplemental briefs (Doc. 505, 516, 519, 520) on the summary judgment motions.

**I.    Background**

Lisa Salgado died on June 28, 2011 after being booked into the David L. Moss Criminal Justice Center (the Jail) three days earlier. She was 40 years old. At booking on June 25, 2011, she reported insulin-dependent diabetes, neuropathy, and cardiac, cholesterol, and hypertension issues. After reporting and being observed exhibiting symptoms including chest pain, vomiting, nausea, weakness, and hyperventilation for at least two days, Ms. Salgado died at the Jail on June 28, 2011.

Plaintiff brings claims under state law and 42 U.S.C. § 1983, alleging that Dr. Washburn and CHC were negligent and deliberately indifferent to the serious medical needs of Ms. Salgado, resulting in her death. Those defendants seek summary judgment.

## II.     Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The courts thus must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255. The court may not weigh the evidence and may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam). Instead, the court must view the evidence in the light most favorable to the non-moving party. *Id.* at 657.

## III.    The Record Facts

The summary judgment record includes evidence of the following: When Ms. Salgado was booked into the Jail on June 25, 2011, a "Receiving Screening" form was completed. (Doc. 318-2 at 6-7). The form indicates that Ms. Salgado reported that she had

2

recently been hospitalized for chest pain and that she had medical problems, which included diabetes, as well as cardiac, neuropathy, and cholesterol issues. (*Id.* at 7). Another record reflects that Ms. Salgado reported that she had been to the hospital emergency room within the prior three days. (Doc. 318-16 at 22).

Records indicate that, on June 25, 2011, the Jail's Medical Director, Phillip Washburn, M.D., referred Ms. Salgado for an electrocardiogram (EKG) (*see* Doc. 318-2 at 27-28), and she was administered two EKGs, one at 2:43 p.m., and another at 2:51 p.m. One of the results was "abnormal," showing right atrial enlargement, a S-T abnormality, and "sinus tachycardia." (*Id.* at 27). The other EKG was "borderline," showing a normal sinus rhythm, but right atrial enlargement, with S-T abnormality. (*Id.* at 28).[1]

Dr. Washburn testified that he would have reviewed the EKG results, which he initially testified were "normal," "[p]robably as soon as it came over the line." (Doc. 318-8 at 19-21 [Dep. pp. 157, 160]). However, the EKG results were not uploaded into the medical system until over two weeks after Ms. Salgado died. (*See id.* at 26-28) (uploaded into the system July 14, 2011 and "N/A" in response to "Document has been reviewed?"). When that was pointed out to him during his deposition, Dr. Washburn responded, "I had somebody read it to me, I guess." (Doc. 318-8 at 20 [Dep. p. 161]). He ultimately indicated that it was his practice to "just call the nurses station and ask them to give [him] an EKG report" by reading it to him. (*Id.* at 22-23 [Dep. pp. 164-165]).

---

[1] The records and testimony are inconsistent as to whether Ms. Salgado's EKGs were administered on June 25 or June 26, 2011, or whether EKGs were administered both days. The EKG reports themselves are dated June 25, 2011.

3

On June 26, 2011, Jail nursing staff generated a "problem oriented record" indicating that Ms. Salgado reported chest pain and answered numerous questions pursuant to a "protocol" for "Chest Pain/Indigestion." (*Id.* at 17). She informed staff that she had a history of "cardiac disease," her pain started suddenly at 4:15 p.m. and was "11 on a scale of 0-10," radiating to the neck, and nothing reduced the pain. (*Id.*). Staff also recorded that Ms. Salgado was suffering from nausea, shortness of breath, and chest wall tenderness. (*Id.*). She was rubbing her chest, appeared to be hyperventilating, and stated that she was too weak to hold the bag that Jail staff gave her to "breathe into." (*Id.* at 18). The chart instructs that, "[i]f pain is suspected to be cardiac in nature," medical personnel are to administer aspirin, start oxygen, lay the patient down, and administer nitroglycerin, repeating every five minutes for chest pain, and obtain an EKG. (*Id.*). On June 26, 2011, Ms. Salgado was administered nitroglycerin every five minutes for four doses. (*Id.* at 19). She was returned to her cell. (*See* Doc. 318-2 at 18 ["after EKGs pt was returned to her POD and will see Dr. Washburn in the morning"]).[2]

The order for nitroglycerin and EKGs indicate concerns of a cardiac etiology of the chest pain. (Doc. 318-4 at 189:12-14; *see also* Doc. 318-2 at 18 [instructions for pain that is "suspected to be cardiac in nature" includes aspirin, nitroglycerin, and EKG]). By definition, Ms. Salgado was suffering from unstable angina. (Doc. 318-4 at 190:16-192:4). Ms. Salgado's symptoms showed "clear and significant risks for acute coronary

---

[2] As noted, the records are inconsistent as to when EKGs were conducted. While CHC's medical record indicates EKGs were administered on June 26, 2011, no EKGs with that date are found in the summary judgment record. Instead, the only EKG records are dated the previous day, June 25, 2011, in the afternoon.

syndrome." (Doc. 318-7 at 20). Yet, no ambulance was called, and no arrangements were made to transport Ms. Salgado to a hospital for follow up care.

Nurse Metcalf testified that she was unaware that there had been an abnormal EKG, which was important information that would have led her to be concerned about potential "heart problems." (Doc. 318-11 at 16-17 [Dep. pp. 121-123]). The purpose of putting such important information in the medical notes would have been to provide the information to everybody who dealt with Ms. Salgado, but that information was not included in the chart for Ms. Salgado. (*See id.* at 18 [Dep. p. 145]).

> Q. And why would it have been important?
>
> A. So I'd be aware of impending heart problems and let the doctor be aware of it.
>
> Q. Okay. And do you think that you would have viewed her nausea, vomiting and chest pain complaint on the 27th differently if you had known she had an abnormal EKG the day before?
>
> A. Correct.

Despite Salgado's very severe chest pain, nausea, vomiting, and abnormal EKG, Dr. Washburn could not remember any details about seeing Ms. Salgado, and he did not document *any* medical visit or examination until June 29, 2011, *after* she died. Records indicate that Dr. Washburn's medication orders for Ms. Salgado were made by phone on June 26, 2011. (Doc. 318-2 at 18).

Nurse Metcalf recorded a single check of Ms. Salgado on June 27, 2011 at 10:24 a.m., but Metcalf testified that the note would have been from a check at about 7:00 a.m. that was entered into the computer hours later. The note indicates that Metcalf took Ms.

5

Salgado's vital signs and that Ms. Salgado again reported nausea, vomiting, abdominal pain, and chest pain. (Doc. 318-2 at 6). By that time, Salgado had continued to report cardiac symptoms over the course of at least two days. On the morning of June 27, 2011, Nurse Metcalf further recorded that Dr. Washburn had seen the patient and ordered a chest x-ray and Vistaril. Washburn, however, believed that he saw Ms. Salgado on June 28, 2011 and that Metcalf's note may be wrong. (Doc. 318-8 at 26 [Dep. 169]).

Nurse Metcalf testified that she would have taken vitals at some point during the balance of her shift, which was from 7:00 a.m. to 7:00 p.m. on June 27, but she did not record any vitals beyond those she put into the system for her 7:00 a.m. check of Ms. Salgado. (*Id.* at 11 [Dep. p. 100]).[3] Detention Officer Joshua Walker reported that, on June 27, 2011, he "observed Lisa Salgado being in pain and unresponsive" after "she had allegedly fell flat on her face," although she was not bleeding, bruised, or unconscious. (Doc. 318-16 at 11). There is no documentation of the pain or falling flat on her face in

---

[3] The plaintiff has questioned the veracity of the medical records and pointed to numerous inconsistencies, inaccuracies, and information that was never recorded but which medical personnel claimed was collected. Plaintiff submitted an affidavit of Tammy Harrington, R.N., who was the Director of Nursing for CHC from June 5, 2011 through March 20, 2012 and, prior to that, was a sick call nurse for the Jail from August 2008 through June 2011. Nurse Harrington averred that, after Ms. Salgado "died from a heart attack, it was discovered that her vital signs had not been recorded," and the Jail's Health Services Administrator, "Chris Rogers[, R.N.,] instructed the nursing staff to doctor [Salgado's] medical records so that it would appear that Ms. Salgado's vitals had been taken and recorded." (Doc. 318-10 at 7). According to Harrington, Chris Rogers "routinely directed nursing staff to falsify, doctor and backdate medical records and charts in this manner." (*Id.*).

the medical records, although Officer Walker allegedly reported his observations to the nursing staff on June 27. (*Id.*).

On June 28, 2011, Nurse Metcalf again worked the 7:00 a.m. to 7:00 p.m. shift. She did not document *any* care or assessment of Ms. Salgado that day prior to her death.[4] At shift change, Metcalf informed Nurse Paul Wallace that "everybody was okay." (Doc. 318-17 at 2 [Dep. p. 46]). Metcalf did not mention Ms. Salgado or inform Nurse Wallace about Salgado's condition. When Nurse Wallace was completing his beginning of shift "walk through" at about 7:25 p.m., he noted that Ms. Salgado was under covers on the left part of her cell, had blankets on top of her, and she "did not look good." (*Id.*; Doc. 318-16 at 3). She was not responding, so he banged on her door to see if he could wake her. She still did not respond, and he yelled for a few more minutes. (*Id.*). She "looked kind of hinky" and he yelled at the detention officer to open the cell for Wallace to check on her. (*Id.*). When he entered the cell, he kicked the side of the mattress Salgado was on, but she still did not respond. (*Id.* at 3 [Dep. p. 47]).

When the Jail staff entered the cell, Ms. Salgado was pale or diaphoretic, did not "have good color to her," was "grayish," and she was not moving and was "extremely cold" to the touch. (*Id.* at 3-5 [Dep. pp. 53-55]). Wallace believes that "she may have possibly

---

[4] After Ms. Salgado died, Nurse Metcalf indicated that she had spoken to Ms. Salgado and that Salgado allegedly said she was feeling better, at 3:00 p.m. on June 28, 2011. Metcalf also reported that Salgado took medication without difficulty, and that Metcalf saw her resting with her eyes closed at 5:30 p.m. (Doc. 318-16 at 3). None of those observations were recorded before Ms. Salgado was found unresponsive after Metcalf was relieved by Nurse Wallace at the 7:00 p.m. shift change. The plaintiff has presented evidence from which a reasonable juror could find Nurse Wallace's post-mortem allegations to be lacking accuracy or credibility.

been passed away for awhile," although he could not "ascertain how long that might have been." (*Id.* at 6 [Dep. p. 56]). Wallace called for a medical emergency, and he started CPR. (Doc. 318-16 at 3). Jail staff could not revive Ms. Salgado, and she was pronounced dead at 8:01 p.m., after EMSA paramedics also were unable to revive her upon taking over CPR. (*Id.* at 4).

The *only* note by Dr. Washburn relating to Ms. Salgado was a "Late Note" he entered on June 29, 2011, the morning *after* Ms. Salgado died. (*See* Doc. 318-2 at 3). He did not even mention chest pain, shortness of breath, or her abnormal EKG, and instead characterized his visit with her as being about abdominal pain that had improved. He did not record the time of that alleged visit on June 28, and Nurse Metcalf had recorded that he actually saw Ms. Salgado on June 27 – two days before Washburn recorded the "Late Note" after she died – and not June 28. Whether he saw Ms. Salgado on June 27 or 28, the note he recorded was not consistent with other observations of Salgado's chest pain, shortness of breath, nausea and vomiting, and a jury could reasonably find his post-mortem "late" note to be self-serving or lacking in accuracy or credibility.[5]

In his deposition, Dr. Washburn reported that Ms. Salgado had been "up and down," with multiple reports that "she's bad" and was "crashing" or had "crashed," probably two or three times over the course of a day before she died. (Doc. 318-8 at 29 [Dep. p. 222]). He acknowledged that Ms. Salgado should have been sent to the hospital emergency room

---

[5]   During the post-mortem investigation into Ms. Salgado's death, "the toilet in her room contained what appeared to be vomit" and nursing staff reported that Salgado "had been vomiting regularly." (Doc. 318-16 at 6).

"sometime that evening when she crashed again on us." (*Id.* at 28-29 [Dep. p. 221-222]). Unfortunately, she was not sent to the hospital, and she subsequently died in her cell.

## IV. Discussion

### A. Section 1983 Claim Against Dr. Washburn

*Deliberate Indifference Standard*

Claims under 42 U.S.C. § 1983 based upon a failure to provide medical care for serious medical needs of inmates are judged under the "deliberate indifference to serious medical needs" test of *Estelle v. Gamble*, 429 U.S. 97 (1976). As explained by the Supreme Court:

> The [Eighth] Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . against which we must evaluate penal measures. . . . These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," . . . the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that "it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."
>
> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," . . . proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

9

429 U.S. at 102-05 (internal citations and footnotes omitted); *see also Al-Turki v. Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014) ("[T]he Eight Amendment's prohibition against cruel and unusual punishment extends to the unnecessary and wanton infliction of pain caused by prison officials' deliberate indifference to serious medical needs of prisoners.").

Prison officials violate an inmate's constitutional rights where the officials "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). A delay in medical care also "constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).

These principles "appl[y] to pretrial detainees through the due process clause of the Fourteenth Amendment." *Howard v. Dickerson*, 34 F.3d 978, 980 (10th Cir. 1994). Deliberate indifference is defined as something more than mere negligence; it requires knowing and disregarding an excessive risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference has both objective and subjective components. *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991).

*Objective Component*

The objective component is met if the harm suffered is sufficiently serious. *Id.* at 298. "A medical need is serious if it is 'one that has been diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Ramos v. Lamm*, 639 F.3d 559, 575 (10th

10

Cir. 1980); *see also Al-Turki*, 762 F.3d at 1192-93; *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).

The Tenth Circuit has "held that 'death [is], without doubt, sufficiently serious to meet the objective component." *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)). Because Ms. Salgado died, the evidence plainly supports the objective component. In addition, a reasonable jury could find upon the record evidence that Ms. Salgado experienced severe pain for days without being taken to a hospital or receiving proper treatment, and such evidence also independently provides support for the objective element. "When the pain experienced during [a] delay [in medical care] is substantial, the prisoner 'sufficiently establishes the objective element of the deliberate indifference test.'" *Kikumura v. Osagie*, 461 F.3d 1269, 1292 (10th Cir. 2006) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000)). Numerous types of ailments and pain have been considered sufficiently serious medical conditions within the *Estelle* framework. *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (chest pain); *Mata*, 427 F.3d at 752-54 (severe pain and worsening of heart condition); *Kikumura*, 461 F.3d at 1292-93 (severe pains, cramps, vomiting due to hyponatremia).

*Subjective Component*

The plaintiff argues that the Court should adopt the objective-only standard for deliberate indifference, such that there need be no evidentiary support for a finding of the subjective component. In support of that argument, plaintiff cites *Kingsley v. Hendrickson*, __ U.S. __, 135 S. Ct. 2466, 2473, 2475 (2015). In *Kingsley*, the Supreme Court held that

11

the Eighth Amendment standard for excessive force claims brought by prisoners, which requires that defendants act "maliciously and sadistically to cause harm," does not apply to Fourteenth Amendment excessive force claims brought by pretrial detainees. *Id.* at 2466, 2473, 2475. Instead, Fourteenth Amendment excessive force claims by pretrial detainees require showing only that the defendant's use of force was "objectively unreasonable." *Id.*

The "Circuits are split on whether *Kingsley* alters the standard for conditions of confinement and inadequate medical care claims brought by pretrial detainees." *Estate of Vallina v. County of Teller Sheriff's Office*, 757 F. App'x 643, 646 (10th Cir. 2018) (unpublished). The Tenth Circuit has continued to apply both the subjective and objective components to medical care claims by pretrial detainees and has thus far declined to address the issue. *See, e.g., Burke v. Regalado*, 935 F.3d 960, 991-992, n.9 (10th Cir. 2019); *Perry v. Durborow*, 892 F.3d 1116, 1122 fn. 1 (10th Cir. 2018); *Khan v. Barela*, )) F. App'x __, 2020 WL 1488762 (10th Cir. Mar. 26, 2020) (unpublished) ("In this circuit, there is an open question whether, in light of *Kingsley*'s pronouncement regarding excessive-force claims, the subjective component of the *Farmer* test applies to a pretrial detainee's claims regarding conditions of confinement and inadequate medical care.").

Without guidance from the Tenth Circuit, the undersigned declines to extend *Kingsley*'s excessive force, objective-only standard to pretrial detainee claims of inadequate medical care. In any event, there is a genuine dispute of material facts, such that a reasonable jury could find the subjective component is satisfied here. The subjective component "lies 'somewhere between the poles of negligence at the one end and purpose

12

. . . at the other.' . . . The Supreme Court has analogized it to criminal recklessness, to the conscious disregard of a 'substantial risk of serious harm.'" *Blackmon v. Sutton*, 734 F.3d 1237, 1244-45 (10th Cir. 2013) (quoting *Farmer*, 511 U.S. at 836). The inmate's symptoms "are relevant to the subjective component of deliberate indifference. The question is: were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?" *Martinez*, 563 F.3d at 1089. Whether the defendant had the "requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. The "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

Here, construed in plaintiff's favor, the record evidence would support a finding that Dr. Washburn and Nurse Metcalf were deliberately indifferent to Ms. Salgado's serious medical needs. Ms. Salgado reported a history of heart attack and issues with cholesterol and hypertension, among other ailments. She complained of very severe chest pain, nausea, vomiting, extreme weakness, and she was rubbing her chest in pain. An EKG, nitroglycerin, and aspirin were ordered by Dr. Washburn, which indicates a suspected cardiac etiology. She was administered at least two EKGs, one of which was abnormal and the other indicated borderline with abnormal findings. After Ms. Salgado died, nursing staff reported that she had been "vomiting regularly." A jury could infer that Dr. Washburn and other medical staff were aware of an obvious substantial risk to Ms. Salgado's health.

In addition, it is clear there were concerns that Ms. Salgado's symptoms were cardiac in nature. She had a history of cardiac issues, and her symptoms were consistent

with a heart problem. Testing was ordered, but the record is devoid of credible evidence that medical staff even read the results or acted upon them. The results of the EKGs shown in the record were borderline and abnormal, but those results were not uploaded into the medical system until long after Ms. Salgado died, and it is not clear that Dr. Washburn ever considered the abnormal results. Ms. Salgado continued to report chest pain, vomiting, and nausea at least through June 27, 2011, when Nurse Metcalf recorded a check from around 7:00 a.m. that morning. (Doc. 318-2 at 6).

The records thus indicate that she had been suffering serious cardiac symptoms for at least two, and perhaps three, days. The EKGs were taken on June 25 or June 26, 2011, Ms. Salgado complained of off-the-scale chest pain on June 26, 2011, and she continued to suffer chest pain, vomiting, and nausea at least until June 27, 2011. Yet, there were no further documented checks on June 27 or June 28, 2011, before she was found unresponsive, extremely cold, and grayish in color, in her cell after 7:00 p.m. on June 28, 2011. She was not sent to a hospital, and Dr. Washburn did not bother to record anything about Ms. Salgado's two or three days of cardiac symptoms. Indeed, his only notation, which was entered the day after she died, did not mention the EKG or cardiac symptoms, and it is not clear that he even saw her on the day he claimed to have seen her.

While Dr. Washburn and CHC attempt to characterize the medical care as merely involving "an incorrect judgment call and/or . . . inadequate treatment" (*see* Doc. 246 at 2), a reasonable jury could find on this record that Washburn and other CHC staff were deliberately indifferent to Ms. Salgado's serious medical needs. While providing little care for her serious symptoms, which continued over at least two days until her death, medical

staff also did not refer her to outside medical personnel who could have helped her. It is unclear from CHC's inconsistent and incomplete medical records that any actual care was provided for Ms. Salgado's cardiac systems on the day she died. Dr. Washburn's testimony would further support a finding that he was advised two or three times on the last day of Ms. Salgado's life that she "was crashing," but she was not sent to a hospital.

The Tenth Circuit has held that deliberate indifference may be found where an inmate is prevented "from receiving treatment" or is denied "access to medical personnel capable of evaluating the need for treatment." *Burke*, 935 F.3d at 993 (quoting *Sealock*, 218 F.3d at 1211). If the official delays or refuses to fulfill that gatekeeper role, he "may be liable for deliberate indifference." *Id.* Thus, deliberate indifference has been found where inmates exhibited serious symptoms but officials took no action to treat them. *Id.*; *Sealock*, 218 F.3d at 1210-11 (deliberate indifference to severe chest pain by refusing to refer inmate to hospital). Here, there is evidence from which a factfinder may infer that Dr. Washburn was deliberately indifferent by his failure to properly and timely act upon Ms. Salgado's numerous serious cardiac symptoms, and he prevented her from obtaining the medical treatment she needed at a hospital.

For these reasons, Dr. Washburn's summary judgment motion is **denied** with respect to the § 1983 claim for deliberate indifference to medical needs.

  B.     **Section 1983 Claim Against CHC**

CHC first argues that it cannot be held liable under § 1983 because it is a private corporation and not a "person" within the meaning of the statute. However, the municipal liability principles in *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691

15

(1978), extend to private companies that contract to provide services on behalf of governmental entities. *See, e.g., Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (*Monell* extends to "private entities acting under color of state law"); *Carr v. El Paso Cnty, Colo.*, 757 F. App'x 651, 655 (10th Cir. 2018) (unpublished).

Under *Monell*, to survive summary judgment, plaintiff must supply record evidence of the following: (1) the existence of a CHC policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. "whether there is a direct causal link between [the] policy or custom and the alleged constitutional deprivation"). *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694; *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

CHC next argues that it cannot be liable because none of its employees violated Ms. Salgado's constitutional rights by deliberate indifference to her medical needs. (*See* Doc. 244 at 24). For the reasons discussed above, the record evidence is sufficient to support a finding by a reasonable jury that Dr. Washburn and Nurse Metcalf were deliberately indifferent to Ms. Salgado's serious medical needs.[6]

---

[6] CHC also contends that it is not responsible for Dr. Washburn's deliberate indifference because he was employed by a CHC affiliate, Correctional Healthcare Physicians II, PC. (Doc. 244 at 25). There is evidence that counters CHC's claim that CHC lacked control over any policy or custom applicable to Dr. Washburn. For example, Washburn testified that he interviewed with CHC and worked for CHC. (*See* Doc. 315-8 at 2 [Dep. 8]). His contract to serve as Medical Director at the Jail refers throughout to obligations with respect to "affiliates" of the contracting Correctional Healthcare company (*see* Doc. 245-1). Larry Wolk, MD – CHC's Chief Medical Officer – signed the contract (*id.*), and CHC notably failed to provide the part of the contract (Exhibit A) that contained a description of Dr. Washburn's "duties" and "scope of service." (*See id.* at 1). Even

Moreover, plaintiff has presented sufficient evidence to demonstrate the existence of a fact issue preventing summary judgment on the *Monell* claim against CHC. Based on the record evidence, construed in plaintiff's favor at this stage, a reasonable jury could find that, in the years prior to Ms. Salgado's death in 2011, CHC maintained a policy and custom of failing to provide medical care in response to serious medical needs of Jail inmates, failing to provide proper training and supervision regarding emergent medical conditions, and continuing to adhere to a constitutionally deficient system of care for detainees with serious medical needs. In the two years before Ms. Salgado died, there were systemic, repeated, and documented failures to deliver appropriate healthcare, which specifically included delay in seeking emergency medical care for inmates with symptoms of cardiac failure, resulting in deaths of other inmates under CHC's care. CHC was aware of other documented failures, which were cited in audits in 2009 and 2010 as including a failure to comply with mandatory health standards, understaffing of medical personnel, deficiencies in doctor coverage, a lack of health services oversight and supervision, failure to provide training, delays in delivery of health care, and improper documentation of health services. The evidence here, construed in favor of the plaintiff, would support a finding that CHC continued its failure to provide adequate medical care and failed to address documented deficiencies, which amounted to a custom that was the moving force behind the deliberately indifferent failure of medical staff to provide or obtain timely and

---

without that, it is clear from the contract that Washburn was required to provide supervision and to review the services provided by all non-physicians involved in the provision of medical care (*id.*), which would necessarily include numerous other CHC employees.

17

appropriate treatment for Ms. Salgado. CHC's Motion for Summary Judgment (Doc. 244) as to plaintiff's § 1983 claim is thus **denied**.

## C. State Law Claims

With respect to plaintiff's state law negligence claims, Dr. Washburn and CHC argue that the defendants are immune from liability under the Oklahoma Governmental Tort Claims Act (GTCA). The GTCA provides tort immunity to "the state, its political subdivisions, and all of their employees acting within the scope of their employment." *Okla. Stat.* tit. 51, § 152.1(A); *see also Okla. Stat.* tit. 51, § 163(C) (tort actions may not be brought against "an employee of the state or political subdivision acting within the scope of his employment"). The statute defines employees to include "licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies." *Okla. Stat.* tit. 51, § 152(7)(b)(7).

The Oklahoma Supreme Court has stated that, "[g]enerally speaking, the staff of a healthcare contractor at a jail are 'employees' who are entitled to tort immunity under the GTCA by virtue of sections 152(7)(b), 153(A), and 155(25)." *Barrios v. Haskell Cty. Pub. Facilities Auth.*, 432 P.3d 233, 236 fn.5 (Okla. 2018). However, the court specifically noted that it had "not been asked whether Turn Key Health, LLC or its staff are 'employees' under section 152(7)(b), but ha[d] assumed they are for purposes of answering the questions certified to [the Oklahoma Supreme Court]." *Id.* Based on that strong indicator by the Oklahoma Supreme Court, federal judges in this district have recently extended the footnote in *Barrios* to corporate jail medical contractors and their employees, determining

18

them to be entitled to immunity on state claims pursuant to the GTCA. *See, e.g., Prince v. Turn Key Health Clinics, LLC*, No. 18-CV-0282-CVE-JFJ, 2019 WL 238153, at *9 (N.D. Okla. Jan. 16, 2019) (unpublished); *Burke v. Regalado*, 18-CV-231-GKF-FHM, 2019 WL 1371144, at *2–3 (N.D. Okla. Mar. 26, 2019) (unpublished); *Wirtz v. Regalado*, 18-CV-599-GKF-FHM, 2020 WL 1016445 (N.D. Okla. Mar. 2, 2020) (unpublished).

Based on the Supreme Court's footnote in *Barrios* and the reasoning of other federal district judges in this District, the Court determines that the Jail's health care contractor and its employees are immune from tort claims pursuant to the GTCA. Accordingly, Dr. Washburn and CHC are immune on plaintiff's state law negligence claim, and those defendants are entitled to summary judgment on that claim.[7]

## V. Conclusion

For the foregoing reasons, the summary judgment motions (Doc. 244, 246) of CHC and Dr. Washburn are **denied** as to the plaintiff's § 1983 claims and are **granted** as to the state law negligence claims.

SO ORDERED this 3rd day of April, 2020.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[7] If this Court had disposed of plaintiff's federal claims in favor of the defendants, it would be appropriate to decline to exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c). *See Birdwell v. Glanz*, 790 F. App'x 962 (10th Cir. 2020) (unpublished). However, the federal claims have survived, and the undersigned has adopted the reasoned approach of colleagues in this District at this time.