**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| CHRISTINE WRIGHT, as Special Administrator of the Estate of Lisa Salgado, deceased, et al., | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | Case No. 13-CV-315-JED-JFJ |
| STANLEY GLANZ, et al., | ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

Before the Court is the summary judgment motion of defendants Stanley Glanz, who was formerly the Tulsa County Sheriff, and Vic Regalado, the current Tulsa County Sheriff (Doc. 251), as to the claims of plaintiff, Christine Wright (now known as Christine Hamilton). Former Sheriff Glanz is sued in his individual capacity, and Sheriff Regalado is sued in his official capacity. The Court has considered the motion, the plaintiff's response (Doc. 316), the defendants' reply (Doc. 348), and supplemental briefs (Doc. 505, 516 and 524) that were filed as to the sheriffs' summary judgment motion.

**I.    Background**

Lisa Salgado died on June 28, 2011 after being booked into the David L. Moss Criminal Justice Center (the Jail) three days earlier. Ms. Salgado reported a history of cardiac and other medical problems and that she had recently been hospitalized. During her three days at the Jail before Ms. Salgado died, she reported and was observed exhibiting symptoms including chest pain, vomiting, nausea, weakness, and hyperventilation. Jail

personnel did not seek emergency treatment for her until she was found in her cell unresponsive, cold to the touch, with grayish-colored skin.

Plaintiff brings claims under the state constitution and 42 U.S.C. § 1983, alleging that Jail medical staff violated Ms. Salgado's constitutional rights by deliberate indifference to her serious medical needs and that former Sheriff Glanz was deliberately indifferent in knowingly maintaining a deficient medical system at the Jail, which caused the underlying constitutional violation. Plaintiff also sues current Sheriff Regalado in his official capacity as a result of the alleged unconstitutional medical system. Sheriffs Glanz and Regalado move for summary judgment.

## II.     Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The courts thus must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255. The court may not weigh the evidence and may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant. *Tolan v. Cotton*, 572

U.S. 650, 656-57 (2014) (per curiam). Instead, the court must view the evidence in the light most favorable to the non-moving party. *Id.* at 657.

### III. The Record Facts

The factual record with respect to Ms. Salgado's symptoms and death at the Jail is summarized in the Court's order entered April 3, 2020 (Doc. 527) and is incorporated herein. The summary judgment record also includes significant evidence that, between 2007 and Ms. Salgado's death in 2011, former Sheriff Glanz, who at the time was responsible for the Jail's medical care system, was repeatedly informed of medical understaffing, inadequate training, poor follow-up, and resulting bad health outcomes. These include a 2007 audit by the National Commission on Correctional Health Care (NCCHC), which reported findings that inmate health needs were not timely addressed, a 2009 mock audit and report by Elizabeth Gondles, Ph.D., and a 2010 NCCHC report.

For her report, Dr. Gondles reviewed documents, toured the Jail, and interviewed Jail medical and detention personnel. Dr. Gondles's report, which was provided to the Jail administrator, identified numerous issues with the Jail's health care system, including understaffing of medical personnel, deficiencies in doctor coverage, lack of health services oversight and supervision, training failures, nursing shortages, failure to provide timely health appraisals, and hundreds of health-related problems in the prior year. (Doc. 316-29). Dr. Gondles recommended "substantial changes" at the Jail after she noted certain numerous failures to comply with mandatory health standards and concluded that "[m]any of the health service delivery issues outlined in this report are a result of the lack of understanding of correctional healthcare issues by jail administration and contract

oversight and monitoring of the private provider." (*Id.* at 7, 22). Gondles recommended that the Jail establish a department of health services, which would employ a professional to oversee health services deliver and monitor the competency of the health staff and adequacy of the health delivery system. (*See id.* at 4). Sheriff Glanz did not follow Dr. Gondles's recommendations.

Following the 2010 NCCHC audit of the Jail's health services, the NCCHC placed the Jail on probationary status. (Doc. 316-34 at 1 [p. 00069]). The 2010 audit report identified numerous serious deficiencies with the Jail's health services program. The report noted several inmate deaths in the prior year, with poorly performed mortality reviews, a failure to identify problems and implement corrective actions, physicians' failure to document reviews of medical health assessments and conduct clinical chart reviews to determine if clinically appropriate care was implemented, and a failure to conduct timely diagnostic testing and specialty consultations. (Doc. 316-34). Glanz testified that he did not remember reading the complete report, but his practice was to typically read the first two or three pages of such reports. (*See* Doc. 316-24 at 5-6 [Dep. pp. 140-141]).

In the months prior to Ms. Salgado's death, other inmates died from cardiac arrest after alleged delays in emergency treatment. (Doc. 316-32). One inmate died on March 12, 2010, after documented chest pain over the prior week's time. The Jail's internal medical auditor determined that delay in calling for an ambulance may have contributed to the inmate's death. (*See id.* at 2). Another inmate died on June 17, 2010 after going into cardiac arrest. (*Id.*). The Jail's auditor found that there were "several standard of care issues in the care of this inmate," which included a lack of monitoring after considerable

4

risk of continued rise in her [potassium] which could lead to cardiac arrest." (*Id.*). On December 14, 2010, another inmate died from cardiac arrest. (*Id.* at 3). The inmate had a history of heart attacks and had been prescribed Metoprolol. The inmate apparently did not receive the prescription while at the Jail because the medical staff failed to follow up on the prescription. The Jail's internal medical auditor noted that "[i]f [the] inmate had been on this medicine, his chances of having a fatal cardiac event would have been significantly decreased." (*Id.*).

On October 28, 2010, Assistant District Attorney Andrea Wyrick wrote an email to Josh Turley, the Tulsa County Sheriff's Office's Risk Manager, to voice Wyrick's concerns about the Jail's medical services. (Doc. 316-33). Wyrick wrote, "This is very serious, especially in light of the three cases we have now – what else will be coming? It is one thing to say we have a contract with CHMO to cover medical services and they are indemnifying us . . . [I]t is another to ignore any and all signs we receive of possible issues or violations of our agreement with them for services in the jail. The bottom line is, the Sheriff is statutorily . . . obligated to provide medical services." (*Id.*).

Despite receiving notice of significant issues with the medical care system at the Jail, then-Sheriff Glanz could not identify any changes made as a result of the issues that were repeatedly identified in external and internal audits. The evidence, construed in plaintiff's favor, would support a finding that Sheriff Glanz did not make any discernible changes to the medical delivery system despite knowledge of serious failures that placed inmates like Ms. Salgado at risk. (*See, e.g.,* Doc. 316-8 at ¶ 9; Doc. 316-24 at 8-9 [Dep. pp. 162-163]; Doc. 316-33).

## IV. Discussion

### A. Underlying Constitutional Violation

The Sheriffs first argue that there was no underlying violation of Ms. Salgado's constitutional rights because there is no evidence of deliberate indifference to a serious medical need. (Doc. 251 at 28, 39). Glanz and Regalado both assert that "the medical staff at the jail was not indifferent and did not disregard the risk of a fatal medical condition" (*id.* at 29), that no medical staff violated any clearly-established constitutional rights (*id.* at 36), and "the medical records do not demonstrate any individual at the jail was indifferent to the care and treatment of Salgado while she was in the medical unit" (*id.* at 39).

On the medical providers' summary judgment motions, the Court determined that the record evidence could support a jury finding of subjective indifference:

> Here, construed in plaintiff's favor, the record evidence would support a finding that Dr. Washburn and Nurse Metcalf were deliberately indifferent to Ms. Salgado's serious medical needs. Ms. Salgado reported a history of heart attack and issues with cholesterol and hypertension, among other ailments. She complained of very severe chest pain, nausea, vomiting, extreme weakness, and she was rubbing her chest in pain. An EKG, nitroglycerin, and aspirin were ordered by Dr. Washburn, which indicates a suspected cardiac etiology. She was administered at least two EKGs, one of which was abnormal and the other indicated borderline with abnormal findings. After Ms. Salgado died, nursing staff reported that she had been "vomiting regularly." A jury could infer that Dr. Washburn and other medical staff were aware of an obvious substantial risk to Ms. Salgado's health.
>
> In addition, it is clear there were concerns that Ms. Salgado's symptoms were cardiac in nature. She had a history of cardiac issues, and her symptoms were consistent with a heart problem. Testing was ordered, but the record is devoid of credible evidence that medical staff even read the results or acted upon them. The results of the EKGs shown in the record were borderline and abnormal, but those results were not uploaded into the medical system until long after Ms. Salgado died, and it is not clear that Dr. Washburn ever considered the abnormal results. Ms. Salgado continued to

6

> report chest pain, vomiting, and nausea at least through June 27, 2011, when Nurse Metcalf recorded a check from around 7:00 a.m. that morning. (Doc. 318-2 at 6).
>
> The records thus indicate that she had been suffering serious cardiac symptoms for at least two, and perhaps three, days. The EKGs were taken on June 25 or June 26, 2011, Ms. Salgado complained of off-the-scale chest pain on June 26, 2011, and she continued to suffer chest pain, vomiting, and nausea at least until June 27, 2011. Yet, there were no further documented checks on June 27 or June 28, 2011, before she was found unresponsive, extremely cold, and grayish in color, in her cell after 7:00 p.m. on June 28, 2011. She was not sent to a hospital, and Dr. Washburn did not bother to record anything about Ms. Salgado's two or three days of cardiac symptoms. Indeed, his only notation, which was entered the day after she died, did not mention the EKG or cardiac symptoms, and it is not clear that he even saw her on the day he claimed to have seen her.
>
> While Dr. Washburn and CHC attempt to characterize the medical care as merely involving "an incorrect judgment call and/or . . . inadequate treatment" (*see* Doc. 246 at 2), a reasonable jury could find on this record that Washburn and other CHC staff were deliberately indifferent to Ms. Salgado's serious medical needs. While providing little care for her serious symptoms, which continued over at least two days until her death, medical staff also did not refer her to outside medical personnel who could have helped her. It is unclear from CHC's inconsistent and incomplete medical records that any actual care was provided for Ms. Salgado's cardiac systems on the day she died. Dr. Washburn's testimony would further support a finding that he was advised two or three times on the last day of Ms. Salgado's life that she "was crashing," but she was not sent to a hospital.

(Doc. 527 at 13-15). The evidence presents an issue of fact upon which a reasonable jury could find that Jail medical staff were deliberately indifferent to Ms. Salgado's constitutional rights.

The defendants' argument that the law was not clearly established is also unavailing. At the time Ms. Salgado was experiencing medical problems and pain at the Jail, the law was clearly established that jail medical staff violate the constitutional rights of an inmate by deliberate indifference to serious medical needs, including preventing an inmate from

7

receiving necessary emergency medical care or delaying treatment of a serious condition where there is pain or risk of death. *See Estelle v. Gamble*, 429 U.S. 97 (1976); *Sealock v. Colorado*, 218 F.3d 1205, 1210-11 (10th Cir. 2000) (prison officials violate constitutional rights when they "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment"); *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (delay in medical care in the face of severe pain and worsening heart condition "constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm").

### B. Individual Liability of Stanley Glanz

! "[T]he three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities [are]: (1) personal involvement[,] (2) causation, and (3) state of mind." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013); *see also Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). The first element requires the plaintiff to "show an 'affirmative link' between the supervisor and the constitutional violation." *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (quotations omitted). "The plaintiff can show such a link by establishing 'the [supervisor] promulgated, created, implemented[,] or possessed responsibility for the continued operation of a policy,' or 'the establishment or utilization of an unconstitutional policy or custom' . . . provided the policy or custom resulted in a violation of the plaintiff's constitutional rights." *Burke v. Regalado*, 935 F.3d 960, 997 (10th Cir. 2019) (quoting *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) and *Dodds*, 614 F.3d at 1199).

Under the second element, there must be evidence that "the defendant's alleged action(s) caused the constitutional violation by setting in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Burke*, 935 F.3d at 997 (quoting *Estate of Booker*, 745 F.3d at 435). With respect to the third element, "a plaintiff can 'establish the requisite state of mind by showing that [a supervisor] 'acted with deliberate indifference.'" *Id.* (quoting *Perry v. Durborow*, 892 F.3d 1116, 1122 (10th Cir. 2018)). "[A] local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Id.* at 998 (quoting *Hollingsworth v. Hill*, 110 F.3d 733, 745 (10th Cir. 1997)).

Glanz asserts that he is entitled to qualified immunity and cannot be held under a supervisory liability theory because (1) he "had no personal contact with Salgado or direct or contemporaneous knowledge of [her] treatment by the medical or jail staff in June of 2011" and (2) there was no underlying constitutional violation by any individual at the jail. (Doc. 251 at 38).[1] Faced with an evidentiary record much like the summary judgment record in this case, the Tenth Circuit determined that "a reasonable jury could conclude that one or more of Sheriff Glanz's subordinates violated [the decedent's] constitutional rights" such that supervisory liability was proper if the plaintiff demonstrated that "(1) he

---

[1] Rather than providing a typical qualified immunity analysis, Glanz's qualified immunity argument is premised upon his argument that the evidence is not sufficient to show that any subordinate violated Ms. Salgado's rights. (*See* Doc. 251 at 38).

9

maintained a policy or custom that (2) led to the underlying constitutional violation and (3) that he acted with deliberate indifference." *Burke*, 935 F.3d at 999.

Applying that standard, the *Burke* court determined that the evidence was sufficient to support the jury's finding of Glanz's supervisory liability. *Id.* The Circuit concluded that the evidence sufficiently "showed that Sheriff Glanz maintained a policy or custom of providing deficient medical care at the jail." *Id.* The evidence supporting that determination included the Gondles Report and the 2007 and 2010 NCCHC reports, all of which are in the record here. *Id.* The Circuit determined that a "reasonable jury could find these deficiencies [in Jail medical care] resulted in [the decedent's] death," such that the causation element was also satisfied. *Id.* at 1000.

Finally, the *Burke* court stated that "a reasonable jury could conclude Sheriff Glanz was deliberately indifferent to the risk that deficient medical care would result in a constitutional violation like the one [the decedent] suffered." *Id.* The court noted evidence "that Sheriff Glanz neglected to remedy deficient medical care," which included the NCCHC 2007 and 2020 audit reports and Ms. Gondles's 2009 report. *Id.*

The *Burke* court summarized its determination as to Glanz's supervisory liability as follows:

> It was reasonable for the jury to find (1) Sheriff Glanz was responsible for "an unconstitutional policy or custom," *Dodds*, 614 F.3d at 1199, of poor training, inadequate staffing, and lack of urgency surrounding jail medical care; (2) that this policy or conduct resulted in a violation of Mr. Williams's right to adequate medical care under the Fourteenth Amendment; and (3) Sheriff Glanz acted with deliberate indifference toward the risk that the policy or conduct of providing inadequate medical care would result in an injury like Mr. Williams's. Accordingly, the evidence was sufficient to

> support the jury's verdict against Sheriff Glanz holding him liable for supervisory liability.

*Id.* at 1001. For the reasons set forth above, a reasonable jury could find upon the summary judgment record that Glanz is liable under a supervisory liability theory. Accordingly, summary judgment is inappropriate as to that claim.

As noted, Glanz's qualified immunity argument is not premised upon the typical legal analysis, but is premised upon his factual claim that there was no underlying constitutional violation by a subordinate (*see* Doc. 251 at 38-39). In any event, the Court has previously conducted the qualified immunity / clearly established law analysis on nearly identical evidence that a jury could find constituted deliberate indifference by Sheriff Glanz to Jail detainees' serious medical needs. *See Burke v. Glanz*, 11-CV-720-JED, 2016 WL 3951364 at **25-26 (Jul. 20, 2016) (unpublished). That analysis is adopted here. Among other things, the law was clearly established before Ms. Salgado suffered and died that a jail official like Mr. Glanz could be held liable for violating a pretrial detainee's constitutional rights under the circumstances described above. *See Estelle*, 429 U.S. at 104-05 (prison officials who intentionally deny or delay inmate access to medical care violate the Eighth Amendment); *Mata*, 427 F.3d at 751 (delay in medical care would violate the Eighth Amendment where the delay causes the inmate substantial harm); *Dodds*, 614 F.3d at 1199 (identifying bases for supervisory liability); *Gonzales v. Martinez*, 403 F.3d 1179, 1183 (10th Cir. 2005) ("an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm *actually* would befall an inmate; it

11

is enough that the official acted or failed to act *despite his knowledge* of a substantial risk of harm") (quoting *Farmer*, 511 U.S. at 842).

### C. Municipal Liability

Plaintiff's official capacity claim against Sheriff Regalado is an action against the entity of which he is an agent. "This is why the official capacity claim here is effectively a claim against Tulsa County and also why, when Sheriff Glanz left office in 2015, the official capacity claim transferred to his successor, Sheriff Regalado." *Burke*, 935 F.3d at 998. Under *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978), to survive Sheriff Regalado's motion for summary judgment, the plaintiff must supply record evidence of the following: (1) the existence of a jail policy or custom by which Ms. Salgado was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. "whether there is a direct causal link between [the] policy or custom and the alleged constitutional deprivation"). *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694; *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

Here, as in *Burke v. Regalado*, 935 F.3d at 995-999, the "elements of supervisory and municipal liability merge" because the plaintiff's supervisory liability theory is predicated on Sheriff Glanz's maintenance of a policy or custom that resulted in the constitutional violation, and that same policy or custom is a prerequisite for municipal liability. "Accordingly, the elements for supervisory and municipal liability are the same in this case." *Id.* at 999. As noted, a reasonable jury could find upon the evidence that (1) Sheriff Glanz "maintained a policy or custom of insufficient medical resources and

training, chronic delays in care, and indifference toward medical needs at the jail, and that he did so knowing of an urgent need for reform," (2) the policy or custom resulted in the underlying violation of Ms. Salgado's constitutional rights, and (3) Glanz's maintenance of the policy was deliberately indifferent to serious medical needs of inmates. *Id.*

The same evidence that would support those findings as to the supervisory liability claim against Glanz prevents summary judgment as to the official capacity claim against Sheriff Regalado. *See id.* at 999-1001. "Sheriff Glanz – then the Tulsa County official charged with managing the jail – furthered a 'policy or custom' . . . of deficient medical care at the jail characterized by inadequate training, understaffing, and chronic delays" and "[a] reasonable jury could find his continuous neglect of these problems 'was the moving force behind the injury alleged.'" *Id.* (citations omitted). "And as explained above, Sheriff Glanz acted with deliberate indifference toward the risk that the policy or custom of providing inadequate medical care would result in an injury" like Ms. Salgado's. *See id.* at 1001.

### D.   State Constitutional Claims

Plaintiff also asserts a claim for alleged violations of Ms. Salgado's rights under the Oklahoma Constitution, Art. II, §§ 7 and 9. Those articles are the state's counterparts to the Eighth and Fourteenth Amendments to the United States Constitution. The plaintiff asserts that her state constitutional claim is appropriate under *Bosh v. Cherokee Cnty. Bldg. Auth.*, 305 P.3d 994 (Okla. 2013). In *Bosh*, the Oklahoma Supreme Court recognized a private right of action by a pretrial detainee for excessive force under Okla. Const. art. II, § 30.

*Bosh* did not recognize the claim asserted by plaintiff in this case. *See id.* Moreover, since *Bosh*, the Oklahoma Supreme Court has continued to narrow its holding. *See, e.g., Perry v. City of Norman*, 341 P. 3d 689, 692-93 (Okla. 2014); *Barrios v. Haskell Cty. Pub. Fac. Auth'y*, 432 P.3d 233 (Okla. 2018) (declining to extend *Bosh* to inmate denial of medical claims under the Oklahoma constitution and stating "even if not barred by sovereign immunity . . . it is doubtful that such claims would exist in the Oklahoma common law"). The federal courts in Oklahoma have also recently declined to extend *Bosh* to other constitutional claims. *See Dodson v. Cty. Comm'rs of Mayes Cty.*, 18-CV-221-TCK-FHM, 2019 WL 2030122 (N.D. Okla. May 8, 2019); *Burke v. Regalado*, 18-CV-231-GKF-FHM, 2019 WL 1371144, *3 (Mar. 26, 2019); *Snow v. Board of County Commissioners of the County of McClain*, Civ-14-911-HE, 2014 WL 7335319, at *3 (W.D. Okla. Dec. 19, 2014); *Payne v. Oklahoma*, CIV-15-10-JHP, 2015 WL 5518879, at **3-4 (E.D. Okla. Sept. 17, 2015).

The federal courts typically decline to expand state law to an extent not addressed by the state's highest court. *See Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013). As the Oklahoma Supreme Court noted in *Barrios*, "expanding tort remedies for constitutional violations is now a 'disfavored judicial activity.'" *Barrios*, 432 P.3d at 240 (quoting *Ziglar v. Abbasi*, __ U.S. __, 137 S. Ct. 1843 (2017)). Accordingly, plaintiff's claim under the state constitution is subject to summary judgment.

## V.  Conclusion

For the foregoing reasons, the Sheriffs' summary judgment motion (Doc. 251) is **denied** as to the plaintiff's § 1983 claims and is **granted** as to her claim under the Oklahoma constitution.

SO ORDERED this 14th day of May, 2020.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT