**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| ALMA MCCAFFREY, as Personal Representative of the Estate of Gregory Brown, deceased, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. 13-CV-315-JED-JFJ<br>)<br>) |
| STANLEY GLANZ, et al., | )<br>) |
| Defendants. | ) |

**OPINION AND ORDER**

Before the Court is the summary judgment motion of defendants Stanley Glanz, who was formerly the Tulsa County Sheriff, and Vic Regalado, the current Tulsa County Sheriff (Doc. 337), as to the claims of plaintiff, Alma McCaffrey, on behalf of the Estate of Gregory Brown. Former Sheriff Glanz is sued in his individual capacity, and Sheriff Regalado is sued in his official capacity. The Court has considered the motion, the plaintiff's response (Doc. 388), and the defendants' reply (Doc. 401).

**I.   Background**

   **A.   Mr. Brown's medical deterioration at the jail**

Gregory Brown was booked into the David L. Moss Criminal Justice Center (the Jail) on February 17, 2012. Five days later, on February 22, Mr. Brown's cellmate reported that Brown had been vomiting all night, and a medical emergency was called as to Brown. He was taken to the Jail's medical unit. A nurse saw him and noted he had been vomiting all night and reported tenderness on his lower right side. When the Jail doctor, Dr. Adusei,

examined Mr. Brown that afternoon, Brown reported a history of perforated gastric ulcers. Dr. Adusei diagnosed Mr. Brown with likely renal colic. He ordered an x-ray of Brown's bladder, ureter, and kidneys. However, the x-ray did not reflect any masses or calcifications indicative of kidney stones. Later that day, a Jail nurse noted that Mr. Brown was unable to hold down any food. That evening, Mr. Brown continued to report abdominal pain, and he was dizzy when standing.

Between February 22 and February 29, 2012, Mr. Brown was in the Jail's medical unit with his condition deteriorating. By the early morning of the second day in the medial unit, Mr. Brown continued reporting abdominal pain, stated that he could "not move," and he voided "dark tea colored urine." He continued to exhibit signs over the following week that his condition was serious, declining, and emergent. Those signs included days of critically low pulse oximeter ratings, vomiting what look like black coffee grounds or watery dark chocolate colored emesis, abdominal distension, and urine output that was dark and tea-colored. He could not eat. According to plaintiff's expert, these signs are highly suggestive of significant internal bleeding from the gastrointestinal tract.

On Sunday morning, February 26, 2012, Jail detention staff entered the following notes into the Jail Shift Report:

> AT 0954 MEDICAL STAFF WAS INFORMED BY THE DOCTOR TO START AN IV ON INMATE BROWN. THE NURSING STAFF STATED THAT INMATE BROWN NEEDED TO GO TO THE HOSPITAL FOR INTER[N]AL INJUR[I]ES. AT 1002 CPT VICKERS WAS NOTIF[I]ED AND SGT KNAUSS WAS NOTIFIED. BOTH STATED THAT THEY CAN NOT GO AGAINST THE MEDICAL DOCTOR WEARTHER [sic] AN INAMTE [sic] CAN GO TO THE HOSPITAL. IM BROWN WILL BE PLACED ON 15 MINUTE CHECKS. I/M BROWN HAS REFUSED ALL MEALS SINCE WEDNESDAY.

Plaintiff's expert has opined that there was "no question" by that day that Mr. Brown was in urgent need of hospital care and surgical consult.

Mr. Brown was not physically capable of attending a court appearance on February 27. A Jail nurse reported that Mr. Brown was lethargic, continuing to vomit black emesis and suffering abdominal pain, and his abdomen was hard and distended. Mr. Brown's lab results that day showed abnormal results, which included ominous findings suggestive that Mr. Brown was suffering from sepsis. That evening, Dr. Adusei noted symptoms of a small bowel obstruction, black tarry fluid from the nasogastric tube, and continuing abdominal distension, but he still did not send Mr. Brown to the hospital.

On February 28, 2012, Jail nursing staff continued to plead with Dr. Adusei to send Mr. Brown to the hospital emergency room. Adusei again noted that afternoon that Mr. Brown had a small bowel obstruction and was lethargic. Yet, again, Mr. Brown was not sent to the hospital, and Dr. Adusei merely planned to monitor Mr. Brown and noted that he would "consider" transferring Brown to the emergency room if he did not improve within "the next couple of days."

Mr. Brown was finally sent to the hospital on February 29, 2012, seven days after first admitted to the medical unit pursuant to a "medical emergency," and several days after experiencing abdominal distension, hypoxia, lethargy, toxicity / signs of sepsis, vomiting dark material and having dark tea-colored urine, experiencing fever and continuing pain. Upon admission to the hospital, pain of 10/10 was recorded, Brown was febrile, and he appeared toxic, malnourished and dehydrated, with tachycardia and exquisite tenderness on the right side. Mr. Brown was diagnosed with hypoxemic respiratory distress and

systemic inflammatory response syndrome. A CT scan of Mr. Brown's abdomen showed "free air and free fluid consistent with bowel perforation." Hillcrest recorded that Mr. Brown had exhibited symptoms for the previous nine days. A hospital surgeon performed an exploratory laparotomy, which confirmed bowel perforation and peritonitis.

After surgery, Mr. Brown had to be placed on mechanical ventilation and hemodynamic life support, but he continued to decline due to the severity of his intra-abdominal injuries. He was ultimately removed from life support on March 8, 2012, and died shortly thereafter.

### B. Evidence regarding the Jail's medical system

The summary judgment record also contains evidence that, between 2007 and Mr. Brown's death in 2012, former Sheriff Glanz, who at the time was responsible for the Jail's medical care system, was repeatedly informed of medical understaffing, inadequate training, poor follow-up, and resulting bad health outcomes. These include a 2007 audit by the National Commission on Correctional Health Care (NCCHC), which reported findings that inmate health needs were not timely addressed, a 2009 mock audit and report by Elizabeth Gondles, Ph.D., and a 2010 NCCHC report.

For her report, Dr. Gondles reviewed documents, toured the Jail, and interviewed Jail medical and detention personnel. Dr. Gondles's report, which was provided to the Jail administrator, identified numerous issues with the Jail's health care system, including understaffing of medical personnel, deficiencies in doctor coverage, lack of health services oversight and supervision, training failures, nursing shortages, failure to provide timely health appraisals, and hundreds of health-related problems in the prior year. Dr. Gondles

recommended "substantial changes" at the Jail after she noted certain numerous failures to comply with mandatory health standards and concluded that "[m]any of the health service delivery issues outlined in this report are a result of the lack of understanding of correctional healthcare issues by jail administration and contract oversight and monitoring of the private provider." Gondles recommended that the Jail establish a department of health services, which would employ a professional to oversee health services delivery and monitor the competency of the health staff and adequacy of the system. Sheriff Glanz did not follow Dr. Gondles's recommendations.

Following the 2010 NCCHC audit of the Jail's health services, the NCCHC placed the Jail on probationary status. The 2010 audit report identified numerous serious deficiencies with the Jail's health services program. The report noted several inmate deaths in the prior year, with poorly performed mortality reviews, a failure to identify problems and implement corrective actions, physicians' failure to document reviews of medical health assessments and conduct clinical chart reviews to determine if clinically appropriate care was implemented, and a failure to conduct timely diagnostic testing and specialty consultations. Glanz testified that he did not remember reading the complete report, but his practice was to typically read the first two or three pages of such reports.

In the months prior to Mr. Brown's death, other inmates died after alleged delays in emergency treatment. The deficiencies were apparent to county lawyers. On October 28, 2010, Assistant District Attorney Andrea Wyrick wrote an email to Josh Turley, the Tulsa County Sheriff's Office's Risk Manager, to voice Wyrick's concerns about the Jail's medical services. Wyrick wrote, "This is very serious, especially in light of the three cases

5

we have now – what else will be coming? It is one thing to say we have a contract with CHMO to cover medical services and they are indemnifying us . . . [I]t is another to ignore any and all signs we receive of possible issues or violations of our agreement with them for services in the jail. The bottom line is, the Sheriff is statutorily . . . obligated to provide medical services." The evidence indicates that Sheriff Glanz did not require changes necessary to alleviate the substantial risks from the deficient medical system.

### C. Plaintiff's claims

Ms. McCaffrey filed this suit on behalf of Mr. Brown's estate. She brings claims under the 42 U.S.C. § 1983 and the state constitution, alleging that Jail staff violated Mr. Brown's constitutional rights by deliberate indifference to his serious medical needs and that former Sheriff Glanz was deliberately indifferent in knowingly maintaining a deficient medical system at the Jail, which caused the underlying constitutional violation. Plaintiff also sues current Sheriff Regalado in his official capacity as a result of the alleged unconstitutional medical system. Sheriffs Glanz and Regalado move for summary judgment.

## II. Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The

courts thus must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255. The court may not weigh the evidence and may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam). Instead, the court must view the evidence in the light most favorable to the non-moving party. *Id.* at 657.

## III. Discussion

### A. Section 1983 claim for deliberate indifference to serious medical needs

Seeking summary judgment on plaintiff's § 1983 claim, the Sheriffs first argue that there was no underlying violation of Mr. Brown's constitutional rights. (*See* Doc. 337 at 27-40). Claims under 42 U.S.C. § 1983 based upon a failure to provide medical care for serious medical needs of inmates are judged under the "deliberate indifference to serious medical needs" test of *Estelle v. Gamble*, 429 U.S. 97 (1976). As explained by the Supreme Court:

> The [Eighth] Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . against which we must evaluate penal measures. . . . These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," . . . the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with

7

contemporary standards of decency as manifested in modern legislation codifying the common-law view that "it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."

We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," . . . proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

429 U.S. at 102-05 (internal citations and footnotes omitted); *see also Al-Turki v. Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014) ("[T]he Eight Amendment's prohibition against cruel and unusual punishment extends to the unnecessary and wanton infliction of pain caused by prison officials' deliberate indifference to serious medical needs of prisoners.").

Prison officials violate an inmate's constitutional rights where the officials "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). A delay in medical care also "constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).

These principles "appl[y] to pretrial detainees through the due process clause of the Fourteenth Amendment." *Howard v. Dickerson*, 34 F.3d 978, 980 (10th Cir. 1994). Deliberate indifference is defined as something more than mere negligence; it requires knowing and disregarding an excessive risk to inmate health or safety. *Farmer v. Brennan*,

511 U.S. 825, 837 (1994). Deliberate indifference has both objective and subjective components. *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991).

### 1. Objective Component

The objective component is met if the harm suffered is sufficiently serious. *Id.* at 298. "A medical need is serious if it is 'one that has been diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Ramos v. Lamm*, 639 F.3d 559, 575 (10th Cir. 1980); *see also Al-Turki*, 762 F.3d at 1192-93; *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).

The Tenth Circuit has "held that 'death [is], without doubt, sufficiently serious to meet the objective component." *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)). Because Mr. Brown died, the evidence plainly supports the objective component. In addition, a reasonable jury could find upon the record evidence that Mr. Brown experienced severe pain for days without being taken to a hospital or receiving proper treatment, and such evidence also independently provides support for the objective element. "When the pain experienced during [a] delay [in medical care] is substantial, the prisoner 'sufficiently establishes the objective element of the deliberate indifference test.'" *Kikumura v. Osagie*, 461 F.3d 1269, 1292 (10th Cir. 2006) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000)). Numerous types of ailments and pain have been considered sufficiently serious medical conditions within the *Estelle* framework. *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (chest pain); *Mata*, 427 F.3d at 752-54 (severe pain and worsening of heart

9

condition); *Kikumura*, 461 F.3d at 1292-93 (severe pains, cramps, vomiting due to hyponatremia).

## 2. Subjective Component

There is a genuine dispute of material facts, such that a reasonable jury could find the subjective component is also satisfied here. The subjective component "lies 'somewhere between the poles of negligence at the one end and purpose . . . at the other.' . . . The Supreme Court has analogized it to criminal recklessness, to the conscious disregard of a 'substantial risk of serious harm.'" *Blackmon v. Sutton*, 734 F.3d 1237, 1244-45 (10th Cir. 2013) (quoting *Farmer*, 511 U.S. at 836). The inmate's symptoms "are relevant to the subjective component of deliberate indifference. The question is: were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?" *Martinez*, 563 F.3d at 1089. Whether the defendant had the "requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. The "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

Here, construed in plaintiff's favor as is required at this stage, the record evidence would support a finding that Dr. Adusei and other Jail staff were deliberately indifferent to Mr. Brown's serious medical needs. The records indicate that Jail nurses advised both Dr. Adusei and Jail detention staff that Mr. Brown needed to go to the emergency room, but Mr. Brown was not sent to the emergency room. His symptoms, including continuing abdominal pain, distended abdomen, low pulse oximeter readings, dizziness, coffee-

ground-like vomit, dark urine, and signs of sepsis were objective symptoms from which a jury could infer that Dr. Adusei and other staff were aware of an obvious substantial risk to Mr. Brown's health and life.

Mr. Brown had reported a history of perforated ulcer, for a week he exhibited signs of gastrointestinal distress and potential perforation, and his symptoms did not subside, but got worse while he was denied access to emergency hospital care. The evidence supports a finding that he was hypoxic, potentially septic, he continued suffering abdominal pain and distension, could not eat, repeatedly vomited dark emesis, had dark tea-colored urine, and was lethargic. Even after Dr. Adusei believed he was toxic and had a small bowel obstruction, he still did not immediately send Mr. Brown to the hospital. Nursing staff implored him to authorize Mr. Brown's transport to the hospital, but Dr. Adusei refused until Mr. Brown's condition deteriorated significantly. In addition, Jail detention staff refused to send Mr. Brown to the emergency room even after nurses alerted them that he should be sent to the emergency room.

While the defendants attempt to characterize the medical care as merely involving an incorrect diagnosis (*see* Doc. 337 at 44), a reasonable jury could find on this record that Dr. Adusei and other Jail staff were deliberately indifferent to Mr. Brown's serious medical needs. A reasonable jury on this evidence could determine that Mr. Brown experienced significant pain, exhibited symptoms that even a layperson would recognize as requiring emergency hospital care, and that he did so for several days without being sent to a hospital. A jury could also reasonably find that the delay in seeking treatment contributed to his death.

11

The Tenth Circuit has held that deliberate indifference may be found where an inmate is prevented "from receiving treatment" or is denied "access to medical personnel capable of evaluating the need for treatment." *Burke*, 935 F.3d at 993 (quoting *Sealock*, 218 F.3d at 1211). If the official delays or refuses to fulfill that gatekeeper role due to deliberate indifference, then he "may be liable for deliberate indifference." *Id.* Thus, deliberate indifference has been found where inmates exhibited serious symptoms but officials took no action to treat them. *Id.*; *Sealock*, 218 F.3d at 1210-11 (deliberate indifference to severe chest pain by refusing to take inmate to hospital).

Here, construed in the plaintiff's favor, there is evidence from which a factfinder may infer that Dr. Adusei and other Jail nurses and detention staff were deliberately indifferent by observing critical symptoms that clearly called for emergency medical care, but they prevented him from obtaining the emergency medical evaluation and treatment he needed.

      **B.**    **Individual Liability of Stanley Glanz**

!     "[T]he three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities [are]: (1) personal involvement[,] (2) causation, and (3) state of mind." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013); *see also Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). The first element requires the plaintiff to "show an 'affirmative link' between the supervisor and the constitutional violation." *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (quotations omitted). "The plaintiff can show such a link by establishing 'the [supervisor] promulgated, created, implemented[,] or possessed

12

responsibility for the continued operation of a policy,' or 'the establishment or utilization of an unconstitutional policy or custom' . . . provided the policy or custom resulted in a violation of the plaintiff's constitutional rights." *Burke v. Regalado*, 935 F.3d 960, 997 (10th Cir. 2019) (quoting *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) and *Dodds*, 614 F.3d at 1199).

Under the second element, there must be evidence that "the defendant's alleged action(s) caused the constitutional violation by setting in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Burke*, 935 F.3d at 997 (quoting *Estate of Booker*, 745 F.3d at 435). With respect to the third element, "a plaintiff can 'establish the requisite state of mind by showing that [a supervisor] 'acted with deliberate indifference.'" *Id.* (quoting *Perry v. Durborow*, 892 F.3d 1116, 1122 (10th Cir. 2018)). "[A] local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Id.* at 998 (quoting *Hollingsworth v. Hill*, 110 F.3d 733, 745 (10th Cir. 1997)).

Glanz asserts that he is entitled to qualified immunity and cannot be held under a supervisory liability theory because (1) he "had no personal contact with Brown or direct or contemporaneous knowledge of [his] treatment by the medical or jail staff" and (2) there was no underlying constitutional violation by any individual at the Jail. (Doc. 337 at 41). However, the evidence, construed in plaintiff's favor, would support a finding that Sheriff

13

Glanz received notice of significant failures of the medical care system at the Jail, but did not make discernible changes to alleviate the substantial risks to inmates like Mr. Brown.

Faced with an evidentiary record much like the summary judgment record in this case, the Tenth Circuit determined that "a reasonable jury could conclude that one or more of Sheriff Glanz's subordinates violated [the decedent's] constitutional rights" such that supervisory liability was proper if the plaintiff demonstrated that "(1) he maintained a policy or custom that (2) led to the underlying constitutional violation and (3) that he acted with deliberate indifference." *Burke*, 935 F.3d at 999.

Applying that standard, the *Burke* court determined that the evidence was sufficient to support the jury's finding of Glanz's supervisory liability. *Id.* The Circuit concluded that the evidence sufficiently "showed that Sheriff Glanz maintained a policy or custom of providing deficient medical care at the jail." *Id.* The evidence supporting that determination included the Gondles Report and the 2007 and 2010 NCCHC reports, all of which are in the record here. *Id.* The Circuit determined that a "reasonable jury could find these deficiencies [in Jail medical care] resulted in [the decedent's] death," such that the causation element was also satisfied. *Id.* at 1000.

Finally, the *Burke* court stated that "a reasonable jury could conclude Sheriff Glanz was deliberately indifferent to the risk that deficient medical care would result in a constitutional violation like the one [the decedent] suffered." *Id.* The court noted evidence "that Sheriff Glanz neglected to remedy deficient medical care," which included the NCCHC 2007 and 2020 audit reports and Ms. Gondles's 2009 report. *Id.*

The *Burke* court summarized its determination as to Glanz's supervisory liability as follows:

> It was reasonable for the jury to find (1) Sheriff Glanz was responsible for "an unconstitutional policy or custom," *Dodds*, 614 F.3d at 1199, of poor training, inadequate staffing, and lack of urgency surrounding jail medical care; (2) that this policy or conduct resulted in a violation of Mr. Williams's right to adequate medical care under the Fourteenth Amendment; and (3) Sheriff Glanz acted with deliberate indifference toward the risk that the policy or conduct of providing inadequate medical care would result in an injury like Mr. Williams's. Accordingly, the evidence was sufficient to support the jury's verdict against Sheriff Glanz holding him liable for supervisory liability.

*Id.* at 1001. For the reasons set forth above, a reasonable jury could find upon the summary judgment record that Glanz is liable under a supervisory liability theory. Accordingly, summary judgment is inappropriate as to that claim.

Glanz's qualified immunity argument is not premised upon the typical legal analysis, but is premised principally upon his factual claim that there was no underlying constitutional violation by a subordinate. In any event, the Court has previously conducted the qualified immunity / clearly established law analysis on nearly identical evidence that a jury could find constituted deliberate indifference by Sheriff Glanz to Jail detainees' serious medical needs. *See Burke v. Glanz*, 11-CV-720-JED, 2016 WL 3951364 at **25-26 (Jul. 20, 2016) (unpublished). That analysis is adopted here. Among other things, before Mr. Brown suffered and ultimately died following a delay in emergency medical treatment, the law was clearly established that a Jail official like Mr. Glanz could be held liable for violating a pretrial detainee's constitutional rights under the circumstances described above. *See Estelle*, 429 U.S. at 104-05 (prison officials who intentionally deny

or delay inmate access to medical care violate the Eighth Amendment); *Mata*, 427 F.3d at 751 (delay in medical care would violate the Eighth Amendment where the delay causes the inmate substantial harm); *Dodds*, 614 F.3d at 1199 (identifying bases for supervisory liability); *Gonzales v. Martinez*, 403 F.3d 1179, 1183 (10th Cir. 2005) ("an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm *actually* would befall an inmate; it is enough that the official acted or failed to act *despite his knowledge* of a substantial risk of harm") (quoting *Farmer*, 511 U.S. at 842).

### C. Municipal Liability

Plaintiff's official capacity claim against Sheriff Regalado is an action against the entity of which he is an agent. "This is why the official capacity claim here is effectively a claim against Tulsa County and also why, when Sheriff Glanz left office in 2015, the official capacity claim transferred to his successor, Sheriff Regalado." *Burke*, 935 F.3d at 998. Under *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978), to survive Sheriff Regalado's motion for summary judgment, the plaintiff must supply record evidence of the following: (1) the existence of a jail policy or custom by which Mr. Brown was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. "whether there is a direct causal link between [the] policy or custom and the alleged constitutional deprivation"). *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694; *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

Here, as in *Burke v. Regalado*, 935 F.3d at 995-999, the "elements of supervisory and municipal liability merge" because the plaintiff's supervisory liability theory is

predicated on Sheriff Glanz's maintenance of a policy or custom that resulted in the constitutional violation, and that same policy or custom is a prerequisite for municipal liability. "Accordingly, the elements for supervisory and municipal liability are the same in this case." *Id.* at 999. As noted, a reasonable jury could find upon the evidence that (1) Sheriff Glanz "maintained a policy or custom of insufficient medical resources and training, chronic delays in care, and indifference toward medical needs at the jail, and that he did so knowing of an urgent need for reform," (2) the policy or custom resulted in the underlying violation of Mr. Brown's constitutional rights, and (3) Glanz's maintenance of the policy was deliberately indifferent to serious medical needs of inmates. *Id.*

The same evidence that would support those findings as to the supervisory liability claim against Glanz prevents summary judgment as to the official capacity claim against Sheriff Regalado. *See id.* at 999-1001. "Sheriff Glanz – then the Tulsa County official charged with managing the jail – furthered a 'policy or custom' . . . of deficient medical care at the jail characterized by inadequate training, understaffing, and chronic delays" and "[a] reasonable jury could find his continuous neglect of these problems 'was the moving force behind the injury alleged.'" *Id.* (citations omitted). "And as explained above, Sheriff Glanz acted with deliberate indifference toward the risk that the policy or custom of providing inadequate medical care would result in an injury" like Mr. Brown's. *See id.* at 1001.

### D.  State Constitutional Claims

Plaintiff also asserts a claim for alleged violations of Mr. Brown's rights under the Oklahoma Constitution, Art. II, §§ 7 and 9. Those articles are the state's counterparts to

17

the Eighth and Fourteenth Amendments to the United States Constitution. The plaintiff asserts that the state constitutional claim is appropriate under *Bosh v. Cherokee Cnty. Bldg. Auth.*, 305 P.3d 994 (Okla. 2013). In *Bosh*, the Oklahoma Supreme Court recognized a private right of action by a pretrial detainee for excessive force under Okla. Const. art. II, § 30.

*Bosh* did not recognize the claim asserted by plaintiff in this case. *See id.* Moreover, since *Bosh*, the Oklahoma Supreme Court has continued to narrow its holding. *See, e.g., Perry v. City of Norman*, 341 P. 3d 689, 692-93 (Okla. 2014); *Barrios v. Haskell Cty. Pub. Fac. Auth'y*, 432 P.3d 233 (Okla. 2018) (declining to extend *Bosh* to inmate denial of medical claims under the Oklahoma constitution and stating "even if not barred by sovereign immunity . . . it is doubtful that such claims would exist in the Oklahoma common law"). The federal courts in Oklahoma have also recently declined to extend *Bosh* to other constitutional claims. *See Dodson v. Cty. Comm'rs of Mayes Cty.*, 18-CV-221-TCK-FHM, 2019 WL 2030122 (N.D. Okla. May 8, 2019); *Burke v. Regalado*, 18-CV-231-GKF-FHM, 2019 WL 1371144, *3 (Mar. 26, 2019); *Snow v. Board of County Commissioners of the County of McClain*, Civ-14-911-HE, 2014 WL 7335319, at *3 (W.D. Okla. Dec. 19, 2014); *Payne v. Oklahoma*, CIV-15-10-JHP, 2015 WL 5518879, at **3-4 (E.D. Okla. Sept. 17, 2015).

The federal courts typically decline to expand state law to an extent not addressed by the state's highest court. *See Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013). As the Oklahoma Supreme Court noted in *Barrios*, "expanding tort remedies for constitutional violations is now a 'disfavored judicial activity.'" *Barrios*, 432 P.3d at 240

(quoting *Ziglar v. Abbasi*, __ U.S. __, 137 S. Ct. 1843 (2017)). Accordingly, plaintiff's claim under the state constitution is subject to summary judgment.

## IV.  Conclusion

For the foregoing reasons, the Sheriffs' summary judgment motion (Doc. 337) is **denied** as to the plaintiff's § 1983 claims and is **granted** as to the claim under the Oklahoma constitution.

SO ORDERED this 30th day of September, 2020.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT