## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

DEIBY H. REVILLA GUERRERO,           )
Special Administrator of the Estate of  )
Bridget Nicole Revilla,              )
                                     )
          Plaintiff,          )
                                     )     Case No. 13-CV-315-JED-JFJ
v.                                   )
                                     )
STANLEY GLANZ, et al.,               )
                                     )
          Defendants.         )

### OPINION AND ORDER

Before the Court are the defendants' summary judgment motions as to the claims of plaintiff Guerrero. (*See* Doc. 398, 413, 415). The plaintiff responded (Doc. 435, 451, 452), and the defendants replied (Doc. 438, 474, 475). The Court has also considered supplemental briefs (Doc. 505, 516, 519, 520) on the summary judgment motions.

## I.    Background

While incarcerated in the David L. Moss Criminal Justice Center (the Jail) between June 19 and August 12, 2012, Bridget Revilla reportedly attempted to commit suicide two times. She ultimately reported on June 19 that she was feeling suicidal after being asked multiple times. She was placed on suicide watch, where she was to be checked every 15 minutes. The next day, June 20, 2012, she was removed from suicide watch, but placed in a cell in the medical unit, to be checked every 30 minutes. At deposition, she reported that, while on suicide watch, she "was fine." Ms. Revilla reported that she had previously been prescribed a number of medications, which Jail medical staff attempted to verify.

On the afternoon of June 20, 2012, Revilla was evaluated by Dr. Adusei, who prescribed 300 mg of Dilantin.   She was administered Dilantin that day.   Revilla subsequently had seizures, which were treated by injections of Ativan.   Upon Adusei's order, Ms. Revilla was later transported to a hospital.   She informed hospital staff that she had not taken Dilantin for several weeks, and she was administered more Dilantin.   Ms. Revilla also informed the hospital that she was not suicidal.   The hospital discharged her approximately four hours later.

Upon returning to the Jail in the early morning hours of June 21, 2012, Ms. Revilla was placed in the medical unit for continuing observation.   She later reported feeling sleepy and lethargic, and Adusei ordered her Dilantin level be tested.   Later that evening, she had more seizures, and Adusei ordered that she be given Ativan.   She remained in the medical unit for observation. Because of the seizure activity and her verbal reports, she was prescribed Dilantin twice daily.

She continued in the medical unit, being monitored and receiving Dilantin and other medications.   On June 25, 2012, she reported that she felt drunk and had an unsteady gait.   Her blood Dilantin level test was returned and registered at 28.3 mcg/ml, which was high but not in the toxic range.   Because of Ms. Revilla's report of feeling drunk, a nurse noted that her Dilantin level should be rechecked and she would see a doctor.   It does not appear that the level was rechecked.   At 7:30 p.m. that evening, a nurse found Ms. Revilla with a sheet tied around her neck.   A medical emergency was called, and nurses responded and administered care until EMSA arrived approximately 8 minutes later.   Ms. Revilla was taken to the hospital, where she spent two days.

2

On the morning of June 27, she appeared in court and, thereafter, was returned to the Jail, where she was placed on suicide watch.  Upon return to the Jail, she had a visible blue Coban bandage on her wrist, but Jail staff did not remove it or take it from her.  She denied that she was suicidal, but she was placed on suicide watch. She was unhappy about being in the suicide watch cell and was reportedly combative with detention staff.  Dr. Adusei evaluated her that afternoon.  She subsequently removed the Coban bandage, which had held her IV in place while at the hospital, and placed it around her neck.  A few minutes later, a detention officer performed a check and noted she had a blue cord around her neck. The officer called a medical emergency and requested a cutting instrument.  A nurse entered the cell and pulled the blue cord from Ms. Revilla's neck.  Despite putting the Coban around her neck, Ms. Revilla had a strong pulse and was breathing.   Ms. Revilla did not need to go to the hospital after that incident, and she acknowledged that she did not suffer injuries.[1]  She further testified that she did not warn Jail staff that she was suicidal and did not indicate her intention to put the blue Coban around her neck before she did so.

Ms. Revilla remained on suicide watch from June 28 through July 2, 2012, where she continued to be monitored.  On the morning of July 2, she was given a mental health assessment and received a physical evaluation from nursing staff.  She was placed in the medical unit and removed from suicide watch.  She remained in the medical unit until July 9, where she continued to be monitored and received mental health assessments. During

---

[1]     The events surrounding her ultimately tying the blue Coban around her neck were recorded in a video-monitored cell and submitted as an exhibit to the summary judgment briefing.  (*See* Doc. 399 [Exhibit 16], under seal).

that week, she generally reported no serious issues, and she was then returned to the general population on July 10.  She was in general population from July 10 to July 13, 2012.  She reported hearing voices, and she was returned to the medical unit for observation on July 13, and remained there until July 23, 2012.  She was assessed during that time and continued receiving prescribed medications.

On July 20, 2012, a pillowcase tied in knots was found in her cell, and officers apparently were concerned it was a makeshift noose.  Revilla testified at deposition that it was *not* a noose, but something she uses when she has earaches, and she was not suicidal or planning to attempt suicide.  She was placed on suicide watch, where she remained until the next day.  She was placed in the medical unit through July 22.

On July 23, 2012, Ms. Revilla reported respiratory distress and she indicated that she had a past history of pulmonary emboli and prior treatment at a hospital.  She was then transported to that hospital for evaluation and treatment.  The hospital pulmonologist was familiar with Ms. Revilla and noted that, despite her reports, she had "never had a history of pulmonary embolus."  The doctor noted that "her exam was really pretty unremarkable" and Ms. Revilla "seemed to be forcing herself to wheeze and was taking very shallow respirations."

Ms. Revilla was returned to the Jail on the evening of July 26, 2012, where she was readmitted to the medical unit for observation.  She remained in the medical unit until August 12, 2012, when she was released from the Jail.  During those final two weeks in the medical unit, she continued to receive her medications for both physical and mental health.

4

Thereafter, the plaintiff filed this action, asserting claims under state law and 42 U.S.C. § 1983, alleging that Dr. Adusei, CHC, and former Sheriff Stanley Glanz were deliberately indifferent to her serious medical needs. Ms. Revilla faults the defendants for her two suicide attempts, suggests that she was suffering from toxic or high Dilantin levels while at the Jail, and asserts that she was never seen by the Jail's psychiatrist despite her history and reports of mental illness and her suicide attempts. The defendants move for summary judgment.

## II.  Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The courts thus must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255. The court may not weigh the evidence and may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam). Instead, the court must view the evidence in the light most favorable to the non-moving party. *Id.* at 657.

### III.    Discussion

### A.    Deliberate Indifference under § 1983

Claims under 42 U.S.C. § 1983 based upon a failure to provide medical care for serious medical needs of inmates are judged under the "deliberate indifference to serious medical needs" test of *Estelle v. Gamble*, 429 U.S. 97 (1976).  As explained by the Supreme Court:

> The [Eighth] Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . against which we must evaluate penal measures. . . . These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," . . . the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that "it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."
>
> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," . . . proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

429 U.S. at 102-05 (internal citations and footnotes omitted); *see also Al-Turki v. Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014) ("[T]he Eight Amendment's prohibition against cruel

and unusual punishment extends to the unnecessary and wanton infliction of pain caused by prison officials' deliberate indifference to serious medical needs of prisoners.").

Prison officials violate an inmate's constitutional rights where the officials "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). A delay in medical care also "constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).

These principles "appl[y] to pretrial detainees through the due process clause of the Fourteenth Amendment." *Howard v. Dickerson*, 34 F.3d 978, 980 (10th Cir. 1994). Deliberate indifference is defined as something more than mere negligence; it requires knowing and disregarding an excessive risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference has both objective and subjective components. *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991).

### Objective Component

The objective component is met if the harm suffered is sufficiently serious. *Id.* at 298. "A medical need is serious if it is 'one that has been diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Ramos v. Lamm*, 639 F.3d 559, 575 (10th Cir. 1980); *see also Al-Turki*, 762 F.3d at 1192-93; *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).

The defendants argue that the plaintiff cannot meet the objective component of sufficiently serious harm because Ms. Revilla testified that she did not suffer permanent injuries or experience severe pain, and her Dilantin levels were resolved while she was at the Jail. In addition, there was no delay in referring Ms. Revilla to the hospital, as she was taken to hospitals three times while at the Jail between June 19 and August 12, 2012.  The plaintiff responds that the suicide attempts did have consequences that meet the objective component.  Specifically, plaintiff alleges that Ms. Revilla had to be administered CPR to return to spontaneous respirations after her first suicide attempt, and she spent days in the hospital thereafter.  And, although Ms. Revilla did not require hospital care following the second suicide attempt (with the blue Coban), she coughed and turned red.  The medical care and hospitalization required after the first suicide attempt is sufficiently serious to meet the objective component, while the harm following the incident with the Coban appears to be less serious.

### *Subjective Component*

The subjective component "lies 'somewhere between the poles of negligence at the one end and purpose . . . at the other.' . . . The Supreme Court has analogized it to criminal recklessness, to the conscious disregard of a 'substantial risk of serious harm.'" *Blackmon v. Sutton*, 734 F.3d 1237, 1244-45 (10th Cir. 2013) (quoting *Farmer*, 511 U.S. at 836).  The inmate's symptoms "are relevant to the subjective component of deliberate indifference. The question is: were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?" *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009).  A defendant must "both be aware of facts from which the inference could

8

be drawn that a substantial risk of serious harm exists, and ... also draw the inference."
*Farmer*, 511 U.S. at 837. Whether the defendant had the "requisite knowledge of a
substantial risk is a question of fact subject to demonstration in the usual ways, including
inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

Here, construed in plaintiff's favor, the record evidence does not support a
reasonable finding that any of the defendants or other Jail staff were deliberately indifferent
to a substantial risk of serious harm.  Ms. Revilla received treatment for multiple ailments,
including seizure activity.  She was sent to hospitals three separate times, once for her
failed suicide attempt, another time for seizures, and a third time because she reported a
history of pulmonary embolism. She was placed on suicide watch when staff were aware
that she may be suicidal, and she was frequently checked even while not on suicide watch.

The plaintiff asserts that Jail staff were deliberately indifferent by permitting her
access to a bed sheet and the blue Coban, in violation of Jail policies applicable to suicide
watch. However, the record does not support the plaintiff's claim that Ms. Revilla was still
on suicide watch at the time she used the bed sheet on June 25, 2012, and she testified that
she had not indicated to Jail staff that she was suicidal in proximity to her attempt that day.
She had been housed in the medical unit for evaluation and frequent checks.

She attempted to commit suicide twice, but she was unsuccessful in her attempts
because Jail staff performing checks found her in time before she was permanently injured
or died. While plaintiff argues that Ms. Revilla was not seen by the Jail's psychiatrist, she
has not pointed to any serious harm that she suffered as a result.  On the record here, the
Court determines that no reasonable jury would find deliberate indifference on behalf of

any of the defendants or other Jail personnel that would satisfy the subjective component of the deliberate indifference analysis.

Because the evidence does not reveal any genuine dispute of material facts upon which a jury could find that any Jail personnel were deliberately indifferent to Ms. Revilla's serious medical needs or risk of suicide attempts, the defendants are entitled to judgment as a matter of law on plaintiff's § 1983 claims against them.

### B. Qualified Immunity

Sheriff Glanz, who is sued in his individual capacity, asserts that he is entitled to qualified immunity on plaintiff's § 1983 claim. Even had the Court not determined that summary judgment was appropriate because of a lack of evidence to support a finding of deliberate indifference by any Jail staff, Mr. Glanz would be entitled to qualified immunity on plaintiff's § 1983 claim here, as there is no evidence that Glanz possessed a "particularized mental state with respect to" any substantial risk that Ms. Revilla would attempt to commit suicide. *See Cox v. Glanz*, 800 F.3d 1231, 1250-51 (10th Cir. 2015) (applying particularized mental state to claim of supervisory liability in context of jail suicide). That is, for Mr. Glanz "to be found to have acted with deliberate indifference, he needed to first have knowledge that the specific inmate at issue presented a substantial risk of suicide." *Id.* at 1250.[2]

---

[2]    While Ms. Revilla's attempts at suicide were unsuccessful, it is difficult to discern any reason why *Cox's* particularized mental state requirement would apply only to successful suicides and not suicide attempts. Accordingly, the Court would apply that particularized standard to attempted suicide as well.

### C.     State Constitutional Claims against the Sheriff

Plaintiff also asserts a claim against Sheriff Regalado for alleged violations of Ms. Revilla's rights under the Oklahoma Constitution, Art. II, §§ 7 and 9.  Those articles are the state's counterparts to the Eighth and Fourteenth Amendments to the United States Constitution.  The plaintiff asserts that the state constitutional claim is appropriate under *Bosh v. Cherokee Cnty. Bldg. Auth.*, 305 P.3d 994 (Okla. 2013).  In *Bosh*, the Oklahoma Supreme Court recognized a private right of action by a pretrial detainee for excessive force under Okla. Const. art. II, § 30.

*Bosh* did not recognize the claim asserted by plaintiff in this case.  *See id.*  Moreover, since *Bosh*, the Oklahoma Supreme Court has continued to narrow its holding.  *See, e.g., Perry v. City of Norman*, 341 P. 3d 689, 692-93 (Okla. 2014); *Barrios v. Haskell Cty. Pub. Fac. Auth'y*, 432 P.3d 233 (Okla. 2018) (declining to extend *Bosh* to inmate denial of medical claims under the Oklahoma constitution and stating "even if not barred by sovereign immunity . . . it is doubtful that such claims would exist in the Oklahoma common law").  The federal courts in Oklahoma have also recently declined to extend *Bosh* to other constitutional claims. *See Dodson v. Cty. Comm'rs of Mayes Cty.*, 18-CV-221-TCK-FHM, 2019 WL 2030122 (N.D. Okla. May 8, 2019); *Burke v. Regalado*, 18-CV-231-GKF-FHM, 2019 WL 1371144, *3 (Mar. 26, 2019); *Snow v. Board of County Commissioners of the County of McClain*, Civ-14-911-HE, 2014 WL 7335319, at *3 (W.D. Okla. Dec. 19, 2014); *Payne v. Oklahoma*, CIV-15-10-JHP, 2015 WL 5518879, at **3-4 (E.D. Okla. Sept. 17, 2015).  Thus, even had plaintiff been able to present evidence of

deliberate indifference, her claim under the Oklahoma Constitution for denial of medical care would not survive summary judgment.

The federal courts typically decline to expand state law to an extent not addressed by the state's highest court. *See Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013). As the Oklahoma Supreme Court noted in *Barrios*, "expanding tort remedies for constitutional violations is now a 'disfavored judicial activity.'" *Barrios*, 432 P.3d at 240 (quoting *Ziglar v. Abbasi*, __ U.S. __, 137 S. Ct. 1843 (2017)). Accordingly, plaintiff's claim under the state constitution is subject to summary judgment.

### D.     State Law Claims against CHC and Dr. Adusei

With respect to plaintiff's state law negligence claims against them, Dr. Adusei and CHC argue that they are immune from liability under the Oklahoma Governmental Tort Claims Act (GTCA). The GTCA provides tort immunity to "the state, its political subdivisions, and all of their employees acting within the scope of their employment." *Okla. Stat.* tit. 51, § 152.1(A); *see also Okla. Stat.* tit. 51, § 163(C) (tort actions may not be brought against "an employee of the state or political subdivision acting within the scope of his employment"). The statute defines employees to include "licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies." *Okla. Stat.* tit. 51, § 152(7)(b)(7).

The Oklahoma Supreme Court has stated that, "[g]enerally speaking, the staff of a healthcare contractor at a jail are 'employees' who are entitled to tort immunity under the GTCA by virtue of sections 152(7)(b), 153(A), and 155(25)." *Barrios v. Haskell Cty. Pub.*

*Facilities Auth.*, 432 P.3d 233, 236 fn.5 (Okla. 2018).   However, the court specifically noted that it had "not been asked whether Turn Key Health, LLC or its staff are 'employees' under section 152(7)(b), but ha[d] assumed they are for purposes of answering the questions certified to [the Oklahoma Supreme Court]."  *Id.*

However, it is appropriate here to decline to exercise supplemental jurisdiction over the state law claims because the Court has disposed of all of plaintiff's federal claims.  *See* 28 U.S.C. § 1367(c); *Birdwell v. Glanz*, 790 F. App'x 962 (10th Cir. 2020) (unpublished). As the Tenth Circuit stated in a nearly identical context in *Birdwell*:

> Because Mr. Birdwell does not appeal the grant of summary judgment on the federal causes of action, all of the claims triggering original jurisdiction are gone. All that's left is an undecided issue of state law, involving interpretation of an assumption stated in a footnote to a recent opinion of the Oklahoma Supreme Court. Given the novelty of this issue, we conclude that the interest in comity predominates and should have led the district court to decline supplemental jurisdiction over the state-law claim against Armor.... We thus reverse and remand with instructions to dismiss the state-law claim asserted against Armor without prejudice.

790 F. App'x at 964.

Based upon *Birdwell* and § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over the plaintiff's state law claims against Dr. Adusei and CHC, and those state law claims are dismissed without prejudice.

IV.    **Conclusion**

For the foregoing reasons, the summary judgment motion (Doc. 398) of defendants Glanz and Regalado is **granted**, and the summary judgment motions of CHC and Dr. Adusei (Doc. 413, 415) are **granted** as to the plaintiff's § 1983 claims.  Because the Court has disposed of all federal claims, the undersigned declines to exercise supplemental

13

jurisdiction over the state law claims against Dr. Adusei and CHC, and those claims are accordingly **dismissed without prejudice**.  A separate judgment will be entered.

SO ORDERED this 30th day of September 2020.

_____
JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

14