## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DEBORAH YOUNG, as Special Administrator )<br>of the Estate of Gwendolyn Young, deceased, )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>STANLEY GLANZ, et al., )<br> )<br>Defendants. ) | Case No. 13-CV-315-JED-JFJ |

## <u>OPINION AND ORDER</u>

Before the Court are the defendants' summary judgment motions as to the claims of plaintiff Deborah Young. (*See* Doc. 466, 468, 469). The plaintiff responded (Doc. 493, 491, 492), and the defendants replied (Doc. 501, 500, 498). The Court has also considered supplemental briefs (Doc. 505, 516, 519, 520) on the summary judgment motions.

## I.      Background

Gwendolyn Young was detained in the David L. Moss Criminal Justice Center (the Jail) from October 16, 2012 until February 8, 2013, when she was found dead in her cell. During her time at the Jail, Ms. Young notified staff that she was diabetic, had a history of stroke, hypertension, and urinary tract infections. About a week before her death, Ms. Young began complaining of stomach pain and vomiting. On January 28, 2013, her blood pressure was taken and was low, at 99/71. The next day, a nurse noted that Ms. Young had refused her food tray because it upset her stomach. Ms. Young continued to report stomach pain on February 3, 2013. The following day, her blood pressure was very low, at 80/64,

with a fast heart rate of 106.  Ms. Young reported stomach pain for the third day in a row on February 5, 2013, she refused her medications, and she indicated that the pain was worsening.

In the early afternoon of February 6, 2013, Ms. Young reported that she had been throwing up blood.  Jail staff reportedly looked at some vomit in the cell, and commented that there was "not enough blood" and that the vomit looked like Kool-Aid.  Ms. Young refused her medication again later that afternoon.  On the morning of February 7, detention staff reported to nursing staff that Ms. Young had not eaten for three days and had complained of vomiting blood for three days.  No medical care was provided in response, and no physical examination or vital signs were recorded.

Ms. Young continued to report illness, weakness, and vomiting on the evening of February 7, 2013.  Just before midnight, housing Sergeant Byrd was called to Young's cell and was informed by a detention officer that Ms. Young "ha[d] not eaten or drank anything in three days" and that she had "been throwing up everything."  Byrd took Young to the medical unit.  The nurse told Byrd that Ms. Young likely had the flu, but instructed Byrd to take Ms. Young back to the housing unit without any treatment.

At approximately 6:48 a.m. on February 8, 2013, Ms. Young banged on the glass of her cell and reported that she was having difficulty breathing.  A few minutes later, a nurse arrived, and Ms. Young told her that she wanted to go to the hospital.  The nurse replied that she was "o.k." and did not need to go to the hospital.  The nurse told Ms. Young to take her medications, and then left her in her cell.  Within a few minutes, a detention officer found Ms. Young on the floor of her cell. The detention officer called a medical emergency.

2

Sergeant Byrd and three nurses responded.  Byrd informed one of the nurses that Ms. Young had not eaten or drank anything for three days because she could not keep anything down and kept vomiting.  The nurse noted that Young also had not been taking her medications.  Byrd told the nurse that "something is wrong with inmate Young beside her not taking her medication."  Byrd later testified that it was "obvious" that something was wrong with Ms. Young.

Another detention officer, Corrie King, observed that Ms. Young was not responding to nurses' questions and did not move off of the floor to the gurney. A nurse then grabbed Ms. Young's arms and started to drag her across the floor of the cell.  At approximately 7:05 a.m., Ms. Young collapsed after nurses attempted to lift her off the floor onto her feet.  She also fell to the ground while waiting for medical staff to lower the stretcher. Ms. Young was subsequently placed on the gurney and taken to the medical unit. Medical staff determined that Ms. Young should take Prilosec 20 mg.  Ms. Young was returned to her cell at around 8:05 a.m. At the time she was taken to her cell, she appeared incoherent and was not responsive.  Corporal D'Souza was concerned that something was wrong with Ms. Young, but deferred to higher ranking officers that she was not going to the hospital.

Detention Officer Aaron Sherman also observed that Ms. Young was not talking or complying with directives.  D'Souza and another detention officer assisted in moving Ms. Young from the gurney to her bunk, and Ms. Young was then left in her cell at around 8:16

a.m.[1]  It does not appear that medical staff checked on Ms. Young in her cell from 8:16 until 10:03 a.m., when she was found in her cell unresponsive, with no pulse or respirations. The Jail Medical Director, Dr. Adusei, noted that she had "already expired" by the time he entered her cell.

The plaintiff filed this action, asserting claims under state law and 42 U.S.C. § 1983, alleging that Dr. Adusei, CHC, and former Sheriff Stanley Glanz were deliberately indifferent to Ms. Young's serious medical needs. The defendants move for summary judgment.

## II.    Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  The courts thus must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  The non-movant's evidence is taken as true, and all

---

[1]      There is video from various angles showing the time that Ms. Young was outside of her cell and taken to the medical unit.  (*See* Doc. 491-14).  The Court has reviewed the video.  The video shows Ms. Young's fall in the hallway while waiting to be put on the gurney.  In addition, Ms. Young appeared to show serious discomfort while in the medical unit, with an elevated respiratory rate, and she appeared to have difficulty walking.

justifiable and reasonable inferences are to be drawn in the non-movant's favor.  *Id.* at 255. The court may not weigh the evidence and may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant.  *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam).  Instead, the court must view the evidence in the light most favorable to the non-moving party.  *Id.* at 657.

## III.  Discussion

### A.    Deliberate Indifference under § 1983

Claims under 42 U.S.C. § 1983 based upon a failure to provide medical care for serious medical needs of inmates are judged under the "deliberate indifference to serious medical needs" test of *Estelle v. Gamble*, 429 U.S. 97 (1976).  As explained by the Supreme Court:

> The [Eighth] Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . against which we must evaluate penal measures. . . . These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," . . . the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that "it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."
>
> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," . . . proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to

medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

429 U.S. at 102-05 (internal citations and footnotes omitted); *see also Al-Turki v. Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014) ("[T]he Eight Amendment's prohibition against cruel and unusual punishment extends to the unnecessary and wanton infliction of pain caused by prison officials' deliberate indifference to serious medical needs of prisoners.").

Prison officials violate an inmate's constitutional rights where the officials "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). A delay in medical care also "constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).

These principles "appl[y] to pretrial detainees through the due process clause of the Fourteenth Amendment." *Howard v. Dickerson*, 34 F.3d 978, 980 (10th Cir. 1994). Deliberate indifference is defined as something more than mere negligence; it requires knowing and disregarding an excessive risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference has both objective and subjective components. *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991).

### *Objective Component*

The objective component is met if the harm suffered is sufficiently serious. *Id.* at 298. "A medical need is serious if it is 'one that has been diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention.'" *Ramos v. Lamm*, 639 F.3d 559, 575 (10th Cir. 1980); *see also Al-Turki*, 762 F.3d at 1192-93; *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).

The Tenth Circuit has "held that 'death [is], without doubt, sufficiently serious to meet the objective component." *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)).  Because Ms. Young died, the evidence plainly supports the objective component.  In addition, a reasonable jury could find upon the record evidence that Ms. Young experienced severe pain for days without being taken to a hospital or receiving proper treatment, and such evidence also independently provides support for the objective element. "When the pain experienced during [a] delay [in medical care] is substantial, the prisoner 'sufficiently establishes the objective element of the deliberate indifference test.'" *Kikumura v. Osagie*, 461 F.3d 1269, 1292 (10th Cir. 2006) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000)). Numerous types of ailments and pain have been considered sufficiently serious medical conditions within the *Estelle* framework.  *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (chest pain); *Mata*, 427 F.3d at 752-54 (severe pain and worsening of heart condition); *Kikumura*, 461 F.3d at 1292-93 (severe pain, vomiting due to hyponatremia).

### *Subjective Component*

There is a genuine dispute of material facts, such that a reasonable jury could find the subjective component is also satisfied here.   The subjective component "lies 'somewhere between the poles of negligence at the one end and purpose . . . at the other.' . . . The Supreme Court has analogized it to criminal recklessness, to the conscious

disregard of a 'substantial risk of serious harm.'" *Blackmon v. Sutton*, 734 F.3d 1237, 1244-45 (10th Cir. 2013) (quoting *Farmer*, 511 U.S. at 836).  The inmate's symptoms "are relevant to the subjective component of deliberate indifference.  The question is: were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?" *Martinez*, 563 F.3d at 1089.  Whether the defendant had the "requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.  The "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

Here, construed in plaintiff's favor, the record evidence would support a finding that Jail detention and medical staff were deliberately indifferent to Ms. Young's serious medical needs. Ms. Young's condition worsened over the course of a week to the point that she was in respiratory distress, could not eat or drink, vomited for days, fell, was extremely weak, and was left in her cell after being incoherent and unresponsive to questions and directions. Despite days of reportedly vomiting blood, refusing medications, not eating or drinking, complaining of respiratory distress, falling, and being observed in an incoherent state, Ms. Young was not taken to a hospital for the emergency medical care she needed. Detention staff were concerned that something was obviously wrong with Ms. Young, but did not call for her to be transported to the hospital, and nursing staff also refused to call for emergency care.  Her condition included objective symptoms from which a jury could infer that Jail staff were aware of an obvious substantial risk to Ms. Young's health and

life, but failed to take appropriate action to obtain necessary medical care to save her life. A jury could also reasonably find that the delay in seeking treatment caused her death.

The Tenth Circuit has held that deliberate indifference may be found where an inmate is prevented "from receiving treatment" or is denied "access to medical personnel capable of evaluating the need for treatment." *Burke*, 935 F.3d at 993 (quoting *Sealock*, 218 F.3d at 1211).  If the official delays or refuses to fulfill that gatekeeper role due to deliberate indifference, then he "may be liable for deliberate indifference." *Id.*  Thus, deliberate indifference has been found where inmates exhibited serious symptoms but officials took no action to treat them.  *Id.*; *Sealock*, 218 F.3d at 1210-11 (deliberate indifference to severe chest pain by refusing to take inmate to hospital).

There is evidence from which a factfinder may infer that Jail medical and detention staff were deliberately indifferent by observing critical symptoms that clearly called for emergency medical care, but they prevented Ms. Young from obtaining the emergency medical evaluation and treatment she needed.  There is also evidence that, despite Ms. Young's chronic health conditions and significant evidence of acute illness, Dr. Adusei never saw or examined Ms. Young until she was already dead, although there is evidence that he was aware of her deterioration and symptoms.[2]

---

[2]     Dr. Adusei argues that he cannot be liable because Ms. Young had not been diagnosed with a subdural hematoma. That argument is unpersuasive, because Ms. Young's symptoms were objectively and obviously serious. In the face of obvious symptoms of a need for emergency medical care, and her request to go to the hospital after vomiting and being unable to eat or drink for days, Ms. Young was prevented from obtaining the emergency medical care, diagnosis, and treatment that she needed.

In summary, there are factual issues precluding summary judgment, as the evidence would support a finding that medical and jail staff were deliberately indifferent to Ms. Young's serious medical needs in this case.

### B.     Individual Liability of Stanley Glanz

!      "[T]he three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities [are]: (1) personal involvement[,] (2) causation, and (3) state of mind." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013); *see also Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).  The first element requires the plaintiff to "show an 'affirmative link' between the supervisor and the constitutional violation." *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (quotations omitted). "The plaintiff can show such a link by establishing 'the [supervisor] promulgated, created, implemented[,] or possessed responsibility for the continued operation of a policy,' or 'the establishment or utilization of an unconstitutional policy or custom' . . . provided the policy or custom resulted in a violation of the plaintiff's constitutional rights." *Burke v. Regalado*, 935 F.3d 960, 997 (10th Cir. 2019) (quoting *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) and *Dodds*, 614 F.3d at 1199).

Under the second element, there must be evidence that "the defendant's alleged action(s) caused the constitutional violation by setting in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Burke*, 935 F.3d at 997 (quoting *Estate of Booker*, 745 F.3d at 435).  With respect to the third element, "a plaintiff can 'establish the requisite

state of mind by showing that [a supervisor] 'acted with deliberate indifference.'" *Id.* (quoting *Perry v. Durborow*, 892 F.3d 1116, 1122 (10th Cir. 2018)). "[A] local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Id.* at 998 (quoting *Hollingsworth v. Hill*, 110 F.3d 733, 745 (10th Cir. 1997)).

Glanz asserts that he is entitled to qualified immunity and cannot be held under a supervisory liability theory because (1) he "had no personal contact with Young or direct and contemporaneous knowledge of her treatment" and (2) there was no underlying deliberate indifference. (Doc. 469 at 32-33). However, the evidence, construed in plaintiff's favor, would support a finding that Sheriff Glanz received notice of significant failures of the medical care system at the Jail, but did not make discernible changes to alleviate the substantial risks to inmates like Ms. Young.

Faced with an evidentiary record much like the summary judgment record in this case, the Tenth Circuit determined that "a reasonable jury could conclude that one or more of Sheriff Glanz's subordinates violated [the decedent's] constitutional rights" such that supervisory liability was proper if the plaintiff demonstrated that "(1) he maintained a policy or custom that (2) led to the underlying constitutional violation and (3) that he acted with deliberate indifference." *Burke*, 935 F.3d at 999.

Applying that standard, the *Burke* court determined that the evidence was sufficient to support the jury's finding of Glanz's supervisory liability. *Id.* The Circuit concluded that the evidence sufficiently "showed that Sheriff Glanz maintained a policy or custom of

11

providing deficient medical care at the jail." *Id.* The evidence supporting that determination included the Gondles Report and the 2007 and 2010 NCCHC reports, all of which are in the record here. *Id.* The Circuit determined that a "reasonable jury could find these deficiencies [in Jail medical care] resulted in [the decedent's] death," such that the causation element was also satisfied. *Id.* at 1000.

Finally, the *Burke* court stated that "a reasonable jury could conclude Sheriff Glanz was deliberately indifferent to the risk that deficient medical care would result in a constitutional violation like the one [the decedent] suffered." *Id.* The court noted evidence "that Sheriff Glanz neglected to remedy deficient medical care," which included the NCCHC 2007 and 2010 audit reports and Ms. Gondles's 2009 report. *Id.*

The *Burke* court summarized its determination as to Glanz's supervisory liability as follows:

> It was reasonable for the jury to find (1) Sheriff Glanz was responsible for "an unconstitutional policy or custom," *Dodds*, 614 F.3d at 1199, of poor training, inadequate staffing, and lack of urgency surrounding jail medical care; (2) that this policy or conduct resulted in a violation of Mr. Williams's right to adequate medical care under the Fourteenth Amendment; and (3) Sheriff Glanz acted with deliberate indifference toward the risk that the policy or conduct of providing inadequate medical care would result in an injury like Mr. Williams's. Accordingly, the evidence was sufficient to support the jury's verdict against Sheriff Glanz holding him liable for supervisory liability.

*Id.* at 1001. For the reasons set forth above, a reasonable jury could find upon the summary judgment record that Glanz is liable under a supervisory liability theory. Accordingly, summary judgment is inappropriate as to that claim.

Glanz's qualified immunity argument is not premised upon the typical legal analysis, but is premised principally upon his factual claim that there was no underlying constitutional violation by a subordinate. In any event, the Court has previously conducted the qualified immunity / clearly established law analysis on nearly identical evidence that a jury could find constituted deliberate indifference by Sheriff Glanz to Jail detainees' serious medical needs. *See Burke v. Glanz*, 11-CV-720-JED, 2016 WL 3951364 at **25-26 (Jul. 20, 2016) (unpublished). That analysis is adopted here. Among other things, before Ms. Young suffered and ultimately died following a delay in emergency medical treatment, the law was clearly established that a Jail official like Mr. Glanz could be held liable for violating a pretrial detainee's constitutional rights under the circumstances described above. *See Estelle*, 429 U.S. at 104-05 (prison officials who intentionally deny or delay inmate access to medical care violate the Eighth Amendment); *Mata*, 427 F.3d at 751 (delay in medical care would violate the Eighth Amendment where the delay causes the inmate substantial harm); *Dodds*, 614 F.3d at 1199 (identifying bases for supervisory liability); *Gonzales v. Martinez*, 403 F.3d 1179, 1183 (10th Cir. 2005) ("an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm *actually* would befall an inmate; it is enough that the official acted or failed to act *despite his knowledge* of a substantial risk of harm") (quoting *Farmer*, 511 U.S. at 842).

C.    **The County's Municipal Liability**

Plaintiff's official capacity claim against Sheriff Regalado is an action against the entity of which he is an agent. "This is why the official capacity claim here is effectively a claim against Tulsa County and also why, when Sheriff Glanz left office in 2015, the

13

official capacity claim transferred to his successor, Sheriff Regalado." *Burke*, 935 F.3d at 998.  Under *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978), to survive Sheriff Regalado's motion for summary judgment, the plaintiff must supply record evidence of the following: (1) the existence of a jail policy or custom by which Ms. Young was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. "whether there is a direct causal link between [the] policy or custom and the alleged constitutional deprivation").  *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694; *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

Here, as in *Burke v. Regalado*, 935 F.3d at 995-999, the "elements of supervisory and municipal liability merge" because the plaintiff's supervisory liability theory is predicated on Sheriff Glanz's maintenance of a policy or custom that resulted in the constitutional violation, and that same policy or custom is a prerequisite for municipal liability.  "Accordingly, the elements for supervisory and municipal liability are the same in this case." *Id.* at 999.  As noted, a reasonable jury could find upon the evidence that (1) Sheriff Glanz "maintained a policy or custom of insufficient medical resources and training, chronic delays in care, and indifference toward medical needs at the jail, and that he did so knowing of an urgent need for reform," (2) the policy or custom resulted in the underlying violation of Ms. Young's constitutional rights, and (3) Glanz's maintenance of the policy was deliberately indifferent to serious medical needs of inmates.  *See id.*

The same evidence that would support those findings as to the supervisory liability claim against Glanz prevents summary judgment as to the official capacity claim against

Sheriff Regalado.  *See id.* at 999-1001.  "Sheriff Glanz – then the Tulsa County official charged with managing the jail – furthered a 'policy or custom' . . . of deficient medical care at the jail characterized by inadequate training, understaffing, and chronic delays" and "[a] reasonable jury could find his continuous neglect of these problems 'was the moving force behind the injury alleged.'" *Id.* (citations omitted).  "And as explained above, Sheriff Glanz acted with deliberate indifference toward the risk that the policy or custom of providing inadequate medical care would result in an injury" like Ms. Young's. *See id.* at 1001.

### D.    State Constitutional Claims against Sheriff Regalado

Plaintiff also asserts a claim for alleged violations of Ms. Young's rights under the Oklahoma Constitution, Art. II, §§ 7 and 9.  Those articles are the state's counterparts to the Eighth and Fourteenth Amendments to the United States Constitution.  The plaintiff asserts that the state constitutional claim is appropriate under *Bosh v. Cherokee Cnty. Bldg. Auth.*, 305 P.3d 994 (Okla. 2013).  In *Bosh*, the Oklahoma Supreme Court recognized a private right of action by a pretrial detainee for excessive force under Okla. Const. art. II, § 30.

*Bosh* did not recognize the claim asserted by plaintiff in this case.  *See id.*  Moreover, since *Bosh*, the Oklahoma Supreme Court has continued to narrow its holding.  *See, e.g., Perry v. City of Norman*, 341 P. 3d 689, 692-93 (Okla. 2014); *Barrios v. Haskell Cty. Pub. Fac. Auth'y*, 432 P.3d 233 (Okla. 2018) (declining to extend *Bosh* to inmate denial of medical claims under the Oklahoma constitution and stating "even if not barred by sovereign immunity . . . it is doubtful that such claims would exist in the Oklahoma

15

common law"). The federal courts in Oklahoma have also recently declined to extend *Bosh* to other constitutional claims. *See Dodson v. Cty. Comm'rs of Mayes Cty.*, 18-CV-221-TCK-FHM, 2019 WL 2030122 (N.D. Okla. May 8, 2019); *Burke v. Regalado*, 18-CV-231-GKF-FHM, 2019 WL 1371144, *3 (Mar. 26, 2019); *Snow v. Board of County Commissioners of the County of McClain*, Civ-14-911-HE, 2014 WL 7335319, at *3 (W.D. Okla. Dec. 19, 2014); *Payne v. Oklahoma*, CIV-15-10-JHP, 2015 WL 5518879, at **3-4 (E.D. Okla. Sept. 17, 2015).

The federal courts typically decline to expand state law to an extent not addressed by the state's highest court. *See Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013). As the Oklahoma Supreme Court noted in *Barrios*, "expanding tort remedies for constitutional violations is now a 'disfavored judicial activity.'" *Barrios*, 432 P.3d at 240 (quoting *Ziglar v. Abbasi*, __ U.S. __, 137 S. Ct. 1843 (2017)). Accordingly, plaintiff's claim under the state constitution is subject to summary judgment.

### E.   CHC's § 1983 Liability

CHC argues that it cannot be held liable because there is no evidence that would support a finding that its medical staff was deliberately indifferent to Ms. Young's serious medical needs. As noted above, the evidence construed in the plaintiff's favor, would support a finding that medical staff were deliberately indifferent in refusing to obtain emergency medical care for Ms. Young after she exhibited obvious symptoms of a seriously deteriorating condition and need for emergency medical care.

CHC further argues that it cannot be held liable under *Monell* because it did not make the policies for the Jail. The municipal liability principles in *Monell v. New York City*

*Dep't of Social Servs.*, 436 U.S. 658, 691 (1978), extend to private companies that contract to provide services on behalf of governmental entities.  *See, e.g., Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (*Monell* extends to "private entities acting under color of state law"); *Carr v. El Paso Cnty, Colo.*, 757 F. App'x 651, 655 (10th Cir. 2018) (unpublished).

Under *Monell*, to survive summary judgment, plaintiff must supply record evidence of the following: (1) the existence of a CHC policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. "whether there is a direct causal link between [the] policy or custom and the alleged constitutional deprivation").  *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694; *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

Plaintiff has presented sufficient evidence to demonstrate the existence of a fact issue preventing summary judgment on the *Monell* claim against CHC.  Based on the record evidence, construed in plaintiff's favor at this stage, a reasonable jury could find that, in the years prior to Ms. Young's death in 2013, CHC maintained a policy and custom of failing to provide medical care in response to serious medical needs of Jail inmates, failing to provide proper training and supervision regarding emergent medical conditions, and continuing to adhere to a constitutionally deficient system of care for detainees with serious medical needs. In the three years before Ms. Young, died, there were systemic, repeated, and documented failures to deliver appropriate healthcare, which specifically included delay in seeking emergency medical care for inmates with symptoms warranting

17

emergency treatment, resulting in deaths of other inmates under CHC's care. CHC was also aware of other documented failures, which were cited in audits in 2009 and 2010 as including a failure to comply with mandatory health standards, understaffing of medical personnel, deficiencies in doctor coverage, a lack of health services oversight and supervision, failure to provide training, delays in delivery of health care, and improper documentation of health services.  The evidence here would support a finding that CHC continued its failure to provide adequate medical care and failed to address documented deficiencies, which amounted to a custom that was the moving force behind the deliberately indifferent failure of medical staff to provide or obtain timely and appropriate treatment for Ms. Young.  CHC's Motion for Summary Judgment (Doc. 468) as to plaintiff's § 1983 claim is thus denied.

### F.    State Law Claims against Dr. Adusei and CHC

With respect to plaintiff's state law negligence claims, Dr. Adusei and CHC argue that they are immune from liability under the Oklahoma Governmental Tort Claims Act (GTCA). The GTCA provides tort immunity to "the state, its political subdivisions, and all of their employees acting within the scope of their employment." *Okla. Stat.* tit. 51, § 152.1(A); *see also Okla. Stat.* tit. 51, § 163(C) (tort actions may not be brought against "an employee of the state or political subdivision acting within the scope of his employment"). The statute defines employees to include "licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies." *Okla. Stat.* tit. 51, § 152(7)(b)(7).

18

The Oklahoma Supreme Court has stated that, "[g]enerally speaking, the staff of a healthcare contractor at a jail are 'employees' who are entitled to tort immunity under the GTCA by virtue of sections 152(7)(b), 153(A), and 155(25)." *Barrios v. Haskell Cty. Pub. Facilities Auth.*, 432 P.3d 233, 236 fn.5 (Okla. 2018). However, the court specifically noted that it had "not been asked whether Turn Key Health, LLC or its staff are 'employees' under section 152(7)(b), but ha[d] assumed they are for purposes of answering the questions certified to [the Oklahoma Supreme Court]." *Id.*  Based on that strong indicator, federal district judges in this state have recently extended the footnote in *Barrios* to corporate jail medical contractors and their employees, determining them to be entitled to immunity on state claims pursuant to the GTCA. *See, e.g., Prince v. Turn Key Health Clinics, LLC*, No. 18-CV-0282-CVE-JFJ, 2019 WL 238153, at *9 (N.D. Okla. Jan. 16, 2019) (unpublished); *Burke v. Regalado*, 18-CV-231-GKF-FHM, 2019 WL 1371144, at *2–3 (N.D. Okla. Mar. 26, 2019) (unpublished); *Wirtz v. Regalado*, 18-CV-599-GKF-FHM, 2020 WL 1016445 (N.D. Okla. Mar. 2, 2020) (unpublished).

Based on the Supreme Court's footnote in *Barrios* and the reasoning of other judges in this District, CHC and its employees are immune from plaintiff's tort claims pursuant to the GTCA.  Accordingly, Dr. Adusei and CHC are immune on plaintiff's state law negligence claim, and those defendants are entitled to summary judgment on that claim.[3]

---

[3]  If this Court had disposed of plaintiff's federal claims in favor of the defendants, it would be appropriate to decline to exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c). *See Birdwell v. Glanz*, 790 F. App'x 962 (10th Cir. 2020) (unpublished).  However, the federal claims have survived, and the undersigned has adopted the reasoned approach of colleagues in this District at this time.

## IV.    Conclusion

The summary judgment motion (Doc. 469) of defendants Glanz and Regalado is **denied** as to the plaintiff's § 1983 claims and is **granted** as to her claims under the Oklahoma constitution.  The summary judgment motions of CHC and Dr. Adusei (Doc. 466, 468) are **denied** as to the plaintiff's § 1983 claims and are **granted** as to the state law negligence claims.

SO ORDERED this 6th day of October, 2020.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT