1          UNITED STATES DISTRICT COURT FOR THE
               NORTHERN DISTRICT OF OKLAHOMA
2

3
   DEBORAH YOUNG, as Special      )
4  Administrator of the Estate    )
   of Gwendolyn Young, deceased,  )
5                                 )
               PLAINTIFF,         )
6                                 )
   vs.                            )  Case No. 13-CV-315-IDJ-JFJ
7                                 )
                                  )
8  CORRECTIONAL HEALTHCARE        )
   COMPANIES, INC.,               )
9                                 )
               DEFENDANT.         )
10 _____)

11

12

13          TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                         VOLUME I
14        BEFORE THE HONORABLE IAIN D. JOHNSTON
               UNITED STATES DISTRICT JUDGE
15          FEBRUARY 13, 2023 P.M. SESSION

16

17

18               A P P E A R A N C E S

19

        FOR THE PLAINTIFF:  DANIEL E. SMOLEN and BRYON D. HELM,
20 Attorneys at Law, 701 Cincinnati Ave., Tulsa, OK 74119

21

        FOR THE DEFENDANT:  SEAN P. SNIDER and ANTHONY C. WINTER,
22 Attorneys at Law, 9801 N. Broadway Ext., Oklahoma City, OK
   73114 and MR. RONALD W. CHAPMAN, SR., Attorney at Law, 1441 W.
23 Long Lake Rd, Suite 310, Troy, MI  48098

24

25 Reported by:  Laura Griffin, United States Court Reporter

## <u>INDEX</u>

Opening Statement by Mr. Smolen........................  2
Opening Statement by Mr. Snider .......................  29

PLAINTIFF'S CASE IN CHIEF:

Bill McKelvey
    Direct By Mr. Smolen ...................................... 38

1    FEBRUARY 13, 2023

2        (PROCEEDINGS WERE HELD PREVIOUSLY BUT NOT DESIGNATED AS

3    PART OF THIS TRANSCRIPT.)

4            THE COURT:  So if you're paying attention, the next

5    step is what, opening statements.  All right.  So, again,

6    start with the Plaintiff.  If the Defendant wants to make an

7    opening statement, they can, and then we'll go from there and

8    start hearing witnesses.

9        So, Plaintiff, if you're ready, go ahead.

10           MR. SMOLEN:  Thank you, Your Honor.  Your Honor, can

11   we have the TVs moved just so that the jury -- they could see

12   some of the material that we pull up.  I know that they --

13           THE COURT:  Sure.

14           MR. SMOLEN:  Thank you.  And we need to get it

15   switched over.  Thank you.  Thank you so much.

16       Charlie, could you pull up a picture of 1, please.

17       Gwendolyn Young was born in Texas in 1960.  She relocated

18   to Tulsa with her family when she was a baby.  She flipped

19   properties around Tulsa for a long time, buying undeveloped

20   land, holding it, later selling it or holding it for her kids.

21   She had three children; Johnny, Angela, and Deborah.  They're

22   all here in the courtroom today.

23       Johnny runs a trucking and logistics company in Texas.

24   Angela is currently enrolled in beauty school.  And Deborah

25   has been an ICU nurse, RN, for the last 19 years.

1        I've been told that Gwendolyn made a really good chicken

2    and noodle and cornbread and I've been told that her favorite

3    snack was sardines and mustard.  I never got to meet Gwendolyn

4    Young because she bled to death over a ten-day period of time

5    in the Tulsa County jail.  She bled to death between January

6    the 28th of 2013 and February the 8th of 2013.

7        At the time of her death, nurses mocked her and called

8    her a faker.

9        Charlie, would you go ahead and show the jury slide 2,

10   please.

11       You won't have to take my word for it because the

12   documentation in this case is extensive about the last ten

13   days of Gwendolyn's life.  According to official documentation

14   provided by the Tulsa County Sheriff's Office, on the morning

15   of her death, at 8:05 a.m., Young appeared incoherent, but the

16   nurse repeatedly stated that she was faking her actions.

17       Another employee at the Tulsa County Sheriff's Office, a

18   gentleman by the name of Aaron Wade Sherman, documented almost

19   contemporaneously with her death that Nurse White made the

20   comment that she's faking an injury and trying to get

21   attention.

22       These nurses worked for a company called CHC.  CHC was

23   the contracted jail medical provider in the Tulsa County jail

24   during 2013 when Ms. Young was housed there.  The nurses that

25   were tending to Ms. Young were participating in what the

1    evidence will show is a pattern and culture that existed

2    within CHC to disregard inmate's complaints, to assume inmates

3    were fakers, to deny inmates of emergent medical needs when

4    they desperately needed help.

5        About ten months before Gwendolyn died in the jail, CHC,

6    through their CMO -- that's a certified medical officer.  It's

7    like a CEO for a medical company, it's that high of a level of

8    position.  A gentleman by the name of Raymond Herr.  Mr. Herr

9    was required to write a letter to the Tulsa County Sheriff's

10   Office, specifically an individual by the name of Brian

11   Edwards.  Brian Edwards was the undersheriff of Tulsa County

12   Sheriff's Office at that time.  He was the number two guy in

13   charge of the entire sheriff's office.

14       And on March the 23rd of 2012, Raymond Herr, on behalf of

15   CHC, a company that has more than 550 contractual facilities

16   and on average sees about 300 patients -- 300,000 patients

17   annually, Mr. Herr wrote a letter on behalf of this company

18   and he promised the undersheriff several different things.

19       He promised the undersheriff in March 23rd of 2013 that

20   CHC would immediately fix the broken sick call system.

21       Charlie, you can take this down if you will.

22       He promised the Tulsa County undersheriff that from here

23   on out, I promise CHC medical providers and physicians will

24   conduct face-to-face evaluations for every patient admitted to

25   the infirmary in the jail.

1    He promised that every inmate who had been housed in the

2   special housing unit would also receive a face-to-face, full

3   evaluation pertaining to their medical health.

4    Third, Raymond Herr, on behalf of the defendant, CHC,

5   promised unequivocally that he would implement immediately,

6   the day he makes the written promise, an immediate transfer

7   criteria for an inmate who has medical conditions that the

8   jail cannot handle their medical condition so they had to be

9   emergently sent to the nearest emergency room hospital.

10    Fourth, Raymond Herr, as the medical officer for CHC,

11   promised Tulsa County and the Tulsa County undersheriff that

12   every single infirmary patient's charts would be looked at on

13   a daily basis, that they would be collaboratively reviewed

14   with the physician, the RN assigned to the infirmary, and any

15   other nurse that was assigned to the care of the patient.

16    Fifth, Raymond Herr and CHC promised the Tulsa County

17   Sheriff's Office that no later than May 30th of 2012 they

18   would implement a protocol that would deal with and

19   specifically address repetitive medical complaints made by

20   patients at the Tulsa County Jail.

21    And lastly, Raymond Herr, on behalf of CHC, promised and

22   guaranteed that the medical director who was onsite at the

23   Tulsa County Jail, an individual by the name of Dr. Andy

24   Adusei, would no longer be allowed to work within that

25   facility and that he would be terminated no later than May the

1    31st of 2012.

2        As I mentioned, one of the promises that was made on

3    March the 23rd of 2012 was explicitly clear.  It was that

4    we're going to implement a criteria going forward that every

5    single inmate who presents to the medical staff with certain

6    conditions would be immediately sent to the hospital.  Because

7    it was clear by this point, based on the deaths that had

8    occurred in the facility, that they were not capable of caring

9    for patients that fit this category.

10        And in a half-page document, Raymond Herr, on behalf of

11    CHC, promised Tulsa County nine very specific things as it

12    pertained to immediate transfer for a patient to a hospital

13    outside of the Tulsa County Jail.

14        Number one, if any inmate presents at any time with a

15    systolic blood pressure of less than 100, they would be sent

16    out emergently and immediately.  Simple.  Even a lay person

17    could follow it.

18        Number two, he promised that if any patient presents with

19    a pulse greater than 120 and they have signs of illness, they

20    will be emergently sent to the hospital immediately.

21    He promised that any patient that had a pulse ox of less than

22    88 percent would be seen and sent to a hospital emergently.

23        Any patient with a GI bleed, any patient with chest pain

24    that's ischemic in nature, any patient that had chest pain

25    associated with shortness of breath, any inmate with prolonged

1    seizure, delirium that was felt to be led by nature, or severe

2    abdominal pain of an unknown cause, all of those patients

3    would be sent emergently to the hospital immediately.

4        CHC promised that any deviation from this immediate

5    transfer plan would require contemporaneous, written

6    authorization by the chief medical officer, that he would be

7    required at that very moment to override this plan.

8        This case is critical.  What's really important in

9    understanding the promise that was made on March the 23rd,

10   2012, was what had happened prior to that promise being made

11   and why it was being made to the person it was being made to,

12   the undersheriff.

13       There were five primary reasons that CHC and Raymond Herr

14   promised the Tulsa County Sheriff's Office in 2012 these very

15   specific things.  The first reason this promise was made in

16   2012 was because that in 2010 and 2009 there were a rash of

17   deaths in the Tulsa County Jail and the Tulsa County Sheriff's

18   Office's risk manager, a gentleman by the name of Josh Turley,

19   and the Tulsa County DA's Office took note of a very public

20   suit in Oklahoma County where CHC was being sued by the

21   Oklahoma County Sheriff's Office.

22           MR. SNIDER:  Objection, Your Honor.  Can we take a

23   sidebar?

24           THE COURT:  Sure.  Give us a moment.

25       (THE FOLLOWING WAS HELD AT THE BENCH OUTSIDE THE HEARING

1    OF THE JURY:)

2              THE COURT:  I'll just remind you that if anybody

3    speaks, be sure you speak into the microphone so the court

4    reporter can hear you.

5         There's an objection, which is unusual in opening, but go

6    ahead.

7              MR. SNIDER:  Your Honor, plaintiff's counsel just

8    violated motion in limine number 4 with regard to prior

9    lawsuits.  The Court said he was not allowed to reference or

10   get into those.  He could mention other instances, but not

11   lawsuits.

12        He just said lawsuits in opening as a basis for this

13   letter in response from Herr.  We filed that motion in limine

14   anticipating this, so we object.

15             MR. SMOLEN:  May I respond, Your Honor?

16             THE COURT:  When he's finished.

17        Are you done?

18             MR. SNIDER:  I'm done.

19             THE COURT:  Okay.  Go ahead.

20             MR. SMOLEN:  The motion in limine is specifically

21   pertaining to inmate lawsuits in the Tulsa County Jail against

22   CHC or the county.

23        This was a lawsuit filed by the County of Oklahoma County

24   against CHC on a breach of contract theory.  It was never

25   addressed in the defendant's motion in limine and in fact it

1    actually makes the evidentiary foundation for the case that

2    this becomes awareness for Tulsa County based on what was

3    happening 100 miles away over in Oklahoma County, but there's

4    certainly nothing in the motion in limine that in any way

5    addresses the lawsuit by Oklahoma County against CHC.

6              THE COURT:  Okay.  So the response is the motion in

7    limine 4 related to inmate lawsuits by other inmates, this is

8    my understanding and in the exhibits is that this was an

9    action by a governmental body against CMC.

10              MR. SMOLEN:  Correct.

11              THE COURT:  What's the response?

12              MR. SNIDER:  I believe our motion in limine was

13    addressing suits against CHC, which is what that would have

14    been.

15              MR. SMOLEN:  The motion in limine is --

16              THE COURT:  Don't talk over each other, but go

17    ahead.

18              MR. SNIDER:  The court's order talks about our

19    motion seeking to exclude evidence of other lawsuits, other

20    conduct of any of the defendants.  The court said that

21    lawsuits -- at the very end the court said that the -- if the

22    plaintiff seeks to introduce evidence of other litigation, she

23    must first raise the issue with the court and other counsel

24    outside the presence of the jury, explain the relevance of the

25    litigation itself as opposed to the underlying incidents for

1    conduct.

2        He should have raised that he was going to use litigation

3    relating to CHC, any litigation.  That is the issue.

4            THE COURT:  Hold on a second.  I didn't hear that

5    last part.

6            MR. SNIDER:  If he was going to present to the jury

7    or raise to the jury another litigation, he should have raised

8    it to the Court beforehand so we could know what he was going

9    to talk about.

10       When he stood up and said suits, I didn't know what he

11   was going to talk about, but even still, suits from the county

12   with CHC should be encompassed in this.  They're irrelevant to

13   this action.  He's already talked about prior litigation.  I

14   think we're -- at this point we're severely prejudiced by his

15   statements to the jury.

16           MR. SMOLEN:  In response to that, Your Honor, again,

17   we would stand on the position if the court were to look at

18   the motion in limine, it does -- it certainly does not

19   encompass -- it is our reading of the court's order pertaining

20   to the motion in limine it does not encompass this suit.

21       But I'm not even going to talk about -- I'm done talking

22   about it.

23           MR. SNIDER:  The problem is you threw a skunk in the

24   jury box.

25           MR. SMOLEN:  I don't think that -- Your Honor, I

1 | really don't believe that that is covered in the motion in

2 | limine.  When I read the motion in limine, it was about all

3 | the other cases that we've had against the Tulsa County Jail

4 | pertaining to inadequate medical delivery system in this jail.

5 |     I haven't even told the jury anything about what the suit

6 | was about in Oklahoma County, it's just -- it's really what

7 | precipitates the letter.

8 |        MR. SNIDER:  Your Honor, any lawsuit, regardless of

9 | it being from a patient of CHC's or the Sheriff's Office

10 | relating to the provision of healthcare, it would be

11 | encompassed by our request here.  This is what we sought to

12 | have excluded because we want this case to be about the facts

13 | and evidence in this case, this issue, not prior litigation,

14 | prior lawsuits.  It started off on the wrong track.

15 |        THE COURT:  Yes, we did.  Hold on.

16 |     This is very difficult for me.  Do you have the motion in

17 | limine?  Because I have a very distinct recollection of what

18 | it said, but I want to make sure it's correct.  So if y'all

19 | are fighting over what the motion in limine requested,

20 | somebody hand me that.  My recollection to me will be

21 | confirmed or disproved by that, because we are definitely

22 | starting off on the wrong foot.

23 |     Can you -- do you have the motion in limine?

24 |        MR. SNIDER:  It's document -- 610 was the document.

25 |        MS. WINTER:  I can pull it up on the computer, Your

1  Honor.  Would that be helpful?

2          THE COURT:  Hold on a second.  Document 610.

3          MR. SMOLEN:  It's the first sentence of the motion

4  in limine, first paragraph.

5          THE COURT:  Motion in limine number 4 starts with

6  the sentence which is as broad as it gets, quote, "It would be

7  a violation of the federal rules of evidence to put evidence

8  of other lawsuits and other conduct of any of the defendants

9  into this case." Fed R. Evid. 404(b).  Makes sense.

10     "In this case, the Plaintiff's attorneys have repeatedly

11  attempted to inject information from other irrelevant lawsuits

12  where claims by inmates or employees from the Tulsa County

13  Jail." So, broad, then specific.

14      The motion then goes on and the second paragraph says,

15  quote, "Allowing plaintiff, plaintiff's counsel or plaintiff's

16  witnesses to introduce evidence of other litigation not

17  limited to inmates, introduced evidence of other litigation,

18  (including but not limited to," again, "including but not

19  limited to separate, unrelated cases filed against these

20  defendants such as -- such as the cases of Elliott Williams,

21  Gwendolyn Young, Gregory Brown, Bridget Revilla, Michael

22  Moritz, Charles Jernegan and Charles Ray) would distract the

23  jury from the issues at hand."

24      Next paragraph, after citing Fed. R. Evid. 401(b) and

25  404, also citing federal evidence 403, "Therefore, the only

1 | purpose of attempting to introduce evidence of other

2 | lawsuits" -- I'll read that again. "Therefore, the only

3 | purpose of attempting to introduce evidence of other lawsuits

4 | or claims against any defendant is to inflame the jury on

5 | issues which are not related to -- not related or probative to

6 | matters in the case."

7 | Why was that limited only to lawsuits by inmates?

8 | MR. SMOLEN: Your Honor, when the Court addressed it

9 | in the order, essentially my understanding of the order of

10 | holding was that plaintiffs would be not allowed to talk about

11 | the other lawsuits that inmates had filed, but that we would

12 | be allowed to talk about the other deaths to the extent that

13 | the court found they were relevant.

14 | I did not read that motion in limine as a blanket of I

15 | can't mention any lawsuits at all. And if that was the intent

16 | of the court's order, then I apologize, Your Honor, because we

17 | went through this last night, looked through everything, and I

18 | just read the motion in limine as those claims that plaintiffs

19 | have tried to repeatedly inject into this case, which that's

20 | essentially what they argued, but the court's ruling was, if I

21 | understood it properly, was that I would be allowed to talk

22 | about the deaths to the extent I could establish relevancy,

23 | but I would not be able to talk about the fact that there were

24 | lawsuits related to those deaths unless I asked for

25 | permission.

1       THE COURT:  Did you ask for permission before you

2   got up and said it in front of the jury?

3       MR. SMOLEN:  But this isn't a lawsuit related to any

4   inmate death that I'm talking about.

5       THE COURT:  Your interpretation is absolutely

6   unbelievably wrong, and we have started with a skunk in the

7   jury box.

8       MR. SMOLEN:  I apologize, Your Honor.

9       THE COURT:  Don't do it again.

10      MR. SMOLEN:  I won't.

11      THE COURT:  Sustained.

12   (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT WITHIN

13   THE PRESENCE AND HEARING OF THE JURY:)

14      THE COURT:  Ladies and gentlemen of the jury,

15   remember that statements by counsel are not evidence.  You're

16   ordered to disregard the statement regarding the lawsuit filed

17   by the county against CHC.

18   You may continue.

19      MR. SMOLEN:  Thank you, Your Honor.

20   The second reason that CHC was promising the undersheriff

21   these very specific items was because in 2010 CHC had

22   miserably failed a 2010 medical accreditation audit at the

23   Tulsa County Jail.  The audit identified numerous deficiencies

24   in the medical delivery system.  You'll hear about the audit.

25   It's referred to as the 2010 NCCHC audit.

1    The third reason that CHC and Raymond Herr were required

2  to make this promise to the Tulsa County Sheriff's Office in

3  2012 was because there was an audit in 2011 by the United

4  States Department of Homeland Security.  Homeland Security had

5  conducted an audit in the Tulsa County Jail on or around

6  September the 28th of 2011.

7    During this investigation, Homeland Security officers

8  found numerous issues with CHC's delivery system of medical

9  services at the Tulsa County Jail.  Specifically, they found

10 that there was a prevailing attitude of indifference amongst

11 CHC medical staff.

12   Secondly, Homeland Security officers determined that CHC

13 doctors were using standing orders in violation of state and

14 federal guidelines.  They additionally found that nurses were

15 practicing outside their scope of licensure.

16   Third, they found that CHC nurse staff was undertrained.

17 Fourth, they found that the CHC nurses were not documenting or

18 evaluating patients properly.  And, lastly, they determined

19 that CHC was using what they described as a home-grown system

20 of electronic medical records that had failed to take into

21 consideration what had been learned over the last 20 years in

22 correctional healthcare.

23   The fourth reason these promises were required to be made

24 to the Tulsa County Sheriff's Office was because of the

25 high-profile deaths of Lisa Salgado, Elliott Williams and

1    Gregory Brown, all who died in the Tulsa Jail in 2011 and

2    2012.  The evidence will show that these deaths were all the

3    result of systemic failures in CHC's medical delivery system.

4        The fifth reason CHC was required to make these promises

5    on March the 23rd of 2012 was because of a 2011 report

6    conducted by a doctor by the name of Dr. Roemer.  His company

7    was called AMS Services.  He was a Tulsa County physician.

8        Dr. Roemer had been brought in by the undersheriff in the

9    Tulsa County Sheriff's Office to conduct an audit as to the

10   medical delivery system under CHC, Tulsa's contractor.

11       Dr. Roemer confirmed that many of the people that had

12   been housed in the facility were dying needless deaths that

13   were preventable.  The deaths included Frankie Thomas on

14   January the 4th of 2010; the death of Damien Tucker on March

15   12th of 2010; Clinton Labor on March 28th of 2010; Linda

16   Henshaw on June the 18th of 2010; Patrick Gibson on December

17   the 14th of 2010; and Charles Jernegan on September 1st of

18   2010.

19       The report further noted that CHC's medical staff were

20   practicing beyond the scope of their licensure and were not

21   utilizing available medical protocols.  They were not using

22   appropriate medical guidelines and they were not creating

23   individualized treatment plans for the patients housed at the

24   jail.

25       The reason Dr. Herr was required to make these promises

1   to undersheriff Brian Edwards was because Brian Edwards had

2   brought in Dr. Roemer.  Brian Edwards had known Dr. Roemer for

3   about 15 years at the time.  He understood him to be an expert

4   in the area of medical delivery systems.  He trusted his

5   opinion and he trusted his experience in auditing medical

6   systems.

7       Between 2010 and 2012, Undersheriff Edwards in the Tulsa

8   County Sheriff's Office, risk manager Josh Turley would

9   receive periodic updates regarding Dr. Roemer's findings.

10  Brian Edwards was aware of the NCCHC audit result as well as

11  the 2011 Homeland Security investigations.  That's another

12  reason why he was the person who this information was being

13  provided to.  Brian Edwards was also in command over the

14  investigation into CHC medical staff involving the death of an

15  inmate by the name of Elliott Williams in October of 2011.

16  And last but not least, this information was required to be

17  given to Undersheriff Edwards because he was second in command

18  of the Tulsa County Sheriff's Office.

19      The promises made to Undersheriff Edwards are critical to

20  understanding this case.  He required that these promises be

21  put on letterhead and memorialized in writing and officially

22  by the highest executive at CHC.  He required it because a

23  month later he would be leaving.  Brian Edwards would be

24  leaving the Tulsa County Sheriff's Office and taking a new

25  career at the GRDA, the Grand River Dam Authority, as the vice

1  president.

2      After Brian Edwards left, roughly 20 days after the

3  explicit promises were made, CHC did nothing to fix the

4  problem.  CHC utterly ignored the promises that they had made,

5  and they continued to do what they had done in the past and

6  tried to cover their tracks over inmates who had died needless

7  deaths.

8      Despite promising Undersheriff Edwards that Dr. Adusei

9  would be terminated on May the 31st of 2012, they instead

10 fired the director of nursing, a lady by the name of Tammy

11 Harrington.  Unbeknownst to Undersheriff Edwards, Tammy

12 Harrington had been documenting the systemic failures at the

13 Tulsa County Jail between 2010 and 2012.

14     Tammy Harrington had not only been documenting the

15 systemic deaths in the facility, but she been reporting all of

16 this information up the chain of command to the highest

17 executive level at CHC corporate.

18     None of that information had ever been shared to the

19 Tulsa County Sheriff's Office.  They didn't know that the

20 director of nursing was documenting these failures as well,

21 contemporaneous to the sheriff's office investigations.

22     Tammy Harrington, as the director of nursing,

23 specifically reported up the chain of command to CHC that

24 nurses were falsifying medical charts, that nurses were

25 reporting patient vitals when they weren't actually taking

1    them.  She went on to report that she had been specifically

2    requested by CHC's Health Services Administrator, a lady by

3    the name of Chris Rogers, to falsify patient charts for

4    inmates who had been dead and were in severe rigor mortis by

5    the time they had been discovered.

6        She reported that Dr. Adusei was refusing to see patients

7    unless he said they were, quote, dying or septic.  She was

8    reporting that Dr. Adusei was coming to work as the medical

9    director at the Tulsa County Jail with the smell of alcohol on

10   his breath and slurred speech.

11       She also went on to heavily document the previous medical

12   director, an individual by the name of Phillip Washburn, and

13   his total and utter disregard for patients' -- inmates' needs

14   and inadequate medical delivery system under his control.

15       CHC, despite their pledge to the Tulsa County Sheriff's

16   Office to terminate Dr. Adusei, the medical director of the

17   facility, chose to terminate the one person who was trying to

18   do the right thing, was trying to fix the problem and was

19   documenting all of it.

20       Despite its explicit pledge, CHC continued to retain Dr.

21   Adusei for over a year.  They continued to retain every nurse

22   that had been identified as falsifying records, falsifying

23   jail incident reports, falsifying statements to investigators

24   that were taking place after the deaths had occurred.

25       And then in January and February of 2013, CHC breaks the

1  biggest promise.  At least if you're the family of Gwendolyn

2  Young.  They broke the promise that they would always

3  transport inmates that had clear emergent medical needs to the

4  hospital, the half page list of nine items that I covered with

5  you earlier in the opening.  And I want to show you how their

6  complete disregard for their promise simply killed Gwendolyn

7  Young.

8       If you would, Charlie, pull up the second cut.

9       I want to show you a portion of Ms. Young's medical

10  record.  You'll see it on the screen in front of you.  On

11  January the 28th of 2013 Ms. Young, who has historically high

12  blood pressure, is supposed to be taking medication for high

13  blood pressure.

14       Her blood pressure drops -- her systolic blood pressure

15  drops blow 100.  According to the promise that CHC had made

16  ten months ago, at that very moment, January the 28th of 2013,

17  Ms. Young was required to be sent emergently to the hospital.

18  But no one did anything.  They just let her stay in her cell,

19  not helping her at all.

20       By the time February 4th rolls around --

21       Charlie, would you go to the next cut, please.

22       -- Ms. Young's blood pressure had dropped to 80.  This

23  was a lady who had a baseline of a blood pressure of about

24  160.  She had been vomiting blood for three days.  She had

25  been unable to take her high blood pressure medication and no

 1    one did anything to help her.

 2         Next slide.

 3         On February the 5th, February the 6th, and February the

 4    7th, as Ms. Young laid in her cell continually vomiting

 5    everything she could try to eat, unable to take her

 6    medication; they did nothing for her.  She was in severe pain,

 7    continually reporting the stomach pain that she was

 8    experiencing to every single medical staff that would listen.

 9    And by the morning of February the 8th, the day of her

10    death --

11         Charlie, next slide if you would, please.

12         -- at 6:48 in the morning, Ms. Young was banging on the

13    glass of her cell saying she was having difficulty breathing,

14    another criteria that would have required immediate emergency

15    transport.

16         At 6:40 in the morning, she still could have been saved

17    if they had just followed the promises that they had made to

18    the Tulsa County Sheriff's Office ten months before, but no

19    one did anything for her.

20         Her respiratory distress was so significant that you'll

21    be able to see it on videotape and you'll be able to watch it

22    during the presentation of evidence in this case.  They pushed

23    her on a gurney up against the wall, and they just left her

24    there while she struggled to breathe.

25         An hour after that --

1      Charlie, if you would please pull up the next cut.

2      -- it was reported by TCSO staff --

3      I want you to go to the larger portion if you would,

4  Charlie, please.

5      -- the nurses were asking her questions; however, she was

6  not responding to the questions being asked.  After evaluating

7  her, the nursing staff made the decision to send her to

8  medical.

9      At this time Nurse Wallace grabbed ahold of her arms and

10 started to drag her across the floor of the cell.  Sergeant

11 Henshaw at the same time said, do not drag her, place her on

12 the gurney.  The nurses were dragging Ms. Young across the

13 floor of the cell because her blood pressure had dropped so

14 low because of her internal bleeding that she was unable to

15 walk without assistance.

16     Charlie, would you use the next cut, please.

17     Around 10:00 that morning Sergeant Darby, based on what

18 he had been told by the CHC medical staff, said to Ms. Young,

19 "I'm in charge and the medical staff stated to me that you are

20 not going to the hospital."

21     You see, Ms. Young knew she was in dire need of help.

22 She was begging to go to the hospital.  And no one would send

23 her.  So she laid there for the next hour and she died alone

24 in a dark cell without her kids, without her 14 grandkids,

25 without her five great-grandchildren.  No one did anything to

1  help her.

2      The evidence in this case is overwhelming and it's

3  undeniable.  CHC had a corporate culture of ignoring inmates

4  with emergent, serious medical needs.  CHC's culture was

5  known, it had been known for years.  It was pervasive.  It was

6  documented.  It had been identified to the highest levels of

7  CHC corporate staff.  But they did nothing to fix it.  They

8  just continued to cover it up, encourage nursing staff to

9  falsify vital signs despite inmates dying tragic and

10  imminently preventable deaths.

11      As a result of this indifference, Deborah Young is here

12  representing her mother's estate.  Her brother and sister

13  voted for her, because of her history as an ICU nurse, to be a

14  voice of her mother.

15      After I show you all the evidence I just talked to you

16  about, and that's just the tip of the iceberg, you'll be asked

17  to render a decision in this case.  This family has waited ten

18  years to get this case to trial and you people will help get

19  it over the finish line.  So I just want to thank you for your

20  time.

21              THE COURT:  Thank you, Counsel.

22              Opening statement from Defense?

23              MR. SNIDER:  Yes, Your Honor.  May we address

24  something at sidebar quickly?

25              THE COURT:  Sure.

1    (THE FOLLOWING WAS HELD AT THE BENCH OUTSIDE THE HEARING

2  OF THE JURY:)

3          MR. SNIDER:  Your Honor, I couldn't help but notice

4  that throughout the course of Mr. Smolen's opening statements

5  he was getting emotional to the point of what appeared to be

6  to me almost crying.

7          MR. SMOLEN:  I was not.

8          THE COURT:  Stop, stop.  I've said this many times

9  don't interrupt.

10      Go ahead and finish.

11          MR. SNIDER:  To the point of crying in front of the

12  jury.  Emotional pleas like that are known to be cause for a

13  mistrial.  In this instance I think between Mr. Smolen crying,

14  his client crying in front of the jury, in addition to him

15  violating motion in limine number 4, I have to move for a

16  mistrial.

17          THE COURT:  Go ahead, Mr. Smolen.

18          MR. SMOLEN:  Your Honor, as the Court is aware I've

19  worked on a number of these cases over my career.  This is the

20  last death in the Tulsa County Jail during this timeframe that

21  I've worked on.  I can't help the fact that I'm an emotional

22  human being.

23      I'm trying to do my absolute best to not, but I'm

24  certainly not up at the stand bawling or making some kind of

25  emotional plea to this jury in an opening, but I would do my

1   very best.  Again you won't see any kind of teary eyes until

2   maybe the closing in this case.  But I can't help the fact

3   that somebody in my view of the world was neglected to the

4   point that she just suffered a totally preventable death.  Her

5   kids are crying, her family is here, it's upsetting.

6            THE COURT:  Go ahead.

7            MR. SNIDER:  Your Honor, I understand it may be

8   emotional for the family, but it's the responsibility and the

9   professional duty of the lawyers in this case to conduct

10  themselves in a way that they're not garnering sympathy from

11  the jury.

12      If he prevails at this trial, it needs to be based off

13  the evidence and testimony, not the emotions the jury may feel

14  from Mr. Smolen, and what we saw today was just that.  That,

15  on top of the violation of motion in limine number 4 I think

16  is enough for a mistrial to be granted.

17      And I've seen sanctions granted for lawyers crying during

18  their opening or closing statements before, too, and that may

19  be appropriate as well.

20           THE COURT:  Okay.  Okay.  There's a comment about

21  Ms. Young crying.  I'm not going to hold anything against a

22  daughter for crying when her mother's death is being

23  discussed, especially in the manner that it was discussed.  So

24  any crying by Ms. Deborah Young, that's -- I'm not going to

25  take any action on that.

1      Look, it's emotional, but, counsel, you've got to be

2  professional.  It's emotional stuff.

3           MR. SMOLEN:  It won't happen again, Your Honor.

4           THE COURT:  We have a dead human being with a lot of

5  family who is here.  They're upset, they're outside -- mostly

6  outside the view, they're way off to the side of the court.  I

7  hadn't seen a juror look over to the family yet so far.  I've

8  been eyeing both the family and the jury to see if that was

9  occurring and I did not see any jurors looking for the family

10 members.  And they can obviously see Ms. Deborah Young because

11 she's sitting right in front of them.

12      But, Mr. Smolen, if you can't control your emotions, you

13 let me know and we'll take a break so you can keep your

14 emotions under control.

15      As to the combination of the violation of motion in

16 limine number 4 with the emotional actions by Mr. Smolen, it's

17 close.  We've had -- the opening was really cutting a line

18 close to closing argument, but there was no objection on that.

19      I instructed the jury to disregard the statements

20 regarding the lawsuit filed by the county against CHC, so I

21 think that cured it, in addition to the instructions that I

22 gave them before they heard openings, and in addition to the

23 instructions that they'll hear in closing as statements that

24 are not evidence, and in addition to the instructions I told

25 them to disregard things they should disregard.

1      So, Mr. Smolen, if you're going to lose control of your

2  emotions, give me notice and we will take a break so that you

3  can regain your emotions, but I fully expect you to continue

4  in control during the remainder of the trial.

5          MR. SMOLEN:  I understand, Your Honor, I apologize.

6  I was doing my very best.

7          THE COURT:  All right.  The motion for mistrial will

8  be denied.

9      Counsel, you've got two warnings already and we haven't

10  done a witness on the stand yet, okay.  So let's get this

11  thing done and done right.

12      (THE FOLLOWING PROCEEDINGS WERE HELD IN OPEN COURT WITHIN

13  THE PRESENCE AND HEARING OF THE JURY:)

14          THE COURT:  All right, ladies and gentlemen of the

15  jury, what is it, 3:42.

16      Who's the first witness and how long do you think that

17  witness's testimony will be for the plaintiff?

18          MR. SMOLEN:  The first witness that the Plaintiff

19  will call would be Billy McKelvey, and I anticipate it will be

20  several hours of testimony.  But, Your Honor, I believe he'll

21  be one of the longer examinations.

22          THE COURT:  Okay.  Is there a reasonable breaking

23  point in his testimony that you could anticipate in about 45

24  minutes?

25          MR. SMOLEN:  Absolutely.

1          THE COURT:  Then we'll get Mr. McKelvey on the

2     witness stand.

3          MR. SMOLEN:  Are they doing their opening or they

4     waive?

5          MR. SNIDER:  We are going to do our opening

6     statements now.

7          THE COURT:  That's fine.  That's fine.  Okay.  Sorry

8     about that, Counsel.  Let me know when you're ready.

9          MR. SNIDER:  Good afternoon.  My name is Sean

10    Snider.  Also at my table is Anthony Winter, Ronald Chapman,

11    and here on behalf of CHC as a corporate representative is

12    Jamie Vaz.  Also at our table is Brian Ramsey who is going to

13    be putting up stuff for us occasionally.

14        I'd like to thank you for your time and service on the

15    jury.  What we're doing now is outlining what the evidence

16    will be.  It's not the evidence that comes next.

17        What Mr. Smolen has told you the evidence will be is just

18    his opinion as to what the evidence will be, just like what

19    I'm about to tell you the evidence will be is my opinion as to

20    what the evidence will be in this case.

21        You heard from Ms. Young's counsel first today and that's

22    how this is going to go.  They have the burden of proof in

23    this case, so they get the first word and the last.

24        There are some parts of this story that both sides are

25    going to agree on and other parts we're going to disagree.

1    Other parts we're going to disagree to great ends.  While we

2    as the defendants don't have the burden of proof in this case,

3    there's one thing that we are going to do, we're going to show

4    you the whole picture, what was really going on.  We're going

5    to show you and put on evidence and testimony of what

6    treatment Ms. Young was receiving while at the Tulsa County

7    jail.

8         While I ask that you pay close attention to the evidence

9    and testimony that the plaintiffs put on in their case in

10   chief, I also ask that you wait and listen to the testimony

11   and see the evidence that we're going to put on and what we're

12   going to show you as well.

13        Wait until you hear and see all the evidence of how the

14   medical unit was staffed on that day, the staffing levels for

15   the nurses and physicians and nurse practitioners on the day

16   of Ms. Young's death.  Wait until you hear how CHC had

17   processes in place to ensure that patients had access to

18   mid-level providers, nurse practitioners, or physicians 24

19   hours a day, seven days a week.

20        Wait until you see how CHC and the Tulsa County jail had

21   a system in place to ensure that if a patient was sick, if a

22   patient was ill and needed to be treated at a higher level of

23   care facility, they would be immediately transported to a

24   hospital.

25        Over the next few days each side will put on evidence and

1    show what we believe happened in this case.  We do agree on

2    some things and others we don't.  For instance, both sides

3    agree that when Ms. Young died she was 52 years old and an

4    inmate at the Tulsa County Jail, and that she had a medical

5    history of a prior stroke with right-sided weakness, diabetes,

6    hypertension, hyperlipidemia, high cholesterol, severe chronic

7    back pain and acid reflux or heartburn.

8         The evidence will be that Ms. Young also suffered from

9    mental health problems and was diagnosed with bipolar disorder

10   and borderline personality disorder.  You're going to see that

11   the bipolar and borderline personality disorder often made her

12   agitated and that she would often not want to take her

13   prescribed medications.

14        The evidence will be that Ms. Young was not new to the

15   jail at the time of her death in February of 2013.  At the

16   time of her death she had been incarcerated at the Tulsa

17   County jail since October of 2012.  Prior to that

18   incarceration Ms. Young had been incarcerated at the jail from

19   August of 2011 to March of 2012.

20        The evidence will be that Ms. Young had a well-documented

21   history of knowing how to report her medical concerns to the

22   staff at the Tulsa County jail.  For example, you're going to

23   see that Ms. Young had a history of reporting her food

24   upsetting her stomach.  She had a history of acid reflux or

25   heartburn requiring medication for relief.

1    You're going to hear testimony and see evidence that on

2    February 7th, 2013, the day before her death, Ms. Young

3    complained of vomiting blood and not eating for three days.

4    You're going to then see where she was evaluated by a nurse

5    who determined that she had not vomited blood.  The evidence

6    will further show that that same nurse checked with the

7    detention staff and their paperwork and confirmed that

8    Ms. Young had been eating those prior three days.

9    The nurse then instructed Ms. Young to make sure she was

10   getting adequate hydration by drinking at least two liters of

11   fluid a day.  You'll see that on the following morning, the

12   morning of the 8th at 6:00 a.m., or around 6:00 a.m.,

13   Ms. Young complained of lower back pains, nausea and vomiting.

14   In response, she was taken to the medical unit in the

15   jail on a gurney where she was seen by and assessed by the

16   nursing staff.  Her vital signs were taken and found to be

17   stable and within her normal limits.  And were reported --

18   those vital signs were reported to the on-call nurse

19   practitioner.

20   The complaints of lower back pain and nausea and vomiting

21   were also communicated during that call to the nurse

22   practitioner.  Ibuprofen was given for her lower back pain.

23   And in response to her reports of nausea and vomiting, the

24   nurse practitioner changed Ms. Young's order from Zantac, a

25   prescription for heartburn, to a different type of heartburn

1   medication, Prilosec.

2        After receiving her medications and being assessed by the

3   nursing staff in the medical unit, Ms. Young requested to be

4   taken back to her cell.  As such, Ms. Young was then escorted

5   back to her cell from the medical unit on a gurney.

6        Now, Ms. Young was in a cell.  She wasn't housed in the

7   medical unit as a medical patient.  She was housed in a

8   segregated housing unit at the jail, not because of her health

9   issues, but because of her behavioral issues that she had had.

10  That's important when you listen to the evidence and see the

11  records in this case to consider why she was where she was at,

12  why she was segregated.  She wasn't being segregated because

13  of her medical issues; it was for other reasons.

14       You're going to see that on the morning of February

15  8th -- I'm sorry, on the morning of February 8th after she had

16  returned back to her cell -- she was escorted back -- the

17  evidence will be that the detention staff continued to round

18  on Ms. Young.

19       In addition to the detention staff checking on her, the

20  evidence will be that one of the same nurses that had seen her

21  in the medical unit also came back to her cell, a different

22  part of the jail, to check on her hours later.

23       The evidence will show that during that check Ms. Young

24  did not respond to them calling her name.  The nurse and the

25  detention officer opened her cell and checked to see if she

1   was okay.  Upon examination she was found to not be breathing

2   and didn't have a pulse.  As a result they called an immediate

3   medical emergency.  CPR was initiated immediately.  Three

4   additional nurses came to help and assist with trying to

5   resuscitate her.

6       Dr. Andrew Adusei was also the physician that arrived

7   shortly around that time for his work -- normal schedule.  He

8   then came to her unit and began helping out with CPR.  EMS was

9   called a short time later to take over CPR and she was

10  ultimately transported to the hospital.

11      Once at the hospital, Ms. Young was ultimately declared

12  dead.  The evidence will be that not a single person, not a

13  single person that saw Ms. Young on February the 8th or

14  February the 7th, observed any signs of head trauma to

15  Ms. Young.

16      Nobody observed any signs of head trauma to Ms. Young.

17  None of the detention staff, none of the nursing staff, none

18  of the medical staff, none of the EMS team, and not even the

19  physicians at the hospital where she was brought to and

20  ultimately declared dead.  In fact, the evidence will be that

21  the hospital physician listed cardiac arrest as her clinic --

22  as his clinical impression for why she had died.

23      The evidence will be that no one knew the secret that

24  Ms. Young's body had until the medical examiner performed his

25  autopsy.  You're going to see and hear that the medical

1  examiner also did not note any signs of external trauma to

2  Ms. Young's head.  He did, however, upon autopsy find a 100

3  milliliter clot of blood located in the subdural space which

4  is below the skull in dura mater.  Blood in the space that

5  nobody's eyes could possibly see.

6      You're going to hear that a fatal bleed like Ms. Young

7  had was insidious, extremely difficult for any physician to

8  diagnosis.  You're going to hear that a fatal bleed like

9  Ms. Young's is not only challenging to diagnose, it's equally

10  challenging to find and treat in time to save a patient's

11  life.  Even when there is a known history of head trauma,

12  which the evidence doesn't have in this case.

13      Like I said, there are some things we're going to agree

14  on and a lot that we're not.  One such thing that we're going

15  to disagree on is whether Ms. Young exhibited any signs or

16  symptoms severe enough to warrant her being transferred to a

17  hospital via ambulance.

18      The evidence will show that Ms. Young's complaints were

19  vague, nonspecific, and consistent with her prior known health

20  history; chronic back pain, nausea and vomiting.  We will show

21  you the actual information that the nurses and the medical

22  providers had when using their clinical judgment at the time

23  of their care of Ms. Young.

24      For example, you're going to see that her prior history

25  of abdominal and gastrointestinal complaints were being

1    treated just like the nausea and vomiting she experienced on

2    the 7th and 8th.  You're going to see that the evidence of her

3    having reported history of severe, chronic back pain was being

4    treated by the nurse and the medical staff at the jail.

5        You're going to see that the evidence that the nurses

6    promptly checked Ms. Young's vital signs, which were stable

7    and nonemergent.  In addition to that big disagreement we have

8    over whether or not she was exhibiting any obvious signs or

9    symptoms of being in a serious medical condition, we disagree

10   on whether any earlier or different treatment would have saved

11   her life.  We disagree as to whether CHC had a policy or

12   practice that was constitutionally inadequate.  And we

13   disagree as to whether any of CHC's policies or practice

14   caused Ms. Young's death.

15       We believe that the evidence will show that CHC's medical

16   system at the Tulsa County jail was constitutionally adequate

17   and that none of its employees -- none of its employees were

18   indifferent to Ms. Young's serious medical needs.

19       As you listen to the testimony and see the evidence in

20   this case, keep in mind what it is you're here to decide and

21   as the court will instruct, as I mentioned, you will hear

22   their side of the story first and then we get to go.  Please

23   pay close attention to both sides of the evidence before

24   coming to any conclusion.

25       At the conclusion of this case we believe that you're

1   going to find that on February the 8th, 2013, CHC's policies

2   and practices at the jail were constitutionally adequate, that

3   none of CHC's nursing staff or physician staff were

4   deliberately indifferent to Ms. Young.

5       Likewise, we believe that you'll find that Ms. Young

6   unfortunately died as a result of a silent, invisible,

7   insidious, subdural hematoma that developed without any

8   specific signs or any reports of head injury.  At that point

9   we're going to ask that you return a verdict in our favor.

10  Thank you.

11          THE COURT:  Thank you, Counsel.

12      All right.  Let's start with Mr. McKelvey.

13          MR. SMOLEN:  Your Honor, we would call Mr. McKelvey

14  to the stand.

15          (WITNESS SWORN.)

16          THE COURT:  Good afternoon, Mr. McKelvey.

17  Mr. McKelvey, have you ever testified in court before?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  So you know to speak slowly, clearly

20  into the microphone, let counsel finish with his questions

21  before you start answering a question.  Likewise he's going

22  let you finish with your answer before he launches into

23  another question; okay?

24          THE WITNESS:  Yes, sir.

25          THE COURT:  Thank you.

1              BILL McKELVEY,

2  having been called as a witness, after being first duly sworn,

3  testified as follows:

4                    DIRECT EXAMINATION

5  BY MR. SMOLEN:

6  Q.  Good afternoon, Mr. McKelvey.  Would you please state your

7  full name for the record.

8  A.  Billy Joe McKelvey, Sr.

9  Q.  Mr. McKelvey, are you currently employed?

10  A.  Yes.

11  Q.  How are you currently employed, sir?

12  A.  I currently own and operate my own construction company.

13  Q.  Okay.  And have you ever been employed in law

14  enforcement?

15  A.  Yes.

16  Q.  Okay.  And can you tell the jury a little bit about your

17  work history in law enforcement if you would, please.

18  A.  I started in law enforcement on my 21st birthday in 1993.

19  I retired out of law enforcement in September of 2018 for 25

20  years.  During that time I worked patrol, investigations,

21  internal affairs, training, command staff level, SWAT team,

22  assortment of duties like that.

23  Q.  As it pertains to your investigative jobs in law

24  enforcement, were you ever employed to work in jail

25  investigations?

1  A.   Yes.

2  Q.   And was there a name for that?  I mean, I know you

3  mentioned IA, but was there a name for jail investigations?

4  A.   Yes.

5  Q.   And what was that, sir?

6  A.   Jail -- JCIU, jail criminal investigative unit.

7  Q.   Okay.  Can you tell the jury just briefly as far as what

8  was important, what was the JCIU and what were their

9  responsibilities?

10  A.   JCIU, we did a host of things there, we monitored inmate

11  phone calls, field requests from other law enforcement

12  agencies that might want copies of their phone calls,

13  monitored visitation logs and, you know, provided information

14  to other law enforcement agencies on who may be coming and

15  going within the jail to see certain people.

16      To work with the mail delivery system inside the jail

17  concerning gang activity, making sure the inmates -- if we had

18  any requests from inmates that they needed to stay away from,

19  to work with classifications unit to make sure that inmates

20  stayed away from other inmates.

21      We also investigated fights amongst inmates in jail,

22  minor complaints on staff that's in the jail.  Just a host of

23  things within the jail.

24  Q.   Okay.  Mr. McKelvey, did officers that were assigned to

25  the JCIU, did they have any involvement in any way in

1  investigating inmate deaths at the Tulsa County jail?

2  A.   Yes.

3  Q.   Can you describe to the jury what involvement a JCIU

4  officer might have as it pertained to a Tulsa County jail

5  death?

6  A.   When a jail death would occur, obviously the criminal

7  investigative unit within the Sheriff's Office called CID,

8  Criminal Investigative Division, would work the actual death

9  of the inmate like the crime scene, et cetera.

10      And then the jail investigative unit would recover any

11 documents within the jail that pertained to that inmate's

12 death like copies of medical records, inmate visitations, any

13 requests from the inmate that had been sent to any person

14 within the jail like classifications or food or doctor or, you

15 know, the medical unit or for clergy or anything.

16      We would basically recover all of the information we

17 could on this particular inmate to help the criminal -- the

18 Criminal Investigative Division to figure out what happened.

19 Q.   Okay.  Mr. McKelvey, if you would just let the jury know

20 what timeframe of your career in law enforcement that you were

21 working in this JCIU unit?

22 A.   It's been awhile so I'm going to try to remember.  I was

23 working in the training division within the jail and then

24 sometime in the middle, I'm going to guess to say 2009

25 timeframe, May, June, July timeframe, I was transferred from

1  the training division to the jail investigative division

2  inside the jail.

3  Q.  Okay.  And for roughly how long did you serve in that

4  capacity at the Tulsa County Sheriff's Office?

5  A.  I worked there until I was transferred to internal

6  affairs, roughly, July timeframe, August of 2010.

7  Q.  Okay.  What was the difference between -- you mentioned

8  you were transferred in July of 2010 from JCIU to internal

9  affairs.  What's the difference?  If you would, just explain

10  to the jury the difference between those two groups.

11  A.  The jail investigative unit just does simple

12  investigations in the jail, not really complex investigations

13  within the jail, just your -- just a basic level of

14  investigation.

15      Internal affairs within the Tulsa County Sheriff's Office

16  at that time investigated policy and procedure related

17  complaints on any Tulsa County Sheriff's Office employee.

18  Q.  Okay.  Would the internal affairs division and officers

19  assigned to that division also investigate medical staff that

20  were employed within the jail that were employees of CHC?

21  A.  Ask that one more time, please.

22  Q.  Would the internal affairs division of the Tulsa County

23  Sheriff's Office, when they were conducting investigations,

24  ever investigate the actions or inactions of any medical staff

25  employed at the Tulsa County Jail?

1    A.   Yes.

2    Q.   And did you understand that medical staff, during at least

3    your time in the jail, to be employees of CHC?

4    A.   Yes.

5    Q.   Did you yourself have direct involvement as an internal

6    affairs officer working injuries or deaths in the Tulsa County

7    jail?

8    A.   Yes.

9    Q.   Can you tell the jury just briefly, if you recall, what

10   the first investigation that took place as it specifically

11   pertained to jail medical was?

12   A.   When I first went to -- when I first reported to internal

13   affairs, I reported to a gentleman by the name of Robbie

14   Lillard.  He was a sergeant.  Shortly after reporting to him,

15   there was an incident in the jail where the undersheriff had

16   heard about this, I don't know how the undersheriff had heard

17   about this incident --

18           MR. CHAPMAN:  Your Honor, I'm going to object.  If

19   the undersheriff heard about something, it's going to be

20   hearsay if he's not here to talk about it.

21           THE COURT:  Objection, rule, basis, response, reply.

22   No speaking objections.

23       So what is the objection?  Give me a rule.

24           MR. CHAPMAN:  The objection is hearsay, 803, Your

25   Honor.  It's an out of court statement.

1      THE COURT:  Well, I think it goes to course of

2   action because that's what he's asking, but what's your

3   response?

4      MR. SMOLEN:  That was my response, that it goes to

5   the course of action as far as what he was doing based on his

6   assignments.  It's not also a statement that we're using to --

7      THE COURT:  Not for the truth of the matter

8   asserted.

9      MR. SMOLEN:  Right.

10      THE COURT:  Okay.  Ladies and gentlemen, the

11   statement to what is said just goes to show what he did and

12   why he did it, his actions based upon what he heard, not the

13   truth of what was told to him; okay?

14    Overruled.

15      MR. SMOLEN:  Thank you, Your Honor.

16   Q.  (BY MR. SMOLEN) Mr. McKelvey, you can continue.

17   A.  Robbie Lillard and I went to the jail, evidently this --

18   this inmate had been brought into the county jail on a public

19   intoxication charge.  And within just a few hours he was

20   transported to the hospital because he had a large laceration

21   somewhere on his head, on the front of his head, whether it be

22   the face or the forehead.

23    The reason I remember it is it was my first investigation

24   in internal affairs and the gentleman was wealthy, and I

25   remember it because we dubbed it a skull cap, we called him

1   the skull cap man.

2       He had been involved in an accident, he crashed his car,

3   left the scene of this crash, was walking down the road.

4   Tulsa police was called to the crash, couldn't put the --

5   couldn't put him -- I believe his last name was Byrd, I can't

6   remember his first -- could not place him in the car and they

7   arrested him for public intoxication and booked him in the

8   jail.

9       He was in the booking process and was looked at by

10  detention staff and the nurse was processed through the

11  booking process and was sent to a cell within the jail.

12      On video you could tell there was nothing wrong with him

13  on the video -- the best I can remember, the jail staff and

14  medical looked at the back of his head on the left side and

15  he -- when he -- when he wound up in his cell within a few

16  minutes his celly, the person he was living with or

17  potentially going to be living with in the cell, notified the

18  jailer within that pod that there was a problem with this

19  inmate and somehow somewhere he had fallen and cut his

20  forehead.

21      Well, he was taken to the hospital due to the fall and

22  the injury to his head and they did a CT and found that he was

23  experiencing a brain bleed.  And being that he was at the

24  hospital, he survived.

25      We called him skull cap because they peeled his skull

1  back or his scalp back exposing his skull and did whatever,

2  you know, surgery they needed to do.  And he never came back

3  to jail.  I don't know what happened to him.  I know that he

4  survived but I just don't know what happened to him from

5  there.

6  Q.  Okay.  And I think you had said to the jury that was your

7  first investigation in IA; is that correct?

8  A.  Yes.

9  Q.  Did you have an opportunity while you were serving in IA

10 to actually investigate any jail deaths?

11 A.  Yes.

12 Q.  Okay.  If you would, can you tell the jury what you recall

13 or if you recall what the first jail death was that you

14 investigated?

15 A.  The first jail death that I investigated from an I -- from

16 an internal affairs standpoint was an inmate by the name of

17 Elliott Williams.

18 Q.  And can you tell the jury how you got involved in that

19 investigation while you were assigned to internal affairs?

20 A.  That particular day I don't know why I was at the jail.  I

21 was there on another investigation of some sort.  I had heard

22 a medical emergency called over the radio.  I had heard that

23 an inmate was possibly deceased and so I went to medical just

24 to -- just to walk through because I know I -- I know the

25 Undersheriff Brian Edwards at the time was going to ask me and

1  so I walked through, seen where this gentleman had died, and I

2  had talked to the chief of the facility Michelle Robinette and

3  at that time Robbie Lillard had been transferred to the jail

4  and he was a captain, administrative captain at the jail and I

5  talked to him and then I left.

6  Q.  Okay.  Did you ultimately become the lead investigator on

7  that jail death?

8  A.  Yes.

9  Q.  Okay.  So as a result of that investigation were you

10 required to write a report?

11 A.  Yes.

12 Q.  If you would, could you briefly just summarize to the jury

13 what your conclusion was as it pertained to Mr. Williams's

14 death based on what your specific assignment was?

15         MR. CHAPMAN:  Your Honor, objection.  The witness is

16 reading a statement and it hasn't been used to refresh his

17 memory.

18         THE COURT:  Okay.  I can't see that.

19    Are you reading from something, sir?

20         THE WITNESS:  No, sir.

21         MR. CHAPMAN:  He brought one with him.

22         THE COURT:  Overruled.

23 Q.  (BY MR. SMOLEN) Mr. McKelvey, let me just ask you this

24 way:  Do you recall what the specific assignment was that you

25 had?

1   A.  I recall not a hundred percent specific, no, but I do

2   recall snippets of it.

3   Q.  Did you bring a copy of your investigation with you

4   today?

5   A.  Yes.

6   Q.  Okay.  Would it help refresh your memory if you were able

7   to look at your investigative report as it specifically

8   pertains to what the investigation assignment was as it

9   pertained to what you were to do?

10  A.  Yes.

11  Q.  Go ahead and take a look, if you would, at that report,

12  Mr. McKelvey, and see if it refreshes your memory.

13  A.  Yes, sir.

14  Q.  Okay.  Can you tell the jury, after you've had your memory

15  refreshed, what your specific investigative assignment was as

16  it pertained to Mr. Williams' death?

17  A.  I was instructed to find out if any Tulsa County employee

18  had violated any policies surrounding his death.  I was asked

19  to look at any actions or inactions taken by the medical unit

20  and if there was anything that they did that contributed to

21  it -- contributed to Inmate Williams' death.

22  Q.  When you say the medical unit, did that include the

23  employees of Correctional Healthcare Company?

24  A.  Yes.

25  Q.  Do you recall if you were also asked to determine whether

1    or not any CHC's employees's actions or inactions had

2    contributed to the death of Mr. Williams?

3    A.   I -- this investigation took place in the latter part of

4    October 2011 and I either interviewed or reviewed audio tapes

5    of interviews by a number of other investigators and my typed

6    report is 80-plus pages long.

7    Q.   Okay.

8    A.   And at that time I had three 3-ring binders full of

9    information, so I can't remember everything.

10   Q.   Take a look at the first page of your report under the

11   investigation assignment and it's number 3 and see if it

12   refreshes your memory.

13   A.   Yes.

14   Q.   Okay.  And after you've had your memory refreshed, can you

15   tell the jury what specifically you were assigned in number 3

16   to do during this investigation?

17   A.   Was there any wilful acts by TCSO employees or

18   Correctional Healthcare Company employees that caused the

19   death.

20   Q.   Can you tell jury -- you said you had three large binders

21   that you ultimately gathered information of pertaining to that

22   death.  Can you give the jury just some sense of idea as to

23   what material you were referencing?  What you were actually

24   looking at to investigate the death?

25   A.   I -- there was a total of roughly 50-plus-or-minus

1  interviews conducted.  There were hundreds of pages of medical

2  documents, jail reports, pod reports, information that the --

3  the jailers type into a computer and videotape evidence,

4  reports from other law enforcement agencies that was completed

5  and was given to us concerning this investigation for me to do

6  a -- an overall view of what occurred.

7  Q.  Okay.  So we're talking about jail documentation, medical

8  records, videos, all of that stuff?

9  A.  Yes.

10  Q.  Witness interviews, all of those things?

11  A.  Yes.

12  Q.  And after you completed that investigation -- well, let me

13  ask you, how long did it take?

14  A.  If memory serves my correctly, I finished the report early

15  March of 2012.

16  Q.  And were you able to come to any findings based on this

17  extensive investigation that you conducted?

18  A.  Yes.

19  Q.  Okay.  And are you able -- I know it's been over ten

20  years, are you able to specifically tell the jury what those

21  findings are?

22          MR. CHAPMAN:  Objection, Your Honor, under 701.

23  This is a lay witness.  He's unable to give opinion testimony

24  particularly based on scientific or technical knowledge.  He's

25  reviewing medical records where they talk about an employee

1    whether they --

2              THE COURT:  Did you hear the no speaking objections

3    part?

4              MR. CHAPMAN:  Pardon?

5              THE COURT:  Did you hear the no speaking objections

6    part?

7              MR. CHAPMAN:  Sorry.

8              THE COURT:  So the question was, are you able -- "I

9    know it's been over ten years, are you able to specifically

10   tell the jury what those findings are?"

11        So can you answer that question?

12        The question is, do you remember what the findings were

13   as to this investigation and do you remember counsel is asking

14   about the scope and he was focusing on the scope of the

15   investigation relating to conclusions relating to CHC.

16        Do you recall what your conclusions were as you sit here

17   today?

18   A.  No, be not 100 percent specifically.

19             THE COURT:  Okay.  There's the answer.

20        So overruled.  Ask another question.

21   Q.  (BY MR. SMOLEN) Mr. McKelvey, did you memorialize your

22   findings as the lead investigator in the IA unit after your

23   investigation?

24   A.  Yes.

25   Q.  And did you prepare a summary of those findings?

1   A.   Yes.

2   Q.   Do you have a copy of that with you?

3   A.   Yes.

4   Q.   Would that refresh your memory about what your findings

5   were specifically as it pertained to medical staff?

6   A.   Yes.

7   Q.   And if you would, take a minute to look at that document.

8   I don't want you to read from it but look at it and when your

9   memory has been refreshed, I want you to tell the jury what

10  you recall the summary of your findings to be.

11           MR. CHAPMAN:  Objection, Your Honor.  This is the

12  701 objection.

13           THE COURT:  Right now all he's doing is refreshing

14  his recollection.  That's all he's doing.

15           MR. CHAPMAN:  Counsel said when you're done --

16           THE COURT:  That's all he's doing.

17           MR. CHAPMAN:  Okay.

18           THE COURT:  When you're done, let counsel know.

19  Thank you.

20  Q.   (BY MR. SMOLEN) And, Mr. McKelvey, have you had a chance

21  to review your summary findings?

22  A.   Yes.

23  Q.   And I'm asking you specifically, I don't want you to make

24  any opinions, I'm asking you specifically to tell the jury

25  what you found factually from the investigation as it

1    pertained to the medical staff.

2           MR. CHAPMAN:  Your Honor, again this is the 701.  He

3    can't give that testimony as to what he found.  He would have

4    to give opinion testimony to do that, Your Honor.

5           THE COURT:  Are you going lay the foundation?  I

6    don't know why we have to do this, but are you going to lay a

7    foundation that this is a fact?  I think you have that this is

8    a report, investigation by a public body which by definition

9    is not hearsay.

10          MR. SMOLEN:  I will be doing that.  I just didn't

11   know we were going to do that every time but I'll do that.

12          THE COURT:  Why don't you lay the foundation for

13   that.

14          MR. SMOLEN:  Absolutely.

15   Q.  (BY MR. SMOLEN) Mr. McKelvey, as part of your job as

16   investigator in internal affairs, were you specifically

17   required to draft a report to your superior?

18   A.  Yes.

19          MR. CHAPMAN:  Your Honor, may we approach for a

20   minute?

21          THE COURT:  We'll take a quick break, okay.  Thank

22   you.

23      (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, OUT OF

24   THE PRESENCE AND HEARING OF THE JURY:)

25          THE COURT:  All right.  What's the issue?

**United States District Court**

1          MR. CHAPMAN:  The issue with respect to this, is

2    this is not an exhibit, Your Honor.

3          THE COURT:  It's not what?

4          MR. CHAPMAN:  It's not an exhibit.  It was never

5    offered, it's not on an exhibit list, it has nothing to do.

6    So laying a foundation to arguably to have it admitted or so

7    that he can talk about it is an end run around our requirement

8    to list exhibits.

9          THE COURT:  Okay.  Well, are you offering it as an

10   exhibit?

11         MR. SMOLEN:  No, I'm not offering it as an exhibit.

12         THE COURT:  Okay.

13         MR. SMOLEN:  We're using it to refresh his memory

14   based on what his investigation was.

15         THE COURT:  Okay.

16         MR. SNIDER:  But then you wouldn't qualify.  We

17   could use anything.  We could use a leaf from outside to

18   refresh somebody's memory to go through qualifying what this

19   is.  It's a precursor to having being admitted, that's not

20   what you do.

21         THE COURT:  Well, do you want him to lay a

22   foundation or don't you?  You're arguing circles.  It's

23   objection 701.  It's opinion -- don't interrupt me.

24         MR. CHAPMAN:  I'm not, I'm not.

25         THE COURT:  701 and then I'm asking whether it's --

1    is it coming in, are you using it as an investigation?

2        Answer, yes.

3        Okay.  We can lay the foundation so we can avoid this

4    whole 701 issue, and now you're saying he can't lay the

5    foundation.

6        So if he's not offering the exhibit, I guess you don't

7    have to lay the foundation, so I don't have to do that, so

8    what's the problem?

9            MR. CHAPMAN:  The problem, Your Honor, is, one,

10   under 701 he can't give opinion testimony.

11           THE COURT:  Yes, he can.

12           MR. CHAPMAN:  I'm sorry?

13           THE COURT:  Did you read 701?

14           MR. CHAPMAN:  Yes, I have, Your Honor, it's based on

15   scientific information.  He's giving testimony relating to

16   health care.

17           THE COURT:  We haven't even heard his opinion and

18   he's giving you, what it sounds like, is his opinion as to the

19   investigation as to, if my notes are correct, as to "there

20   were wilful acts caused by CHC that caused the death."  Right?

21           THE WITNESS:  Yes, sir.

22           THE COURT:  Okay.

23           MR. CHAPMAN:  My argument is that would be based on

24   scientific knowledge.  He's not a medical professional.  How

25   can he determine whether or not a nurse or a doctor or

1   somebody did a wilful act that caused somebody's death.

2           THE COURT:  It's wilfulness; right?

3       Overruled.

4       This is going to be a long, long trial.  We've got two

5   weeks.  All this stuff you're -- you're new to this case.  You

6   find a case as you arrive, especially if you arrive the week

7   before.  A two-week jury trial in a 2013 case.  Okay?

8       You may have a lot of ideas rummaging around in your

9   brain matter, that's great, but you can't be dropping them on

10  me with the first witness within half an hour of testimony as

11  to a critical document.

12      That's why we have the final pretrial conference.  That's

13  why you're supposed to do this giant order.  These are things

14  if you're going to bring them up, there's motions in limine.

15  Why wasn't there a motion in limine on this thing?  I assume

16  you took this man's deposition.  Did anybody take his

17  deposition?

18          MR. SMOLEN:  Nope.

19          MS. WINTER:  Not in this matter, Your Honor.

20          THE COURT:  Have you taken his deposition in other

21  cases?

22          MR. WINTER:  Yes, Your Honor.

23          THE COURT:  Did it relate to the investigation of

24  Mr. Williams' death?

25          MR. SNIDER:  Yes, Your Honor.

```
 1              THE COURT:  Did you know what his report said?  Have
 2    you seen his report?
 3              MR. SNIDER:  Yes, Your Honor.  It's not listed as an
 4    exhibit in this case.
 5              THE COURT:  But he said he's not offering it.
 6              MR. SMOLEN:  Right.  I'm not offering it.
 7              THE COURT:  What clearly is Mr. Smolen's intent is
 8    to get from this witness what, if any, conclusions he drew
 9    within the scope of his investigation as to whether there was
10    any wilful acts by CHC that caused the death of Mr. Williams.
11        Right?
12              MR. SMOLEN:  Yes, sir.
13              THE COURT:  Okay.  Why isn't that admissible?
14              MR. CHAPMAN:  Is that rhetorical or are you asking
15    me a question?
16              THE COURT:  I'm asking you a question.
17              MR. CHAPMAN:  Because in order to arrive at that
18    conclusion whether something is wilful, he would have to be
19    applying scientific technical knowledge regarding what are the
20    duties and responsibilities of a nurse or a doctor, whether
21    doing this or doing that was within the standard of care or
22    not in the standard of care in order for him to make that
23    determination.  He's not a doctor, he's not a nurse, he's not
24    a healthcare provider.
25              THE COURT:  So there's certain medical activities
```

1    that are just so blatantly obvious that an average lay person

2    can't say -- come to the conclusion that it's wilful?  That if

3    you went to a doctor and you said, doctor, my left eye hurts,

4    and he says, great, let me amputate your right toe?

5            MR. CHAPMAN:  Are you asking me?

6            THE COURT:  Yeah.

7            MR. CHAPMAN:  That could be obvious.

8            THE COURT:  Okay.

9            MR. CHAPMAN:  But that's not what we're getting

10   to here.

11           THE COURT:  You don't even know.

12           MR. CHAPMAN:  Because I'm trying to prevent it from

13   coming out to the jury before we know what the person is going

14   to say.  I think I know what he's going to say.

15           THE COURT:  What are you going to tell him?

16           THE WITNESS:  What I found was that Elliott Williams

17   died from a broken neck.

18           THE COURT:  Okay.  How did you learn that?

19           THE WITNESS:  I read a document from a medical

20   examiner that says he has a broken neck.

21           THE COURT:  What else do you want from this witness?

22   If that's what his conclusion is and it's based upon reading a

23   document that says the man died from a broken neck, are we

24   going to bring in a doctor that says he died from a broken

25   neck and then have this witness that says, I relied upon a

1    medical record from a doctor that says he died of a broken

2    neck?  Is that what we are going to do?

3            MR. CHAPMAN:  No, Your Honor, but I highly doubt

4    he's on the witness stand to say Mr. Williams died of a broken

5    neck.  But maybe that's all he's going to say.

6            THE COURT:  I just asked the man what his testimony

7    would be, didn't I?

8        Is that going to be your testimony, sir?

9            THE WITNESS:  Honestly, Your Honor --

10           THE COURT:  It's all we've got is honesty.

11           THE WITNESS:  That's all I'm going to give you.

12       I interviewed or listened to interviews on 50 different

13   people.  I'm going to testify that -- that Elliott Williams

14   said he had a broken neck.  I'm going to testify to he laid in

15   his cell for ten and a half hours untreated.

16       I'm going to say that Williams rammed his head into a

17   cell door.  I'm going to say that people seen him standing

18   when he wasn't, the medical staff.  I'm going to say that

19   he -- that they didn't know where he was paralyzed and

20   couldn't figure it out.

21       I'm going to say that he's continued to complain since

22   when he entered his cell until he left, I don't know, four,

23   five, six, seven days later, whatever it is.  That he

24   continued to claim that he had a broken neck.

25       I'm going to -- I'm going to testify to nurses putting in

1   wrong orders into the -- or lying about the -- what they put

2   into his medical chart.

3           THE COURT:  Let me pause you right there, because

4   most of what you just talked about are things other people

5   told you, that's not medical opinion.  You're just relaying

6   what was told to you and then you draw your opinion from that.

7       The issue about nurses putting wrong orders or lying in

8   the medical records, where did that come from?

9           THE WITNESS:  From the medical records themselves.

10  From --

11          THE COURT:  So did you compare what they were saying

12  to what was in the medical records?

13          THE WITNESS:  Your Honor, after -- I'm going to

14  testify to not just in this document that if there's any other

15  things that's given to me, I'm going to testify to -- for like

16  one of the documents that I have reviewed is Ms. Young's

17  document.  She's dead and then a nurse comes in and puts in

18  she's, you know, her blood pressure is this and she's oriented

19  and she's alive just a few minutes later.  So...

20          THE COURT:  How did you figure -- how did you come

21  to the conclusion that a nurse put in evidence into a medical

22  record after Ms. Young had passed?

23          THE WITNESS:  It's wrote in her medical charts.  I

24  read it.

25          THE COURT:  Okay.

1          THE WITNESS:  It's the medical charts that I've

2    reviewed multiple times and --

3          MR. SMOLEN:  I mean, just a lot of what we do is

4    comparing what the video shots because he pulls the video off

5    the jail systems.  He reviews the video.  So for example with

6    Mr. Williams, nurses were reporting that Mr. Williams was up

7    walking around the cell using the restroom.

8      The video evidence that Mr. McKelvey pulled from his

9    investigation shows that Mr. Williams laid in his cell and

10   didn't get up to ever use the restroom.

11     It's not an opinion, it's a factual finding based on his

12   investigation.  I'm not asking him, and was that medically

13   appropriate for them to do that, I'm saying, what did you

14   find.  He's going to say, I reviewed medical shift logs that

15   said he was up using the bathroom.  We watched surveillance

16   video from the entire time he was in cell number 1, this man

17   never stood up.  That's a factual finding.

18          THE COURT:  Here's what rule 701 states, quote, "If

19   a witness is not testifying as an expert, or qualified and

20   presented as an expert" --

21          MR. SMOLEN:  No, he's not.

22          THE COURT:  -- "testimony in the form of an opinion

23   is limited to one that is, A, rationally based on a witness's

24   perception."  Sounds like what he's relying upon, statements

25   he's read, information that he's provided by these witnesses,

1  video that he's reviewed.

2       "B, helpful to clearly understanding the witness's

3  testimony or to determining a fact in issue."  Well, that's

4  certainly met.

5       "And not based on scientific, technical or other

6  specialized knowledge within the scope of 702."  Reading

7  medical records about what somebody said when they said them

8  is not medical, it is comparing what a fact is to another fact

9  and drawing a conclusion.  So overruled.

10            MR. SMOLEN:  Thank you, Your Honor.

11            THE COURT:  We're at 4:30.  Let's go for another

12  half hour, unless you need a break.  Does anyone need a quick

13  break?  Okay.  Let's bring back the jury.  Thank you.

14       (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, WITHIN

15  THE PRESENCE AND HEARING OF THE JURY:)

16            THE COURT:  Thank you.  You can be seated.  Do you

17  need the last question read back to you or can you do it from

18  memory, or do you want it off your notes?  Pick one.

19            THE WITNESS:  I would prefer it read back, please.

20            THE COURT:  If you want to go with a different

21  question.

22            MR. SMOLEN:  I think I can break it down a little

23  simpler.

24  Q.  (BY MR. SMOLEN) Mr. McKelvey, I want to focus just with

25  respect to -- I want to set this up for the jury.  When were

1  you investigating Mr. Williams' death?  What was the timeframe

2  that you were investigating that?

3  A.  I believe he -- he died October -- if I can look at my

4  notes, I can tell you exactly when he died and when I finished

5  the report.

6  Q.  Look at your report, your executive summary, not your full

7  hundred-page report but your executive summary, okay, the very

8  top paragraph.  Does that refresh your memory as to when this

9  encounter with Mr. Williams started?

10  A.  Yes.

11  Q.  When was it?

12  A.  October 21st of 2011.

13  Q.  Okay.  And then I want you to look at the bottom of your

14  report on that executive summary, okay.  And can you tell the

15  jury how long Mr. Williams was in the Tulsa County Jail before

16  he was found deceased?

17  A.  Yes.

18  Q.  Okay.  Take a minute, refresh your memory, and let the

19  jury know essentially when he was booked into the jail and

20  then the date when he was found deceased.

21  A.  He was booked into the jail on October 21st and died

22  October 27th.

23  Q.  Okay.  And did you investigate that entire time period

24  that he was housed in the jail?

25  A.  Yes.

1  Q.  And I want to kind of take you step by step into what you

2  found on each of those days; okay?  I think that might be

3  easier.  Are you ready?

4  A.  Yes, sir, that would be great.

5  Q.  Okay.  Based on just your executive summary, okay.  And if

6  you can do it from your memory, great, but if you can't, feel

7  free to refresh your memory.

8        THE COURT:  Let us know if you're looking at the

9  document; okay?

10        THE WITNESS:  Yes, sir.

11  Q.  (BY MR. SMOLEN) What did you find -- or what did you

12  document in your executive summary that you found as it

13  pertained to Mr. Williams when he was first booked into the

14  jail?

15  A.  Off memory, when he was first booked into the jail, I

16  believe there was a confrontation with the Owasso Police

17  Department in the prebook area where he was physically taken

18  to the ground.

19      And then once he came into the booking area of the jail,

20  he did become agitated and he was ultimately put in a holding

21  cell there in the prebook area.  He ran his -- he ran into the

22  cell door or the window and from there I never seen him walk

23  under his own power again.

24  Q.  Let me -- I want to take one step back, okay.  The holding

25  cell you described to the jury, was it a video-monitored

1  holding cell?

2  A.  No.

3  Q.  Okay.  Based on your investigation -- and I want to talk

4  about just specifically this non-video-monitored holding cell,

5  did you make findings as it pertained to what medical staff

6  did on Mr. Williams' first day after he had rammed his head

7  when he was in a non-video-monitored holding cell?

8  A.  I don't remember specifically.

9  Q.  Okay.  Take a look at your report on your executive

10  summary, okay.  On the third paragraph I want you to read it

11  to yourself and I want you to see if that refreshes your

12  memory specifically about what you found as it pertained to

13  just the initial holding cell.

14  A.  What I found was jail staff and medical staff both went

15  into the cell.  And how I know this is there's a video camera

16  outside of the holding cell that captures the foyer area of --

17  I believe it's three separate holding cells.  And I watched,

18  via the camera, jail staff and medical staff entering the cell

19  and then coming back out.  And upon review of that video and

20  reading other documents, Williams was on the ground

21  complaining that he had broken his neck.

22  Q.  Did you find that Williams reported to CHC nursing staff

23  while in the holding cell that he had broken his neck?

24  A.  Yes.

25  Q.  And can you tell the jury what nurse he specifically told,

1    or nurses for CHC, were specifically told by Mr. Williams that

2    he had broke his neck?

3    A.   At the holding cell time frame?

4    Q.   Yes, sir, I want to just focus on the holding cell.

5    A.   I believe it was Nurse Hughes.

6    Q.   Okay.  And after -- or did you find that after Nurse

7    Hughes had been informed by Mr. Williams that he had broken

8    his neck, what did you find that Nurse Hughes did?

9    A.   Nurse Hughes rubbed his neck and rubbed his upper back

10   area.  They set him up in the cell, meaning they, the nurse

11   and the detention staff, set him up in the cell and she

12   massaged his neck.

13   Q.   Okay.  Based on your investigation at the time that

14   Mr. Williams indicated to Nurse Hughes that he had broke his

15   neck, was he ever viewed walking again in the jail?

16   A.   I -- I have reports that he had been walking, yes, but

17   from the video that I have, no, he never walked.

18   Q.   Okay.  And we're going to get into that in a little bit of

19   detail later, but I want you to listen to the question, okay.

20   Based on your investigation into the death of Elliott

21   Williams, after he had reported to CHC Nurse Hughes that he

22   had broken his neck, was there any evidence that you found,

23   credible evidence that you found, that Mr. Williams ever

24   walked again?

25   A.   No.

1    Q.   Okay.  I want you to look at your larger report if you

2    would.  And again, I don't want to you read from this, but I

3    want to see if this helps refresh your memory a little bit

4    more about what you found pertaining specifically to Nurse

5    Hughes; okay?  If you would, look at the Bates page -- look at

6    Bates page 3064.  Excuse me, I'm sorry, 3141.

7    A.   I'm there.

8    Q.   3064, paragraphs 13 to 15, read those to yourself, okay.

9    A.   I'm sorry, did you say 3141?

10   Q.   3064, I apologize.

11           THE COURT:  He did say 31.

12           MR. SMOLEN:  I did and I misspoke.

13   Q.   (BY MR. SMOLEN) And I'm sorry, Mr. McKelvey.  3064.

14   A.   Okay.  I'm there.

15   Q.   I want you to just, to yourself, read paragraph 15 and see

16   if you learned any more information through your investigation

17   pertaining to Nurse Hughes.

18   A.   Okay.

19   Q.   Does that refresh your memory specifically about your

20   findings as it pertained to Nurse Hughes while Mr. Williams

21   was in the non-video-monitored holding cell?

22   A.   Yes.

23   Q.   Can you tell the jury what you learned from your

24   investigation particularly pertaining to CHC Nurse Hughes

25   during this timeframe?

1   A.   Just -- it's an awful big paragraph, so I'm going to do my

2   best to summarize it.   He complained about his neck.   She

3   rolled him on his side like he asked.   He was able to move his

4   head.   He moved his head some and I believe he moved his hands

5   some so she claimed or thought that that -- he's not -- he's

6   claiming he can't move, he can't get up, but he's able to move

7   his head and his hands and so he's obviously -- he's not all

8   there or the information is not all there, so she's basically

9   disregarding it.

10   Q.   Did you determine, based on your investigation, that Nurse

11   Hughes thought Mr. Williams was faking a broken neck?

12   A.   Yes.

13   Q.   Do you recall from your investigation after Mr. Williams

14   reported that he had a broken neck how long he was left by

15   himself in holding cell number 10 in the booking area?

16   A.   I'll need to look at my notes.

17   Q.   If you will, go ahead and take a look at your notes.   I'll

18   have you look at 3141 just to speed this up, Mr. McKelvey.

19   A.   Thank you.

20   Q.   Second paragraph, sir.

21   A.   Mr. Williams was left in the holding cell for ten and a

22   half hours.

23   Q.   And based on your investigation, did any medical staff for

24   CHC do anything to help Mr. Williams for that ten-hour period

25   of time that he was in holding cell 10 unable to walk?

1   A.   They didn't.

2   Q.   Okay.  Were you able to determine how many times -- what

3   happened next, Mr. McKelvey, after Mr. Williams was laying in

4   the cell for ten hours unable to walk?  Can you tell the jury

5   what you found happened next?

6   A.   Yes.  The next shift that came on, the supervisor made a

7   determination that after talking with the jail nurse or the

8   booking nurse that if Williams wasn't able to get up, they

9   would just call a medical emergency, that way they could get a

10  gurney to take him to medical.

11  Q.   Okay.  And did you review videotape from that during your

12  investigation?

13  A.   Yes.

14  Q.   Was Mr. Williams, in fact, lifted onto a gurney and

15  removed from the non-video-monitored holding cell?

16  A.   Yes.

17  Q.   After Mr. Williams was removed from the non -- let me ask

18  you this, while he was lifted onto the gurney, was CHC staff

19  present?

20  A.   Yes.

21  Q.   Did you find anything that indicated that CHC staff did

22  anything to protect his neck from further injury?

23  A.   They did not protect his neck.

24  Q.   Tell the jury, if you can, what you recall happening next

25  to Mr. Williams.

1  A.  He was put on a gurney and taken to the medical unit of

2  the jail where he was assessed by a nurse and a number of

3  medical people there and jail detention staff.

4  Q.  Do you recall from memory what CHC nurses specifically

5  interacted with Mr. Williams after the medical emergency had

6  been called on his first day in the jail?

7  A.  Not specifically, no.

8  Q.  All right.  Take a look at your report, okay, at 3067 at

9  paragraph 28.

10      I apologize, Mr. McKelvey, it's 3067, paragraph 30.

11  A.  Okay.  I'm sorry, what was your question?

12  Q.  My question was:  After Mr. Williams was removed from the

13  holding cell, placed on the gurney, brought down to medical

14  for this medical emergency, okay, did you find anything else

15  out about what the nursing staff believed was happening with

16  Mr. Williams?

17  A.  Yes.  Mr. Williams was faking -- faking that he couldn't

18  walk, that he couldn't move.

19  Q.  At the time that nursing staff made the determination

20  early on in his stay at the Tulsa County Jail that Mr.

21  Williams was faking, to your knowledge, based on your

22  investigation, did any medical staff, prior to making the

23  determination that he was faking, do any kind of physical

24  assessment on Mr. Williams?

25  A.  Their -- you're going to have to direct me.

1  Q.  Okay.

2  A.  I'm doing my best not to show any disrespect to the courts

3  and -- because I need to be directed where to look in my

4  report because I can't remember.

5  Q.  Okay.  That's fine.  We'll get through it.  Did you learn

6  that when Mr. Williams was brought to medical that soon

7  thereafter he was taken to the shower stalls?

8  A.  Yes.

9  Q.  Okay.  And what did you learn happened when Mr. Williams

10  was brought to the shower stalls on his first day in the

11  jail?

12  A.  What I -- what I recall is he was told to get off the

13  gurney by staff.  I remember a nurse --

14          THE COURT:  Pause right there.  When you say

15  "staff," we need to be careful between jail staff and

16  nursing/CHC staff.  So make sure you're careful on that;

17  okay.

18          THE WITNESS:  Yes, sir.  Thank you.

19          THE COURT:  Thank you very much.

20  A.  He was told to get up by jail staff to get off the gurney,

21  and he was also told to get up by the nursing staff to get off

22  the gurney.  He said he couldn't.  One of the nurses -- and I

23  would have to look in my report, but one of the nurses said

24  "get up, I know you're faking."

25      He didn't so -- and he had defecated on himself and so

1    they took him -- when I say "they," the jail staff took him to

2    the jail or the cell in medical that has a shower in it and

3    they took him off the gurney, stripped him of his clothes and

4    put him in the shower and turned the shower on and closed and

5    locked the door and he was told to wash himself.

6    Q.   (BY MR. SMOLEN)  I want you to look at page 3141 in your

7    report in the fourth paragraph and see if that refreshes your

8    memory as to which CHC nurse, now in the shower of the medical

9    unit, claimed Mr. Williams was faking a broken neck.

10   A.   Okay.  It was RN Nurse Chappell.

11   Q.   Okay.  So now we've got a second nurse for CHC hearing

12   reports from Mr. Williams that he can't get up, that his neck

13   is broken, that he can't get up, and the second nurse also

14   thinks he's faking?

15   A.   That's correct.

16   Q.   Okay.  Do you recall from your investigation how long

17   after Mr. Williams -- let me ask you this:  Did you find out

18   how Mr. Williams got off the gurney if he couldn't walk?

19   A.   Yes.

20   Q.   What did you find out?

21   A.   What I remember is the jail staff tilted the gurney in a

22   manner for him to slide off of the gurney into the shower.

23   Q.   And during him being dumped off the gurney, was Mr.

24   Williams ever able to stand or walk?

25   A.   No.

1  Q.  After Mr. Williams was dumped -- well, let me ask you

2  this:  When Mr. Williams was dumped off the gurney, were CHC

3  nurses present?

4  A.  Yes.

5  Q.  Did anyone take any protective action to protect his

6  neck?

7  A.  No.

8  Q.  After Mr. Williams was dumped off the gurney into the

9  shower in the medical unit, how long did he lay there?

10  A.  If memory serves me correctly, he laid there roughly an

11  hour.

12  Q.  Based on your investigation, okay, based on your findings,

13  was Mr. Williams himself even capable of washing the feces off

14  of his body while he laid in the cell?

15  A.  No.  And let me clarify that previous answer.  He -- Mr.

16  Williams was in this shower for roughly two hours.  He was

17  slid off the gurney into the shower, positioned in a way where

18  the shower head would hit his lower half of the body, and then

19  roughly an hour had passed, detention staff came back into the

20  shower, rolled him over and positioned him in a manner where

21  the shower head would hit him in the buttocks.

22  Q.  Did your investigation find that during this first, let's

23  say, 12 hours of interaction at the jail that Mr. Williams was

24  repeatedly telling medical staff that he was paralyzed?

25  A.  Yes.

1  Q.  What happened -- if you recall, after Mr. Williams laid in

2  the shower for two hours, what happened next?

3  A.  Mr. Williams was removed from the shower, this time placed

4  on a gurney and taken to a -- a -- another cell where the

5  nurses and the detention staff was there and he was -- he was

6  placed in another cell and placed on suicide watch.

7  Q.  Okay.  Based on your investigation, did Mr. Williams ever

8  indicate that he was suicidal?

9  A.  No, he did not.

10 Q.  Okay.  And when Mr. Williams was placed in this cell, was

11 the cell in the medical unit?

12 A.  Yes.

13 Q.  Do you recall what the cell number was?

14 A.  I'm going to say medical cell 26.

15 Q.  You're correct, Mr. McKelvey.  Based on your understanding

16 of the jail video camera system, was cell 26 a video-monitored

17 cell?

18 A.  No.

19 Q.  When Mr. Williams was housed in cell 26, was he clothed?

20 A.  No.

21 Q.  Okay.  Can you describe to the jury, based on your

22 investigation, what you found him to be dressed as, dressed

23 in?

24 A.  He was not dressed.  He was placed on a suicide blanket,

25 which a suicide blanket is a -- the bottom half or the one

1    side of the suicide blanket is real thick, heavily sewn, minor

2    padding and then there's a -- I wouldn't call it a sheet, it

3    was more of a heavy blanket that's heavily sewn so they can

4    cover up, but he had no clothes.

5    Q.   Okay.  And he's essentially in there naked on a wool

6    suicide blanket; is that right?

7    A.   Yes.

8    Q.   Okay.  And based on your investigation, what did you find

9    the next interaction to be that Mr. Williams had with CHC

10   medical staff?

11   A.   I remember that being a weekend and I remember jail staff

12   and medical staff entering the cell.  And I remember an inmate

13   actually entering the cell and all at the -- it was all at the

14   same time and Williams was complaining that he was thirsty and

15   so the inmate worker brought him a glass of water and the

16   detention staff helped him drink the water or set him up in a

17   manner to pour the water in his mouth.

18   Q.   Okay.  I appreciate you trying to do it from memory, okay,

19   but I know you wrote a hundred pages or so, but I want to have

20   you look at it and just read those to yourself because my

21   question is specifically pertaining to nursing staff.

22       Look at 3069 to 3070, paragraphs 46, if you would, sir.

23   And just read it to yourself and let me know if that refreshes

24   your memory about what your investigative findings were.

25   A.   What paragraph?

1   Q.  Paragraph 46.  It should be between 3069 and 3070.

2   A.  Okay.

3   Q.  Does that refresh your memory?

4   A.  Yes.  It was reported that the nurse said he looked fine,

5   there's nothing wrong with him.  The person that was being

6   interviewed could not give a name of the nurse but gave a

7   description of the nurse to be a black female.

8   Q.  Did you know who the nurse was that was described?

9   A.  I would have to look, but I believe it's Nurse Chappell.

10  Q.  Okay.  Let me ask you this:  Did you find based on your

11  investigation at the time Mr. Williams was housed in cell 26

12  if any nursing staff took any vitals?

13  A.  I would have to look.

14  Q.  Okay.  Take a look, if you would.  Again, it should be the

15  same paragraph of that report you were just looking at.

16  Paragraph 46.

17          THE COURT:  And while the witness is looking at

18  that, how much more testimony do you have of this witness

19  regarding to Mr. Williams and the witness's investigation of

20  Mr. Williams?

21          MR. SMOLEN:  Probably another -- I would say 45

22  minutes, Your Honor, just because we've just -- the second day

23  or first day still.

24          THE COURT:  I understand.  Is there a good breaking

25  point?  I know you're walking through the witness sort of day

1 by day with Mr. Williams.  Are we getting to a good point --

2 breaking point?

3          MR. SMOLEN:  Yeah, this is a great spot if you'd --

4 I'll stay all night.

5          THE COURT:  Well, I think they've got other things

6 they've got to do, but why don't we finish with the question

7 on whether or not vital signs were taken of Mr. Williams by

8 any nursing staff.  I think that was the last question.

9          MR. SMOLEN:  Yeah, it was.

10 Q.  (BY MR. SMOLEN)  And, Mr. McKelvey, I'm talking about

11 vital signs taken while he's now in cell 26.

12 A.  The report tells me that no vital signs was taken.

13 Q.  Okay.

14          MR. SMOLEN:  Your Honor, if you would like us to

15 break now.

16          THE COURT:  Okay.  We'll take a break.  All right.

17 Don't talk about the case, keep an open mind, don't

18 investigate anything.  I don't know -- do they get fed at all?

19 Do they get donuts?  No.

20          DEPUTY COURT CLERK:  Well you do now, yes.

21          THE COURT:  Put it on my bill.  Put it on the

22 Northern District of Illinois' bill.  We'll bring you in here

23 at 9:00 to get started; okay.  All right.  Thanks.

24     (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT, OUT OF

25 THE PRESENCE AND HEARING OF THE JURY:)

1          THE COURT:  Somebody I think left their notes.

2      All right.  Have a seat.

3      Based upon last week, I think it was when we were here,

4  it sounded like we're going to have an issue about Dr.

5  Adusei's status, whether employee or agent or an independent

6  contractor.

7      I don't want to have that discussion in the middle of his

8  testimony or at the beginning of his testimony.  What would be

9  extremely helpful to allow me to do my job to make a

10  determination under 801(d)2D, as in dog, would be his

11  agreement with CHC.

12      So if anybody has that, that would be helpful for me to

13  read tonight so that I can get ahead of the curve of this case

14  and tackle issues outside of the jury's presence.  So if

15  anybody has his agreement with CHC, I think that would go a

16  long way as well as any testimony we might need.  But the

17  agreement itself would be a good starting point, and that's

18  what the law says I should look at.

19          MR. SMOLEN:  Your Honor, can I excuse Mr. McKelvey

20  unless you're going to need him again until the morning?

21          THE COURT:  You can be excused.  Thank you.  Be here

22  a little before 9:00.

23          MR. SMOLEN:  Thank you.

24          THE COURT:  Sorry, I forgot he was there.

25          MR. SNIDER:  Your Honor, Defendant's --

1          THE COURT:  I'm sorry, your voice came from here,

2    but you're standing there.  Sorry.

3          MR. SNIDER:  Defendant's Exhibit 56 would be Dr.

4    Adusei's agreement.

5          THE COURT:  56, okay.  Hold on a second.

6          MS. WINTER:  And, Judge, if it's not in your binder,

7    that may have been one we withdrew after his dismissal.  So if

8    you look there and it's not, I'd be happy to get you a hard

9    copy at some point in the future.

10          THE COURT:  55.  My exhibits go from 55 to 60.

11          MS. WINTER:  I think that was one we withdrew after

12    his dismissal.

13          THE COURT:  Which makes sense.  That's

14    understandable.

15          MR. SNIDER:  I do have a hard copy.

16          THE COURT:  I don't want to take your only copy.  We

17    can make a copy.  Okay.  That would be great.

18          DEPUTY COURT CLERK:  Do you need a copy?  You do

19    not?

20          MR. SNIDER:  I've got more paper.

21          THE COURT:  I'll take it.  Thank you very much,

22    Counsel.  Thank you.

23          DEPUTY COURT CLERK:  Where does this go in with it?

24          THE COURT:  That's a signature page probably.  Thank

25    you.  Okay.  I'll take a look at this tonight so at least I

 1 | have the knowledge of this document on that issue. *Crews v.*
 2 | *Farmers Insurance*, not a bad case, kind of helpful, 42 F.4th
 3 | 1205.
 4 |         MR. CHAPMAN:  Could you repeat that, Your Honor?
 5 |         THE COURT:  Sure.  *Crews v. Farmers Insurance*
 6 | *Exchange*, 42 F.4th 1205.  And you've got, oh, some ancient law
 7 | from Oklahoma, *Ellis and Lewis v. Trimble*, 57 -- I always
 8 | found it interesting that Oklahoma is in the Pacific
 9 | reporters, but it is.  So 57 P.2d 244 and 246.  That's
10 | Oklahoma 1936.  Still good law as far as I could tell, we
11 | could tell.
12 |     *Broach Company, Inc., v. City of Corona*, 2004 U.S.
13 | District Lexis 32094 lays out some factors.  So I know what
14 | the law is, I need to know what the facts are, okay, so we can
15 | talk about that before we get Dr. Adusei on the witness stand.
16 |     So that's what I wanted to cover before we close tonight.
17 | Anything from the Plaintiff's side?
18 |         MR. SMOLEN:  Nothing from the Plaintiff's side.
19 | Thank you, Your Honor.
20 |         THE COURT:  How about from the Defense?
21 |         MR. SNIDER:  Nothing, Your Honor.
22 |         THE COURT:  Okay.  Be here no later than 8:45 so we
23 | can get the jury in here at 9:00 promptly.  Okay.  Thank you.
24 |         (PROCEEDINGS CONCLUDED)
25 |

1

2

3

4                        **REPORTER'S CERTIFICATION**

5        I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

6    TRANSCRIPT OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8                CERTIFIED:        S/Laura Griffin
                                   Laura Griffin, RPR, CRR
9                                  United States Court Reporter
                                   333 W. 4th Street, RM 411
10                                 Tulsa, OK  74301
                                   (918) 699-4879
11                                 laura_griffin@oknd.uscourts.gov

12

13        .

14

15

16

17

18

19

20

21

22

23

24

25