IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DEBORAH YOUNG, as Personal | ) | |
| Representative of the Estate of | ) | |
| Gwendolyn Young, deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. 13-CV-315-IDJ-JFJ |
| | ) | |
| CORRECTIONAL HEALTH CARE | ) | |
| COMPANIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF JURY TRIAL CLOSING ARGUMENTS

BEFORE THE HONORABLE IAIN D. JOHNSTON

UNITED STATES DISTRICT JUDGE

FEBRUARY 23, 2023

REPORTED BY:      BRIAN P. NEIL, RMR-CRR
                  United States Court Reporter

1                          A P P E A R A N C E S

2

3              Daniel E. Smolen, Robert Blakemore, and Bryon D. Helm,
       Attorneys at Law, Smolen & Roytman, 701 South Cincinnati
4      Avenue, Oklahoma, 74119, attorneys on behalf of the Plaintiff;

5

6              Sean P. Snider and Anthony C. Winter, Attorneys at
       Law, Johnson, Hanan & Vosler, 9801 North Broadway
       Extension, Oklahoma City, Oklahoma, 73114, attorneys on behalf
7      of Defendant CHC;

8

9              Ronald W. Chapman, Sr., Attorney at Law, Chapman Law
       Group, 1441 West Long Lake Road, Suite 310, Troy, Michigan,
10     48098, attorney on behalf of Defendant CHC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3                                                    PAGE

4

5   Closing Argument of Mr. Smolen                    5

6   Closing Argument of Mr. Chapman                  39

7   Final Closing Argument of Mr. Smolen             72

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        Thursday, February 23, 2023

2                * * * * *

3            (Jury enters the courtroom)

4        THE COURT:  Good morning.  Have a seat.

5        I apologize for the delay.  We were getting some things

6    finalized.  We're at the beginning of the end.  So if you

7    remember a week and a half ago when I gave you sort of how

8    things are going to flow, we're done with the evidence.

9    There's some documents you're going to get that you really

10   didn't see but you'll get those to take back to the jury room.

11   So we're going to have closing arguments at this point.

12       So, if you recall, the plaintiff has the burden of

13   proof so they get to start, defense responds, and then

14   plaintiff gets rebuttal at the last word.  I think how it will

15   shake out with timing is, we'll hear from Mr. Smolen, probably

16   break for lunch, then we'll hear from Mr. Chapman -- right,

17   Mr. Chapman, you're doing closing?

18           MR. CHAPMAN:  Yes, Your Honor.

19           THE COURT:  -- Mr. Chapman, then we'll hear from

20   Mr. Smolen again, and then I've got jury instructions that I'll

21   read to you.  You'll get copies, your own copies, so you can

22   follow along.  Back in the day you didn't get these things; you

23   had to remember them.  It was nuts.  So you'll get the

24   instructions.  I'll give you the instructions.  You'll go back

25   and you can start deliberations, okay?  So we're almost there.

1         All right.  So, Mr. Smolen, whenever you're ready to

2    proceed, let me know.

3              MR. SMOLEN:  Thank you, Your Honor.

4         Charlie, I want to go ahead and pull up for the jury

5    the jury instruction 14.  First off, I want to tell you guys

6    I'm really, really appreciative of the time that you spent

7    taking out of your lives listening to the evidence in this

8    case.  It's a lot of evidence.  We're going to have an

9    opportunity to have a closing that allows me to go through some

10   of it.  You've been taking notes the whole time.  I think you

11   understand the importance of the evidence.

12        I really want to tie it initially, before I start the

13   closing, to the jury instruction 14, and I specifically want

14   you guys to take a look at, if you would -- what this jury

15   instruction is, it's about the elements, the definitions, and

16   the policies of deliberate indifference of constitutional

17   violations and how they happen and what you have to establish

18   to have that, okay?  It's a really important instruction and I

19   want you first just to look at the definition of the term

20   "deliberate indifference."

21        Charlie, would you highlight that for the jury, please?

22   Right below that, Charlie, where it says -- yep, there you go.

23        "'Deliberate indifference' means a knowing disregard of

24   an excessive risk to an inmate's health or safety, including

25   preventing an inmate from receiving treatment or denying an

1   inmate access to those able to evaluate the need for medical

2   care.  Knowledge may be inferred from circumstantial evidence,

3   including the following examples:

4          "obviousness of the risk;

5          "the delay in providing medical treatment that causes

6   pain or a worsening of the inmate's condition, or.

7          "the continuation of a course of treatment that the

8   medical professional knows to be ineffective."

9          That's the definition of "deliberate indifference."

10  That's what we're looking at.  That's the evidence that we've

11  been presenting for the last two weeks.

12         Specifically, as it pertains to Gwendolyn Young, we've

13  identified and you'll see --

14         If you will, Charlie, on page 15 for the jury's

15  benefit.

16         There's bullet points.  And these are really, really

17  important that you guys understand the way that the law works.

18  These instructions, they've been put together and they're

19  incredibly clear and really, really straightforward.  But I

20  want you to understand that in this case what we're alleging is

21  that CHC, Correctional Health Care Companies, follows customs,

22  policies, and practices that deny a person their constitutional

23  rights to adequate health care.

24         The specific policies that we're talking about being

25  the moving force behind that are these that we've identified in

1    the jury instruction:

2            "A systemic failure of medical policies and procedures;

3            "A pattern of failures to provide medical care in

4    response to serious and obvious medical needs of inmates;

5            "Failing to provide adequate training and supervision

6    regarding emergent medical conditions;

7            "Continuing to adhere to a deficient system of care for

8    inmates with serious medical needs;

9            "A pattern of failures to provide inmates with

10   sufficient access to a physician; and" lastly,

11           "A pattern of failures to send inmates with obvious and

12   emergent needs to a hospital."

13           We only have to establish one of those, but the

14   evidence in this case is overwhelming that all of those have

15   been met.  And I want to walk you through each one of those

16   specific motivating, moving forces that brought about

17   Ms. Young's constitutional violations.

18           Charlie, if you would, I want to just pull up slide 1.

19           So what I've done is just for the purposes of the

20   closing, to make sure that everyone understands the way that

21   the jury instruction works, I've put together an outline and

22   we're going to go through it.  Each one of those policies,

23   customs, or practices intersect through the death of Gwendolyn

24   Young.  They also connect all the other deaths that we've

25   talked about over the last eight days.

1          I want to first look at -- you see here we've got

2     pattern of failure to send inmate with obvious and urgent needs

3     to the hospital, failing to provide adequate training, systemic

4     failures in medical policies and procedures, pattern of failure

5     to provide medical care, continuing to adhere to a deficient

6     system, and a pattern of failures to provide inmates with

7     sufficient access to a physician.

8          I want to start by looking at the pattern of

9     failures -- this is slide 2 -- the pattern of failures to send

10    an inmate with obvious and emergent needs to the hospital.  I

11    want to talk about it in the context of their knowing

12    disregard.  When I first started doing this, I used to get

13    really confused and I've seen the term attempted to be confused

14    by opposing counsel at times during litigation, and it's this

15    idea that what is deliberate indifference?  It's really to just

16    know of a risk and disregard it.  It's really that simple.

17         But when we talk about it in the context of a Monell

18    claim -- you've heard that term perhaps during the trial --

19    we're talking about all of these policies and procedures and

20    how they become a moving force behind the systemic deaths that

21    were happening in this facility.

22         So when we look at it, a pattern of obvious failures to

23    send inmates with obvious and emergent needs to the hospital, I

24    want to show you, just kind of going back through the evidence,

25    of what evidence was presented that establishes that particular

1    motivating force.

2          If you'll look at slide 3.  In Plaintiff's Exhibit 1,

3    which is Dr. Roemer's report, on pages 2 and 3, there were two

4    inmates that Dr. Roemer identified during the audit process,

5    one was Linda Henshaw and the other was Damien Tucker, that

6    really relate to the concept of a pattern of failures to send

7    inmates with obvious and emergent needs to the hospital.

8          When Dr. Roemer conducted his audit on the 2010 deaths,

9    what he found was that pertaining to Linda Henshaw that she had

10   a blood pressure of 94/60 between 7:00 a.m. and 7:00 p.m.  He

11   also found that at 5:30 the inmate has a cardiac arrest and is

12   eventually pronounced dead at the scene.

13         This is another situation where a person's blood

14   pressure is dangerously low.  Between 7:00 a.m. and 7:00 p.m.

15   on the previous date, the blood pressure was measured

16   dangerously low.  No one does anything for Ms. Henshaw.  She

17   remains in the jail, she's not transported to the hospital

18   emergently, and she dies.

19         Same thing with Damien Tucker in 2010.  March 12th of

20   2010, an inmate was found to have an altered level of

21   consciousness and breathing difficulties.  At 12:12, medical

22   staff arrived.  Chest pain over the past week was also

23   reported.  Dr. Adusei appeared to be notified -- time is

24   unclear -- and arrived around 12:25.  There was a 42-minute

25   delay in calling EMSA.  An inmate with his clinical findings at

1    12:03 would certainly have chances for survival optimized with

2    a prompt 911 call and a hospital transport.

3          That is more evidence going back to the 2010 time

4    frame, three years before Ms. Young dies, that CHC has notice

5    that they're not getting people to the hospital in a timely

6    fashion based on their obvious medical -- their serious obvious

7    medical conditions, dangerously low blood pressure, chest pain

8    for a week, altered mental state, altered consciousness.  They

9    don't transport them.

10          Dr. Roemer is identifying this, he's sharing it with

11    the Tulsa County Sheriff's Office, and that information's being

12    shared with CHC all the way back to 2010.

13          The NCCHC requirements that you guys have heard about

14    in this case, they require emergent transport under these

15    conditions of an inmate to an outside facility so that they can

16    get diagnostic testing and they can get a heightened level of

17    care, where a dangerous condition, like a subdural hematoma,

18    like a stroke, like a heart attack can actually be diagnosed.

19    They don't have the capabilities to do it in the jail.  And so

20    that's what we're talking about here.

21          I want to look at some more evidence that pertains to

22    CHC's pattern and practice of failing to send inmates with

23    obvious and emergent needs to the hospital.

24          Next slide.

25          On October the 27th, 2011, Elliott Williams died in the

1    Tulsa County Jail.  You guys watched the video.  You'll have an

2    opportunity to watch the video when you go back and deliberate.

3    It's Plaintiff's Exhibit 67.

4         When I first saw the Elliott Williams video, it was

5    very, very disturbing for me, so disturbing that it changed --

6    literally changed the course of the work that I was doing.  I

7    don't know how you can watch that video and forget what was on

8    it, like Chris Rogers did, and she was the person that was in

9    charge.  I'll never forget that video.

10        That's more evidence in October of 2011 of just a

11   total, total disregard.  You've got a person that's been drug

12   on a blanket covered in feces and urine into his cell for the

13   purposes of proving that they're faking paralysis, even though

14   they've been telling medical staff for over 12 hours that they

15   broke their neck and they can't move.  They're begging for

16   water, he's begging for a pitcher of water, and they drag him

17   into his cell, and they put a cup of water out of his reach to

18   try to make him move, to go get it.  They don't do any

19   examination at all.

20        One of the questions that was asked by the jury -- it

21   was a really, really good question -- to Dr. Adusei, I think is

22   who it was, what's a cursory examination?  Like what does that

23   even mean?  There's no such thing as a cursory examination.

24   When they talk about it -- and we'll talk about this later --

25   it's, oh, we just pop in and take a look at them, ask them how

1    they're doing.

2         We see a cursory examination in Plaintiff's Exhibit 67

3    when Dr. Harnish walks into that cell as Mr. Williams is on the

4    floor begging for help, begging to be sent to a hospital,

5    begging for water, and he just stairs at him, flips the blanket

6    over him so he doesn't see his private parts, walks out, and

7    says, let's just continue to monitor him in a video-monitored

8    cell.

9         No vitals were taken.  Despite the evidence that they

10   said they had been, no vitals were taken.  Mr. Williams

11   proceeds to lay there for 52 hours trying to put his hand in a

12   cup of water so he can drip some water into his mouth.  But,

13   hey, he could still move his arm.  How were they to know?

14   That's the defense, that that's somehow not deliberate

15   indifference.  It's an absurd argument.

16        Chris Rogers sat here and said, oh, the care was really

17   inappropriate, it was really bad.  In 2015, she testified under

18   oath she didn't have a problem with it.  I don't know how you

19   can watch that, be responsible for this human being, and not

20   only not remember the video, okay, but to sit here and lie to

21   the jury about your view of the appropriateness of the care.  I

22   think that it's shocking.

23        When you see -- if you go back -- we hit on it during

24   the presentation of the evidence -- but if you go back -- I

25   promise you if you go back and watch this video, it will change

1    your life when it comes to the way you view Correctional Health

2    Care.  It just will.  And to watch them roll him off the

3    blanket while they're supposedly performing resuscitative

4    efforts, to watch them rip a blanket up, roll his dead body

5    across the floor, come back, and then kick it over with his

6    foot, and then start the CPR process again.

7            That's the elements that we're talking about when we're

8    talking about CHC's pattern and practice of failing to send

9    inmates with obvious and emergent needs to the hospital.  It

10   goes to knowledge.  It goes to continued indifference.  They're

11   already put on notice about this.

12           When they begin contracting with the county in 2005,

13   they had to guarantee -- one of the things we didn't get into,

14   but you guys are going to have an opportunity to look at it

15   during your deliberations, were the county contracts, okay,

16   that existed between CHC and the Tulsa County Sheriff's Office

17   and the county.

18           What's really, really important that you understand is,

19   when they agreed to contract to provide medical care to people

20   in Tulsa County, they acknowledged that they were bound by

21   NCCHC standards and guidelines.  They already knew what they

22   were required to do.  They've known the entire time.  It wasn't

23   uncovered until about the 2009-2010 time frame and people

24   started to catch on to what was happening.  Inmates started to

25   die at high rates in the Tulsa County Jail and people really

1    started to look into it.

2          We talked about Brian Edwards looking into it;

3    Dr. Roemer doing the audit; Josh Turley, the head of risk

4    management, participating in that process.  That's when you

5    first start to really learn about all the deaths, but that's

6    when the county started to learn about it.  CHC was supposed to

7    do mortality reviews.  They were required to -- and we're going

8    to get into that -- they were required to do a lot of things,

9    but there's no doubt they had knowledge of what was going on in

10   the facility in 2005 all the way forward, okay?

11         Let's go to the next slide.

12         Dr. Allen, the only physician to testify about the care

13   and the type of conditions that existed in the jail.  That was

14   the only witness that testified about that.  You had Nurse

15   Harrington talking about factually what she observed.  You had

16   Dr. Adusei talking about his factual -- his actual day-to-day.

17   But as far as looking at it from a system-wide level, Dr. Allen

18   was the only person that ever testified about that.

19         And we've got here a photograph of Lisa Selgado and in

20   the middle Gregory Brown and on the right Gwendolyn Young.  I

21   think this is important when we're looking at it in the context

22   of sending inmates or not sending inmates to the hospital who

23   have obvious and emergent needs.  Here's what Dr. Allen said.

24         I asked him, "I want you to tell the jury what, if any,

25   similar problems that you found between the deaths of

1    Ms. Selgado, Ms. Young, and Mr. Brown that you felt like, if at

2    all, were present in those three individual reviews."

3         And his answer, "The most significant crosscutting

4    feature in those medical cases was the fact that in all three

5    cases, the patients met multiple criteria for immediate

6    referral and transfer to an emergency room but it did not

7    happen."

8         That was the same for Elliott Williams.  That was the

9    same for Damien Tucker.  That was the same for Linda Henshaw.

10   It was a crosscut, a moving force behind all of their deaths.

11   That's just one thing that I can show establishes liability in

12   this case.

13        Six real quick, if you would.

14        So Roemer's review -- it's Plaintiff's Exhibit 1,

15   okay -- you will go back, if you want to, and look at that and

16   you'll see where he pulls out of their medical charts.  This is

17   his findings.  This is how he knows independently, right?  He's

18   different than Dr. Allen.  He's different than all these other

19   people.  He's in there doing an independent audit for TCSO and

20   the county.  He starts to heavily document.

21        Let's look at slide 7, Charlie.

22        This is like just damning evidence of knowledge and

23   indifference, okay, is Plaintiff's Exhibit 65, pages 1,

24   paragraph 3, which references the criteria for immediate

25   referral to a hospital.

1        The reason it's so damning is because, one, it's just a

2   reiteration of the NCCHC standards that they had already

3   contractually agreed to do in 2005.  But in the language of

4   Dr. Herr's letter to the Tulsa County Sheriff's Office, under

5   criteria for immediate referral --

6        Charlie, will you highlight that in the box, please,

7   and then right underneath that.

8        You guys heard a lot about it.  I talked about it in

9   the opening because it really is -- it's a backbone to

10  understanding liability in this case.  Because we got to show,

11  one, that they knew there was a risk, right; and two, that they

12  ignored the risk to inmates like Ms. Young.  That's what we're

13  looking at.

14       In their very own language that they put into the

15  criteria for immediate referral, it says, "The following is a

16  list which is not meant to be exclusive of abnormal vital signs

17  and medical conditions that are generally not acceptable for

18  ongoing care in jail or prison setting and require emergent

19  transfer to the nearest emergency department."

20       That is evidence, direct evidence, of CHC's knowledge

21  that those conditions identified on this list are not

22  appropriate to continue to house in a correctional setting,

23  that you have to move those people out because you have to get

24  diagnostic in, you have to get a real evaluation by a physician

25  in.  That's why they had to do it.  They were supposed to be

1  doing it from 2005 forward.  This is a reiteration, a

2  recommitment of what had already been promised.

3       The Tulsa County Sheriff's Office made them put it in

4  writing based on what the audit findings show, the 2010 NCCHC

5  audit, 2011 ICE audits, Dr. Roemer's continued work that he was

6  doing.  CHC, on behalf of Dr. Herr, says, look, we agree, all

7  of these conditions are really not appropriate to continue to

8  house somebody in a correctional setting.

9       Gwendolyn Young met three of them during her

10  incarceration.  Her systolic blood pressure was measured two

11  times below a hundred.  Never sent.

12       Five, chest pain that is possibly ischemic in nature.

13  If you look at Plaintiff's Exhibit 44, check out -- I think

14  it's in January or late January -- she's having chest pain.

15  They don't follow it.  They don't send her out.  They just

16  completely disregard the protocol.  That is just continued

17  evidence of deliberate indifference of a known emergent medical

18  need that they're not sending out for additional care.

19       Eight, delirium that is felt to be medical in nature.

20  According to jail staff, who didn't even know her that well,

21  they're saying that this is not the person that we're used to

22  housing.  If everything was okay, she'd be up cussing at us.

23  But she's laid on the floor for four days.  She's been vomiting

24  blood.  She had a blood pressure of 80.  And no one's doing

25  anything to help her.  All they had to do -- all anyone had to

1    do was follow a half-page instruction that the defendant put in

2    place because none of the staff had been doing it before.  So

3    let's make it real simple, let's put it on half a page so that

4    no one can screw this up.  Blood pressure below a hundred, get

5    them out.  Delirium that's believed to be medical in nature,

6    get about them out.  Chest pains, shortness of breath, get them

7    out.  They don't do it.  They don't do it despite knowing

8    everything they know prior to March 23rd of 2012 when they make

9    this promise.

10        After they make the promise, here's what Dr. Roemer

11   continues to find.  If you go down the timeline, the timeline

12   is really important in this case.

13        Look at slide 8, Charlie.

14        So this is a continued audit from April the 16th, okay?

15   It's auditing charts, random audits of inmates that had been

16   booked into the facility in April, a month after CHC had made

17   the promise that they made, okay, based on everything they

18   knew.  Here's what Dr. Roemer found.

19        Overall the audits demonstrated deficiencies.  Several,

20   three and eight, are of major concern as they involve

21   high-risk.

22        I asked, "What's your understanding of whether or not

23   CHC was meeting the requirements that they had stated in

24   March?"  And I asked this of the Tulsa County Sheriff's Office

25   risk manager.

1    His answer was, "I don't believe that they were meeting

2    what they had told us that they were going to do."

3    And I asked him, "And with respect, what did he find on

4    the 4/16 audit in the first sentence?  He states it in there.

5    He answers, "The 4/16 audit could not identify actual

6    occurrence where staff complied with the policy.  The above

7    episodes are of major concern for potential of the system to

8    allow serious adverse outcomes.  This should be cause to

9    generate immediate systems of improvement."

10    A month after they were promised, again, we're going to

11    do these very simple things, Howard Roamer is finding that

12    across the board they are not.

13    I want to go to the next slide, 9.  Let me know when

14    you're there, Charlie.

15    This is an excerpt from Dr. Allen's testimony during

16    the trial.  You guys don't get the benefit to go back there

17    with the trial transcript and read it all so I want to point

18    out some things that were really critical in the testimony.

19    "So you've talked to the jury what you found so far up

20    through the 7th.  Do you believe it is reckless at this point

21    for Ms. Young not to have been sent to a hospital?

22    "ANSWER:  Yes.

23    "Do you believe it's dangerous to continue to house

24    her?

25    "ANSWER:  Absolutely.

1          "QUESTION:  And does that fall below the standard of

2     care for providing constitutionally sound adequate care in a

3     jail facility?

4          "ANSWER:  Yes."

5          That's the only expert who's testified in this case

6     about the standards in correctional settings, Dr. Allen.  He is

7     the leading expert in the entire country on correctional health

8     care.

9          Let's look at the next slide.

10         Going back to Ms. Young, the way all of this kind of

11    intersects through her life and her untimely death.  Dr. Allen

12    testified, "At 6:51 on February the 8th of 2013 in the SHU, the

13    detention staff called medical at 6:48 telling them that

14    Ms. Young is complaining of difficulty breathing.  They stated

15    they were sending a nurse to assess her now.

16         "QUESTION:  With all Ms. Young's other complaints

17    that we've talked about up until this point and her other

18    symptoms that had been identified, what, if anything, does a

19    complaint of difficulty breathing or shortness of breath tell

20    you as a physician?"

21         He answered, "Again, in a picture that is already

22    abundantly clear to a clinician, that she is deteriorating and

23    well past the line of needing care in an emergency room, we now

24    have the additional symptom of difficulty breathing.  We're now

25    seeing multiple organ system complaints, not just a focal

1    complaint in one system, and that's not a good sign."

2        She should have been sent to the hospital seven days

3    before.  They could have sent her on the 4th.  They were

4    required to send her on the 4th.  Her body continues to die

5    slowly over time and no one does anything for her, just like

6    Elliott Williams, just like Damien Tucker, just like Linda

7    Henshaw, just like all of the people that Dr. Roemer

8    identified, just like Lisa Selgado, same physician,

9    Dr. Washburn.  Same guy who said, hey, it was my bad when he

10   was asked to go check on Williams and didn't go.

11       He's the same guy that didn't go check on Lisa Selgado

12   when she was in cardiac arrest and had been vomiting for days

13   and was severely dehydrated.  When her body was found, she was

14   modeled and cyanotic, cold to the touch.  But Nurse Metcalf

15   came in and she fixed the vital signs like she had done time

16   and time and time again.  She did it in front of nursing

17   students.  How crazy is that?  Like that is absolutely insane

18   that that was happening in our jail.

19       I want to look at slide 14, Charlie.

20       This idea of faking, this idea of we're not going to

21   send then to the hospital because they're faking, it is so

22   wrong on so many levels, okay?  Because these people, they

23   can't get to a hospital, they can't just walk into a hospital.

24   They know what's going on with their own bodies.  They're

25   telling everybody something is really, really wrong, and they

1   just are ignored.

2          We have Nurse White in front of the detention staff,

3   she's faking her injury.  She's been vomiting for days.  She

4   can't get off the floor.  She can't breathe.  And this lady has

5   the audacity -- and I tried to get her here.  She dodged

6   service for 16 weeks.

7                MR. CHAPMAN:  Objection, Your Honor.

8                THE COURT:  Sustained.

9                MR. SMOLEN:  I want you to hear from everyone.  I

10  did my best to get them all here in the time that I was

11  allotted --

12               MR. CHAPMAN:  Objection, Your Honor.

13               THE COURT:  Sustained.

14               MR. SMOLEN:  Let's look at what Dr. Allen had to say

15  about Ms. Young.  I asked him, "Okay.  Was this an appropriate

16  response by Nurse White?"

17         He asked me, "Was what an appropriate response?

18         "QUESTION:  Taking her back to the SHU after all of

19  these things that she's observed in the medical unit, was that

20  an appropriate medical response?

21         "ANSWER:  So no.  And I would add, though, that

22  there's now the involvement of Dr. Adusei.  So Dr. Adusei at

23  this point, the decision to send her back to the special

24  housing unit or segregated housing unit without having a done a

25  proper evaluation is very problematic.  But the nurses do have

1    some responsibility if they feel that someone who is above them

2    is not doing the right thing to advocate for their patient.

3    All of us in health care, regardless of our licensure or rank,

4    have a duty to advocate if someone appears to be making a very

5    dangerous decision.  That's on teams.  We call that sort of the

6    duty to worn.  Anyone on the team, regardless of rank, can say,

7    hold on, I'm worried about this.  Are you sure you've

8    considered this?  That kind of advocacy is routine in medical

9    teams."

10           There was absolutely no advocacy for Ms. Young by

11   anybody with CHC.

12           Let's go to slide 16, please.

13           And this is the last thing because we're still under

14   the first prong of just one of those elements that we can show,

15   okay?  I want to try to get to the rest of them in the amount

16   of time that I have.  I could talk to you guys about this for

17   days but we've got a limited amount.

18           I asked Dr. Allen during the trial, "Do you believe at

19   this point in time, based on your review of the records, the

20   video, all of the statements, all of the materials that you've

21   reviewed, that even at 8:05 in the morning, do you have an

22   opinion as to whether or not Ms. Young, if she had been taken

23   to the hospital even at this late point in time, would have

24   been able to survive this event?

25           "ANSWER:  I think she had a good -- very good chance

1    of surviving had she received the intervention that she

2    needed."

3         "Okay.  And would you state that to reasonable degree

4    of medical certainty?

5              "ANSWER:  Yes."

6         That's absolutely consistent with what the medical

7    examiner testified, too, that these are survivable events if

8    you get a person to a hospital, let it get diagnosed, and do

9    treatment, treatment that you can't provide in the Tulsa County

10   Jail in a medical clinic.

11        All right.  Let's look at 17.

12        I want to touch on another component of liability under

13   the deliberate indifference standard.  That's failing to

14   provide adequate training and supervision regarding emergent

15   medical conditions.

16        Let's look at 18.

17        And this is wrong on the slide, guys.  It's PX 35,

18   which is Karen Metcalf's disciplinary records.  It's her

19   personal file, okay?  That piece of evidence is critical to

20   understanding this component, this thread of deliberate

21   indifference.

22        I asked her, "I asked you while you were under oath in

23   your deposition, line 13, overall was your supervisors

24   satisfied with your employment when you worked at the jail?"

25        "And what was your answer at line 19?"

1        "Yes.  Because I didn't get fired so I thought it was
2   okay."
3        She's routinely falsifying medical charts.  She's
4   routinely leaving the medical clinic and disappearing for 20 to
5   30 minutes at a time.  There are probably a dozen write-ups in
6   her file.  Look at all of them.  I'll bet you two-thirds of
7   them aren't signed.  And why weren't they signed?  Well, Chris
8   Rogers told us.  Because those disciplinary reports had been
9   sent to CHC corporate executives and they chose not to
10  discipline her.
11       That is an affirmation that what you're doing is okay
12  when you're hands-on supervisors, your direct supervisors, at
13  the facility are wanting to write you up because you're
14  violating every policy and procedure, you're unable to figure
15  it out, your care is dangerous to the inmates and to your
16  patients, right, and then corporate says, hey, we're not going
17  to write her up.  That sends a message that the behavior's
18  okay.  That's failing to provide adequate training and
19  supervision.
20       Then not only to not administer the discipline, but to
21  give her a positive job evaluation during the same time frame
22  that four or five inmates died that she was responsible for
23  their care, that's absolutely nuts.  But that's what happened.
24       I want to look at another element, Charlie, on slide
25  19.

1       Systemic failure of medical policies and procedures.

2   It's another component of liability.  Again, I know you guys

3   took great notes.  You were incredibly receptive the whole

4   time.  But just putting those notes into the right categories,

5   I want you guys to understand how it works.  This is another

6   individual line of liability.  Again, if we just establish this

7   line, it's a verdict for the plaintiff, okay, a systemic

8   failure of medical policies and procedures.

9       I think this is probably one of the best statements

10  that came out during testimony because it was with Chris Rogers

11  on the stand.  I think it was Friday before we took a weekend

12  break.  It's the one thing that I absolutely agreed with her

13  on, okay?  No question about it.  We do not agree on a lot of

14  things but she and I agree on this.  Look at her testimony from

15  Friday before we had the weekend break.

16      I asked her, "Who do you think is responsible for

17  Mr. Williams' death?"

18      And her answer, "Responsible?  I think the whole

19  system."

20      She's absolutely right.  It was a complete systemic

21  failure across the board.  But what's so sad about it is that

22  she only acknowledged that after multiple depositions, after me

23  putting her on the stand having to get it out of her, okay?

24  That's -- you're watching indifference when you see that.  Like

25  that is indifference in the courtroom.  You don't have to go

1   back and try to figure out whether or not the person was

2   indifferent; she acknowledges it here finally, okay?

3          But what's so sad about it is that like just because

4   they videotaped his death, that's now the -- like we know what

5   happened to him, right, because it was videotaped for five

6   days.  But there's so many people who have died in this

7   facility where there's not a videotape of their death so you're

8   having to kind of reconstruct it based on falsified medical

9   records.

10          I think it's just really sad that people -- I think

11  what happened to Mr. Williams is incredibly sad and wrong and

12  disgusting and torture, okay?  But there are other people like

13  Ms. Young, okay?  I don't see any difference between the way

14  Ms. Young died and the way Mr. Williams died other than the

15  fact that she was in a nonvideo-monitored cell, right?  If she

16  had been in cell No. 1, where Williams was housed, you guys

17  would have video of her laying on the floor for four days,

18  unable to get up, with him wanting to drag her around on a

19  blanket --

20          MR. CHAPMAN:  Objection, Your Honor.  There's no

21  evidence of that.

22          THE COURT:  Sustained.  Sustained.

23          MR. SMOLEN:  There is evidence that they sought to

24  drag her on a blanket.  It's in Plaintiff's Exhibit 41.  And

25  it's when the Tulsa County Sheriff's Office say, huh-huh,

1    you're not going to drag Ms. Young on a blanket.  You're going

2    to pick her up and you're going to put her on a gurney.

3    Because they know what happened to Mr. Williams just 18 months

4    before.  That's why they stopped them.  But it was the

5    medical's decision to drag her on and a blanket.  It's in

6    writing, Plaintiff's Exhibit 41.

7            Let's look at -- we can look at 21 real quick, Charlie.

8            Again, Dr. Allen testified to the point of CHC's

9    systemic failure of medical policies and procedures.  "The key

10   thing is, I think, with all of these points we've gotten to,

11   you don't need to diagnose.  It's nice if you can.  But here's

12   the point.  You can't diagnose these conditions a lot of them

13   that we're considering about where we are.  That's why the

14   protocols are all built around -- our practices are all built

15   around recognizing when someone is too sick to be in your

16   facility and to get them to a hospital."

17           Again, it's the same thing we're talking about, right,

18   plaintiff's Exhibit 65.  They acknowledge it.  Dr. Allen's

19   talking about it.  All the audits are pointing to it.  They

20   were well aware of the situation.

21           Let's look -- because we did hear about the NCCHC stuff

22   even though Dr. Adusei had never heard of it.  I mean, that's

23   the medical director, right, that had never heard of NCCHC.

24   Like that's crazy.

25           But let's look at slide 23.

1      Because I want to show you guys some of those NCCHC

2   standards.  You'll find this in Plaintiff's Exhibit 36.  There

3   was a long day of like reading this stuff into the record by

4   defense counsel and he was talking about, well, that didn't

5   really apply here, that didn't really apply there.  Let me show

6   the ones -- a lot of them applied but some the primary ones are

7   here.

8      Man down drills was when a person was down, when they

9   were sick, right, when they couldn't get up.  They had nothing

10   in place.  The compliant -- it wasn't met.  The standard wasn't

11   met, right, J-A-07.  But look at J-A-10.  This one is really

12   shocking because this is a NCCHC standard that they were aware

13   of since 2005, okay?

14      It says, "There have been several inmate deaths" -- and

15   I'm reading on the right-hand side.

16      You got it?  Thanks, Charlie.

17      "There have been several inmate deaths in the past

18   year.  In March 2010, deaths were related to pulmonary

19   embolism, suicide, and unknown cause.  There was no

20   psychological autopsy for the suicide.  The clinical mortality

21   reviews were poorly performed.  In June 2010, there was a death

22   due to natural causes.  No death review was conducted.  The

23   standard is not met."

24      What's really important about the mortality reviews is

25   it's because it's what CHC is supposed to be doing every time

1    they have an inmate that dies in the facility.  And if you'll

2    look at the corrective action, right, this is, again, a note

3    from a 2010 NCCHC report to CHC saying here's the corrective

4    action that was required.  Again, this is before Lisa Selgado

5    dies, Gregory Brown dies, Gwendolyn Young dies.  All of this is

6    before they die, okay?

7         "All deaths should be reviewed within 30 days.  The

8    death review should consist of an administrative review,

9    clinical mortality review, and psychological autopsy if the

10   death is by suicide.  The clinical mortality review is an

11   assessment of the clinical care provided and the circumstances

12   leading up to the death.  Its purpose is to identify areas of

13   patient care or system policies and procedures that can be

14   improved and it should be included in the death review.

15        "As the psychological autopsy is a written

16   reconstruction of an individual's life with an emphasis on

17   factors that may have contributed to the death, it should also

18   be a component of the overall death review.  That occurs within

19   30 days in cases of suicide.

20        "The following is acceptable documentation" --

21            THE COURT:  Slow down a little bit.

22            MR. SMOLEN:  -- "for compliance."

23        The RHA, okay, resident health authority; Chris Rogers,

24   the HSA; the director of medical, Dr. Adusei or Dr. Washburn,

25   should submit to NCCHC an action plan that describes how this

1    standard will be corrected.  Specifically, any necessary policy

2    or procedure change to ensure that all three components of

3    death reviews, including the psychological autopsy in the case

4    of suicide and the clinical mortality review, are conducted

5    within 30 days of the death.

6         The reason that they're doing that and that they're

7    requiring that -- and that's always been required -- is because

8    when you go and you do a mortality review on any of the

9    individuals that Dr. Roemer identified or Dr. Allen identified,

10   you will identify the systemic failures that led to that death.

11   That's why they're doing it.

12        And there's a reason why Chris Rogers or an HSA or the

13   medical director is required to be involved, so they can't come

14   and say, well, I don't know how that one went down.  I don't

15   really remember that one.  It goes to notice.  They have a

16   constitutional right to know.  You can't just put your head in

17   a hole and say, well, I never looked at the mortality reviews

18   so I didn't know why all these people were dying so I really

19   didn't know.

20        That's not the way it works.  You should have known,

21   you were required to know, the guidelines require you to make

22   yourself knowledgeable about what happened so you can prevent

23   it from happening in the future, and that never happened.

24        Let's look at slide 24.

25        This is another line of liability.  Pattern of failures

1  to provide medical care in response to serious and obvious

2  medical needs of inmates.  Just real quickly, I want --these,

3  again, are identified by Dr. Roemer, Plaintiff's Exhibit 1,

4  page 5.

5          Slide 25, if you would, Charlie.

6          According to CHC policy 17.8, triage is to occur daily.

7  That wasn't happening with Mr. Jernigen.  The note that

8  Dr. Roemer takes from his chart, puts into the audit report

9  says, Charles Jernigen inmate request, "Need to speak about

10 problems."  That's what he put in on the kiosk request.

11         Two days later he hangs himself alone in his cell.  He

12 told them, I need to speak to somebody, I'm having problems,

13 and no one went and saw him and he killed himself.  That is a

14 pattern of failure to provide medical care in response to

15 serious and obvious medical needs of an inmate.

16         Next page.  Frankie Thomas.  Date of the death was

17 January 2nd, 2010.  More than three years before Gwendolyn

18 Young dies, there is a CH see 2009 alcohol intoxication

19 protocol, L04.  The patient appeared to meet criteria.

20 Implementation of the protocol would very likely have prevented

21 inmate's death.

22         If you'll just follow the policies that you have --

23 there was a great jury question about it, and it was, well, is

24 NCCHC really just looking to see if the policies are in place

25 or are they actually looking to see if they're being followed?

1    Well, this goes directly to that point, okay?  I don't know who

2    wrote the question but it goes directly to that point.  Here we

3    have Dr. Roemer saying, yeah, CHC has a policy, right, they're

4    just not following them.  The fact that they have a policy is

5    evidence of their knowledge.  They know or should know what to

6    do.  They just disregard it.

7          Same thing, slide 27.  Damien Tucker.  We talked about

8    this, 42-minute delay in calling EMSA.

9          Slide 28.  Clinton Labor, same thing.  Two issues

10   appear to be significant.  First, there's a six-day interval

11   between inmate request and mental health visit.  Six days after

12   he has expressed suicidal ideation no one saw him.  That's

13   deliberate indifference to a serious medical need.  That is a

14   pattern of failure to provide medical care in response to

15   serious medical needs.

16          Slide 29.  Linda Henshaw.  We talked about Linda with

17   her blood pressure, you know, 94/60.  She had indications to

18   send her out for emergent medical care.  No one does it, she

19   dies in the jail, cardiac arrest.

20          Slide 30.  Patrick Gibson.  This is an example of them

21   not providing care as it pertains to the delivery of

22   medications in the clinical setting.  We've got Mr. Gibson

23   here.  The main concern in this inmate's care relates to a lack

24   of follow-up in his metoprolol medication.  If inmate had been

25   on his medicine, his chances of having a fatal cardiac event

1    would have been significantly decreased.

2        We talked about Gwendolyn Young continuing to receive

3    high blood pressure medication, despite her blood pressure

4    being 80, up until the day of her death.  No physician

5    oversight.  No one stepping in to intervene.  No gatekeeping

6    function at all in this very broken system.

7        Ms. Selgado.  Slide 31.  I asked Dr. Allen, "Okay.

8    Similarly with Ms. Selgado, did you find that as it pertained

9    to the medical director, Dr. Washburn, at the time, did he ever

10   see the patient based on what information was being reported to

11   him?"

12        "No.  We -- or if memory serves, he might have -- there

13   was no note in the medical record saying he saw the patient.

14        "QUESTION:  Did you find in your review of

15   Ms. Selgado's case that there were emergent medical criteria

16   for immediate transport to a hospital but it was not followed

17   by Dr. Washburn?"

18        "Yes.  That being the chest pain with cardiac history."

19        Let's look at slide 33.  Again, Dr. Allen's testimony

20   also pertaining to this issue falls within this line of

21   liability of the pattern of failure to provide medical care in

22   response to serious and obvious medical needs of the inmate.

23   His death was March 8th of 2012, about eleven months before

24   Ms. Young died in the facility.

25        Again, the most significant crosscutting feature in

1    those medical cases was the fact that all three cases the

2    patient spent multiple criteria for immediate referral and

3    transfer to an emergency room but it did not happen.

4          Slide 35.  I believe this is the last moving force

5    policy, practice, and custom that we've identified in

6    Ms. Young's case, but continuing to adhere to a deficient

7    system of care for inmates with serious needs.

8          Slide 36.  I asked Dr. Allen, "Don't you think that's

9    concerning if you've got a nurse down there who is repeatedly

10   failing to follow policies, procedures, and protocols?"

11         His answer, "It would be, yes.

12         "QUESTION:  Don't you think it affects inmates'

13   health and safety?

14         "ANSWER:  It could be an issue, yes."

15         "Well, if they're not following the chest pain

16   protocol, if they're not following the abdominal pain protocol,

17   if they're not following the infirmary care admission protocol,

18   you would agree with me, would you not, that can cause serious

19   life-threatening risk to an inmate patient?"

20         Yes, it could."  That was his answer.

21         That goes to this prong of adherence to a deficient

22   system of care for inmates with serious medical needs.

23         Slide 38, Charlie.

24         Nurse Harrington testified when I asked her, "Nurse

25   Harrington, during your time at the Tulsa County Jail, did you

1    experience inadequacies in the delivery of health care to

2    inmates?

3              "ANSWER:  Almost on a daily basis."

4        Because this wasn't just one-offs, right?  Every death

5    that was reviewed from 2010 forward that we've talked about in

6    this case was determined to be preventible, every one of them.

7    She was documenting it in realtime, contemporaneous notes.  It

8    was happening on an almost daily basis.  She was the director

9    of nursing.  She was clearly trying to make things stop but the

10   corporation didn't want to.  They didn't want her there.  They

11   fired her three days before they promised Brian Edwards, hey,

12   we're going to fix it, we promise.  But that's just

13   coincidental?  I mean, that's circumstantial evidence, okay, of

14   what their intent and what their disregard is.

15       Slide 40.  Because there's an abundance of evidence,

16   I'm just trying to hit the high points during the closing.  But

17   CHC's adherence to a deficient system of care for inmates with

18   serious medical needs.  These are the other relevant exhibits

19   that I've not had time to talk about.  If you want to go back

20   and review them, here are the specific exhibit numbers and page

21   numbers that will lead you to understand that this is evidence

22   that establishes adherence to a deficient system.

23       The ICE audit, PX 61, letter from Paul Branstetter to

24   Brian Edwards; the Roemer report, PX 1; Roemer's continued

25   audit, Plaintiff's Exhibit 46; the NCCHC findings, PX 36.

1    Those are additional materials that support from an evidentiary

2    standpoint the last prong that we're talking about, the

3    adherence to a deficient system.

4        Lastly, I want to talk about the last prong and this is

5    the sixth bullet point.

6        Slide 41, Charlie, please.

7        A pattern of failures to produce inmates with

8    sufficient access to a physician.

9        Next slide.  "Doctor, can you tell the jury would it

10   have fallen below the standard of care in a correctional

11   setting for a CHC nurse, medication aid to continue to give

12   high blood pressure medication to a patient who had presented

13   with a systolic of 80?"

14       "Yes.

15       "QUESTION:  And did you find that it was continuing

16   to happen when you reviewed the medical chart?

17       "ANSWER:  Yes."

18       I want to look -- I've gone over my time a little bit

19   but I want to look at Exhibit 21, Charlie.

20       From what I've gathered with the defense -- with their

21   case, right, because they only called the medical examiner, who

22   no one disagreed with his findings at all but that's who they

23   put on, okay, and Mr. Winter towards the end of that

24   examination looked at the medical examiner and said, Well, did

25   her blood pressure cause her to die?  Did the fact that she

1    continued to receive medication cause her to die?  Did her

2    nausea, vomiting cause her to die?  Did her shortness of breath

3    cause her to die?  No.  And no one said that it did.  She died

4    from blunt-force trauma to the head.

5         He said, hey, that could be a million different things,

6    right?  That's like their defense:  These could have been a

7    million different things.  That's why you send them to the

8    hospital.  Because it could be a person having a heart attack.

9    It could be a person having a stroke.  It could be a person

10   with a subdural hematoma.  That's the whole point.  There is a

11   million different things that it could be, but you have to send

12   somebody to the hospital to find out what it is.  Very basic,

13   right?

14        So to see them try to defend the case in a way that has

15   absolutely nothing to do with the liability, it has absolutely

16   nothing to do with it, it's just a way to try to confuse you

17   about what's important.  And that's not what's important.

18   Everybody knows she died from blunt-force trauma, but everyone

19   also agrees that it was likely within 72 hours of her death.

20   If you go back 72 hours of her death, do you know where that

21   takes you?  February 4th of 2013 when her blood pressure's 80.

22   That's where it takes you.  That's 72 hours before her death.

23   Look at the medical charts.

24        But this whole defense of, that could be a thousand

25   different things, a million different things, we know.  But we

1   know there's nine of the things that you got to send them to

2   the hospital for, right?  She meets three of them and you never

3   send her out.  Just like Elliott Williams, just like Linda

4   Henshaw, just like Damien Tucker, just like Frankie Thomas,

5   just like Clinton Labor, just like Charles Jernigen, all of

6   them, they never got the chance because they just wouldn't send

7   them out.

8           And we're going to talk about it in the second part of

9   my closing about why that was, okay?  But I'm going to sit down

10  for now.

11          THE COURT:  All right.  Thank you, Mr. Smolen.

12  It's -- my computer's showing 11:28 and it's my understanding

13  at 11:30 there should be food for you, right?  And I don't

14  think you're going to be able to get everything done before a

15  reasonable time for a lunch break.

16          MR. CHAPMAN:  Oh, I will get it before 12:20, 12:15.

17          THE COURT:  Do you think you'd be done at 12:15?

18          MR. CHAPMAN:  Throw a lasso around my neck and pull

19  me off if I'm not.

20          THE COURT:  Okay.  What do you want to do?  Dealer's

21  choice.  Okay.  Go.

22          MR. CHAPMAN:  Thank you, Your Honor.

23          THE COURT:  Okay.  Thank you.

24          MR. CHAPMAN:  I guess I made a commitment I have to

25  go fast, huh?  I don't want a lasso around my neck.

1          Again, like Mr. Smolen said, thank you so much for

2     being here.  I think the judge said it in the beginning:  Our

3     system wouldn't be the greatest system in the world if we

4     didn't have juries.  We don't settle our disputes out in the

5     street with guns, with fists, with whatever.  We settle them in

6     here in a civilized world.  You have plaintiff, who puts on a

7     case, defense, who defends it, and the judge who calls the

8     balls and strikes and makes sure we got done on time and makes

9     sure the right evidence and all of that stuff gets in.  So

10    we're really appreciative of that.

11         And, of course, the unsung heros, the court reporter,

12    the court's clerk.  We remember this man.  They take it all

13    down they got to work fast and do that.  So we appreciate all

14    of that, and we appreciate your patience.  When you're not here

15    and you're sitting back there, not able to talk to the case,

16    talking about whatever you want to talk about while we're out

17    here working, I can just assure you as one of the attorneys

18    here, that the honorable judge keeps us working.  He's on time.

19    And when you go out we're in session every day.  Most days we

20    stayed here close to 6:00 or even longer.  So I appreciate

21    that.

22         Am I up?

23         This case is not about the deliberate indifference of

24    people or the negligence that people might have about taking

25    care of a patient regardless of the patients that were

1   identified.  This case is about "CCH."  It's about a

2   corporation.  Did a corporation have policies that forced these

3   other issues to happen?  It's not about the doctors.  It's

4   about three people and I'll mention it to you in a moment.  But

5   it's about the corporation.  And it's about plaintiff trying to

6   villainize a corporation.

7          I stand here today with the pleasure of representing,

8   along with my co-counsel here, Sean and Anthony, and the

9   corporate representative, Jamie, representing a corporation.

10  They are not the bad guys in America.  Corporations provide the

11  health care.  Every hospital is a corporation.  Of course, they

12  are.  We're not the villains.  Corporations are made up of

13  people that do things and we're here to talk about that.

14         If you look, there's four things we have to talk about.

15  You're going to receive jury instructions that address these

16  four topics in general.  Jury instructions are a little bit

17  longer than that, they address some other things.

18         The first one is that I want to address is the cause of

19  death.  And then we're going to talk about the moving force,

20  something that plaintiff counsel, if you read into it, may have

21  been talking about that, but it's more specific that we have to

22  talk about.  And then the actions of Ms. White, Ms. Metcalf,

23  and Dr. Adusei.  Regardless of Dr. Washburn, regardless of the

24  nurse practitioner, regardless of anybody that was involved in

25  the care of Mr. Williams, the care of any of the other people

1    he mentioned, these are the only three individuals that are

2    involved in this case and you're going to read them in the jury

3    instructions.  It's not all these other people that are

4    mentioned.

5            And then, of course, we had the policies, procedures,

6    and practices, which is really the case that's at issue here.

7    The case at issue is, did the corporation have policies,

8    practice, procedures, customs that they knew about and they

9    knew that these things were causing, not just deaths, that they

10   were causing serious injuries, that they were making the

11   inmates -- that their health was always in peril, all of these

12   kinds of things.

13           Focusing on -- and I'll talk about this in a moment --

14   but focusing on some deaths that occurred in a

15   two-and-a-half-year period when, if you calculate that, about

16   85,000 inmates -- no -- about 82,000 inmates had gone through

17   that system.  That's not a high number.  It's a terrible number

18   because people shouldn't have died.  People die in hospitals.

19   People die.

20           Every one of these cases talked about, except

21   Ms. Young, and we heard some longer evidence of Mr. Williams,

22   there's whole other issues of the health care that was going in

23   that's not talked about because we're not here to talk about

24   those people, whether people were negligent, whether people

25   were deliberate indifference.  You didn't hear all that

1    evidence so it's hard to make a judgment call:  Was this poor

2    care for this person or that person?  You heard a few things

3    highlighted.  But to highlight a few things aren't the medical

4    record.  They aren't the details of what did the physicians

5    know or not know.  What did the nurses know and not know that

6    they made decisions on?  And that's something that we're going

7    to go in and we're going to highlight a little bit.

8        So let's talk about the cause of death.  And I thank

9    brother counsel for bringing a couple things up that I don't

10    have to address.  His math may have been a little off.  The

11    time period is 10:00 a.m. on February 8th to 10:00 a.m. on

12    February 5th.  Count back 72 hours, that's 72 hours.

13        There was discussions with the medical examiner and he

14    was firm.  Why was he firm?  Because as a scientist, he could

15    look at the blood, whether the blood was properly coagulating

16    fibrous tissue coming together in the cells, scientific

17    evidence to slow that this could be no more.  It could have

18    been one day.  It could have been 24 hours.  But it's no more

19    than that issue.

20        Why?  Because of these things:  No signs of healing,

21    it's acute.  Why are these important?  Because plaintiff talks

22    about blood pressures that occurred on the 4th, blood pressures

23    that -- that -- or I'm sorry -- on the 6th and on the 7th and

24    things that might have occurred back in January, showed you all

25    the medical records.  Those things aren't relevant in this

1    case.  They're not relevant in this case.  It's the last three

2    days that are relevant.

3         And we're also talking about issues of knowledge, and

4    you're going to hear those issues and I'm going to talk to them

5    a little bit more.  But did the individuals have knowledge?

6    You're going to read the jury instructions that they had to

7    have knowledge.  They had to have knowledge of this serious

8    deed.  They had to have knowledge of subdural hematoma.  And

9    they couldn't have.  There's no visible external signs.

10   There's none.

11        The expert, Dr. John, talked about in a

12   African-American or a dark-skinned person, it's hard to see a

13   bruise.  Plus, when you add hair on top of that, you can't see

14   that.  Nobody saw that.  No clinician had the knowledge of a

15   subdural hematoma.  If they don't have the knowledge of it, you

16   can't hold them responsible for it.

17        Now, Mr. Smolen made my point, and that is that the

18   symptoms that she had -- and they're in the record -- could

19   cover, what did we say, a million, a hundred-thousand, a

20   thousand, all kinds of things.  You don't send somebody to the

21   emergency room because they're vomiting.  The emergency room

22   would be filled with people that are vomiting.  You send people

23   there if there's a reasonable belief, if we're looking at the

24   general issue, a medical necessity that there's a reason for

25   them to go.

1        In this case, if they didn't go because one or more

2   health-care providers made a mistake, were medically negligent,

3   that's not an issue and that's not deliberate indifference and

4   that's not a reason to find CHC responsible.  It's just not.

5   The case is trying to be made about people that aren't part of

6   this case.

7        The case here, the sole issue for you to decide, are

8   the policies that "CCH" implemented the driving force behind

9   this death.  That's the issue.  It's not that people at the

10  death committed medical malpractice, deliberately indifferent.

11  Should Dr. Adusei have done something different?  Should

12  Ms. White have done something different?  That's not the issue.

13  The issues were they medically -- sorry -- the issue is whether

14  they were deliberately indifferent to something.  The other

15  nurses and doctors and things involved they're not at issue

16  here.  It's only the three that are at issue in this particular

17  case.

18       And then we look at the subdural hematoma.  And, again,

19  I won't stay on top of this point because plaintiff's counsel

20  made that point for me.  None of these issues, including the

21  issues of breathing difficulty or the argument that she may

22  have complained that she had chest pain, none of those issues

23  caused the subdural hematoma and that's why she died.  And when

24  you look at and you go back to the autopsy, there were no

25  cardiac issues.  There was no ulcer or bowel obstruction or

1    anything that would have caused anything.  We know in hindsight

2    that any of those were medical issues that should have been

3    brought to an emergency room or that didn't.  The theory is,

4    well, if you would have sent her, they might have seen this.

5    But think about it.  If you go to the emergency room because

6    you're vomiting, they're not going to do a CT and they're not

7    going to do it until there's some belief that that's a problem.

8    They're going to work it out.

9        So if you send her to the emergency room at 6:30 in the

10   morning of the 8th to say that before she died at 10:30 they

11   would have discovered, oh, it's a head issue and we're going to

12   do a CT, then we're going to get a surgeon in, and then we're

13   going to do a procedure to, you know, relieve pressure and

14   things, that's just not going to happen.  There was testimony

15   to that effect.

16       Moving force.  A huge issue in this case, a huge issue

17   in this case, and something that we have to talk about because

18   it is the achilles heel of the plaintiff's case.  That's

19   probably why they didn't address it in the way that they should

20   have addressed it.

21       Remember the moving force.  The judge is really good in

22   coming up with analogies when you're not in the room to explain

23   the differences to plaintiff and I.  I might not be that good

24   at it but a moving force is like you have a vehicle.  You have

25   a bad door, you have all these things.  Mr. Smolen used an

1   example like that.  The moving force is the engine.  You have

2   to have the engine.  In this case, the moving force is the

3   engine.  Without the engine, you don't have a car.  If I

4   remember his analogy correctly, it's the engine we're talking

5   about, the moving force.

6          So what is the moving force?  Well, you're going to

7   read this in the jury instructions, and you have to have these

8   four things.  They're not going to be labeled one, two, three,

9   four, they're actually said in a sentence.  But you have to

10  have a custom, policy, or practice -- the big word is "that" --

11  sets in motion a series of events that CHC knew, or reasonably

12  should have known, would directly cause the violation, which in

13  this case was a subdural hematoma that led to death.

14         Now, their other argument, because you're going to read

15  the jury instructions, there's method one and method two and

16  we're going to talk about that.  Method one has to do with the

17  individuals in this case.  Method two has to do with policies

18  and procedures.  But you're going to see this jury instruction.

19  This is extremely important:  Custom, policy, and practice.

20         What we've heard throughout this trial and throughout

21  Mr. Smolen's, you know, limited opening and then -- when I mean

22  limited, he has an hour and a half, he reserved time to rebut

23  what I have to say and say whatever -- that CHC had these

24  policies, CHC had this, CHC did this, CHC sent Dr. Herr in and

25  they looked and they said, hey, we're going to try to do this

1    better, we're going to try to do that better.  We had good

2    policies.  We had good policies and procedures.

3         If one or two or three -- in this case, three

4    individuals -- didn't follow those policies on occasion, that

5    is not liability of CHC.  They have to have knowledge.  Look at

6    this:  Set in motion a series of events.  Did CHC set in motion

7    a series of events?  We're going to talk about the NCCHC.

8    We're going to talk about the audits.  We're going to talk

9    about in a moment that they have never lost accreditation.

10        I don't care what Dr. Roemer says.  He is not a NCCHC

11   auditor.  We're going to talk about that.  I'm going to give

12   you a quote.  Even Mr. Turley when he was here, critical, what

13   did he say?  We thought he was more after money to keep the

14   contract than he was truly analyzing what was going on.  Think

15   of that.  That's the person that actually hired him that said

16   that.  And he was an emergency room doctor, had nothing to with

17   jails, had nothing to do with NCCHC.

18        And then you get to that CHC knew, or reasonably should

19   have known, what directly caused the violation.  Now,

20   Mr. Smolen makes the point of Ms. Metcalf.  And, yeah, she had

21   problems.  She was disciplined.  Ms. Harrington had problems

22   with her.  Ms. Rogers had problems with her.  She was written

23   up.  She was given warnings, although some of those are way

24   separated in time.  There were corrective action plans to try

25   her to get in place.  I think the theory is the very first time

1  she should have been fired.  But we know the company has an HR,

2  human resources, where these things go to.  That doesn't always

3  happen.  There has to be progressive and you put somebody on a

4  corrective action plan and you do some things.  And, yes,

5  ultimately they terminated her because these things continued

6  to happen what they did.

7         But you're going to learn she is not one that's

8  involved in this case in a big way.  She was there once on the

9  8th when she was brought down to the infirmary.  She was there

10  in the emergency call at the end but.  She didn't do any care.

11  She didn't deliver any care.  There were other nurses and

12  doctors that did that.  And then she was once involved on the

13  6th where she came in, she was already on the unit, she saw

14  Ms. Young, didn't write a note, didn't write anything.  But if

15  you look at those logs, which I don't remember the number of,

16  you'll see hours before, hours after there's no complaint in

17  the logs by the deputies or the detention officers about

18  anything going on.

19         So while she was potentially an employee that needed to

20  be terminated, a bad employee that couldn't be rehabilitated,

21  etcetera, a red herring to this case.  She didn't cause the

22  death.  She had nothing to do with the death of Ms. Young.

23         And then you look at:  Would directly cause.  I

24  highlighted that.  It's not in the jury instructions.  But

25  directly cause means directly.  Now, you're going to read it

1    can be a motivating factor.  It can be directly caused.  In

2    other words, multiple things could cause something but this

3    violation has to directly cause that injury, directly cause.

4    Not in a roundabout way but directly cause.  And we're going to

5    talk about some of those policies and procedures.

6        Moving force.  These are all the elements that

7    plaintiff showed you that they believe are the policy and

8    procedure violations.  They call them the systemic failures.

9    But let's talk about them.  Systemic failure of medical

10   policies and procedures in general.  We'll talk about the

11   NCCHC.  That's the gold standard.  They met those.

12       A pattern of failures to provide medical care in

13   response to serious and obvious medical needs.  Well, they

14   talked about four people in specific:  Williams, Delgado, Brown

15   and Ms. Young.  In passing, he raised other people that had

16   passed away.  No other medical person talked of those.  You had

17   Mr. McKelvey talk about some of those.  He's not a medical

18   doctor.  He's an investigator.  The fact that he can say that

19   something caused somebody's death is completely irrelevant.  He

20   has no knowledge, no expertise to say any of that kind of

21   thing.  And you don't have the medical records of any of those

22   persons.

23       What you have is almost -- well, approximately 80,000

24   inmates that go through.  You can't base a pattern off of

25   three, four, five people.  And remember, we're just not talking

1    about people with deaths.  To say there's a pattern of failure,

2    you'd have to be talking about a failure in sick call, a

3    failure in intake, a failure in chronic care, a failure in all

4    these things and it hasn't been proven at all.  Because

5    remember, we're talking about the corporation.

6         Don't get your sympathies, don't get your -- say, oh,

7    this person was treated poorly to say the corporation's

8    responsible.  It's not responsible.  If I'm in a vehicle that's

9    owned by a corporation and under these kinds of circumstances I

10   get in an accident, it's not the corporation's fault.  It's my

11   fault.  It's my fault.  And that's the thing here, the

12   corporation.

13        They're made out and they will be made out in a moment

14   when plaintiff comes back up here and talks about damages and

15   talks about how the corporation is a villain and you have to

16   punish the corporation, and they knew this and they knew that,

17   and therefore, give 10 million, 20 million.  I think he said

18   he's going to ask for $41 million because the corporation is so

19   evil.  I'm here to plead with you and tell you the corporation

20   isn't evil.  The corporation didn't cause this.

21        They had policies and procedures in place.  Failure to

22   provide adequate training.  That's not what NCCHC said.  Now,

23   that's what Dr. Roemer said.  I don't know what Dr. Roemer

24   knows about the training that's necessary to be in a prison or

25   to work in a jail.  I don't know.  I don't think he has the

1    authority to say that.

2          Continuing to adhere to a deficient system of care for

3    inmates.  What deficient system?  Yes, there were some things

4    that happened to some people.  I didn't like the video of

5    "Ms. Williams" either and I'm sure you didn't.  I didn't like

6    it.  I don't think "Ms. Williams" should have died.  That's not

7    at issue here.

8          What's at issue here is Ms. Young.  The issue here is

9    Ms. Young.  And the issue is whether or not the corporation

10   knew the policies, customs, and practice that were the

11   motivating factor -- a motivating factor -- that directly

12   caused a subdural hematoma that caused her death.  I know that

13   was made light of -- not so much made light of -- but it was in

14   passing when plaintiff came up here as if he gave it three

15   seconds, just completely dismissed that, that doesn't have

16   anything to do with this case.  But that's the crux of this

17   case.  If you believed that individuals were responsible, you

18   could have been after those individuals.  They're not here on

19   trial.  The corporation is on trial.

20         We went over this, the idea that aspirin, that blood

21   pressure, that back pain, that any of these caused the death is

22   wrong.  Blunt-force trauma was the moving force.  And one of

23   the things the judge allowed, which I thought was actually very

24   good because it allowed us to see some of the things that the

25   jury wanted to hear, is you were allowed to ask questions which

1    I thought was really, really good.  You asked a lot of these

2    questions regarding blunt-force trauma.  You asked questions of

3    could the blood pressure have caused that?  Could it have been

4    a factor?  Could the aspirin have been a factor of it?  Could

5    the trauma have occurred if she rolled off her bed?  And

6    Dr. John said no, unless you rolled off like a top bunk and you

7    hit your head really hard.  There weren't bunk beds in there.

8    And I don't know if any of you have had back pain.  I've had it

9    at times.  Sometimes the only time I feel good is if I'm laying

10   on my back on the ground.

11        I don't know why she was there.  I know she was

12   complaining of back pain at that time.  And, again, the system

13   was not failing.  NCCHC national standards were being met.

14   Yes, they were on probation.  Is that a bad thing to be on

15   probation?  Well, it's not a good thing to be on probation.

16   But it's a good thing to get your changes in place to create a

17   corrective action plan.

18        I will suggest to you -- I don't know NCCHC personally

19   and I can't tell you what they do or how they do it other than

20   they do these audits -- I suspect because they're a national

21   accredited association and they accredit people, they have a

22   reputation to maintain.  They don't take it easily when

23   somebody has probation and then comes off probation.  They make

24   sure that they put in place a corrective action plan.  They

25   make sure that that plan is approved.  They make sure that it's

1    properly implemented.  And as you heard, they come back and do

2    a mini-reaudit at some time in the future to make sure it was.

3            The fact that they came off of probation -- and, again,

4    don't lose sight of this.  It's late 2010, early 2011.  It's

5    almost two years and three months before any of this happened,

6    before any of this happened, and they implemented a quality

7    control -- continuous quality improvement program.

8            Now, you heard of ICE coming out.  You heard of

9    meetings with the sheriff.  You've heard of meetings with risk

10   management.  You've heard of staff meetings going over problems

11   every two weeks.  You've heard of online continuous training.

12   All of these things were implemented for continuous quality

13   improvement.  This shows that a corporation cares.  They don't

14   want bad delivery.

15           Do you know how -- you're going hear about how CHC is a

16   for-profit corporation.  I don't deny that.  I don't think

17   that's a bad thing.  Do they want to create a system that

18   continually causes problems?  It's not in their best interest

19   to do that.  So they put a quality improvement -- continuous

20   quality improvement in.  They have corrective action plans.

21   They discipline people.  They do the things that they need to

22   do.

23           And I will say this:  If they're not doing these

24   things -- we all heard from Ms. Harrington.  I don't believe

25   there was a nurse there that she thought was good as her.

1  There are a lot of difficulties I have with her testimony and

2  it goes back to why she was terminated.  I have problems with

3  why she was initially disciplined.  But there are some things

4  that I saw or felt a little ironic.  Remember, one of the

5  employers after she left CHC, she was there for -- what did she

6  say? -- six weeks and she couldn't tolerate their policies and

7  procedures and the way they operated so she left.

8        But here, she'll stay four years, three years in a

9  system that she says is completely failed, nobody does anything

10 right here, et cetera, et cetera.  Well, then why does she say?

11 It doesn't make any sense if she has that internal insight that

12 says, hey, that is a terrible system, I have to leave.  Her

13 argument is, well, I was trying to change it from the inside.

14 That's a good thing.

15       But remember some of the things she also said.  In the

16 middle of the night -- well, she actually didn't say in the

17 middle of night -- there's boxes and boxes and boxes of records

18 that people are feverishly preparing in a backroom and shipping

19 them out.  One, it never happened, and you heard it being

20 denied; but two, it wouldn't matter.  NCCHC comes in and

21 randomly picks off a roster that has nothing do with the

22 records you have.  And then they say, I want these records.

23 They didn't get the records they wanted, it would be in their

24 reporter.  It would be in their report and they would say, I'm

25 missing this record and this record.  Why?  That would go to

1    their recordkeeping.  It would go to whether they had the

2    records in place.

3        So that's just a red herring.  It didn't happen and it

4    wouldn't have anything to do with anything.  It would not have

5    stopped this particular all.  And, again, the alleged practices

6    did not directly cause the injuries.

7        Now let's talk about the individuals.  Because, like I

8    said -- I have to keep my promise to the judge -- there's two

9    ways, there's method one, there's method two.  Method one has

10   to do with individuals.  You have to find, if you go under

11   method one, that Ms. White, Ms. Metcalf, Dr. Adusei had

12   knowledge -- not all together; it could be, you know, one

13   individually -- had knowledge of a serious medical need, a

14   subdural hematoma.

15       And remember, Dr. Adusei didn't treat Ms. Young the day

16   before, the week before, the month before, two months before.

17   He didn't know of a subdural hematoma.  Ms. White didn't know

18   of a subdural hematoma, but we're going to talk about it, but

19   she saw her on the 7th and on the 8th.  They have to know when

20   they disregard it.  In other words, I have to know you have

21   this.  I have to knowingly disregard this that causes harm.

22   Think of that.  That's not negligence.  That's not a mistake.

23   That's not doing something wrong.  That's an intentional thing

24   that's going to happen.

25       And then we look at what did deliberate indifference is

1    not.  It's not medical malpractice.  It's not a mistake.  It's

2    not following an NCCHC standard.  It's not knowing of a serious

3    medical need.  It's knowing of a serious medical need and not

4    doing something.  In other words, if I don't know, I can't be

5    deliberately different.  It is against the interpretation of

6    the law that the judge's going to give you.  That's what sets

7    it apart from medical malpractice.  And actions in this case

8    that were weeks, months, years before Ms. Young's death are

9    completely irrelevant to this discussion.  It's completely

10   irrelevant to this discussion.

11         Let's talk about Dr. Adusei.  He did not treat.  He

12   wasn't called.  The nurse practitioner was, not him.  He did

13   not know the subdural hematoma.  He appeared on the scene.  And

14   he said when he got there, he believed Ms. Young was already

15   deceased, but he explained to you that they continued doing

16   cardiac -- or CPR until EMS gets there.  EMS does things.  And

17   then when it's completely futile, then the person is determined

18   to be dead.  But you keep trying because something could

19   happen.  The person could be revived, et cetera.

20         There were comments that there wasn't epinephrin, there

21   wasn't some other medication there to deliver.  It isn't there.

22   It's not on that crash cart.  It's not required in a jail.  EMS

23   would have brought it and they would have given it, if it was

24   necessary to be given.

25         And even if it wasn't there and it should have been

1    there, it didn't have an impact on her death.  It didn't have

2    -- you know why?  She didn't die of cardiac arrest.  She died

3    of a subdural hematoma, not of a cardiac arrest.

4         And then let's talk about Ms. White for a second.  She

5    did see her two times -- Ms. Young -- two times in this

6    scenario that we're talking about.  The first was on 2/7/2013

7    for vomiting.  The complaint, not the observation from the

8    detention officer, not the observation from Ms. White, but the

9    complaint was that she was vomiting up blood for three days.

10   Now, we know in hindsight, she could not have been vomiting up

11   blood in three days.  There was nothing wrong with her system

12   that would cause that.  There was not a deterioration of her

13   organs.

14        Mr. Smolen told you that she was slowly deteriorating

15   because they weren't doing anything.  No, she had a subdural

16   hematoma.  All of her organs were okay.  Her heart was okay.

17   There were are no ulcers.  There was nothing wrong with her.

18   There was no bowel obstruction.  There was none of that.  It is

19   impossible in this case for her to be throwing up blood, and we

20   know this afterwards.  It doesn't mean she didn't vomit.  In

21   fact, there's evidence she says that she vomited in the note.

22   But there's no evidence of blood.

23        So what did she do?  She checked the detention

24   officer's records.  She saw that she had been eating her meals.

25   Well, that's a good thing.  She advised her to drink -- you

 1   know, continue to drink water and that she would be, you know,

 2   re-assessed.  Now, I guess the argument is she should have been

 3   rushed to the emergency room because she was vomiting.

 4        I think it doesn't take a reasonable person -- and the

 5   judge is going to say that you should use your reason.  You

 6   don't have to give up your reason, give up your mind, give up

 7   your experiences, give up your intellect when you go back to

 8   the jury room and make decisions.

 9        So we know, because we know of the autopsy, what it

10   says and what it doesn't say.  There was nothing else wrong

11   with her.

12        And all this about Dr. Allen.  Do you realize Dr. Allen

13   investigated this case because he was convinced that she had a

14   cardiac arrest?  Except she didn't have a cardiac arrest.  She

15   died of a subdural hematoma and the doctor explained that to

16   you.  And Ms. White had no knowledge of that.

17        Now, on the 8th -- this is important because I thought

18   I heard statements, I'm not sure -- that Dr. Adusei was

19   involved in this.  He wasn't.  This was the nurse practitioner.

20        Now, what should a nurse do when a nurse does an

21   assessment?  A nurse should work it up and call the health-care

22   provider.  A nurse practitioner in the state of Oklahoma has

23   the same rights to treat, to prescribe as a physician does

24   under this context.  They called her.  She made the call.  This

25   decision was not the decision, whether it's right or wrong, of

1    Nurse White.  It was the decision of the nurse practitioner

2    who, by the way, is not on trial.  Not on trial.  CHC is on

3    trial.  CHC is on trial.

4         And then you go to Ms. Metcalf.  We talked about her.

5    She has problems.  But she wasn't there.  She saw once on 2/7

6    at 1608, which is 4:08 in the evening.  That wasn't an issue.

7    It's not even been brought up.  There's nothing wrong with it.

8    Yeah, there was a point in one of the videos she was brought up

9    on that video but she didn't have any involvement in this.

10        So what do you have to find with respect to these

11   individuals?  Go back.  These individuals first have to be

12   deliberately indifferent and the deliberate indifference there

13   has to be related to a custom, policy, or practice of CHC.

14   Nothing CHC did was related to or caused these people to do

15   these things.

16        So now we'll go on to Ms. Harrington.  This is the only

17   thing I'm going to say about Ms. Harrington.  I don't know of

18   any nurse refusing when it was determined they really need

19   medical care.  That is the -- that is the opposite of

20   deliberate indifference.  That statement says, I don't know of

21   any nurse that was ever deliberately indifferent.  Yeah, they

22   didn't follow some policies and procedures.  Yeah, they didn't

23   do this.  But I've never seen a nurse not do the care that's

24   needed when somebody needed it.  Now, the good thing about

25   that, from somebody who's never seen somebody do a right thing

1    in the jail, at least she admitted this.

2          Now, policies and procedures.  NCCHC is the gold

3    standard.  How do we know it's the gold standard?  The sheriff,

4    through Mr. Turley, coveted it, the triple crown.  NCCHC was

5    part of the triple crown.  It wasn't what Dr. Turley says.  It

6    wasn't what ICE says.  It wasn't what Dr. Herr says.  It's the

7    NCCHC that means something.  So if it means something, it ought

8    to be applied in this case.

9          And here's the thing.  It's an objective assessment

10   from somebody that doesn't have a horse in the race.  They

11   don't care whether you're accredited or not.  They're here to

12   be scrutinized -- I mean, to scrutinize your process.  And how

13   do I know that they're here to be scrutinized?  I'm going to go

14   into a slide in a moment on how they come in and do an audit.

15   But before I get to the slide, I think this is important.

16         They were accredited in 2007, CHC was.  I don't know if

17   the jail was accredited before that but it might have been.

18   But CHC came in, CHC applied for accreditation, or continued

19   their accreditation, I'm not quite sure, but they were

20   accredited in 2007.

21         2010 -- there's a re-accreditation every three, four

22   years, I think.  2010 they were found to be on probation.  They

23   submitted their plan, it was accepted, it was implemented, it

24   was re-audited, and full accreditation was granted.  Now, if

25   NCCHC is the gold standard and the coveted triple crown, this

1    is proof that the corporation's policies and procedures

2    qualified, supported the standards.

3         Now, you're going to read in the jury instruction that

4    an individual not following one of those standards is not

5    deliberate indifference of the corporation, that under this

6    theory you should find them liable.  This is the second

7    theory -- or the second -- I can't remember the court's word.

8    But there's two options, theories --

9         THE COURT:  Way.

10        MR. CHAPMAN:  Way.  This is the second way, dealing

11   with these policies and procedures.

12        Never lost accreditation.  You've heard a lot that they

13   were put on probation.  You've heard a lot about Mr. Roemer --

14   Dr. Roemer.  You've heard about ICE coming in.  And remember

15   the thing about ICE -- I'm not going to spend much time on ICE

16   because what did they look at?  They looked at the same

17   records -- or at least some of the same records that NCCHC

18   looked at in 2010.  Well, if you look at the same records and

19   you find some of the same problems, is that a surprise?  No.

20   ICE didn't come in and do an audit.

21        If you look at that exhibit, you will see 80 percent,

22   90 percent of that exhibit is all things that the jail didn't

23   do.  They didn't have a barbershop.  That's one that sticks out

24   in my mind.  They didn't have other kinds of things that were

25   there and a list that had nothing to do with medical except the

1    two or three things that were listed.

2        Now, let's look at the audit.  Two full days of audit,

3    two, with six-plus auditors going through the entire facility.

4    That's not Dr. Roemer.  That's not ICE.  That's not anybody.

5    It's not Dr. Herr.  It's nobody.  It's the NCCHC that did this.

6    And if it's the gold standard, if it is something to be

7    coveted, if it means anything, you've got to go with the

8    experts.  It's not an emergency room doctor that comes in and

9    is evaluating intake in a jail, probably comparing it to intake

10   in an emergency room.  They're different.

11       And they reviewed 30 to 40-plus records in all of the

12   different service areas.  That's now .00029 percent of the

13   records that Mr. Roemer looked at because he only looked at

14   records from one day, 90 records, out of 80,000.  And those

15   were picked in one day.  They weren't randomly picked.  They

16   didn't use a random number generator that you would use to

17   truly do an audit like that.

18       And NCCHC interviewed the nurses.  I don't know if

19   Ms. Harrington said she was interviewed, but if she was so

20   concerned, she probably was.  She was in a position to be.  We

21   don't know for sure.  They interviewed the providers, the

22   sheriff, which probably would have been the captain in charge

23   and things like that.  They interviewed the inmates.  Not all

24   of them.  They just picked -- randomly picked inmates or they

25   might interview inmates that they pull medical records from and

 1    then talk to them.  But they interview all of these people.

 2    You don't see that in Dr. Roemer's report.  You don't see that

 3    in ICE's report.  And then they go on and they do direct visual

 4    inspection of intake, sick call, infirmary, nursing

 5    assessments, and other things, and then they write an unbiased

 6    report.

 7         That's what we're here for.  Did CHC not have policies

 8    and procedures -- or more importantly, did they have policies

 9    and procedures that they know were systemically -- not one

10    time, not two times, not ten times, not fifteen times --

11    systematically for all the patients every day throughout the

12    hospital -- or throughout the jail not followed.  You can't do

13    that on three or four people or five people.

14         And then they wrote a written, unbiased report.  There

15    are some things in there that aren't pleasing, there are.

16    There are some criticisms.  But there's a lot of good things in

17    there too.  And so if you pulled up that -- I can't remember

18    the exhibit number -- you would see -- I just show this for an

19    example -- those are the deficiencies in the essential

20    standards.  We're going to have them in a better -- here's the

21    first few of them.

22         Administrative meetings had nothing to do with

23    Ms. Young's death.  Emergency response, nothing to do.

24    Infection control, initial assessment, oral care, nothing to

25    do.  Now, did she have an initial assessment and oral care?

1    Sure.  But they had nothing to do with her death.

2         Continuous quality improvement, one can argue,

3    plaintiff will argue, did because why?  It failed.  It didn't

4    find these problems.  But it didn't fail.  Even Ms. Harrington

5    said she sat in on meetings.  They had this system they went

6    through and they tried to find problems.

7         Now, granted, they found this in 2010 and it was

8    implemented after 2010.  This death occurred in February of

9    2013.  Continuous quality improvement was implemented.  That is

10   the way that a corporation can ensure that their policies and

11   procedures are followed.  It's the only way that they can.  And

12   they did it.  And they did it.

13        Now, Dr. Roemer says, well, that's a completely

14   inadequate system, it's antiquated, it's inadequate.  I don't

15   know what he's comparing it to, but he doesn't know anything

16   about jails, we know that.  He may be comparing it to a

17   hospital which is a completely different system.  They operate

18   under different rules.  They're not accredited by NCCHC.

19   They're accredited by different organizations.

20        And then we have these two.  Nonemergency health care

21   requests arguably applies to Ms. Young, and we're going to talk

22   about that.  Continuity of care doesn't.  She had been in the

23   jail for a decent amount of time.  Chronic diseases in patients

24   with special needs isn't an issue here.  Suicide prevention is

25   not an issue here.  And infirmary care could be an issue,

1    arguably is an issue.

2         So J-A-06, that's the one that they found quality

3    improvement that that was a problem, continuous quality

4    improvement.  They implemented a more comprehensive program,

5    biweekly meetings, online continuing education, CQI meetings.

6    Those meetings with the sheriff, those meetings with these

7    others, those weren't meetings for the sheriff to come in and,

8    you know, chew them out for not doing this or not doing that.

9    They were quality improvement meetings.

10        If you can't be frank and transparent and open in a

11   meeting to talk about your problems, why have the meeting?  The

12   meeting's there to identify the problems, and they did identify

13   some problems that they continued to work on.

14        I don't believe -- I don't think anybody in this

15   courtroom believes that you could be one and done.  You can

16   just say, here are the policy and procedures, go follow them,

17   I'm going to assume you're doing a great job.  It's not how it

18   works.  It's certainly not how medicine works because things

19   change.  You have to continuously look at it, continuously try

20   to find things.

21        They did have it.  Ms. Harrington even said -- we're

22   not going to this pull this up because I want to keep my

23   promise to you -- but she said, we had meetings, I attended

24   meetings.  Remember, she said they talked about statistics,

25   statistics about chronic care, statistics about sick care,

1    statistics about all these things so we can improve the system.

2            J-A-06.  CHC made changes.  They made changes.

3    Dr. Herr was there and they made changes.  That was a dig deal

4    that Dr. Herr said we're going to terminate Dr. Adusei and they

5    didn't terminate him for some time after that.  Dr. Adusei

6    wasn't involved in the death of Ms. Young which is why we're

7    here.  You didn't hear testimony about Dr. Adusei running

8    around and having problems.  Now, you did hear somebody say

9    that he had alcohol on his breath and you heard Ms. Rogers say

10   she talked to him, there was no evidence, there was nothing

11   they could do.  That's one person complaining.

12           How do you know that one person complained?

13   Ms. Harrington said somebody told somebody who told me.

14   Ms. Rogers said she was told by Ms. Harrington and she went and

15   inspected it.

16           You also heard that he did some things with respect --

17   they wanted to work on him doing more consistent rounds in the

18   infirmary.  They wanted him to have dates that he would

19   specifically do things.  You heard in Ms. Harrington's stuff

20   that he said, I'm not going to see a patient until he's septic.

21   He testified that stuff's ridiculous.  He didn't do those

22   things.  He didn't do those things.

23           And consider -- you will consider the character, the

24   truthfulness, et cetera, of who you want to believe.  Do you

25   want to believe Dr. Adusei?  Do you want to believe all these

1     things that Ms. Harrington had?  That's up to you to do.  But

2     here's how you do quality improvement.  You implement, you

3     train, you review, you test, and you repeat.  That's the very

4     nature of us getting better and them getting better.

5             Nonemergency health care.  Here's the argument that was

6     made by NCCHC.  However -- however -- interesting word -- it

7     means everything is going good, however.  There's a problem.

8     The problem comes after the "however."  Nursing staff are not

9     always told when the kiosk goes down.  Well, who's responsible

10    for the kiosk?  It's the jail.  And that they need to pick up

11    sick call slips.  If they're not told, they cannot be

12    deliberately indifferent.

13            Remember, you have to have knowledge and disregard a

14    serious need.  That's on the jail and then that resulted in

15    people not getting to sick call within a week.  There was no

16    argument that Ms. Young didn't get to sick call.  There was no

17    argument that she didn't get to see somebody in a timely

18    manner.  It's not the issue in this case.

19            And then infirmary care.  I'm going to read this to you

20    because it's important.  Specific scope of medical,

21    psychiatric, and nursing care provided in the infirmary setting

22    is defined by the policies and procedures manual.  They had a

23    manual.  Patients are always within hearing of a qualified

24    healthcare professional.  At the time of the survey, a new

25    speaker system was implemented or being installed.  Registered

1    nurses and LPNs 24-hour coverage in the infirmary.  A

2    supervising RN is on-site at least daily.  And a manual of

3    nursing care procedures is available.

4         So what did they do wrong?  It's a paperwork issue.

5    The physician didn't sign the admission or discharge infirmary

6    care documents.  That's the violation.  Now, that's a big

7    violation to NCCHC, and, granted, it should be.  But that's not

8    what caused any care or deficiency here.

9         ICE report, we've already talked about that.

10   Mr. Roemer -- Dr. Roemer, we've talked about it, local

11   emergency, never worked in a jail.  Mr. Turley, the county

12   auditor, only after money.

13        Let's talk about this for a second.  Ten million,

14   twenty million, thirty million, a hundred million, send a

15   message, the company deserves it, punish the company, do this

16   and do that.  That's what you're going to hear.  You're going

17   to hear this.  Give us money.

18        Now, I understand money is the only way we can redress

19   things.  We can't give people back.  But here's the thing.  The

20   health-care providers are not on trial here.  The corporation

21   is on trial.  And you're going to hear an argument that the

22   corporation -- I think the figure that plaintiff wants to use

23   is over nine years they were paid $4 million a year to provide

24   health care.  You will see in the contract that they had to

25   employ, I think it's about, 15 or 16 people.  So they'll argue

1    that that's profit.  There's probably very little profit in

2    that.  But he's going to argue that they're this big

3    corporation that made 37 million because that's going to be a

4    big number to you.  He's probably -- would be to me.  He's not

5    going to tell you it was over nine years.  He's not going to

6    tell you that they had all these people that they had to

7    employ, but you'll have the contracts and you can look at that.

8    You can look at that.

9          The other thing he's going to come up here and tell you

10   is that everything I said was wrong.  That's just the way the

11   system works.  But I want you when you go back to use the

12   talents that you have individually.  You come here with a

13   different perspective in life.  Talk about those perspectives.

14   Talk about what you heard.  Talk about what you -- what you

15   want to apply, what you think are the problems identified here

16   that you want to consider, that you want your fellow jurors to

17   consider.  I'm not afraid of you looking at everything in this

18   case and I hope that you do.  Of course you probably don't want

19   to be here eight days, so look at what you think is relevant in

20   this case and then make your decisions.  Make them based on

21   sound reason.  Don't make them based on sympathy.

22         I ask you that you don't make them based on because you

23   believe CHC is some evil thing lurking out there that's just

24   trying to kill people.  I assure you they're not.  It's against

25   their best interest to do that and they didn't do it in this

1    case.  Yes, there were deaths.  There are always deaths in

2    jail.  There are always.  The amount of deaths that occur in

3    jail is very similar probably to the amount of deaths that

4    occur in a hospital, the amount of deaths that occur in any

5    other -- there are people that come there that are sick.

6    Inmates that come into a facility are not the most well people

7    and there are 2000 of them at all times.

8            So on behalf of CHC, on behalf of my colleagues, Sean

9    Anthony and Jamie, we thank you for listening.  Our hearts go

10   out to the family.  Nobody should lose a mother, a sister, a

11   brother, but it happens and it's not CHC.  It may be the fault

12   -- some of these may be the fault of an individual, but that's

13   not the issue here, unless it is Ms. White, Ms. Metcalf, or

14   Dr. Adusei, and they weren't involved.  They did not cause

15   this.  And Ms. White, she called the nurse practitioner and

16   that person is not on trial.

17           So on behalf of my client, on behalf of my colleagues,

18   we thank you, we thank the judge, we thank everybody here

19   involved.  Now the hard work, after Mr. Smolen comes up, is for

20   you.  You have to sit in judgment.  You have to go through a

21   lot of stuff.  You'll have the exhibits to go through what you

22   want.  I thank you.

23           THE COURT:  Thank you, Mr. Chapman.

24           (Discussion held off the record)

25           THE COURT:  We're at 12:20.  So total what are we

1    looking at for rebuttal after we shave off that?

2              DEPUTY COURT CLERK:  Thirty-one minutes and --

3              THE COURT:  Thirty-two minutes.  Want to go another

4    32 minutes or take a break, a short break?  We're looking at a

5    short break.  Okay.  We'll take a five-minute break.  We'll

6    come back, okay?

7                    (Jury exits the courtroom)

8              THE COURT:  The record will reflect the jury has

9    left the courtroom to take a break and finish up with rebuttal.

10                      (Short recess)

11                  (Jury enters the courtroom)

12             THE COURT:  You can have a seat.

13        All right.  So Mr. Smolen's going to have his rebuttal,

14   then we'll take our lunch break.  When we come back, we'll go

15   over jury instructions so you can leave the instructions on

16   your chairs during the lunch break and we'll come back and

17   we'll do that and you'll go deliberate.  Before you deliberate,

18   we'll have to swear in the CSO to watch over you, okay?

19             So whenever you're ready, Mr. Smolen.

20             MR. SMOLEN:  Thank you, Your Honor.  Defense counsel

21   stood up here in his closing and he said, I'm sure Mr. Smolen

22   is going to stand up here and tell you that everything I said

23   is wrong.  I'm not going to waste my time doing that, okay?

24        Let me tell I how easy it is.  I counted he said

25   "subdural hematoma" like 68 times.  Look at the jury

1    instructions, the entire jury instructions.  If you can find

2    the words "subdural hematoma" anywhere in them, let me know

3    because I can't find it.  That's because it doesn't matter.  He

4    wants to make it matter.  It doesn't matter.  That's why it's

5    not in the jury instructions.  That's why he's wrong.  They

6    don't have to know that she has a subdural hematoma.  You can't

7    diagnose it without a CAT scan.  You got to diagnose it in a

8    hospital.  He's literally telling you we're not responsible for

9    any death under our care as long as he can't prove that they

10   knew through a CAT scan that she had a subdural hematoma.

11   That's absolutely false.

12        And it's purely stated to mislead you.  It's highly

13   offensive for me to observe it happening because I know what's

14   going on.  You know what's going on.  But I'm a professional

15   attorney and it's hard for me to watch it.  I think it's

16   totally disgusting.  It's so wrong.  Because that's not the

17   issue.  That's just a way to try to deprive the family of

18   justice.  But you guys are all smarter than that and you took

19   notes the whole time.

20        Charlie, let's look at slide 1.

21        I want to talk to you about that while we're talking

22   about the topic of things that are said during this case, okay?

23   This is Mr. Chapman during Nurse Harrington's testimony.

24        "Now, you testified a lot in the Williams case and you

25   went over four, four and a half hours of things that happened

1    in the Williams case and the sad death and all of those

2    things."

3            Every death is sad.  Every death is sad.  Death is sad.

4    But we're not talking about sad deaths.  We're talking about

5    people who have been tortured to death in our county jail.

6    That's what we're talking about.  People who could have been

7    saved if they had just been sent out to a hospital.  That's

8    what we're talking about.

9            When you look at the contracts -- and I don't want to

10   waste the time to pull it up -- but look at any of the

11   contracts that are exhibits in this case.  There is a paragraph

12   in the contract and it says that if you have to send

13   somebody -- CHC, if you have to send somebody to the hospital,

14   you got to pay for their care.  That's what it says.

15           So for him to stand up here and tell you, why would we

16   have any incentive to do that, because it makes them a ton of

17   money every time they don't send an inmate to a hospital

18   because they have to pay for it.  That's why these people with

19   very clear serious medical conditions are not being sent to a

20   hospital.

21           Look, I'm not up here saying we can't have this

22   industry in the United States.  But it is an industry, okay,

23   and we can't allow it to exist in this dangerous condition.

24   That's it.  You can't allow it.

25           So look at the contract.  If you want to know why

1    they're not sending people, it's -- they know all of these

2    things, right?  We sat here for days putting on just a mountain

3    of evidence.  But they're not going to send them because they

4    have to pay for it.  It's absolutely disgusting.  They hold

5    them there.  They hold them there while they die so they just

6    don't have to pay for the medical costs because it cuts into

7    their profit.  I'm not telling you it's evil.  I think you know

8    it's evil.  Look at the evidence.  It's absolutely disgusting.

9        In the United States, if we're going to house people

10   for incarceration, for punishment, right, all those people have

11   to rely on are prison officials to make sure that they get

12   basic constitutional health care.  If they don't, it results in

13   lingering death and torture.  That's what this case is about.

14       He sat here and told you, oh, all those deaths aren't

15   relevant.  Those are the patterns and practices that establish

16   deliberate indifference.  Those are the cases that establish

17   their knowledge.  It's absolutely disgusting.

18       Look, I -- Bryon is from Tulsa.  I am from Tulsa.  You

19   guys are from northeastern Oklahoma.  I very much appreciate

20   this judge coming down from Illinois, okay?  I very much

21   understand that these lawyers are not from here and that

22   they've left families to be here, okay?  But this is our

23   community.  This is where we live.  We have the right to say

24   this is not acceptable here.  That's our right to do that.

25       Mr. McKelvey -- Captain McKelvey testified -- and this

1    was really -- it was really overwhelming for me when it
2    happened -- and he talked about the skull-cap guy was the first
3    guy that he investigated that had had a subdural at the jail
4    and they caught it and he was sent out.

5          Bob Byrd was my neighbor, okay?  And I know how it
6    affected his family.  We had family that went to school
7    together, okay?

8          MR. CHAPMAN:  Your Honor, I'm going to object.  His
9    personal feelings about somebody that's not at issue here are
10   not relevant.

11         THE COURT:  Sustained.  Mr. Smolen, if you need some
12   time, you let me know, okay?

13         MR. SMOLEN:  I'm good.  I gotcha.

14         THE COURT:  Okay.

15         MR. SMOLEN:  Bob was part of our community, okay?
16   You guys are part of this community.  We've been funding this.
17   We pay them with tax dollars.  It's our money.  And then
18   they're going to come here and tell us it's not the
19   corporation, the corporation that we paid $41 million of our
20   money to provide care to the people in our community who happen
21   to be incarcerated pending their trials.

22         Ms. Young was in there because she had been sentenced.
23   She was pending an appeal.  Her case was totally reversed, it
24   was totally dismissed, she would have never been in jail, seven
25   months after she died.  She had no -- she has no prior

1    convictions.  They can't say anything bad about her.  They want

2    to try to insinuate that she was like a bad person because she

3    had been in the jail and that somehow because she was in the

4    jail her life is worth less than ours.  I think that's totally

5    disgusting.

6         Do you know who she was?  She was a grandmother of 15

7    kids.  She had three kids that she had raised.  She made sure

8    one of them became an ICU nurse, the other one owns a trucking

9    company, and the other one's in beauty school.  That's who she

10   was.

11        I feel like they're coming down here like literally

12   stealing our money and laughing at us.  They don't put any

13   witnesses on to explain it.  He wants to stand up here and talk

14   about NCCHC and that they're the gold standard.  Well, where

15   are they?  Why didn't they come and tell you how great

16   everything was at CHC?  Why don't they have Dr. Herr come down

17   here and explain why no one was following the promises that he

18   had made in 2012?  Because they don't have a single person that

19   will testify that this was a safe, constitutionally-sound

20   system.  That's why their case in chief was the medical

21   examiner that nobody disagreed with.  That's what they had.

22        The main defenses in this case that I've heard are, you

23   can't believe Tammy Harrington even though she's making

24   contemporaneous notes and reporting this up the chain to the

25   executives because she got fired from a couple jobs after the

1   fact, right?  Total disregard it, that's what they're saying.

2   But we want you to believe Karen Metcalf, who has repeatedly

3   falsified vital signs.  We want you to believe Karen Metcalf,

4   who never received training.  We want you to believe Karen

5   Metcalf, who lied on her employment application, saying that

6   she had never been terminated from a job, when, in fact, she

7   had been terminated by CHC in 2006.  She doesn't put down the

8   other terminations in her employment application.  It's

9   Plaintiff's Exhibit 35.  Take a look at it.  She lies about her

10  employment history, but they want you to rely on her like her

11  word's good.

12          Chris Rogers, she doesn't even remember the video of

13  Elliott Williams.  She just got to resign from her job.  She

14  testified no one received any discipline for any of the

15  conduct.  Like that is crazy.  The fact that the defense lawyer

16  wants to bring up with Captain McKelvey that the FBI maybe or

17  maybe didn't file charges for committing crimes, that that

18  somehow makes it our system is okay, that's their defense?

19          They want you to believe Dr. Adusei, right?  Dr. Adusei

20  was injecting patients at the jail in their jugular vein with

21  saltwater placebo because he thought they were faking mental

22  health issues.  I didn't make that up.  His own physician

23  co-worker reported him to the sheriff's office.  That's crazy

24  that that was allowed to happen.  That was happening three

25  months after they had promised the county they would fire him,

1    and they still allowed him to continue to work for an entire

2    year.

3           He doesn't see Gwendolyn Young for an entire year.  So

4    like the defense is, well, if I just don't see them, how would

5    they prove that I knew that they were sick?  Well, he's

6    required to review the charts daily.  He's required to do

7    rounds on inmates in the SHU.  He's required to do rounds on

8    inmates in the infirmary.  He's required to chart it.  He's

9    required to document it.  That's how he should know.

10          Hey, Charlie, let's pull up Plaintiff's Exhibit 44,

11   page 12.

12          This part really bothered me about the closing and I do

13   want to address it.  This idea that you wouldn't take a person

14   to the hospital just because they're vomiting, like he totally

15   disregards the blood pressure of 80, totally disregards the

16   shortness of breath, totally disregards the chest pain, totally

17   disregards the fact that she can't even walk on her own, okay,

18   totally disregards the fact that she's been laying on the floor

19   for four days.  It's just that she's been vomiting, folks.

20          Charlie, take them down a little bit in that to --

21   there.

22          This is Dr. Adusei's note when he first responds, okay?

23   He says that it was difficult to access the airway.  There were

24   a lot of soft tissue swelling and vocal cords could not easily

25   be seen.

```
 1          She had been vomiting so profusely for such a long

 2   period of time that they couldn't even intubate her when they

 3   found her.  That's how swollen her throat was.  That is so

 4   wrong on so many different levels.

 5          He goes up at 9:47.  He says that's when he got

 6   called.

 7          Take it up a little bit, Charlie.

 8          This is so important that you understand it.  I mean,

 9   it's just one of the pieces but I think it's just so

10   disgusting.  If you look at Defendant's Exhibit 2, okay -- is

11   it 2, Bryon, or 50?

12              MR. HELM:  50.

13              MR. SMOLEN:  50.  Defendant's Exhibit 50.  Okay.  It

14   shows that Dr. Adusei was called 28 minutes before he actually

15   arrived, okay?  He kind of tried to blame it on like the jail

16   setup.

17          I will tell you that if you watch Defendant's Exhibit

18   -- the videos of Ms. Young.  DX 62?  Or PX 73, okay, it takes

19   two minutes and 29 seconds for them to wheel Ms. Young from the

20   cell in the SHU to the infirmary, two minutes and 29 seconds.

21   You don't have to take my word for it.  Watch the video.

22   That's because the SHU is at the north end of the hall where

23   there's two doors that open.

24          He sat in his office for half an hour --

25              MR. CHAPMAN:  Objection, Your Honor.  There's no
```

1   testimony he sat in his office.

2          THE COURT:  Sustained.  It's the evidence that you

3   recall hearing at trial.

4          MR. SMOLEN:  He was two minutes away at most to go

5   check on her.  He says, this was the best we could do based on

6   our resources.  We're going to let her vomit for four days

7   until the point where her throat is so swollen we can't

8   intubate, I'll wait half an hour to go see her when the nurse

9   comes in and tells me she's nonresponsive, not breathing, but

10  Nurse White says she was faking.

11         MR. CHAPMAN:  Objection, Your Honor.  There's no

12  testimony that the nurse came in to tell him anything.

13         THE COURT:  Sustained.

14         MR. SMOLEN:  Quote -- since there's no evidence -- I

15  was called by the nursing staff for a medical emergency

16  regarding this patient at around 9:47 a.m.

17      I'll just rely on his own note as evidence, okay,

18  because that's what happened.  To let her lay there on the

19  floor for 28 minutes and to act like there was something about

20  the physical structure of the jail that prevented him from

21  getting there, when you could watch the very video of Ms. Young

22  being wheeled down the hall, is totally wrong.  It is hard for

23  me to watch someone do that to a jury.  The evidence is in

24  front of you.  Look at it.  You don't have to believe me.  You

25  have all the evidence that you'll need to determine that.

1    Cut to trial transcript 1303, lines 16 through 22.  I

2    want to show the jury this.

3    This was a question that you guys asked him.  And, I

4    mean, look, I've never, ever had a case -- and I've been doing

5    it for two decades -- I've never had a case where a judge let's

6    the jury write questions.  In fact, in most of my cases, in my

7    openings and in my closings, I tell the jury this is a very

8    weird process, me having to ask questions and you guys never

9    getting to know -- you know, if you've got questions and me

10   never knowing that you had questions.  It's a hard way to

11   communicate with people, the question-and-answer format, right?

12   This is the first time in my entire career that a judge allowed

13   you guys to write questions and I thought it was really amazing

14   that that happened.  I mean, I really truly appreciate that

15   because I've never seen it.  I thought it was amazing to know

16   where you guys were coming from.  Some your questions were so

17   pointed it probably could have got the case done, if you guys

18   were asking the questions, only in about three or four days.

19   But it was reality nice to have it, okay?

20   But you asked this question about, did he feel prepared

21   as the medical director.  And he says, "Now, with respect to

22   jail care, I don't know.  I did the best I could based on my

23   training.  Jail care requires different things it, right?  You

24   have to worry about security at all times, you know.  You go

25   into this room, you can't go into that room, and you have to

1    wait for an officer to come.  Things are a little different.

2    Was I prepared for it?  I don't know."

3           That's what he said.  He wasn't.  He had been asked to

4    leave his residency at OU.  He took the first job that he could

5    get.  He was supposed to be terminated by May 30th of 2012 but

6    they let him stay on.  They let him stay on providing

7    completely deficient care, continuing to ignore inmates,

8    despite repeated complaints from his co-workers.  And when

9    Ms. Young was housed in the SHU, he never saw her, he never

10   reviewed her charts, he never did anything.  That's deliberate

11   indifference.  It's very simple.  If, at any point in time,

12   anyone had done anything to help her, get her to the hospital,

13   she would be here, but they didn't.

14          They kept saying, look, we did some good things.

15   That's a good thing.  CHC, we put a cuff on her arm.  The

16   reality of it was they took no action when she had high blood

17   pressure and had drastic blood pressure drops which should have

18   triggered transfer to a hospital per their own policy, okay?

19   That's what happened.

20          It was a good thing that we took her to the infirmary,

21   right?  That's what they said.  It's a good thing to take her

22   to the infirmary.  Reality:  They tried to drag her on the

23   ground like an animal that couldn't move or walk to the

24   infirmary on a blanket until the guard said no more.  That's

25   the reality.

1    They said, CHC giving meds is a good thing, to give

2    medication is a good thing.  Reality:  They continued to give

3    Ms. Young Advil and high blood pressure medication despite the

4    fact that she had a subdural hematoma, had all the

5    symptomatology of it, and she had a blood pressure below 100.

6    That's not a good thing.

7        Look, we heard Gwendolyn's daughter, Deborah, testify

8    about what they wanted to and how they wanted to use this money

9    to do a foundation.  That's great.  But that's not what damages

10   are for.  With all -- it's not when we're talking about

11   compensatory damages, okay?

12       Compensatory damages are about what Gwendolyn went

13   through, right?  In a constitutional case, we're not talking

14   about her pain and suffering.  We're not talking about the

15   grandkids' pain and suffering from not getting to see their

16   grandma.  We're talking about Gwendolyn being deprived of those

17   things through her constitutional rights being violated.  It's

18   that she is missing seeing these grandkids go to prom.

19       My kid recently had a homecoming and he's a freshman --

20       MR. CHAPMAN:  Your Honor, again, his personal

21   experiences of his children are not relevant here.

22       THE COURT:  Sustained.

23       MR. SMOLEN:  -- and it was -- seeing him with his

24   friends --

25       MR. CHAPMAN:  Objection, Your Honor.  You sustained

1    the objection.

2              THE COURT:  Sustained.

3              MR. SMOLEN:  Our whole community is affected by

4    this, guys.  Look at the evidence.

5              PX 41, subpage 2, if you can get there real quick.

6              She is reporting to the jail staff and the medical

7    staff for days, okay, that she wants to go to the hospital.

8    She's begging to go to the hospital.  She knows she's sick.

9    Deborah talked about how scared she looked.  She knows her

10   better than anybody, okay?  In all the documentation, it's just

11   over and over.

12             Guys, it's really scary to think that someone can lay

13   in a cell for days while people stand over them, like in the

14   Elliott Williams video, like in Gwendolyn's death, and they're

15   like laying there and they're just like, help.  But like no

16   one's listening to them and no one's believing them.  Like

17   that's terrifying.  That's a terrible way to die.  That is just

18   a slow death where you're just laying there day after day

19   telling people, I need help, and no one's doing anything until

20   you can't even walk anymore.

21             That's this company.  That's this company who took $41

22   million from us and did that to those people.

23             Look, I can't tell you more honestly than I've told you

24   how urgent this situation is.  They came down here with no

25   witnesses because they don't think you guys care about people

1    who are in jail.  That's why they don't even have a defense.

2    It's like they're laughing at us, they're taking our money,

3    because they don't think anyone's going to stop them from doing

4    it and I think it's so, so wrong.

5            If you don't think this case is about money, that's

6    what it's about.  They got $40 million.  They had a financial

7    incentive not to send people to the hospital.  It's in the

8    contracts, all the contracts.  They're the largest private

9    health-care provider in corrections in the entire United

10   States.

11           MR. CHAPMAN:  Objection, Your Honor.  There's no

12   testimony, there's no proof of that.

13           THE COURT:  Sustained.

14           MR. SMOLEN:  They filed tax filings last year --

15           MR. CHAPMAN:  Objection, Your Honor.  Tax filings

16   are not relevant.

17           THE COURT:  Sustained.

18           MR. SMOLEN:  Look --

19           THE COURT:  Can we have a quick sidebar, please?

20           MR. SMOLEN:  Yep.

21           THE COURT:  Thank you.

22                   (Bench conference)

23           THE COURT:  We're in rebuttal.  Please don't tank

24   this case now.

25           MR. SMOLEN:  I understand.  I'm sorry.

```
 1                    (Bench conference concluded)
 2              MR. SMOLEN:  One of the reasons that these cases are
 3     so important is because of the deterrent effect that a jury can
 4     have on the system.  Like you don't have to do it through
 5     legislation.  You don't have to do it through Congress.  You
 6     can do it today.  You can be the first people that say we're
 7     not going to accept this, right, a jury in Tulsa, Oklahoma.
 8     You guys can be the first to send an historic verdict that says
 9     this is not okay.  It's not okay.
10          He's up here talking about hundreds of millions of
11     dollars.  The reason why he's doing that is because he knows --
12              MR. CHAPMAN:  Objection, Your Honor.  I'm not
13     talking about hundreds of millions of dollars.
14              THE COURT:  Sustained.  Sustained.  Sustained.
15              MR. SMOLEN:  He knows the severity of the situation
16     and they know the overwhelming amount of evidence, and they are
17     hoping that you guys won't do anything significant.  They'll be
18     high-fiving if you walk out of here giving a verdict of $10 or
19     $20 million, I promise you, because that just means business as
20     usual.  They can continue to do it and they can continue to
21     profit.  That's what they want.  They don't think you're going
22     to do anything.  They think they've explained it all away.
23          He doesn't cite to a single piece of evidence in his
24     closing.  Not one piece of evidence was cited to in his
25     closing, not a document, nothing.
```

1    You guys need to be the first jury in Tulsa, Oklahoma,

2    in the United States of America, to say we care about civil

3    rights, we care about our inmates, our community should be

4    judged by the quality of our incarcerations and the basic

5    services that we provide, and this is not acceptable, it has to

6    stop now.  That's your obligation.  That's why you're being

7    instructed on punitive damages right now because you can deter

8    it from happening.

9    The Young family wanted to put this in front of you

10   guys.  They wanted you guys to make the decision on what

11   deterrence looked like.  Because it didn't matter when NCCHC

12   came in and they told them that they were failing.  It didn't

13   matter when the ICE auditors came in and said they were

14   failing.  It didn't matter when they videotaped Mr. Williams'

15   death.  It didn't matter when they had all the notice about all

16   the other deaths in 2010.  It didn't matter when Dr. Roemer in

17   April of 2013 says there's still broken systems, right?  It

18   didn't matter when they promised to get rid of Dr. Adusei and

19   then they kept him on for 13 minutes.  None of it mattered to

20   them.

21   That's the same way that they've presented their case.

22   It's the same way that they've approached this.  It's not the

23   corporation's fault.  It absolutely is the corporation's fault.

24   They knew everything and they just let people in our community

25   get tortured to death year after year with us funding it.

1           You have to stop it.  I'm asking you to stop it.  Her

2    family is asking you to stop it.

3               THE COURT:  Are you finished?  Are you finished?

4               MR. SMOLEN:  Oh, I'm sorry, Judge.  Yes.

5          (The closing arguments of counsel were concluded)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3

4          I, Brian P. Neil, a Certified Court Reporter for the

5   Northern District of Oklahoma, do hereby certify that the

6   foregoing is a true and accurate transcription of my

7   stenographic notes and is a true record of the proceedings held

8   in above-captioned case.

9

10         I further certify that I am not employed by or related

11  to any party to this action by blood or marriage and that I am

12  in no way interested in the outcome of this matter.

13

14         In witness whereof, I have hereunto set my hand this

15  28th day of February 2023.

16

17

                                s/ Brian P. Neil
18                _____

19                     Brian P. Neil, RMR-CRR
                       United States Court Reporter

20

21

22

23

24

25