IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| Deborah Young, as Special Administrator of the Estate of Gwendolyn Young, Deceased, <br><br>　　　Plaintiff, <br><br>v. <br><br>Correctional Healthcare Companies, Inc. <br><br>　　　Defendant. | ) ) ) ) ) ) ) Case No. 13-CV-315-IDJ-JFJ ) ) ) ) ) |

## MEMORANDUM OPINION AND ORDER

Following a jury verdict in Plaintiff's favor, Defendant Correctional Healthcare Companies (CHC) filed a Rule 50(b) motion for judgment as a matter of law. Dkt. 732. Plaintiff has responded to the motion, and CHC has replied. For the following reasons, the motion is denied. But, in short, there was an avalanche of evidence presented to the jury that CHC's deliberate indifference caused the constitutional violations inflicted on Ms. Gwendolyn Young, resulting in her pain, suffering, and ultimately—and tragically—death.

## FACTS

The Court will not go into all the facts related to this case. Briefly, the decedent (Ms. Gwendolyn Young) was being held at the Tulsa County Jail following her conviction and pending her appeal. Ms. Young suffered from a myriad of medical issues. CHC contracted with the Tulsa County Jail to provide medical care for the inmates. During her time at the Tulsa County Jail, in addition to her other medical issues, including those related to her blood pressure, Ms. Young suffered a subdural hematoma. There is no dispute that this was the ultimate cause of her death, though her death was not the only claim presented to the jury. Ms. Young's daughter, Deborah Young (Plaintiff), filed this action alleging a variety of claims. Ultimately, the only claim that went to trial was Plaintiff's § 1983 claim against CHC under *Monell v. New York Department of Social Services*, 436 U.S. 658 (1978). Following a lengthy and difficult trial, the jury returned a verdict in favor of Plaintiff, awarding Plaintiff $14 million in compensatory damages, and $68 million in punitive damages for a total award of $82 million. Dkt. 707. Following the verdict, the Court entered judgment in Plaintiff's favor in the amount of $82 million. Dkt. 725.

1

The parties filed a raft of post-trial motions, including CHC's motion for judgment as a matter of law under Rule 50(b). Dkt. 732. This order addresses only that motion. The Court will address the other motions through separate orders, with their own separate analysis.

## STANDARD ON A RULE 50(b) MOTION

Rule 50(b) sets a high bar to obtain relief. *Archibald v. County of San Bernardino*, No. ED CV 16-01128, 2018 U.S. Dist. LEXIS 171243, at *10 (C.D. Cal. Oct. 2, 2018). Indeed, Rule 50(b) motions are cautiously and sparingly granted. *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir. 1996). When ruling on a motion for judgment as a matter of law, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-movant. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-50 (2000). The court does not make credibility determinations or weigh the evidence. *Id.* at 150. A court can only grant a Rule 50(b) motion when all of the record evidence shows that no legally sufficient evidentiary basis exists to support a claim under controlling law. *Bill Bennett Corp. v. TMC Realty Co.*, 918 F.3d 760, 766 (10th Cir. 2019). The question for the court is whether, after applying these principles, the only reasonable conclusion is that the verdict can't stand. *See Weese*, 98 F.3d at 547. The court's function is not to determine whether the jury believed the correct witnesses, but simply to assure that the jury was presented with a legally sufficient basis to support its verdict. *Harvey v. Off. of Banks & Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004).

## CONTENTIONS OF PARTIES

CHC argues that there was insufficient evidence to establish an underlying constitutional    violation. Dkt. 732, at 11. Next, CHC asserts the evidence failed to show causation—that it was not responsible for any violation, assuming one existed. *Id.* at 14. Finally, CHC contends that there was insufficient evidence for it to be found liable under what it calls "the *Crowson* exception." *Id.* at 21.

Initially, Plaintiff contends that because CHC's motion for summary judgment under Rule 56 and motion for judgment as a matter of law under Rule 50(a) were denied, this Rule 50(b) motion should be denied, too. Next, Plaintiff makes the overarching assertion that the record contains overwhelming evidence to support the verdict, relying in large part on the Tenth Circuit's decision in *Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019). Plaintiff then tackles CHC's specific arguments regarding the motion; namely, that sufficient evidence of an "underlying" constitutional    violation was presented, that Plaintiff met the more common way of establishing a *Monell* claim through constitutional    violations of CHC's employees, and that Plaintiff also established *Monell* liability under a "*Crowson* theory."

## ANALYSIS

**Introductory Matters**

Initially, the Court addresses two of Plaintiff's argument. First, the Court rejects Plaintiff's apparent argument that the denial of the previous motion for summary judgment and Rule 50(a) motion requires denial of this motion. Second, the Court rejects the wholesale application of *Burke* to the claims here as a basis to deny the motion.

Initially, the Court rejects Plaintiff's first contention despite its superficial appeal. There's no doubt that the standard for summary judgment motions under Rule 56 and motions for judgment as a matter of law under Rule 50(b) are basically the same. *Reeves*, 530 U.S. at 150. And, sometimes, because a court has seen the same evidence at the summary judgment stage and at trial, it might be inclined to deny the motion for judgment as a matter of law. *Johnson v. Breeden*, 280 F.3d 1308, 1318 (11th Cir. 2002). Indeed, the great District Judge Beth Bloom has done so after reviewing the evidence. *Artic Cat Inc. v. Bombardier Rec. Prods.*, No. 14-cv-62369, 2016 U.S. Dist. LEXIS 107654, at *10 (S.D. Fla. Aug. 15, 2016). But the mere denial of summary judgment does not mean that a motion for judgment as a matter of law must be denied. *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 772 (9th Cir. 1981); *Elliott v. Versa CIC, L.P.*, No. 16-cv-0288, 2019 U.S. Dist. LEXIS 16744, at *14-16 (S.D. Cal. Feb. 1, 2019); *Colton v. Cohen*, No. 10-cv-13073, 2015 U.S. Dist. LEXIS 73438, at *5-7 (E.D. Mich. Jun. 8, 2015). Indeed, Plaintiff's argument has been specifically rejected. *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000).

The Court will not deny the motion simply because summary judgment was denied. But CHC's arguments are reminiscent of those raised at summary judgment and at the close of Plaintiff's case. So, while not denying the motion simply based on the denial of summary judgment, the Court will not rehash all of the evidence requiring the denial of this motion but will address CHC's main points.

Again, the evidence at trial—even when viewed neutrally, not in the light most favorable to Plaintiff as this Court must do on this motion—was overwhelming.[1] In part, the Court allowed Plaintiff to establish her *Monell* claim with evidence of a similar constitutional violation—the death of Mr. Williams. Like Ms. Gwendolyn Young, Mr. Williams was accused by CHC staff of "faking" his medical condition and died because of CHC's actions and inactions. Mr. Williams died before Ms. Gwendolyn Young and yet CHC did *nothing* in response to prevent similar deaths. The video recording of Mr. Williams' death captures what can best be described as a slow-motion homicide. And, when questioned about the cause of

---

[1] A reasonable person might infer that this is why the jury returned a verdict in the amount of $82 million, $68 million of which was for punitive damages. A reasonable person might also infer that the verdict was, at least in part, the result of misconduct by Plaintiff's counsel, which is an issue the Court will address in a separate order.

Mr. Williams' death, CHC's former director of nursing at the Tulsa County Jail (Chris Rogers) testified that "the whole system" was responsible for Mr. Williams' death. The video recording of Ms. Gwendolyn Young gasping for breath while having a medical crisis is likewise painful to watch. And Plaintiff's expert witness' opinion that Ms. Gwendolyn Young would likely not have perished of the subdural hematoma had she been taken to a hospital's emergency room was unrebutted by CHC. Dkt. 683, at 10, 60, 68, 73, 81, 82. If the type and volume of evidence presented in this case doesn't establish a *Monell* claim, then the Court is unsure if a *Monell* claim could ever be established.

Next, Plaintiff spills much ink discussing the similarities between the claim in this case and the Tenth Circuit's opinion in *Burke*, which affirmed Mr. Williams judgment against the then-Sheriff of Tulsa County for his customs, policies, and practices of deliberate indifference to the health care of Tulsa County Jail inmates. CHC ignored the *Burke* decision in its opening brief and only cursorily distinguished the decision in its reply brief. Dkt. 746, at 1-2. Plaintiff's reliance on *Burke* is understandable. There is considerable overlap in the cases. Indeed, the claims addressed in *Burke* involved the death of Mr. Williams, and that incident was part of Plaintiff's *Monell* evidence in this case—a point CHC glosses over by unconvincingly contending Mr. William's death is "wholly inapplicable." Dkt. 746, at 2. Moreover, much of the same critical documentary evidence was introduced in both actions, including but not limited to, reports by Dr. Howard Roemer, Immigration and Customs Enforcement (ICE), and the National Commission on Correctional Health Care—all of which contained damning evidence against CHC, not just the Tulsa County Jail. For example, the ICE report found that the clinical staff (CHC) maintained a prevailing attitude of indifference. And, certainly, the Tenth Circuit's analysis in *Burke* is helpful not only as an overview of Eighth Amendment and *Monell* doctrines but also as to the actions and inactions occurring at the Tulsa County Jail during CHC's tenure. The Court will not use *Burke* in any way to estop CHC, but that decision certainly informs the Court's analysis.

**Applicable Law and Overview**

The two relevant legal concepts in this case and motion are the law of the Eighth Amendment and corporate (both municipal and private) liability under *Monell* for claims brought under 42 U.S.C. § 1983.

Eighth Amendment liability attaches when correctional officials—including private health care providers, *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003); *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 945-46 (10th Cir. 2005)—are deliberately indifferent. *Estate of Burgaz v. Bd. of Cnty. Comm'rs for Jefferson Cnty. Colo.*, 30 F.4th 1181, 1186 (10th Cir. 2022). Deliberate indifference has both an objective and subjective component. *Id.* To establish the objective component, the medical condition must be sufficiently serious. *Id.* The subjective component requires a showing of knowledge of and disregard for a sufficiently serious medical need. *Id.*

4

For *Monell* liability to attach, a plaintiff must establish that a custom, policy, or practice of a corporate body (municipal corporations, including local government officials sued in their official capacity, and private corporations) caused the constitutional violation. So, plaintiffs must show (1) an official custom, policy, or practice, (2) causation, and (3) deliberate indifference. *Burgaz*, 30 F.4th at 1189. Ordinarily, plaintiffs show a constitutional violation was inflicted by one of the defendants' agents; however, plaintiffs can also establish a claim of deliberate indifference under *Monell* when the sum of the corporation's agents' actions—not just a constitutional violation inflicted by a single agent's action or inactions—resulted in a constitutional violation. *Crowson v. Wash. Cnty. State of Utah*, 983 F.3d 1166, 1191 (10th Cir. 2020). This second way is unusual, but it is still a recognized way to prove an Eighth Amendment deliberate indifference claim against a private corporation providing medical care to inmates. *See Burton v. Ghosh*, 961 F.3d 960, 972 (7th Cir. 2020) (citing *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 278 (7th Cir. 2017)).

CHC refers to this second way of establishing *Monell* liability as an "exception." Dkt. 732, at 21-24. But it's not really an "exception," despite the Tenth Circuit's use of the word "exception." *Crowson*, 983 F.3d at 1191.[2] It is simply a different method of establishing *Monell* liability. At its core, *Monell* liability requires a finding of that the corporate body's custom, policy, or practice caused a constitutional violation. *See Crowson*, 983 F.3d at 1191; *Glisson*, 849 F.3d at 379. That two different roads lead to Rome does not make one an exception. It's simply a different route.

In this case, from jump, Plaintiff sought to establish *Monell* liability against CHC using both methods. And, at the close of the evidence, the jury was specifically instructed on both ways in which *Monell* liability could be established. Dkt. 727, 23-31. The jury found both ways were proven. More than sufficient evidence was introduced to support the jury's verdict.

Ms. Gwendolyn Young had serious medical conditions, not just the subdural hematoma that caused her death. CHC's care for her, which was based on its customs and practices, evidenced deliberate indifference. Ms. Gwendolyn Young's pain and suffering before her death were patently evident, even to an untrained eye. And the unrebutted expert testimony established that she likely would have survived had she been promptly taken to a hospital's emergency department but CHC possessed, among other things, a custom and practice not to send inmates to outside emergency departments despite the medical need to do so.

---

[2] To use antitrust law by way of example, this is similar to the "co-conspirator exception" to *Illinois Brick*. *See In re Deere & Co. Repair Serv. Antitrust Litig.*, 2023 U.S. Dist. LEXIS 210516, at *32 n.12 (N.D. Ill. Nov. 27, 2023). The attached moniker may be "exception," but the analysis is truly just the correct interpretation of Supreme Court precedent. *Id.*

**CHC's Specific Arguments for Judgment Are Meritless**

As previously noted, CHC makes three specific arguments in support of its motion. None have merit.

First, CHC argues that Plaintiff's claim is limited to Ms. Gwendolyn Young's death caused by the subdural hematoma. Dkt. 732, at 11-14. But this argument is based on a false premise. As Plaintiff notes, during trial, evidence was presented regarding Ms. Gwendolyn Young's myriad of serious medical conditions, which were shabbily treated or simply ignored, in part, because, per CHC's staff's apparent standard operating procedure, she was "faking." There is no doubt that Ms. Gwendolyn Young suffered for days because of these medical conditions, yet she was never sent to a hospital's emergency department. Plaintiff's claim was not based solely on the subdural hematoma, which caused her death. Plaintiff's claim was also based on the "treatment" or lack of it for her other medical conditions. As to the subdural hematoma, it's true that no specific CHC employee knew of it. But the evidence at trial established the reasonable inference that nobody knew of the subdural hematoma because she was ignored. For example, Dr. Adusei never saw Ms. Gwendolyn Young until she was basically dead. Moreover, Plaintiff's expert (Dr. Scott Allen[3]) testified that had Ms. Gwendolyn Young been taken to an outside emergency room for the myriad of medical issues she was suffering, she likely would not have died from the subdural hematoma. This unrebutted testimony fully supported one of Plaintiff's alleged deliberately indifferent customs and policies; namely, a pattern of failures to send inmates with obvious medical needs to the hospital. Dkt. 685. The jury instructions reflected that Plaintiff's claim was not limited to the death of Ms. Gwendolyn Young. So, when the jury considered the cornucopia of evidence introduced, and applied it to the jury instructions, they could easily and reasonably find she suffered a constitutional violation—one that was not limited to her tragic death.

Second, CHC argues that Plaintiff failed to establish a *Monell* claim because no specific agent of CHC violated Ms. Gwendolyn Young's constitutional right.[4]

---

[3] The undersigned has seen an untold number of "expert witnesses" (better referred to as "opinion witnesses") testify over the course of 30 plus years, including medical opinion witnesses. Dr. Allen was easily among the best opinion witnesses the undersigned has seen testify. His testimony was credible and easily understandable. And, importantly for this motion, his testimony was unrebutted. Dr. Allen's repeated and emphatic testimony was the Ms. Gwendolyn Young needed to be taken to a hospital's emergency department, and had that occurred, she likely would have survived. Dkt. 683, at 10, 24, 43, 58-60, 68, 73, 81-82.

[4] A sub-argument is that Plaintiff didn't present enough instances of deliberate indifference to establish a custom or practice. Dkt. 732, at 16. This sub-argument fails for at least two reasons. First, as Plaintiff notes, there's no specific number of violations she needs to prove to establish a practice or custom. *See Glisson*, 849 F.3d at 372. Second, CHC sought to limit the number of alleged constitutional violations, which the Court granted, limiting Plaintiff to Ms. Gwendolyn Young's "treatment" and the "treatment" of three other inmates. Dkt. 654, at 4-6; Dkt. 610. It takes a lot of chutzpah to argue that Plaintiff failed to prove a

But there was more than sufficient evidence for a reasonable jury to conclude that one of a number of CHC agents violated Ms. Gwendolyn Young's constitutional rights. And, in its verdict, the jury specifically found that fact. For example, Nurse Metcalf refused to send Ms. Gwendolyn Young for outside emergent medical care, when it was necessary. (Again, the jury was specifically instructed that this was one of the alleged unconstitutional customs and practices.) Dr. Allen testified that Dr. Adusei's actions and inaction were "very bad," "woefully inadequate," and "absolutely reckless." Nurse White's interaction with Ms. Gwendolyn Young was borderline criminal, at best. Ms. Gwendolyn Young told Nurse White that she had been vomiting blood for three days and had not eaten for three days. But, in response, Nurse White noted in the medical records that Ms. Gwendolyn Young was eating at appropriate times! What good is eating at appropriate times over the course of 72 hours if the patient regurgitates all of the food? Further, Nurse White failed to record vital signs or contact a physician. And, according to Nurse White, Ms. Gwendolyn Young was "faking"—apparently just like Mr. Williams was "faking." A reasonable jury could have found that any—or all—of these individuals violated Ms. Gwendolyn Young's rights. And this jury did.

      Third, CHC argues that Plaintiff failed to establish *Monell* liability under the "*Crowson* exception." Dkt. 732, at 21-24.[5] Under *Crowson*, plaintiffs can establish *Monell* liability for systemic failures in the delivery of medical care because of inadequate policies and procedures. *Crowson*, 983 F.3d at 1192. Despite CHC's refrain that there was no evidence of a systemic failure based upon inadequate policies and procedures, that's simply untrue. Again, one of Plaintiff's claimed alleged deficiencies of CHC was its refusal to send inmates with obvious medical needs to the hospital. Dkt. 685. CHC correctly admits that this was one of the policies and practices submitted to the jury to consider. Dkt. 732, at 15. But CHC's analysis completely ignores this policy and practice. The evidence established that Ms. Gwendolyn Young should have been sent to the hospital. Collectively, CHC's staff failed her in this regard. And, as a result, according to the unrebutted testimony of Dr. Allen, Ms. Gwendolyn Young perished. That's a systemic failure, which *Crowson* and similar cases are designed to address. Even CHC's own staff recognized that systemic failures caused the death of Mr. Williams. The evidence showed these same failures violated Ms. Gwendolyn Young's constitutional rights, too.

---

custom and practice because CHC successfully convinced the Court to limit evidence in this regard under Federal Rule of Evidence 403. CHC's argument also ignores the Roemer Report, among other reports.

[5] CHC argues seemingly for the first time in its motion that the "*Crowson* exception" is a mutually exclusive method to establish *Monell* liability. The Court is unaware of CHC raising this argument previously, and so, it is forfeited. *Passanti v. Cook County*, 689 F.3d 655, 660 (7th Cir. 2012); *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003). But even if it weren't forfeited, the argument has no merit. Alternative theories of liability are acceptable. *Boulware v. Baldwin*, 545 F. App'x 725, 729 (10th Cir. 2013); Fed. R. Civ. P. 8(d).

## CONCLUSION

CHC has failed to meet its high burden to establish that it is entitled to judgment as a matter of law. A reasonable jury presented with the volume and type of evidence presented at trial in this case could return a verdict in favor of Plaintiff on her *Monell* claim.

Entered: January 8, 2024                                    By: s/ Iain D. Johnston
                                                            Iain D. Johnston
                                                            U.S. District Judge