### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| Deborah Young, as Special Administrator of the Estate of Gwendolyn Young, Deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 13-CV-315-IDJ-JFJ |
| Correctional Healthcare Companies, Inc. | ) ) | |
| Defendant. | ) ) | |

### MEMORANDUM OPINION AND ORDER

Despite its desire to do so on occasion, unlike Mercutio, the Court can't simply declare a plague on both sides in litigation when deciding matters. In this case, Defendant Correctional Healthcare Companies (CHC) refuses to accept that its deliberate indifference killed people in its care. Also, in this case, Plaintiff's counsel (Daniel E. Smolen)[1] refuses to accept that his repeated, egregious misconduct throughout the course of the trial has jeopardized his client's verdict. As shown below, in an exercise of its discretion and after a thorough and careful analysis, the Court will not abandon its responsibility to decide who is right and who is wrong simply because both sides have engaged in reprehensible conduct.

The Court previously denied CHC's Rule 50(b) motion for judgment as a matter of law. Dkt. 748. As the Court found, there was an avalanche of evidence

---

[1] The Court's references to "Plaintiff's counsel" generally apply to Mr. Smolen, as he was the trial attorney. But references to "Plaintiff's counsel" as it relates to arguments in the response brief also include Robert M. Blakemore because he appears to be the main author. He was also the main author of the various and sometimes meritless written filings during trial.

presented to the jury that CHC's deliberate indifference caused the constitutional violations inflicted on Ms. Gwendolyn Young, resulting in her pain, suffering, and death.

But CHC's currently pending Rule 59(a) motion raises a different issue. Dkt. 733. Specifically, the issue before the Court is whether it is reasonably probable that the verdict was influenced by the misconduct of Plaintiff's counsel. *See Osterhout v. Bd. of Cnty. Comm'rs*, 10 F.4th 978, 991-92 (10th Cir. 2021). The short answer is both no and yes. Because of the overwhelming evidence as to CHC's liability, CHC's motion for a new trial as to liability is denied. Likewise, because of the overwhelming evidence, the Court will not grant a remittitur as to the jury's compensatory damage award of $14 million—which is consistent with the verdict in the strikingly similar case involving Mr. Elliot Williams. *Burke v. Regalado*, 935 F.3d 960, 980 (10th Cir. 2019); *see also* Verdict Form – For Plaintiff, *Burke v. Glanz*, No. 11 CV 720 (N.D. Okla. Mar. 20, 2017), Dkt. 498. But the Court finds that it is reasonably probable that the cumulative effect of Plaintiff's counsel's misconduct influenced the jury's punitive damages award. Plaintiff's counsel's misconduct was repeated and done with impunity throughout the trial in front of the jury, despite his unbelievable claims of innocence, claims he unfortunately perpetuates in response to CHC's motion. And the misconduct continued despite several warnings. Because of the cumulative effect of this misconduct, the Court grants, in part, CHC's request for a remittitur and reduces the punitive damage award to $7 million from $68 million. This $7 million reflects an amount equal to half of the

compensatory damages, and balances CHC's continued deliberate indifference to patients in its care against the Court's finding that Plaintiff's counsel's misconduct probably influenced the amount of punitive damages. The Court gives Plaintiff until March 26, 2024, to either accept this remittitur or to have a new trial limited to determining punitive damages. *See Sloan v. State Farm Mut. Auto. Ins. Co.*, 360 F.3d 1220, 1225 (10th Cir. 2004).

## FACTS

As previously stated in other orders, the Court will not detail all the underlying facts of this case. Briefly, the decedent (Ms. Gwendolyn Young) was detained at the Tulsa County Jail following her conviction and pending her appeal. Ms. Young suffered from a myriad of medical issues. CHC contracted with the Tulsa County Jail to provide medical care for the inmates. During her time at the Tulsa County Jail, in addition to her other medical issues, including those related to her blood pressure, Ms. Young suffered a subdural hematoma. There is no dispute that the subdural hematoma was the ultimate cause of her death, though her death was not the only injury presented to the jury. Ms. Young's daughter, Deborah Young-Powell (Plaintiff), filed this action alleging a variety of claims.[2] Ultimately, the only claim that went to trial was Plaintiff's § 1983 claim against CHC under a *Monell v. New York Department of Social Services*, 436 U.S. 658 (1978), theory.

---

[2] Nothing in this order should be construed in any negative way toward Ms. Young-Powell. She didn't do anything wrong. Indeed, she was a model party and a strong witness. Ms. Young-Powell presented to the jury as smart, kind, strong, and honest, and as a person anyone would be proud to call a friend or family member. Ms. Young-Powell comes across as a person everybody would want to have as a neighbor or co-worker. The Court has no reason to believe that this presentation was anything but accurate.

Following a lengthy and extremely difficult trial,[3] the jury returned a verdict in favor of Plaintiff, awarding Plaintiff $14 million in compensatory damages and $68 million in punitive damages, for a total award of $82 million.  Dkt. 707.  Following the verdict, the Court entered judgment in Plaintiff's favor in the amount of $82 million. Dkt. 725.

During trial, starting with jury selection, Plaintiff's counsel engaged in misconduct.  The misconduct continued through nearly every stage of the case, including closing arguments.  This misconduct included, but is not limited to, causing the exclusion of a prospective juror with gratuitous, inflammatory, and prejudicial statements; violating the Court's ruling on a motion *in limine* entered to prevent introduction of evidence that would violate Rule 403; crying in front of the

---

[3] Nearly all the trial difficulties were caused by Mr. Smolen, including trial delays.  The Court quotes the following portion of the transcript to give a sense of what the Court was dealing with.  This transcript selection relates to a portion in the trial after the Court had to terminate Mr. Smolen from proceeding despite giving Mr. Smolen more time than was allotted.  Instead of recognizing the Court's accommodation, Mr. Smolen pouted and vigorously objected.  Here's the Court's response:

> Look, Mr. Smolen, I don't know – look, this is my only experience with you and we've had problems from the get-go.  And I did start by giving you a time limit as to how long this case will last and everybody knows how long I am here in Tulsa.  So the case has to be tried within that period of time.  So at the start, I put you on notice that you had four days.  The case has been delayed repeatedly for multiple times for at times significant periods of time.  All those delays were because of your violations of court orders, your misbehavior, your unprofessionalism, your failure to provide even like the most basic modicum of professional courtesy to witnesses, to opposing counsel, and to the court.  So all those delays inured to you and harmed your own client.

Dkt. 694, at 145.  The Court continued, and in the process noticed that Mr. Smolen was ignoring the Court: "I even gave you more than the four days.  I got a bench warrant for you, got Ms. Metcalf here.  I repeatedly asked you throughout this case --- I'm glad you're not listening to me because you haven't listened to me the entire case."  The unrepentant Mr. Smolen shot back, "I'm listening."  *Id*.  The Court responded, "No you're not."  *Id*.

jury; reading from a hearsay document under the guise of refreshing recollection; failing to inform Plaintiff's opinion witness about the ruling on the motion *in limine*; allowing the jury to be exposed to a certificate of insurance for CHC; and improper remarks throughout closing arguments as well as during a witness examination. Rather than confessing error, Plaintiff's counsel doubles—and sometimes triples—down, contending that no errors occurred. Plaintiff's counsel is wrong. He committed multiple egregious errors that probably influenced the jury to return an excessive punitive damages award.

## STANDARD ON A RULE 59(a) MOTION

Unlike a Rule 50 motion, in determining a Rule 59(a) motion, the court does *not* view the evidence in light most favorable to the non-movant; instead, a motion for new trial may be granted when the district court concludes that the asserted error substantially and adversely affected the movant's rights. *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1217 (10th Cir. 2008). It's important to recognize the precise nature of CHC's motion for new trial under Rule 59(a). The motion is not simply a motion for new trial solely because the verdict was in favor of Plaintiff and that the damages were excessive because of evidentiary errors—although the motion argues that, too. *See, e.g.*, *Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d 651, 668 (10th Cir. 2016). Instead, CHC's motion also contends both that the jury reached the wrong result as to liability and that the compensatory and punitive damages were excessive because of Plaintiff's counsel's misconduct. *See* Dkt. 733, at 7, 32-35; *Osterhout*, 10 F.4th at 991-92; *Whittenburg v. Werner Enters., Inc.*, 561 F.3d 1122,

1127 (10th 2009).  According to CHC, the liability verdict and the damage awards are evidence of the misconduct, as well as the damages being excessive.  Dkt. 733, at 7, 32-35.  The excessiveness of the damage awards is itself evidence of the misconduct.  *Id.* at 32 (citing *Whittenburg*, 561 F.3d at 1132); *see Osterhout*, 10 F.4th at 992-93.  For this type of motion, the Tenth Circuit considers four factors: (1) the pervasiveness of the misconduct; (2) the taking of curative action; (3) the size of the verdict; and (4) the weight of the evidence.  *Osterhout*, 10 F.4th at 991-92; *Whittenburg*, 561 F.3d at 1127.  But regardless of the specific nature of the motion, the key is whether the movant suffered prejudice.  *Henning*, 530 F.3d at 1217; Fed. R. Civ. P. 61.

The decision to grant or deny a Rule 59(a) motion—including whether to grant a remittitur—is within the vast discretion of the district court.  *Voda v. Medtronic Inc.*, 899 F. Supp. 2d 1188, 1194 (W.D. Okla. 2012) ("The trial court has great discretion in deciding whether to grant such a motion.");  *see also Hill*, 815 F.3d at 668; *Henning*, 530 F.3d at 1217.  So, appellate courts review these decisions under the abuse of discretion standard of review. *FTC v. Chapman*, 714 F.3d 1211, 1215 (10th Cir. 2013); *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 762 (10th Cir. 2009).  Appellate courts give trial courts wide latitude in determining these motions because they are uniquely able to assess the likelihood that prejudice occurred.  *Henning*, 530 F.3d at 1217.

## MORE THAN A WORD ABOUT DISCRETION

Discretion is a zone, not a fixed point.  So, it is possible that two different judges faced with the same facts could reach opposite conclusions with neither one abusing their discretion. *United States v. Williams*, 81 F.3d 1434, 1437 (7th Cir. 1996); *see Bracey v. Grondin*, 712 F.3d 1012, 1020 (7th Cir. 2013) ("That other trial courts have reached different conclusions on similar facts, however, does not amount to an abuse of discretion by the district court in this case.  Indeed, discretion by its very nature permits different judges to reach different—but reasonable—conclusions on the same set of facts.").  This is particularly true with the discretionary decision to grant a new trial.  *See Williams*, 81 F.3d at 1437. These axioms of discretion sink Plaintiff's counsel's view that because he got away with engaging in similar shenanigans in the past, *see Osterhout*, 10 F.4th at 992-93; *Burke*, 935 F.3d at 1027-1035, his similar antics are insufficient to grant a new trial in this case.  *See Ledien v. Astrachan*, 128 F.3d 1051, 1056 (7th Cir. 1997) ("To disagree with the district court's decision and to find that the court abused its discretion are two different things.").

When a district court is applying its discretion, its decision stands provided it has a basis in reason.  *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 779 (7th Cir. 2010).  So, the inquiry becomes whether any reasonable person could agree with the district court's decision.  *Lho Chi. River L.L.C. v. Rosemoor Suites, LLC*, 988 F.3d 962, 967 (7th Cir. 2021).  An abuse of discretion occurs when a decision is arbitrary, capricious, or whimsical, involves a manifestly unreasonable judgment, prejudice,

7

bias, or ill will, or a failure to provide a reason for the decision. *Pelican Prod. Corp.*

*v. Marino*, 893 F.2d 1143, 1146 (10th Cir. 1990). An abuse of discretion can occur if

the district court fails to exercise meaningful discretion, commits an error of law, or

relies on clearly erroneous factual findings. *Farmer v. Banco Popular of N. Am.*,

791 F.3d 1246, 1256 (10th Cir. 2015); *see also Chamber of Com. of the U.S. v.*

*Edmondson*, 594 F.3d 742, 764 (10th Cir. 2010).

As shown throughout this order, this Court's decision is not arbitrary,

capricious, or whimsical; instead, the order is based upon reasoned judgment,

applying the proper legal standard and correct factual findings. That different

judges might exercise their discretion differently is of no moment. This judge—

having presided over the lengthy trial and having analyzed all the filings and case

law—exercises his discretion to deny the motion for new trial, deny the motion for

remittitur for the compensatory damages, but grant the remittitur for the punitive

damages.

## ALLEGATIONS AND FINDINGS OF MISCONDUCT

### Prefatory Comment to Determining Misconduct

As best as the Court can determine, Plaintiff's counsel approaches trial as

though rules and court orders are mere suggestions, possessing no real force or

consequences when they are violated. This approach leads to the view that counsel

can engage in misconduct with only a remote chance of consequences existing for

misbehavior. The mindset is this. Counsel can engage in misconduct, forcing

opposing counsel to decide whether to object or not object. If no objection occurs,

then the error is waived, but if an objection occurs that is sustained, then any prejudice is cured.  Under Plaintiff's counsel's theory, only misconduct for which an objection was overruled is preserved for appeal.  But as any experienced litigator knows, the likelihood of reversal based on evidentiary errors is as remote as rich men entering the Kingdom.  *Smith v. Great Am. Rests.*, 969 F.2d 430, 437 (7th Cir. 1992).

At least two consequences result from this mindset—both of which existed in this trial.  The first consequence is that counsel simply floods the zone with so much misconduct that opposing counsel is forced to (a) repeatedly object and look like an obstructionist, *see Teter v. Deck*, 274 P.2d 336, 344 (Wash. 2012), and maybe even seek a curative instruction, which likely does more harm than good by drawing the jury's attention to the evidence and argument, *see Laudicina v. City of Crystal Lake*, 328 F.R.D. 510, 517-18 (N.D. Ill. 2018), or (b) not object and allow prejudicial behavior to occur and prejudicial evidence to be presented to the jury to avoid looking like an obstructionist.  The second consequence is that jury trials look more like Thunderdome than a search for the truth.  And it is exhausting for trial judges to try to police what happens in Thunderdome.

Because of these consequences—as well as basic principles of ethics—the Rules of Professional Conduct prohibit conduct that results from this mindset.  R.P.C. 3.4(c), (e); 3.5(d).  In its discretion, the Court chooses not to refer Plaintiff's counsel to any disciplinary body.  But the Court hopes Plaintiff's counsel changes his mindset before different judges exercise their discretion differently.  Counsels'

misconduct eventually catches up with them.  *See, e.g.*, *United States v. Drummond*, 481 F.2d 62, 62-63 (2d Cir. 1973).  Plaintiff's counsel's "games," like those he engaged in during this trial, have been noted by other jurists.  Dkt. 733-1, at 46.  In other words, this Court is not alone in being subjected to Plaintiff's counsel's misbehavior and finding it unacceptable, improper, and unprofessional.

Nevertheless, the Court doesn't believe that Plaintiff's counsel should benefit from this mindset and concomitant behavior.  Again, sound discretion provides the best answer.  The evidentiary waiver rule is discretionary. *First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*, 902 F. Supp. 1356, 1361 (D. Kan. 1995).  Sure, the failure to object *generally* waives the error.  *Abernathy v. Wendes*, 713 F.3d 538, 552 (10th Cir. 2013).  But, in the Court's discretion, the Court can still find error and resulting prejudice despite the failure to object.  *First Sav. Bank*, 902 F. Supp. at 1361; *see Cadorna v. City & County of Denver*, 245 F.R.D. 490, 495 (D. Colo. 2007); *see also A.H. v. Knowledge Learning Corp.*, No. 09-2517-DJW, 2010 U.S. Dist. LEXIS 111242, at *8-9 (D. Kan. Oct. 19, 2010) ("[T]he general rule is that the failure to object to requests for production within the time required constitutes a waiver of any objection.  Thus, a court 'generally overrules objections which are untimely.' Courts, however, have held that waiver is not automatic, and it is within the court's discretion to examine the circumstances surrounding the objections and determine whether the waiver should be excused based on good cause or excusable neglect."); 12 James Wm. Moore et al., *Moore's Federal Practice* § 59.13[2][c][i][C] (3d ed. 2023) ("However, older authority suggests that the failure to make a timely objection does

not automatically dispose of a new trial motion if a miscarriage of justice . . . results from the misconduct."). And, of course, the Court can still find prejudice despite curative actions, such as sustaining objections and instructing the jury to disregard the evidence or argument. *Caudle v. District of Columbia*, 707 F.3d 354, 363 (D.C. Cir. 2013); *see, e.g.*, *United States v. Sullivan*, 919 F.2d 1403, 1425-26 n.32 (10th Cir. 1990); *Cadorna*, 245 F.R.D. at 495; *see also Teter*, 274 P.3d at 344; *Underwood v. Penn. R.R. Co.*, 215 N.E.2d 236, 238 (Ill. 1962) ("While the trial court did sustain recurrent objections to the above questions, their prejudicial effect scarcely can be thought to be erased by this action."). So, in its discretion, the Court will be more forgiving when considering misconduct for which there was no objection.

## Findings of Misconduct

Before the Court can conduct an analysis of whether a motion for new trial or remittitur should be granted based on counsel's misconduct, there must be factual findings whether misconduct occurred, and if so, the extent of the misconduct. In its motion, CHC complains of numerous instances of misconduct. The Court finds that some of the complained of misconduct was not, in fact, misconduct, and that no prejudice occurred because of other misconduct.[4] But, as evidenced in the following

---

[4] For example, CHC complains about what can best be described as an attempted violation of the Court's ruling on the motions *in limine*. But no violation occurred because the inquiry was stopped by the Court before the question was asked. Additionally, CHC complains of Plaintiff's counsel's misconduct during jury selection. Specifically, at a side bar examination of a prospective juror, Plaintiff's counsel made the gratuitous, improper, and unprofessional statement to the juror that the former Tulsa County Sheriff was indicted based on the treatment of inmates at the Tulsa County Jail. Obviously, this juror was tainted by that remark and had to be excused. But no prejudice occurred as a result of

11

analysis, the Court finds numerous instances of misconduct, including but not limited to those discussed below.  Although standing alone, the incidents of misconduct *might* not require a new trial or remittitur, the Court must view the misconduct collectively—a point Plaintiff's counsel completely ignores.  *Osterhout*, 10 F.4th at 993; *Burke*, 935 F.3d at 1034; *see Locken v. United States*, 383 F.2d 340, 341 (9th Cir. 1967); *see generally United States v. Vaughn*, 62 F.4th 1071, 1072 (7th Cir. 2023) ("One persistent error in legal analysis is to ask whether a piece of evidence 'by itself' passes some threshold—to put evidence in compartments and ask whether each compartment suffices.").  When a counsel engages in persistent, unabated, and egregious misconduct, in the face of multiple warnings, a court is well within its discretion to grant a motion for new trial.  *See Cadorna*, 245 F.R.D. at 495-96.

### Violations of the Court's Ruling on a Motion *in Limine*

As previously stated, the only claim that was tried to the jury was Plaintiff's *Monell* claim.  Among the elements that a plaintiff must prove to establish a *Monell* claim is that the defendant possessed a policy, custom, or practice, which was the

---

this misconduct.  The parties and the Court were able to select an excellent juror in his place.  Indeed, this juror—the only African American juror—became the foreperson of the jury.  This juror was fully engaged, filling at least one notebook with entries and asking insightful questions of nearly every witness.  Plaintiff's counsel's misconduct may have resulted in obtaining an extra peremptory challenge, but a fair jury resulted from the selection process, which is the goal of jury selection.  *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). Although the Court doesn't find these and other instances to be worthy to base a new trial or remittitur on, these behaviors certainly inform the Court's views of Plaintiff's counsel's intent and mindset, supporting this Court's findings of Plaintiff's fast-and-loose litigation behavior.  His conduct started with jury selection and opening statements and continued through closing argument, *despite the Court's repeated warnings on nearly a daily basis***.**

moving force behind the plaintiff's constitutional violation.  *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404-07 (1997).  Very few defendants possess a policy to violate citizens' constitutional rights.  *Grech v. Clayton County*, 335 F.3d 1326, 1330 (11th Cir. 2003).  Instead, these days, most *Monell* claims allege constitutional violations caused by a custom or practice.  *Id.*  Custom and practice claims are normally based upon repeated violations of constitutional rights.  *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  This requires a plaintiff to prove up the other constitutional violations as well as the plaintiff's own claim.  *Id.*

The confluence of these factors puts the district judge in a bit of a pickle.  The district judge must allow the plaintiff to prove up the claim while also attempting to avoid the admission of relevant evidence that is substantially outweighed by undue prejudice.  Fed. R. Evid. 403.

In this case, the Court balanced these competing interests and allowed Plaintiff to present evidence on three other matters.  Dkt. 654, at 4-6.  In doing so, the Court was fulfilling its duty under Federal Rule of Evidence 103(d) to conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means.  Fed. R. Evid. 103(d).

CHC was understandably concerned about the jury learning of other *litigation* against it as being irrelevant, unduly prejudicial, or bad character evidence.  Fed. R. Evid. 401, 403, 404(b).  So, CHC filed a broad motion *in limine* to exclude this type of information from being presented to the jury.  Dkt. 610, at 4-5.  In relevant part, CHC's motion stated the following:

13

It would be a violation of the Federal Rules of Evidence to put evidence of other lawsuits and other conduct of any of the Defendants into this case. * * * Accordingly, Defendants urge this Court for a ruling prohibiting Plaintiff from forcing Defendants to defend against other *unrelated litigation* at this trial, as this would constitute trial by ambush. *Allowing Plaintiff, Plaintiff's counsel, or Plaintiff's witnesses to introduce evidence of other litigation (**including but not limited to** separate, unrelated cases filed against these defendants,* such as the cases of Elliott Williams, Gwendolyn Young, Gregory Brown, Bridget Revilla, Michael Moritz, Charles Jernegan, and Charles Ray) would distract the jury from the issues at hand, would confuse the jury as to what the claims are in this action, and would effectively allow Plaintiff's counsel to put forth evidence from their *highly publicized and high profile unrelated litigation*, in an improper attempt to sway and inflame the jury in the instant action against the defendants.

*Id.* (emphasis added).  CHC's concern appeared to be based, at least in part, upon its counsel's dealings with Mr. Smolen in other cases in which CHC's counsel believed Mr. Smolen engaged in misconduct.  Dkt. 733-1, at 86.  CHC's concern proved to be justified.

Plaintiff's response didn't address the specifics of CHC's motion.  Instead, it generally argued that evidence of other violations was necessary to establish a *Monell* claim.  Dkt. 613, 8-11.  Indeed, even after analyzing Plaintiff's counsel's response, the Court was unsure of exactly what Plaintiff's counsel was seeking to present to the jury.  Dkt. 654, at 3-4. Being evasive is not a virtue when addressing a court.  Indeed, it is a sign of a lack of candor.

In fulfilling its responsibility to ensure that inadmissible evidence was not "suggested to the jury by any means," the Court granted, in part, CHC's motions *in limine* to exclude claims or lawsuits against CHC.  *Id.*  Specifically, as to other *litigation*—in contrast with evidence of other conduct—the Court recognized the undue prejudice can arise from this type of evidence.  So, the Court ordered that, "If

14

the plaintiff seeks to produce evidence of *other litigation*, she must first raise [the] issue with the Court and other counsel outside the presence of jurors to explain the relevance of *the litigation* itself." *Id.* at 4.

It should go without saying that violating a court's order on a motion *in limine* is error. Repeatedly violating a court's order on a motion *in limine* amounts to misconduct that can result in a new trial. *French v. Clarksville Stave & Lumber Co.*, No. 11-386, 2014 U.S. Dist. LEXIS 6871, at *12 (E.D. Ky. Jan. 20, 2014) ("[I]f counsel repeatedly violates the court's *in limine* ruling and such misconduct results in prejudice, there may be a basis for a new trial."); *Teter*, 274 P.3d at 344; *Cody v. Mustang Oil Tool Co.*, 595 S.W.2d 214, 216 (Tex. Civ. App. 1980); R.P.C. 3.4(c).

In its motion for new trial, CHC argues that Plaintiff's counsel violated the Court's ruling on the motion *in limine* at least three times: (1) in opening statements, (2) in making an objection, and (3) allowing Plaintiff's opinion witness to reference other litigation. Dkt. 733, at 10-14.

## Opening Statement Violation

After the Court had already scolded Plaintiff's counsel for his misbehavior during jury selection and the jury was finally empaneled, opening statements began. And it didn't take long for Plaintiff's counsel to violate the Court's ruling. During opening statements, Plaintiff's counsel told the jury the following: "The first reason this promise was made in 2012 was because that in 2010 and 2009 there were a rash of deaths in the Tulsa County Jail and the Tulsa County Sheriff's Office's risk manager, a gentlemen by the name of Josh Turley, and *the Tulsa*

15

*County DA's Office took note of a very public suit in Oklahoma County where CHC was being sued by the Oklahoma County Sheriff's Office.*"   Dkt. 674, at 8.

Defense counsel immediately objected.  A side bar quickly ensued.

At the side bar, Plaintiff's counsel gave a bizarre and incredible argument as to why he had not, in fact, violated the Court's order on the motion *in limine*.  In response to the motion for mistrial, Plaintiff's counsel again doubles down and reiterates the same silly interpretation of the Court's order.  According to Plaintiff's counsel, the Court's order was limited to "inmate lawsuits."  This reading isn't reasonable and can't be squared with the wording of the Court's order: "If the plaintiff seeks to produce evidence of *other litigation*, she must first raise [the] issue with the Court and other counsel outside the presence of jurors to explain the relevance of *the litigation* itself."  Dkt. 654, at 4 (emphasis added).  Nothing whatsoever limits the order in any way to "inmate lawsuits."  And, when put in context of the motion *in limine* itself with its concern about and attempt to exclude other litigation including but not limited to several other cases as well as highly publicized and high-profile unrelated litigation, Plaintiff's counsel's view is even more comical.

The Court sustained the objection and instructed the jury that opening statements were not evidence, but not before expressing its displeasure to Plaintiff's counsel that the case "started with a skunk in the jury box."  Dkt. 674, at 15; *Cardorna*, 245 F.R.D. at 495 ("Stated differently, 'you can throw a skunk into the

jury box and instruct the jurors not to smell it, but it doesn't do any good.'" (quoting *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1309 (5th Cir. 1977)).

Telling the jury in the opening statement about the high-profile Oklahoma County Sheriff's Office's litigation against CHC that caught the attention of the Tulsa County Sheriff's Office and the Tulsa County DA's Office was a patent violation of the Court's order on the motion *in limine* prohibiting evidence of *other litigation* without first raising the issue with the Court and defense counsel outside the presence of the jury. Sustaining the objection and instructing the jury was an insufficient cure, especially when Plaintiff's counsel continued to violate the Court's order. *Cardorna*, 245 F.R.D. at 495. No reasonable attorney would think that the Court's order gave carte blanche to Plaintiff's counsel to tell the jury in opening statements about this *other litigation* because it was not an "inmate lawsuit."

### Objection Violation

Undeterred by the Court's vivid warning, Plaintiff's counsel again violated the Court's ruling on the motion *in limine* with a gratuitous, prejudicial speaking objection in front of the jury. Plaintiff's counsel's action in this regard not only violated a specific Court order but also violated established rules of professional trial advocacy. *See, e.g., Cardorna*, 245 F.R.D. at 492-93 (granting motion for new trial in part based upon counsel's editorial comments made during objections); *Howard v. Offshore Liftboats, LLC*, Nos. 13-4811, 13-6407, 14-1188, 2016 U.S. Dist. LEXIS 64837, at *1-13 (E.D. La. May 17, 2016). This was a misconduct twofer.

Again, the Court's order on the motion *in limine* stated "If the plaintiff seeks to produce evidence of *other litigation*, she must first raise [the] issue with the Court and other counsel outside the presence of jurors to explain the relevance of the litigation itself." Dkt. 654, at 4 (emphasis added).  But during cross examination of one of Plaintiff's witnesses, the following exchange occurred:

> CHC's counsel: How many times did you meet with plaintiff's office to discuss your findings, your interpretation, your opinion, your testimony, anything like that?
>
> Mr. Smolen: Objection just as to time frame.  *She's testified in two cases.*

Dkt. 682, at 88-89 (emphasis added).

Again, CHC's counsel objected based on the Court's ruling on the motion *in limine.*  And, again, the Court held a sidebar and once again told Plaintiff's counsel that he needed to be more careful, giving yet another warning—this time highlighting the possibility of a mistrial.  The Court also instructed Plaintiff's counsel on Trial Advocacy 101, telling him not to make speaking objections, especially ones that violate a court's pretrial ruling.

As to the gratuitous speaking objection in which Plaintiff's counsel told the jury about two other cases—which is "other litigation"—Plaintiff's counsel basically ignores that this was problematic.  Plaintiff's counsel is wrong in this regard.  *White v. McKinley*, No. 05-0203-CV-W-NKL, 2009 U.S. Dist. LEXIS 30244, at *10 (W.D. Mo. Apr. 6, 2009) ("Speaking objections serve to pollute the trial with improper argument, coaching of witnesses, and jury confusion.").  Speaking objections like this are improper and unprofessional.  *United States v. Clay*, No. 22-1841 KG, 2023 U.S. Dist. LEXIS 73771, at *3 (D. N.M. Apr. 25, 2023) (["C]ounsel should not make

18

speaking objections.").  Plaintiff's counsel claimed to have tried cases in federal courts all over the country, yet he also claimed to be ignorant about this basic trial advocacy principle.  One doesn't even need to try cases all over the country to know that speaking objections are improper.  As nearly every law student who takes trial advocacy knows, Professor Mauet instructs students that they must not engage in speaking objections. *See* Thomas A. Mauet, *Trial Techniques and Trials* § 10.9 (10th ed. 2017) ("Making a speaking objection with the jury listening is by itself improper."). Not surprisingly, this instruction is backed up by case law from across the country.  *See, e.g.*, *Cole v. Hutchins*, No. 4:17-cv-553-DPM, 2021 U.S. Dist. LEXIS 115767, at *3 (E.D. Ark. Jun. 22, 2021) ("Avoid speaking objections during the trial."); *R.D. v. Shohola, Inc.*, No. 3:16-CV-01056, 2019 U.S. Dist. LEXIS 199839, at *11 (M.D. Pa. Nov. 19, 2019) ("[C]ounsel's statement when making objections should be succinct and verbally economical, stating the basis of the objection and nothing more."); *In re EpiPen*, No. 17-md-2785-DDC-TJJ, 2018 U.S. Dist. LEXIS 210972, at *24 (D. Kan. Dec. 14, 2018) ("The court wouldn't tolerate a speaking objection like this one during a trial."); *Guar. Co. v. Wall*, No. EDCV 13-1893-GW(OPx), 2013 U.S. Dist. LEXIS 202466, at *12 (C.D. Cal. Oct. 22, 2013) ("<u>No speaking objections.</u> If an attorney wishes to make an objection, say the word 'objection' and the word or phrase that delineates its basis (e.g. 'hearsay,' 'lack of foundation,' etc.)." (emphasis in original)).  As with other warnings throughout the trial, the Court had to instruct Plaintiff's counsel more than once against making speaking objections.  Dkt. 747-2, at 3; Dkt. 682, at 88.  Indeed, these other warnings

occurred after nearly identical conduct.  Dkt. 747-2, at 3.  The fact that Plaintiff's counsel's speaking objection additionally violated the Court's ruling on the motion *in limine* only makes it more improper.

As to violating the motion *in limine* order, Plaintiff's counsel makes two arguments.  Neither is persuasive.  First, Plaintiff's counsel contends that Mr. Smolen's improper speaking objection was too vague to have violated the order. This argument is an attempt to sanitize the record in this case.  In the context of this particular witness in Plaintiff's case-in-chief, Plaintiff's counsel's speaking objection allowed the jury to infer that there was other similar litigation.  It was his witness, whom Plaintiff's counsel had clearly used before against CHC in other litigation.  A simple, proper objection along the lines of "Objection.  Foundation. Time frame." would have addressed any concern.  It was improper to include the gratuitous "She's testified in two cases."

Plaintiff's counsel's second argument again ignores his misbehavior.  Instead, Plaintiff's counsel attempts to shift the blame to CHC's counsel for using the term "cases" in questioning a witness.  Plaintiff's argument is meritless for several reasons.  First, Plaintiff's counsel misconstrues and attempts to sanitize the record, again.  Plaintiff's counsel focuses on CHC's counsel's (Mr. Chapman) use of the word "case" in questioning a witness.  Mr. Chapman's questioning of the witness did, in fact, use the word "case."  But context matters.  Mr. Chapman's questioned the witness about his investigation into two incidents.  In context, the term "case" meant this particular witness' investigation of incidents.  Unlike Mr. Smolen's

improper speaking objection, which obviously referenced litigation, Mr. Chapman's use of the word "case" did not indicate litigation.  Next, Plaintiff's counsel makes what can best be described as a "reverse opening the door" argument.  Initially, the purpose of allowing evidence after a party "opens the door"—correctly referred to as "curative admissibility"—is to cure the introduction of inadmissible evidence by a party.  *United States v. Regents of N.M. Sch. of Mines*, 185 F.2d 389, 391 (10th Cir. 1950).  Curatively admissible evidence allows a party to rebut a false impression created by the introduction of inadmissible evidence.  *Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60, 66 (2d Cir. 1998). It's a rule of fairness.  *United States v. Morales-Quinones*, 812 F.2d 604, 610 (10th Cir. 1987).  Here, it was Plaintiff's counsel who introduced inadmissible evidence through his own speaking objection.  CHC was the prejudiced party in these circumstances.  To allow an equitable concept to benefit the party who engaged in misconduct turns the rule on its head.  And, again, the Court had just sustained an objection, held a sidebar, and instructed the jury to disregard Plaintiff's counsel's improper statement in opening that violated the same pretrial ruling.  On the heels of that event, Plaintiff's counsel then told the jury about the other "two cases."  And, to the extent the concept of "opening the door" even applies, just because a party cracks open the door doesn't mean the other side gets to drive a truck through it.  *Baer v. Neal*, 879 F.3d 769, 787 (7th Cir. 2018).  Finally, of course, the Court's order barred Plaintiff from introducing evidence, not CHC.  Mr. Chapman wasn't violating the pretrial ruling.

And, as Plaintiff's counsel does repeatedly, he argues that this one particular error didn't prejudice CHC. But the Court doesn't look at each violation in isolation. It's the cumulative effect of Plaintiff's counsel's misbehavior that is the focus. *Osterhout*, 10 F.4th at 993; *Ventura v. Kyle*, 825 F.3d 876, 886 (8th Cir. 2016) (granting new trial based upon cumulative effect of counsel's misconduct); *Whittenburg*, 561 F.3d at 1133 (same); *Cadorna*, 245 F.R.D. at 491 (considering the totality of the circumstances in granting a new trial based upon counsel's misconduct).

### Opinion Witness Violation

At this point, a reasonable attorney would've been very circumspect about the Court's order on the motion *in limine*. But Plaintiff's counsel wasn't. Violating rudimentary aspects of trial preparation, he failed to inform his opinion witness about the Court's rulings on the motions *in limine*. As a result, the opinion witness—through no fault of his own—violated the Court's order during the following exchange:

> Mr. Smolen: How many cases have you given expert opinions in?
>
> Dr. Allen: Well, so the cases that sort of made it furthest, there was the Williams case with you then and there was these cases but centering today on Ms. Young.

Dkt. 684, at 623.

Again, CHC's counsel objected, and the jury was removed from the courtroom. After admitting that the Court had told him at least four times that he needed to be careful, Plaintiff's counsel claimed he was trying to be—even though

he never showed the opinion witness the order or explained the order prohibiting

testimony regarding other litigation.[5]

Counsel have a duty to inform witnesses of court rulings on motions *in limine*

before the witnesses testify. *State v. Santos-Vega*, 321 P.3d 1, 11 (Kan. 2014) ("The

importance of compliance with orders *in limine* has been underscored by our

caselaw imposing a duty on prosecutors to instruct their witnesses about the

existence and contents of such orders as a guard against improper testimony."); *see*

*People v. Phillips*, 291 Cal. Rptr. 3d 8, 49-50 (Cal. Ct. App. Cal. 2022); *see also* David

Hricik, *Agnor's Georgia Evidence* § 14.2 (Nov. 2023) ("When a trial court grants a

motion *in limine* to exclude evidence from trial, the lawyers have a duty to inform

their clients and witnesses of the court's ruling so they will not violate the order by

mentioning the evidence in front of the jury during their testimony."). And, with

witnesses who are clients, the duty to inform them of pretrial rulings is also found

in the Rules of Professional Conduct.  R.P.C. 1.4.  The failure to properly prepare a

witness can be an ethical violation.  ABA Comm. on Ethics & Pro. Resp., Formal Op.

508 (2023) ("Many would condemn a lawyer's failure to prepare a client or witness.

Failure to do so competently or diligently can constitute an ethics violation.").

Sometimes, courts will remind counsel of their responsibility to inform witnesses of

pretrial rulings on motions *in limine*.  *State v. Hughes*, 451 A.2d 372, 374 (N.H.

1982) ("[W]e would nevertheless caution prosecutors to take all such steps as are

---

[5] The irony is not lost on the Court that Plaintiff's counsel castigates CHC for misconduct by, in part, failing to correct behaviors after being placed on notice, yet Plaintiff's counsel himself continued to engage in misconduct despite numerous warnings and instructions to be careful.

necessary to prepare their witnesses in advance of trial to prevent the presentation, in the presence of the jury, of facts excluded by pretrial order."). And, occasionally, some judges—like the great Magistrate Judge Sidney I. Schenkier—will even go so far as to include language in the order on the motion *in limine*. *See, e.g.*, *Rothwell v. City of Chicago*, No. 10 C 1338, 2011 U.S. Dist. LEXIS 125413, at *12-13 (N.D. Ill. Oct. 31, 2011) ("All counsel are responsible for advising witnesses of these rulings, and to take all reasonable steps to ensure that the witnesses do not offer testimony or comment on any matters barred by these rulings."); *Zitzka v. Village of Westmont*, No. 07 C 949, 2011 U.S. Dist. LEXIS 115922, at *35 (N.D. Ill. Oct. 7, 2011) (same); *Nichols v. Johnson*, No. 00 C 7785, 2002 U.S. Dist. LEXIS 7745, at *23 (N.D. Ill. May. 1, 2002) (same); *see also Shelangoski v. Rexco Equip.*, No. 20-cv-56-MR, 2021 U.S. Dist. LEXIS 210875, at *5 (N.D. Iowa Oct. 1, 2021). Counsel sometimes even stipulate to their responsibility to inform witnesses of pretrial evidentiary rulings. *See, e.g.*, *Apodaca v. Eaton Corp.*, No. 2:20-cv-01064-TL, 2023 U.S. Dist. LEXIS 32384, at *6 (E.D. Wash. Feb. 27, 2023). But, truly, none of this should be necessary.[6] What's the point of a court entering pretrial rulings on evidentiary issues if counsel don't inform the witnesses about the scope of their testimony? How else would the process work? Are witnesses somehow to divine pretrial rulings on motions *in limine* before they hit the witness stand? Requiring

---

[6] The undersigned's good friend and former law partner, Jeremy Margolis, often preached the concept that there are certain things in life that go without saying. For example, according to Jeremy, people should not have to be told not to build fires in their living rooms nor should they have to be told not to put spaghetti in their pockets.

counsel to inform witnesses of pretrial rulings on motions *in limine* is based not only on common sense but also on counsel's various ethical duties.

The opinion witness' response referenced "the [Elliot] Williams *case* with you" and "there was these *cases*." Dkt. 684, at 623 (emphasis added). By this point in the trial, the jury had heard evidence regarding Mr. Williams. But the Court had repeatedly attempted—through the ruling on the motion *in limine* and other actions—to prevent the jury from hearing about *litigation* relating to that event. Those efforts were incinerated by the opinion witness' response. Likewise, the Court had barred evidence of *other litigation* from being presented to the jury, but the opinion witness' response referenced "these cases," allowing the jury to draw the inference that *other litigation* against CHC had been filed. Again, the opinion witness is not to blame in this regard. The duty and responsibility rested with Plaintiff's counsel, who recognized that he was already on "thin ice." Despite the ice cracking under his feet, Plaintiff's counsel did not take reasonable—or even minimal—efforts to inform the opinion witness about the Court's pretrial ruling. That's misconduct. And it's misconduct that prejudiced CHC.

In response, Plaintiff's counsel again ignores, deflects, and shifts blame. Plaintiff's counsel repeats his same meritless argument regarding CHC's counsel's reference to "case" and the related "reverse opening the door" contention. These arguments are just as hollow in this context.

In his response brief, Plaintiff's counsel also claims that "[t]he Court recognized that there was no intent to violate the *in limine* Order on Mr. Smolen's

25

part."  In at least two ways, this is categorically wrong and misrepresents what the Court stated.  The Court never recognized that Mr. Smolen lacked the intent to violate the order.  First, the Court stated that there was no intent *by the witness*— Dr. Allen—to violate a court order.  He couldn't have the intent because Plaintiff's counsel failed his basic responsibility to inform Dr. Allen of the order and instruct Dr. Allen of the contents of the order.  Second, the Court stated that it *understood* Plaintiff's counsel's argument that he claimed there was no intent.  Dkt. 733-1, at 46.  The Court did *not* state that it found Plaintiff's counsel lacked intent.[7]  Indeed, because of the record of Plaintiff's counsel's misconduct generally and specifically with regard to the ruling on the motion *in limine* a reasonable person could easily draw the inference that Plaintiff's counsel intended for Dr. Allen to testify about other litigation in violation of the Court's pretrial ruling.  Plaintiff's counsel's misrepresentation of the record is just more evidence of his mentality that he can play fast and loose in litigation without any significant consequence.  It takes a significant amount of temerity to misrepresent a judge's statements to the very same judge.

Plaintiff's counsel also assumes that the jury already knew that litigation resulted from Mr. Williams' death.  Of course, there's no evidence to support that assumption.  But even if that assumption were correct, then this assumption means that the jury's verdict was based upon evidence not introduced—indeed, that was

---

[7] Just because the Court *understands* an attorney's argument *doesn't* mean the Court *agrees* with it or that the Court will grant a motion based on the argument.  Indeed, the Court also told CHC's counsel that it understood some of their arguments but nevertheless denied CHC's motion based on those arguments.  *See, e.g.*, Dkt. 733-1, at 37.

specifically prohibited from being introduced—at trial, which would be a basis to grant a new trial.

Having addressed these instances of misconduct, it is reasonable to draw the inference that Plaintiff's counsel simply disagreed with the Court's pretrial ruling. So, he decided to ignore it. And that inference is reasonable even in light of his repeated feigned apologies and his inaccurate assertions that he didn't violate court orders.

### Plaintiff's Counsel's Crying

Another basis for CHC's motion for a new trial was Plaintiff's counsel's alleged crying during trial. Before the Court can even address the legal issue, it must first define "crying" and then resolve the factual dispute of whether Plaintiff's counsel cried—as properly defined—during trial.

Like nearly every issue in this litigation, the parties dispute the meaning of "crying." CHC's view is that "crying" is to shed tears because of sadness. In contrast, Plaintiff's counsel's view is that "crying" means bawling. In Plaintiff's brief, her counsel even go so far as to put "cry" in quotation marks. CHC's counsel's definition is more accurate.[8] Plaintiff's counsel's attempt to define the term misunderstands the concept of subsets. Bawling is a type of crying.[9] All bawling is

---

[8] *See, e.g.*, *Cry*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/cry (last visited Feb. 27, 2024); *Cry*, Merriam-Webster, https://www.merriam-webster.com/dictionary/cry (last updated Feb. 22, 2024).

[9] The definition for "bawl" even includes the word "cry." *See Bawl*, Merriam-Webster, https://www.merriam-webster.com/dictionary/bawl (last updated Feb. 22, 2024).

crying, but not all crying is bawling.  Having said that, Plaintiff's counsel was not bawling.  The factual issue is whether he was crying.

CHC points to three instances when it believes Plaintiff's counsel cried or almost cried before the jury.  In making these factual findings, the Court is at a disadvantage because it was difficult to see Plaintiff's counsel's face.  But what was said and not said when the issue arose sheds light on whether Plaintiff's counsel was, in fact, crying.  One alleged instance of crying occurred during opening statements.  An occurrence of "almost crying" happened during closing arguments.  And the third instance of almost crying allegedly occurred when Plaintiff's counsel examined Ms. Young-Powell.

After opening statements, CHC's counsel objected and asserted that Plaintiff's counsel "appeared to be . . . almost crying."  Plaintiff's counsel denied "crying."  But then Plaintiff's counsel *admitted* that he may have had a tear in his eye.  In response to the motion for new trial, Plaintiff's counsel again twice admitted to having "a tear in his eye."  Plaintiff's counsel also didn't dispute having a tear in his eye when he was later confronted about crying.  Dkt. 747-2, at 9.  So, at a minimum, Plaintiff's counsel admitted to having a tear in his eye during opening statements.  That's crying.

During closing arguments, after already warning Plaintiff's counsel about controlling his emotions so as to not cry, on its own, the Court attempted to intercede so that the jury would not be exposed to Plaintiff's counsel's tears.  In its motion, CHC notes that Plaintiff's counsel was on the edge of tears.  CHC doesn't

assert that Plaintiff's counsel cried in closing arguments.  In response, Plaintiff's counsel strangely accuses CHC of falsely arguing that he cried in closing.  But CHC did no such thing.  This is just another example of Plaintiff's counsel's misrepresentations.

As to the third instance, again, the Court didn't see Plaintiff's counsel shed a tear.  But what everybody in the courtroom saw—including the jury—was Plaintiff's counsel dramatically and theatrically placing a box of facial tissues on the podium in front of him during the examination.  Plaintiff's counsel admits to placing the tissue box on the podium.  Dkt. 694, at 118.  This box of tissues was not for Ms. Young-Powell, because the Court already provided her with one.  As Plaintiff's counsel admitted, this box of tissues was for him.  And he made sure the jury saw that.  Whether Mr. Smolen shed a tear on this occasion is a distraction.  He conveyed the same emotionally charged message to the jury by his actions: "I believe my client is truthful because I'm going to cry with her.  Moreover, the testimony you are about to hear will inflame your passions just as it will inflame mine."  The Court finds Plaintiff's counsel's actions in this regard even more egregious because it was premeditated and controlled.  He knew exactly what he was doing and why he was doing it.  There was no aspect of spontaneity about what he did.  And, rather than placing the tissue box on the podium before the jury entered the courtroom, Mr. Smolen waited until the jurors entered and took their seats, so that they could get a full view of his antics.

Having found that Plaintiff's counsel did, in fact, cry on at least one occasion and essentially expressed the same emotions to the jury through his theatrical and dramatic use of the box of tissues, the Court must next determine whether this is legally improper and then, if so, whether CHC was prejudiced by Plaintiff's counsel's actions.

The parties have provided the Court with little legal authority regarding the propriety of counsel crying before a jury. CHC's counsel cited general propositions that there are limits to pleas of passion and that restraints must be placed on those attempts. Dkt. 733, at 14 (citing *Whittenburg*, 561 F.3d at 1128). CHC's counsel helpfully also cited a New Jersey case that granted a new trial based, in part, on the plaintiff's attorney's crying during direct examination. *Id.* at 15 (citing *Carey v. Lovett*, 132 N.J. 44, 63, 65 (N.J. 1993)). Plaintiff's counsel offered no authority on this topic, instead choosing to erroneously argue that Plaintiff's counsel didn't cry.

Courts have found that crying is improper and prejudicial. *See People v. Dukes*, 146 N.E.2d 14, 17 (Ill. 1957). But a single uncontrolled showing of emotion with attempts to hide the emotion from the jury has been excused. *See Brown v. State*, 777 S.W.2d 466, 471 (Ga. 2015). There are good reasons to prohibit counsel from crying before the jury, particularly when examining a client. First, crying inflames the jury's passions instead of focusing the jury on the law and evidence. Second, crying with a client while she testifies is essentially vouching for the witness. And vouching is improper, even in civil trials. *Draper v. Rosario*, 836 F.3d 1072, 1084 (9th Cir. 2016); 75A Am. Jur. 2d *Trial* § 575 ("It is improper for counsel

in a civil action to vouch for the credibility of witnesses, and such remarks generally result in a reversal of the judgment."). Vouching conveys counsel's personal beliefs as to the credibility of a witness to the jury. *Draper*, 836 F.3d 1084. Vouching for witnesses, including clients, has no place in a court of law. *Id.* (citing *Spicer v. Rossetti*, 150 F.3d 642, 644 (7th Cir. 1998)). Indeed, vouching can violate rules of professional conduct. R.P.C. 3.4(e).

In this case, after opening statements, the Court specifically admonished Plaintiff's counsel about controlling his emotions after he cried before the jury. He either couldn't or wouldn't. The Court then told counsel that if he couldn't control his emotions, then a different attorney should do the closing argument. Plaintiff's counsel eschewed that direction and barreled forward. As discussed in more detail later, Plaintiff's counsel didn't control his emotions during closing argument. And Plaintiff's counsel's dramatic and theatrical placing of the tissue box on the podium was neither uncontrolled nor an attempt to hide his emotions from the jury. That action was designed, among other things, to tell the jury that the testimony it was about to hear was credible and emotionally painful.

Plaintiff's counsel's actions prejudiced CHC. Plaintiff's counsel clearly played upon the jury's emotions and told it which witness he thought was credible.

Standing alone, shedding a tear one time in the heat of an emotional moment would not amount to misconduct and a basis for a mistrial. But that's not what happened here. Plaintiff's counsel's actions need to be placed not only in the context of his emotional plays to the jury but also in the context of all the other misconduct.

### The Display of the Certificate of Insurance

A reasonable person might draw the inference that Plaintiff's counsel improperly introduces issues of insurance as a standard operating procedure because he's done it before. *See, e.g.*, *Burke*, 935 F.3d at 1020-21.

In this case, Plaintiff's counsel had proposed an exhibit on his exhibit list that was a certificate of insurance. But even before trial started, the Court warned counsel about attempting to introduce evidence of insurance. The rationale for this warning is not only Federal Rule of Evidence 411, but also common sense. In warning counsel, the Court didn't mince words.

Plaintiff's counsel eventually withdrew the exhibit from his exhibit list. But for an unexplained reason, Plaintiff's counsel kept CHC's certificate of insurance in the trial exhibit presentation program. To this day, Plaintiff's counsel has never adequately explained why an exhibit that was removed from the exhibit list remained in the electronic exhibit presentation program.

During trial, Plaintiff's counsel asked his exhibit technician to put an exhibit on the screen for the jury to see. Instead of the exhibit requested, the exhibit technician loaded CHC's certificate of insurance and placed it on the screen. The exhibit was not published very long. The exhibit technician claims it was published for less than a second. The Court strongly disagrees. The certificate of insurance was published on the screen for longer than that—around two seconds, maybe as long as five seconds. Regardless of how long CHC's certificate of insurance was on the screen, it was published long enough for two things to occur: (1) for CHC's

32

counsel to immediately object, and (2) for the members of the jury to read "Certificate of Insurance" in big letters across the top of the document.  At the trial, the Court specifically found that CHC's certificate of insurance was on the screen long enough for the jurors to read what it was.  As mentioned elsewhere in this order, the jurors were very attentive, often leaning forward in their seats to get better views at various exhibits throughout trial.  And, as science has established, a person can recognize an image, including text, in less than two seconds.  *See* Kalanit Grill-Spector & Nancy Kanwisher, *Visual Recognition: As Soon as You Know It Is There, You Know What It Is*, 16 Psych. Sci. 85, 152 (2005) (measuring the ability to recognize what's in pictures when exposed to them for 33, 50, and 68 milliseconds).

The jury was once again removed from the courtroom while the Court heard arguments on CHC's motion for a mistrial because of Plaintiff's counsel's display of CHC's certificate of insurance.  As he does in the response to CHC's motion for new trial, Plaintiff's counsel offered a variety of responses to the motion for mistrial— none of which are particularly persuasive.  For example, Plaintiff's counsel claimed it was an inadvertent mistake.  (The exhibit technician has fallen on his sword in this regard.)  Plaintiff's counsel also asserts without evidence that the jurors couldn't read the certificate of insurance.  This is factually false.  The Court specifically found that they could have, and certainly, CHC's counsel was able to read the exhibit to allow him to object.  Moreover, the exhibit was published long enough for the exhibit technician to recognize that the certificate of insurance was on the screen and then remove it.  As to the critical issue of prejudice, Plaintiff's

counsel basically states that the exhibit and the reference to insurance was a one-off, insufficient to require a new trial.  Again, Plaintiff's counsel adamantly refuses to recognize that the issue for the Court to address on a motion for new trial is the prejudicial effect of the *cumulative* errors and misconduct.  *Ventura*, 825 F.3d at 886; *Whittenburg*, 561 F.3d at 1133.

The Court then questioned why CHC's certificate of insurance was even in the exhibit program, allowing for the possibility that it might be published to the jury.  The exhibit was withdrawn and it was unduly prejudicial and inadmissible. And, as explained later, it was completely irrelevant for another reason.  Plaintiff's counsel's answers were and are simply not credible.  Plaintiff's counsel contended and continues to contend that CHC's certificate of insurance was relevant because it went to damages, specifically punitive damages.

Plaintiff's contention that CHC's certificate of insurance was relevant to punitive damages is wrong both factually and legally.  Factually, as CHC established and made known to Plaintiff's counsel, the insurance had been exhausted—there was no insurance left under the policy.  Plaintiff's counsel doesn't dispute this fact—a fact that submarines his contention.  He just ignores it. Legally, the argument is meritless for at least three reasons.  First, as the Court raised at the time of the motion for mistrial, many jurisdictions prohibit insurance that covers punitive damages as being against public policy. Alan I. Widiss, *Strong Medicine or Poison Pill?: Liability Insurance Coverage for Punitive Damages? Discerning Answers to the Conundrum Created by Disputes Involving Conflicting*

34

*Public Policies, Pragmatic Considerations and Political Actions*, 39 Vill. L. Rev. 455, 466-72 (1994) (surveying conflicting authorities).  The great state of Oklahoma is one of those jurisdictions that finds public policy prohibits insurance coverage for punitive damages.  *Dayton Hudson Corp. v. Am. Mut. Liab. Ins. Co.*, 621 P.2d 1155, 1160 (Okla. 1980); *see Magnum Foods v. Cont'l Cas. Co.*, 36 F.3d 1491, 1497-98 (10th Cir. 1994). Tellingly, Plaintiff's counsel had no evidence that the insurance policy under the certificate of liability covered punitive damages.  Dkt. 747-2, at 19.  If the policy didn't provide coverage for punitive damages, then the certificate of insurance for the policy is completely irrelevant.  Second, as Federal Rule of Evidence 411 makes clear, "[e]vidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully."  Fed. R. Evid. 411.

Setting aside that CHC possessed no insurance coverage and that Plaintiff's counsel knew this, Plaintiff's counsel insists that evidence of CHC's insurance falls into an exception to Rule 411 because it goes to punitive damages, citing various cases.  At trial, the Court addressed these same cases, finding that this exception exists when a defendant claims to have insufficient funds to pay a judgment.  Occasionally, this is referred to as "poor-mouthing."  *See, e.g.*, *DSC Commc'ns. Corp. v. Next Level Commc'ns.*, 929 F. Supp. 239, 248 (E.D. Tex. 1996).  In response to the motion for new trial, Plaintiff's counsel doubles down and makes the same argument with the same cases, never addressing that its argument is legally meritless as the Court previously established.  In this regard, Plaintiff's counsel

relies on cases like *Valdes v. Miami-Dade County*, No. 12-22426 CIV, 2015 U.S. Dist. LEXIS 155196 (S.D. Fla. Nov. 17, 2015).  But that case relies on *Christiansen v. Wright Med. Tech. Inc.*, No. 13-cv-297, 2015 U.S. Dist. LEXIS 147805, at *9 n.7 (S.D. Fla. Oct. 30, 2015), which explains the rationale for allowing an exception when a party claims it can't pay damages, including punitive damages. *Christiansen*, 2015 U.S. Dist. LEXIS 147805, at *9 n.7 ("There is authority to support the contention that insurance coverage for punitive damage awards is relevant and admissible evidence to rebut a defendant's assertion that a punitive damages award would impact its finances.").[10]  Further, Plaintiff's counsel's citation to *Pinkham v. Burgess*, 933 F.2d 1066 (1st Cir. 1991), is misplaced because there was no suggestion that the defendant in that case was insured; whereas, here, the obvious and only inference the jury could draw from being shown the certificate of insurance is that CHC was insured, which it wasn't and Plaintiff's counsel knew it wasn't.  And Plaintiff's counsel's citation to a dissenting opinion from the Ninth Circuit carries the weight one would expect—zero.  Dispositive of Plaintiff's counsel's argument is the fact that CHC *never* asserted it couldn't pay a damage award or a punitive damage award.  Without that prerequisite, the exception Plaintiff's counsel relies upon doesn't apply, as the Court explained during trial.

Having easily negated Plaintiff's counsel's meritless arguments, the Court must address the prejudice caused by his actions.  The rationale for the general prohibition of insurance evidence by Rule 411 is obvious: "Knowledge of defendant's

---

[10] The *Christiansen* court also addressed the issue that any such insurance policy may not cover punitive damages because doing so would violate public policy.

insurance has traditionally been treated as fruit of the forbidden tree.  Without

question, a trial lawyer is treading on dangerous ground and always approaches

grounds for a mistrial by the mere mention of insurance when same is not at issue."

*Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 758 (6th Cir. 1980) (cleaned up).

In *Ventura v. Kyle*, 825 F.3d 876 (8th Cir. 2016), the Eighth Circuit relied upon

Tenth Circuit case law to grant a motion for new trial based upon plaintiff's

counsel's references to insurance.  The Eighth Circuit found that the risk of

prejudice is high when insurance is referenced to a jury.  *Ventura*, 825 F.3d at 886.

The *Ventura* court stated that it was utterly repugnant to a fair trial or a just

verdict for the jury to hear that the damages sued for will be paid by an insurance

company.  *Id.*; *see also Cleveland*, 624 F.2d at 758 ("The general principle that the

voluntary or intentional introduction into evidence, either directly or indirectly, by

the plaintiff of the fact that a defendant in a tort action is protected by liability

insurance, is prejudicial error and grounds for a mistrial, is . . . well settled."

(quoting *Gleaton v. Green*, 156 F.2d 459, 461 (4th Cir. 1946)).  In finding that

counsel's references—"[a]lthough relatively brief"—required a new trial, the

*Ventura* court found that it has been almost universally held that the receipt of

evidence of insurance coverage constitutes prejudicial error sufficient to require

reversal.  *Ventura*, 825 F.3d at 886.

Factually, the following is undisputed: (1) Plaintiff's counsel failed to remove

CHC's certificate of insurance from the exhibit program after withdrawing the

exhibit following the Court's admonition that insurance coverage evidence was

improper, (2) CHC informed Plaintiff's counsel that the insurance policy was exhausted, (3) Plaintiff's counsel knew the insurance policy was exhausted, (4) CHC's certificate of insurance was placed on the exhibit monitors before the jury, and (5) there was sufficient time to read the document's title "Certificate of Insurance."  The Court further finds that the fully engaged and attentive jury had enough time to read the title of the document.  The Court also finds that the jury could only draw one reasonable inference from CHC's certificate of insurance being shown to them:  CHC was covered by insurance, despite this being factually incorrect.  The Court also finds that Plaintiff's counsel's after-the-fact rationales for keeping CHC's certificate of insurance in the exhibit program are not credible.  Plaintiff's counsel's contentions are both factually and legally meritless.

The critical issue is whether CHC was prejudiced by the display of the certificate of insurance.  *Osterhout*, 10 F.4th at 989.  So, regardless of whether the display of CHC's certificate of insurance was intentional, it is reasonably probable that it—among the litany of other misconduct identified in this order—influenced the jury.  This is particularly true because of Plaintiff's counsel's arguments—again, many of them improper—made during closing argument.  Standing alone, Plaintiff's counsel's display of an unduly prejudicial, inadmissible document for a short time might not require a new trial.  But this event doesn't stand alone.  Moreover, Plaintiff's counsel's completely noncredible arguments—both factual and legal—are just more evidence of his lack of candor and willingness to play fast and loose with the trial process.

**Introducing Evidence from Non-Admissible Documents under the Guise of "Refreshing Recollection"**

During trial, Plaintiff's counsel demonstrated that he understood how to properly refresh a witness' recollection under Rule 612—but only when the witness was friendly. Dkt. 733-1, at 14-15. He conveniently forgot the niceties of foundation and process when it benefited him.

Here's a good example. After CHC's counsel objected and raised concerns about a particular document, at a sidebar, the Court explicitly and repeatedly confirmed with Plaintiff's counsel that the document would be used *solely* to refresh recollection. *Id.* at 59-60. The Court then explicitly stated that the exhibit was not going to be admitted and that the witness was not going to read from the exhibit. *Id.* at 60. The exhibit was inadmissible hearsay, among other problems, and was unduly prejudicial to CHC in a number of ways. *Immediately* after this side bar, the following exchange occurred:

> Q (by Mr. Smolen): Ma'am, do you see that you were reportedly in this meeting on June 12th of 2012?
>
> A: Reportedly, yes, I see that.
>
> Q: And is it true that a discussion took place during the June 12th, 2012, meeting where it was indicated that the Elliot Williams death was not acceptable?
>
> [Counsel for CHC]: Objection. This was to refresh her memory, not to then read a document as to what happened.
>
> The Court: Sustained.

*Id.* at 60-61. Counsel then grumbled about the Court sustaining the objection. *Id.* at 61. The Court again sustained the objection. After again testifying that she did

not recall the alleged meeting—and remember, Plaintiff's counsel repeatedly represented to the Court that the document would only be used to refresh recollection—the following exchange occurred:

> Q (by Mr. Smolen):  Are you telling the jury that the Tulsa County Sheriff's Office did not address CHC's failures in June of 2012 in this meeting?
>
> A: I'm not saying that at all.
>
> [Counsel for CHC]: She said she doesn't recall the meeting --
>
> The Court: Sustained.
>
> [Counsel for CHC]: -- multiple times.
>
> The Court: Sustained.
>
> Q (by Mr. Smolen): If, in fact, everything had been resolved by the time you sent the plan to NCCHC [an accrediting body] in 2010, why are the same issues being addressed by the Tulsa County Sheriff's Office in June of 2012 with you?

*Id.* at 62-63.  During these exchanges, Plaintiff's counsel held the document in his hands in front of the jury and read these passages from the document, which again, Plaintiff's counsel represented to the Court (at a side bar so as to not taint the jury) was only going to be used to refresh recollection and after the Court explicitly stated the document would not be read to the jury.  And these exchanges occurred after the witness repeatedly testified that the document didn't refresh her recollection.

Relying on numerous and vast authority, District Judge Mark Bennett (ret.) addressed the foundational requirements and process for using a document to refresh recollection.  *United States v. Hawley*, 562 F. Supp. 2d 1017, 1051-52 (N.D. Iowa 2008).  First, the witness' memory must be exhausted; then the witness must identify a document that would refresh her memory; next, after marking the exhibit

and providing copies to opposing counsel and the court, the examining attorney provides the exhibit to the witness, thereby allowing the witness to inspect the exhibit; then after being given the opportunity to inspect the exhibit, the examining attorney asks if the witness' memory is now refreshed ("jogged"); and only if the witness states that her memory is now refreshed so that she can testify from her memory, does the examination continue on the topic contained in the exhibit. *Id.*; *see Rush v. Ill. Cent. R.R. Co.*, 399 F.3d 705, 717 (6th Cir. 2005) ("[D]efense counsel terminated the cross examination when it appeared that the transcript failed to refresh Moore's memory."). Based on authority, Judge Bennett stated that the contents of the exhibit "may not even be read into evidence." *Hawley*, 562 F. Supp. 2d at 1051.

Indeed, multiple courts have held that counsel can't read from a document allegedly being used to refresh memory. *United States v. Sheffield*, 55 F.3d 341, 343 (8th Cir. 1995); *Gaines v. United States*, 349 F.2d 190, 192 (D.C. Cir. 1965). The reason is obvious: Reading from the document causes the jury to consider the contents of the document—not the witness' testimony—as substantive evidence. *Gaines*, 349 F.2d at 192. Even outside of the context of using a document to refresh recollection, in front of the jury, counsel can't read from a document that hasn't been admitted into evidence, which may be a basis for granting a new trial. *See Cadorna*, 245 F.R.D. at 494 ("It's inappropriate to read from a document not yet admitted in evidence.").

In fact, generations of attorneys—including the undersigned—were trained on the purpose of Rule 612, its foundational requirements, and the process for refreshing recollection. *See* Thomas A. Mauet, *Trial Techniques and Trials* § 5.13 (10th ed. 2017). After identifying the elements, Professor Mauet even provided a handy example examination, like he had for all foundational questions. *Id*. Not surprisingly, the example followed the legal requirements: (1) establish that the witness' memory was exhausted, (2) ask if anything could refresh the witness' memory, (3) mark the exhibit, (4) show the exhibit to opposing counsel and the court, (5) provide the exhibit to the witness and ask the witness to read to document to herself, and (6) after the witness has read the document, ask the witness if her memory was refreshed. *Id*. Note that the process does not allow the witness to read out loud from the document and certainly doesn't allow counsel to do so. For those attorneys who have attended the National Institute for Trial Advocacy Training, this is familiar ground. *See* Steven Lubet, *Modern Trial Advocacy: Analysis and Practice* 50 (3d ed. 2004) ("Note that in this situation the testimony must ultimately come from the witness's own restored memory; the document may not be offered as a substitute.").

Plaintiff's counsel engaged in misconduct. Despite previously showing that he understood the purpose of Rule 612 and that he could comply with the foundational requirements of the rule, he lied to the Court and then improperly jammed in inadmissible evidence in violation of the rule and court orders. He did *not* use the exhibit to refresh recollection. Instead, he used the exhibit to read its

unduly prejudicial and inadmissible content to the jury—and did so immediately after the Court stated that the contents would not be read to the jury.  No doubt, objections were sustained, but persistently asking knowingly objectionable questions is misconduct.  *Teter*, 274 P.3d at 344.  And sustaining objections doesn't necessarily cure the harm.  *Caudle*, 707 F.3d at 363; *Sullivan*, 919 F.2d at 1425-26 n.32; *Underwood*, 215 N.E.2d at 238.

In Plaintiff's response brief, Plaintiff's counsel doesn't address any of this.  Instead, Plaintiff's counsel simply asserts that the exchange evidenced run-of-the-mill cross examination.  Setting aside the fact that Plaintiff's counsel repeatedly represented to the Court that the document was being used *only* to refresh recollection—which is different than impeachment—this argument misses the entire purpose of Rule 612: "Rule 612 is not a vehicle for a plenary search for contradictory or rebutting evidence that may be in the file but rather is a means to reawaken recollection of the witness . . . ."  *Sheffield*, 55 F.3d at 343.  So, Plaintiff's counsel not only misrepresented to the Court the purpose for which the document would be used, but also then misused the document in contravention of the rule and an explicit court order.  Plain and simple, Plaintiff's counsel knowingly engaged in misconduct, which prejudiced CHC.

### Gratuitous, Improper, and Prejudicial Comment with a Witness

Throughout trial, it was readily apparent that Plaintiff's counsel simply couldn't or wouldn't control his behavior.  Here's a good example.

In Plaintiff's case in chief, Plaintiff's counsel called Tammy Harrington as a witness.  Ms. Harrington had issues regarding her employment with CHC, its supervisors, and others.  On redirect examination, the following exchange occurred:

Mr. Smolen: So how is it possible that you're getting terminated by your supervisor who's Chris Rogers but she's not signing off on the form?

A: I guess she didn't agree with it.

Q: *I guess maybe they'll call her and explain that to the jury.*

[CHC Counsel]: Objection, Your Honor.

Court: Sustained.  Sidebar.

Court: You pull that one more time and we're done.  Do you understand?

Mr. Smolen: *Yeah.*

Court: Do you get it.

Mr. Smolen: Yes.

Court: Why would you make a statement like that?

Mr. Smolen: *I didn't know what rule it affected.*

Court: The rule of common sense.

Dkt. 733, at 18 (emphasis added).  Not captured in the transcript was Plaintiff's counsel's nonplussed, disrespectful, smug attitude for making this statement and the Court sustaining the objection.  At the trial, the Court found that Plaintiff's counsel's actions were intentional and that he knew it was wrong, but he just didn't care.  Dkt. 733-1, at 31.  The Court reiterates those findings now.

Stunningly, just like counsel did at trial, in response to the motion, Plaintiff's counsel "respectfully" believes there was nothing wrong with this "comment" and

that no authority prohibits this behavior.[11]  Besides being wrong, this position is just more evidence of Plaintiff's counsel's mindset that anything goes during trial.

First, as Plaintiff's counsel now finally admits, he was not asking a question of this witness.  Instead, he was making a comment.  When examining a witness, counsel must not to make gratuitous prejudicial comments.  *United States v. Castro*, 795 F. App'x 635, 655 (11th Cir. 2019) (commenting on witness' testimony during examination is improper); *United States v. Dowdy*, 960 F.2d 78, 80 (8th Cir. 1992) (appellate court affirmed contempt finding based on, among other things, counsel's misbehavior, including "making unnecessary remarks" during witness examination).  In fact, one district judge even possesses a standing order warning counsel not to engage in this type of conduct.  *See, e.g.*, *Overstreet v. Allstate Vehicle & Prop. Ins. Co.*, No. 4:20-CV-242-A, 2020 U.S. Dist. LEXIS 197649, at *41-42 (N.D. Tex. Aug. 25, 2020).  Gratuitous comments during witness' testimony are even objectionable in the informal settings of arbitrations.  *See* David Robbins, 1 *Securities Arbitration Procedure Manual* §§ 10-5,12-23 (5th ed. 2024).

During witness examination, counsel's job is to elicit testimony from witnesses with questions; counsel's job isn't to make gratuitous prejudicial comments.  If Plaintiff's counsel needed more authority on this topic, *Howard v. Offshore Liftboats, LLC*, Nos. 13-4811, 13-6407, 14-1188, 2016 U.S. Dist. LEXIS 64837 (E.D. La. May 17, 2016), provides a good example.  In that case, the district

---

[11] At trial, Plaintiff's counsel wouldn't even admit that he was making a comment.  Instead, undeterred by reality, he insisted that the following was a question: "I guess maybe they'll call her and explain that to the jury."  Even a casual reader will note the absence of a question mark and, instead, note the period at the end of the sentence.

court sanctioned plaintiff's counsel for, among other things, making gratuitous comments during a witness examination rather than asking questions—after the district court had warned counsel about engaging in misbehavior. *Howard,* 2016 U.S. Dist. LEXIS 64837, at *10-11. In the show-cause hearing, the district court stated the obvious: "[Y]ou again commented on his testimony rather than asking him questions, which is what you're supposed to do. You're supposed to ask questions, not make comments." *Id.* at *12-13. Plaintiff's counsel can find another example in *Cadorna v. City & County of Denver*, 245 F.R.D. 490, 492-93 (D. Colo. 2007), in which the court granted a motion for new trial based, in part, on the plaintiff's attorney injecting editorial comments during a witness examination.

Like the sanctioned counsel in both *Cadorna* and *Howard*, Plaintiff's counsel made his gratuitous editorial comment, appeared very pleased with himself for doing so, and was unrepentant when called out for engaging in misconduct, after being repeatedly warned not to engage in misconduct. Dkt. 747-2, at 8 (noting Plaintiff's counsel's smug look on his face). His feigned ignorance that his comment was improper only exacerbates his misbehavior. Some misbehavior is so obvious that all counsel should know it is wrong and not have to be instructed not to engage in it. *Dowdy*, 960 F.2d at 81. Making gratuitous comments during a witness examination instead of eliciting testimony is one such behavior.[12]

Second, using best trial practices, before every jury trial, the Court provides the jury with introductory instructions. *See* Seventh Circuit American Jury Project,

---

[12] See *supra* note 6.

25 & 52 (September 2008).  Before publishing these instructions to the jury, the Court provides copies to all sides to address any objections and to ensure that the instructions properly state the law.  The Court did that in this case.  There were no objections, and all agreed that the instructions properly stated the law.  Critically, one of the instructions stated the following: "The Plaintiff will introduce evidence in support of her claims.  At the conclusion of the Plaintiff's case, the Defendant may introduce evidence.  The Defendant, however, is not obligated to introduce any evidence or to call any witnesses."  But Plaintiff's counsel's gratuitous comment told the jury that CHC possessed the burden to not only introduce evidence, but to introduce this specific witness to "explain" this specific issue—contrary to the explicit preliminary jury instruction, which Plaintiff's counsel agreed was an accurate statement of the law.  Respectfully, there's a lot wrong with doing that.  In addition to being legally wrong in this regard, Plaintiff's counsel was basically making a missing witness argument in the middle of re-direct examination.  And there was no basis for that.  *Wilson v. Merrell Dow Pharms.*, 893 F.2d 1149, 1150-51 (10th Cir. 1990) (identifying required elements for a missing witness instruction); *Wytex Prod. Corp. v. Xto Energy, Inc.*, No. CIV-12-12-339-JHP, 2014 U.S. Dist. LEXIS 201062, at *10-15 (E.D. Okla. Aug. 29, 2014).

Plaintiff's counsel's gratuitous comment to Ms. Harrington during her examination—telling the jury that CHC must present evidence to rebut his argument—was misconduct.  The Court is unsure what is worse—that Mr. Smolen claims it wasn't misconduct or that he claims he didn't know it was misconduct.

The disrespect he showed to the Court when his behavior was called out and his continued assertions that he has done nothing wrong further evidences his misguided mindset about trials, his lack of respect for basic rules of trial advocacy, and his lack of candor with the Court.

### Improper Arguments and Comments During Closing Arguments

CHC contends that Plaintiff's counsel made numerous improper statements and argument during closing.  Plaintiff's counsel denies the statements or arguments were improper, notes that no objections were made for some of these, if there were objections, the objections were sustained, or asserts a combination of these contentions.

The Court finds that Plaintiff's counsel made factual representations that were not based on record evidence, made references to documents not in the record, made arguments not based on facts in the record, and most importantly made highly improper arguments in rebuttal.  CHC attempts to place the various improper statements and arguments into different categories, but many of Plaintiff's counsel's improper actions defy singular categorization.  Some of the improper statements and arguments are relatively minor, which would not, alone, be sufficient to establish that it was reasonably probable that the verdict was influenced by Plaintiff's counsel's misconduct.  But, again, those improper statements and arguments didn't stand alone.  There were some doozies.  For example, Plaintiff's counsel made numerous attempts to argue his personal opinion

as to the justness of Plaintiff's case, and even more troublingly, the justness of his actions in bringing the type of cases tried before this jury.  The most egregious misconduct related to Plaintiff's counsel's play to regional bias against CHC and its counsel not being from "our community" and that the jury's obligation was to find in favor of "our community" and against the outsiders.  Despite being the most critical argument, Plaintiff's counsel all but ignores this misconduct.

### Arguments Not Based on Evidence

Plaintiff's counsel made gratuitous statements about documents not in evidence, such as tax filings.  It is axiomatic that closing arguments may not be based on evidence not admitted.  *Whittenburg*, 561 F.3d at 1128-29.  It's undisputed that the tax filings were not in evidence, so there was no basis to mention them, except to bolster Plaintiff's counsel's theme of CHC being a large, evil corporation.  At trial, when questioned outside the presence of the jury why he mentioned the tax filings, Plaintiff's counsel comically responded that he needed to establish that CHC was a corporation and that the tax filings—which again were not in evidence— supported this element of his case.  This argument was absolute nonsense.  In the opposition brief, Plaintiff's counsel abandoned this nonsense and argues a lack of prejudice because the objection was sustained.  Plaintiff's counsel's attempt to claim a lack of misconduct by sanitizing each improper action either by a lack of objection or a curative action by the Court rings hollow.  Moreover, the shifting "justifications" are strong evidence of pretext—also known as a lie.  *Mueggenborg v. Nortek Air Sols., LLC*, No. 20-6147, 2021 U.S. App. LEXIS 30860, at *23 (10th Cir.

Oct. 15, 2021) (*citing Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003)); *Campell v. Wal-Mart Stores, Inc.*, 272 F. Supp. 2d 1276, 1295 (N.D. Ok. 2003) (*citing Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995)).

Plaintiff's counsel also made reference to what a hypothetical video recording of Ms. Young would show. Obviously, this hypothetical video recording was not in evidence. Moreover, there was no evidence to support this argument nor was it a reasonable inference. There was simply no evidence as to what occurred in the cell that housed Ms. Young. This was an improper argument. *See Whittenburg*, 561 F.3d at 1128-29.

Plaintiff's counsel also made a gratuitous, improper statement about his allegedly heroic attempts to obtain a former CHC employee to testify during trial. In reference to Nurse White, Plaintiff's counsel told the jury, "I tried to get her here. She dodged service for 16 weeks." Initially, there was no evidence supporting any of this, so the argument is improper on its face. *Whittenburg*, 651 F.3d 1128-29. Next, the obvious and only reason to make this statement is to imply that CHC was hiding evidence—an implication that is completely unsupported by any evidence. Not surprisingly, the jury was instructed that it could only draw reasonable inferences. *See Coffey v. United States*, 906 F. Supp. 2d 1114, 1143 n.26 (D.N.M. 2012) (citing Tenth Circuit Pattern Jury Instructions § 1.07, at 15 (2011)). And counsel can only make arguments based upon a reasonable inference from the evidence. *Whittenburg*, 561 F.3d at 1128-29. So, Plaintiff's counsel's argument conflicted with the instructions on the law that the jury was provided and Plaintiff's

argument was not based upon any reasonable inference derived from the evidence at trial.  Again, changing course in response to the motion for new trial, Plaintiff's counsel contends that the statement was proper for this reason: "In making the statement, Plaintiff's counsel was merely attempting to explain why such a key figure in Ms. Young's plight at the jail did not testify."  This contention is without merit for at least three reasons.  First, regardless of the purpose of the statement, there was no evidence to support it.  Second, assuming that this was the purported reason, Plaintiff's counsel ran out of his allotted time to put on his case-in-chief because of his repeated, egregious misconduct.  The trial was constantly derailed by sidebars and hearings outside the presence of the jury because of Plaintiff's counsel's misconduct.  Despite exhausting his time because of his own misconduct, the Court nevertheless gave him more time than allotted.  Third, there is absolutely no need to make this statement for this alleged reason because—once again—the jury was instructed on this issue.  The jury was specifically instructed that a party need not call all witnesses or introduce all exhibits.  So, Plaintiff's counsel's after-the-fact contention reeks of pretext.

Finally, Plaintiff's counsel also improperly argued that CHC is "the largest private health-care provider in corrections in the entire United States."  Dkt. 733-5, at 10.  There is no evidence to support this argument.  But rather than admit that this statement was unsupported by evidence, Plaintiff's counsel makes a disingenuous argument.  According to Plaintiff's counsel, "Plaintiff testified, without objection, that 'correctional medicine [is] worth billions of dollars a year."  There's a

lot wrong with Plaintiff's counsel's attempt to avoid the obvious fact that this testimony doesn't support the argument that CHC is "the largest private health-care provider in corrections in the entire United States." Initially, the fact that nationwide correctional medicine might be a billion dollar a year industry in no way equates to CHC's alleged status as "the largest private health-care provider in corrections in the entire United States." It's simply sophistry to argue otherwise. It's not even close to being a reasonable inference. For example, the legal profession is certainly a multi-billion dollar a year industry, but that doesn't mean Mr. Smolen is "the largest provider of legal services in the United States." Besides this critical problem, even Ms. Young-Powell's testimony must be placed in context. Ms. Young-Powell was rightfully providing testimony about her mother's pain and suffering as well as the familial relationships. There was nothing wrong with that type of testimony. However, during her testimony, Ms. Young-Powell volunteered that she and her family wanted to start a foundation in Ms. Young's name. It was in this context that Ms. Young-Powell volunteered without any foundation or established personal knowledge that correctional medicine was worth billions of dollars a year. A mere three sentences later, Ms. Young-Powell stated that correctional medicine is big business "and each one of those corporations are making billions of dollars off the deaths of others." CHC then objected to this testimony. The Court sustained that objection. So, Plaintiff's counsel's assertion that the testimony was "without objection" is a thin reed at best and at worst just another example of counsel's misrepresentations to the Court.

## Community Conscience

Courts have condemned arguments based on pleas to "community conscience." *Westbrook v. General Tire & Rubber Co.*, 754 F.2d 1233, 1238-39 (5th Cir. 1985). Impassioned and prejudicial pleas intended to evoke a sense of community loyalty, duty, and expectation are improper in closing arguments, and can lead to a new trial. *Id*.

Plaintiff's counsel's rebuttal closing argument was peppered with pleas to the jury to be the community conscience and that, indeed, it was their duty to take on this role. Dkt. 733-5, at 12 ("That's your obligation."). In fact, this was the entire theme of the rebuttal argument. *Id*. at 9 ("Our whole community is affected by this, guys.").

This argument was improper. This argument didn't just cross the line prohibiting counsel from inciting the jury's passion against CHC, it hurtled well beyond that line. Once again, Plaintiff's counsel engaged in misconduct.

Plaintiff's counsel's response to these blatant pleas to the jury's passion notes that CHC did not object to these arguments. For the reasons stated throughout this order, in this Court's discretion, that argument is rejected. *See, e.g.*, *First Sav. Bank*, 902 F. Supp. at 1361; *Cadorna*, 245 F.R.D. at 495; 12 James Wm. Moore et al., *Moore's Federal Practice* § 59.13[2][c][i][C] (3d ed. 2023). Plaintiff's counsel's modus operandi is essentially to engage in a game of legal chicken, daring CHC's counsel to object to everything, thereby looking like an obstructionist. *Teter*, 274 P.2d at 344. The Court will not countenance that game.

Additionally, in passing in a footnote, Plaintiff's counsel seems to take the position that arguments based on community conscience are proper when punitive damages are sought.  But Plaintiff's counsel cited no authority.  This Court would be well within its discretion to find that this argument is waived. *See Estate of Jensen v. Clyde*, 989 F.3d 848, 852 (10th Cir. 2021) (undeveloped arguments made in footnote are waived).  But for the sake of a complete analysis, the Court conducted Plaintiff's counsel's research for them.  It is true that some courts, in their discretion, have allowed to some extent arguments based on community conscience when punitive damages are sought. *See, e.g.*, *Mooney v. Roller Bearing Co. of Am., Inc.*, 601 F. Supp. 3d 881, 889 (W.D. Wash. 2022) (collecting cases and conflicting authority).  But it is also true that other courts, in their discretion, have not allowed these arguments even when punitive damages are sought. *See, e.g.*, *Penman v. Correct Care Sols., LLC*, No. 5:18-cv-00058 (TBR), 2022 U.S. Dist. LEXIS 40596, at *7 (W.D. Ky. Mar. 7, 2022); *Mahone v. Eden*, No. 1:15-cv-01009-PJK-KBM, 2019 U.S. Dist. LEXIS 109004, at *2 (D.N.M. Jun. 28, 2019) ("[P]rohibiting such references ensures consideration of this case on these facts, rather than on larger problems with the community.").  But even those cases that allow community conscience arguments in closing when punitive damages are sought don't countenance the no-holds-barred/anything goes approach Plaintiff's counsel used in his closing argument. *Mooney*, 601 F. Supp. 3d at 889 ("Mooney is cautioned to steer clear of the line between 'permissible oratorical flourish' and 'impermissible comment calculated to incite the jury' against the defendant.").

**Regional Bias/Outsiders**

Similar to the "conscience of the community" argument, Plaintiff's counsel's unabashed arguments to treat CHC with disdain because of its—and its counsel's—outsider status were improper.  Like the community conscience line of argument, Plaintiff's counsel's closing argument highlighted the fact that CHC and their counsel weren't from Tulsa or Northeastern Oklahoma.[13]  But Plaintiff's counsel repeatedly emphasized that Ms. Young and he and his co-counsel were from Tulsa—that they were part of the very same community as the members of the jury.  Dkt. 733-5, at 5 ("Look, I – Bryon is from Tulsa.  I am from Tulsa.  You guys are from northeastern Oklahoma. . . . I very much understand that these lawyers are not from here and that they've left families to be here, okay?  But this is our community.  This is where we live."); *id.* at 9 ("Our whole community is affected by this, guys."); *id.* at 10 ("[T]hey're taking our money . . . .").  In doing so, Plaintiff's counsel engaged in misconduct.  *Westbrook*, 754 F.2d at 1238 (error to overrule objection based on us-against-them plea in case against non-resident).

Setting aside the fact that CHC's place of incorporation or principal place of business and the residence of its counsel was not in evidence, *Whittenburg*, 561 F.3d at 1128-29, these arguments were problematic in a much larger way.  These arguments don't address the law or evidence in the case; instead, they seek to pit the jury against outsiders.  *See Pappas v. Middle Earth Condominium Ass'n*, 963

---

[13] One of CHC's counsel is from Michigan.  The jury likely discerned he wasn't from the area when he mispronounced a nearby county on more than one occasion—a fact not lost on those in the courtroom.  But if the jury didn't know this counsel was an outsider before closing, Plaintiff's counsel removed all doubt by highlighting this fact for them.

F.2d 534, 539 (2d Cir. 1992) ("There is no doubt whatever that appeals to the regional bias of a jury are completely out of place in a federal courtroom. Appeals tending to create feelings of hostility against out-of-state parties are so plainly repugnant that the Supreme Court long ago stated that their condemnation required no comment. This sort of argument improperly distracts the jury from its sworn duty to hand down a just verdict based on the evidence presented to it.") (cleaned up). Despite being given wide latitude in closing arguments, these types of arguments are barred because of the prejudice they engender. *Id.* Again, this point is something that should go without saying. The prohibition is based on fundamental fairness and ethical rules of conduct. *Id.* Plaintiff's counsel should brush up on both principles.

### Combining Community Conscience and Regional Bias

Plaintiff's counsel exacerbated this misconduct when he combined the community conscience argument with the outsiders argument. *See Guar. Serv. Corp. v. Am. Emps.' Ins. Co.*, 893 F.2d 725, 729 (5th Cir. 1990) ("Arguments which invite a jury to act on behalf of a litigant become improper 'conscience of the community' arguments when the parties' relative popular appeal, identities, or geographical locations are invoked to prejudice the viewpoint of the jurors."). Here's a good example of Plaintiff's counsel's combining these two improper arguments: "I feel like they're coming down here like literally stealing our money and laughing at us." Dkt. 733-5, at 7.

It can't be seriously disputed that this was misconduct.  In *Botey v. Green*,
No. 3:12-CV-1520, 2017 U.S. Dist. LEXIS 89072, at *8-9 (M.D. Pa. June 9, 2017),
the court explained that counsel are prohibited from these types of arguments:

> [T]he Court discerns in Plaintiff's brief in opposition to Defendant's
> Motion . . . some intent to use language such as "send a message" or to
> suggest that the jury act as the "conscience of the community" on the
> basis that Plaintiff views punitive damages as fulfilling a larger societal
> role.  The Court will not allow the Plaintiff to make prejudicial appeals
> to the members of the jury based on the Texas location of Defendants,
> FFE and Conwell, or the Tennessee residence of Defendant Greene.
> Such arguments are immaterial, parochial and irrelevant.  That such
> information may be disclosed during the course of the testimony does
> not provide Plaintiff's counsel with a license to foment prejudice and
> Plaintiff's counsel is directed to refrain from this kind of oratory in his
> opening and closing statements.

In closing argument, Plaintiff's counsel not only told the jury that it was their
duty to send a message and be the conscience of the community but also to do so
because CHC and its counsel were outsiders, not belonging to the jury's
community—a community it shared with Ms. Young and Plaintiff's counsel.
Plaintiff's counsel engaged in misconduct.  *Westbrook*, 754 F.2d at 1238 ("This us-
against-them plea can have no appeal other than to prejudice by pitting 'the
community' against a nonresident corporation."); *Payne v. Jones*, 711 F.3d 85, 94 (2d
Cir. 2012) ("Regional biases against particular companies, furthermore, may fuel
unreasonable [punitive damage] awards.").

As Plaintiff's counsel knows, an attorney shall not state a personal opinion as
to the justness of a cause.  *Burke*, 935 F.3d at 1031.  By combining the "conscience of
the community" and regional bias arguments, Plaintiff's counsel also improperly
argued his personal opinion as to the justness of the cause.  Plaintiff's counsel's

argument to the jury was that together—Plaintiff's counsel and the jury—they must

vanquish the interlopers because doing so is just.  This is an improper argument.

### Beyond Category Misconduct

Not to be outdone with the improper "Us and Them," "conscience of the

community," or the "justness" of Plaintiff's counsel's cause arguments, Plaintiff's

counsel blasted well beyond the bounds of proper closing argument when he

attempted to bring up his neighbor "Bob."  During closing arguments, Plaintiff's

counsel implied that Bob died in the Tulsa County Jail because of CHC's

indifference—again, a fact not in evidence—and that this was why he litigates these

cases. Dkt. 733-5, at 6.  Plaintiff's counsel argued, "Bob Byrd was my neighbor,

okay?  And I know how it affected him and his family.  We had family that went to

school together, okay?"  *Id*.  CHC's counsel objected.  The Court sustained the

objection.  But not to be hindered by the Court's ruling, Plaintiff's counsel

immediately continued unabated to tie these themes together: "Bob was part of our

community, okay?  You guys are part of this community."  *Id*.

There are at least four ways this argument was improper and constituted

misconduct.  First, the argument is a community conscience "Us and Them"

argument.  Second, it relies on facts not in evidence.  Third, it was an attempt to

argue the justness of not only Plaintiff's claim but also Plaintiff's counsel's own

actions in bringing these types of cases.  Fourth, Plaintiff's counsel continued to

make the argument *even after the Court sustained the objection*.[14]

---

[14] This is yet another example of why Plaintiff's counsel's repeated assertions that he didn't violate the Court's rulings is not just erroneous but also an intentional falsehood.

In *Gilster v. Primebank*, the Eighth Circuit, relying in part on Tenth Circuit precedent, stated, "Moreover, counsel's recounting of her personal experience—facts that were not in evidence—was aimed at enhancing her client's credibility by telling the jury that counsel, too, had endured similar misconduct." 747 F.3d 1007, 1011 (8th Cir. 2014).  In finding plain error, the Ninth Circuit addressed a similar circumstance in *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1192-93 (9th Cir. 2002).  During closing argument, the plaintiff's attorney argued that the defendant had not corrected its policies and that she knew this because she had sued them before.  *Id*.  Despite the failure to object or move for a mistrial, the Ninth Circuit found clear error.  *Id*.  Plaintiff's counsel made these same errors in this case.  *See Gilster*, 747 F.3d at 1011 ("Referring to an experience in her own life was 'plainly calculated to arouse [the jury's] sympathy.'").  These errors were not a bug in the system; they were a feature, there by design.  Plaintiff's counsel engaged in intentional misconduct and persisted in continuing with his improper argument even after the objection was sustained.  The misconduct was intentional.

### Timing of Misconduct

The most egregious errors occurred during Plaintiff's counsel's off the rails rebuttal argument.  As all good trial lawyers and judges know and who understand the concepts of primacy and recency, improper rebuttal arguments are the most prejudicial.  *Gilster*, 747 F.3d at 1011 ("Counsel made a deliberate strategic choice to make emotionally-charged comments at the end of rebuttal closing argument, when they would have the greatest emotional impact on the jury, and when

59

opposing counsel would have no opportunity to respond.").  The Court doesn't believe that the increased egregiousness of misconduct occurring in rebuttal argument was a coincidence.

### Plaintiff's Counsel's Waiver

In support of its motion, CHC cites several relevant cases, including *Gilster*. Dkt. 733, at 25-26.  Rather than addressing these cases and the relevant propositions of law for which they stand, Plaintiff's counsel attempts to distinguish the cases on picayune grounds.  For example, Plaintiff's counsel notes that a case was not a civil rights case—as if the law prohibiting improper closing arguments doesn't apply in civil rights cases.  And Plaintiff's counsel makes these undeveloped distinctions in passing in a footnote.  But, as the Court repeatedly told Plaintiff's counsel at trial, arguments made in passing in footnotes are waived.  Dkt. 700, at 11; *Estate of Jensen v. Clyde*, 989 F.3d 848, 852 (10th Cir. 2021).  Again, the irony of Plaintiff's counsel's action in this regard is not lost on the Court.  Plaintiff's counsel repeatedly attempt to find refuge for their misconduct by invoking principles of waiver.  But they ignore waiver when it suits them.

\*       \*       \*

At this point, it bears repeating:  Just because Plaintiff's counsel's previous misconduct in other cases was not reversed on appeal under an abuse of discretion standard doesn't mean that he didn't engage in misconduct in this case or even those cases.  It only means that, on appeal, an appellate court didn't reverse a district court's denial of a motion for new trial under the most deferential standard

of review.  Plaintiff's counsel's apparent takeaway from cases such as *Osterhout v. Bd. of Comm'rs*, 10 F.4th 978 (10th Cir. 2021), and *Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019), that his misconduct was appropriate is woefully misguided.

The Court finds that Plaintiff's counsel engaged in persistent, intentional misconduct throughout trial, despite repeated warnings from the Court.  So, the Court must apply these findings to the Tenth Circuit's established standard to determine if the Court should grant a new trial or enter a remittitur as to damages.

## STANDARD FOR MOTIONS FOR NEW TRIAL BASED ON ATTORNEY MISCONDUCT

### Four Factors

As Plaintiff's counsel knows—because they are repeatedly accused of misconduct—the Tenth Circuit established a four-part test to determine whether it is reasonably probable that the verdict was influenced by their misconduct. *Osterhout*, 10 F.4th at 991-92; *Burke*, 935 F.3d at 1026-27; *Whittenburg*, 561 F.3d at 1127.  The Court must also consider the cumulative effect of the misconduct, a factor Plaintiff's counsel ignore.  *Osterhout*, 10 F.4th at 993; *Whittenburg*, 561 F.3d at 1133 ("In so concluding, however, we underscore that our decision is not based on any one of these factors singly, but rather their combination after considering the argument as a whole.").  The four factors are (1) the pervasiveness of the misconduct, (2) the taking of curative action, (3) the size of the verdict, and (4) the weight of the evidence.  *Osterhout*, 10 F.4th at 991-92.  In considering the four factors and the cumulative effect of the misconduct, the Court must remember that

the ultimate question is whether the misconduct "influenced the verdict." *Id*. at 992.

As established in detail in the preceding and following pages, the misconduct was pervasive; despite multiple efforts at curative action, the misconduct continued; and the verdict size was extraordinary; however, the weight of the evidence was strong. Balancing these factors and the cumulative effect of the misconduct leads the Court to find that Plaintiff's misconduct influenced the verdict regarding punitive damages.

### Pervasiveness of the Misconduct

The pervasiveness of Plaintiff's counsel's misconduct makes it reasonably probable that this misconduct influenced the verdict. As previously shown, Plaintiff's counsel's misconduct was pervasive. The misconduct infected nearly every aspect of the trial, starting in opening statements, continuing through witness examinations, and ending in closing argument. The Court doesn't recall a single day in which Plaintiff's counsel didn't engage in misconduct. Other than publishing CHC's certificate of insurance, the other improper actions were repeated, including making speaking objections containing inadmissible and prejudicial statements, making gratuitous, prejudicial comments during witness examinations, violating Court orders, attempting to introduce evidence through improper means (such as reading from inadmissible documents not in evidence), asserting facts not in evidence in closing, and making improper closing arguments.

As a cautionary point, Plaintiff's counsel's misconduct has continued in the response brief in opposition to the Rule 59(a) motion.  Moreover, the decisions in *Osterhout* and *Burke* appear to have only emboldened Plaintiff's counsel's misconduct both at trial and in the briefing.  The Court notes this not as a basis for deciding this motion; instead, the Court notes Plaintiff's counsel's behavior as another warning—not that Plaintiff's counsel heeds the Court's warnings.

### Curative Actions

The failure of the Court's curative actions to stop Plaintiff's counsel from engaging in misconduct weighs in favor of finding that it is reasonably probable that the misconduct influenced the verdict. Plaintiff's counsel's misconduct continued throughout trial despite repeated warnings and other curative actions. For example, as to the motion *in limine*, the Court informed the jury that attorneys' statements were not evidence after Plaintiff's counsel violated the Court' order. That curative action didn't have much of an effect on Plaintiff's counsel as evidenced by at least two other violations of the very same order.

Other examples abound.  The Court warned Plaintiff's counsel about making speaking objections, yet he continued to do so.  The same is true for making prejudicial, gratuitous comments during witness examinations.

The fact that curative actions were no hindrance to Plaintiff's counsel is exemplified by parts of his closing argument, specifically Plaintiff's counsel's argument about his neighbor "Bob."  As already established, the argument was

patently improper.  And when CHC's counsel objected, the Court sustained the objection.  But Plaintiff's counsel continued on with his argument undeterred.

Because of Plaintiff's counsel's constant, pervasive, and intentional misconduct, CHC's counsel was forced to choose between constantly, repeatedly objecting to the misconduct and being viewed as obstructionists or choosing strategic moments to make a timely objection so as to not look like obstructionists. CHC's option to have the Court instruct the jury to disregard Plaintiff's counsel's cornucopia of misconduct would likely just draw the jury's attention to the objectionable information.  *See Laudicina*, 328 F.R.D. at 517-18.  There is no doubt that Plaintiff's counsel intentionally put CHC in this position.

Out of the jury's presence, CHC's counsel raised many of these issues in multiple motions for mistrial.  Obviously, the Court denied those motions.  The Court did so because it wanted to give the jury the opportunity to function.  So, both CHC and the Court took corrective action to no avail.

The Court's curative actions failed to stop Plaintiff's counsel's misconduct or eliminate the prejudice to CHC.  As a result, it is reasonably probable that the misconduct influenced the verdict.  The Court's curative actions didn't act like a *Men in Black* Neuralyzer and no reasonable person could expect those actions to have the same result.

### Verdict Size

The verdict size weighs in favor of finding that it is reasonably probable that Plaintiff's misconduct influenced the jury's verdict.  The jury's award of $14 million

for compensatory damages was high, but not unreasonable. The jury in Mr. Williams' trial awarded $10 million in compensatory damages. Dkt. 733-8, at 1. Again, that is a large amount. But it is not unreasonable. The compensatory award in this case being greater than that in Mr. Williams' case could easily be viewed as evidence of the increase in post-pandemic verdicts. *See* Aleeza Furman, *With High-Value Verdicts on the Rise, Some Attorneys Say Post-COVID Jurors Demand Accountability*, Legal Intelligencer Online (Sept. 28, 2022). Regardless, $14 million is still a very large verdict, even under these facts.

In contrast, the jury's award of $68 million in punitive damages is extremely strong evidence that the jury was influenced by Plaintiff's counsel's misconduct. Particularly egregious was Plaintiff's counsel's rebuttal closing argument in which he told them it was their duty as members of the Tulsa community—of which Plaintiff and Plaintiff's counsel were also members—to return an astronomical verdict over $20 million[15] against the foreign corporation represented by counsel not from the area. A critical fact in this regard is that the jury in Mr. Williams' case entered an award of punitive damages of $250,000. Dkt. 733-8, at 1. Sixty-eight million dollars is more than two-hundred and fifty times that amount.

The Court recognizes that courts should hesitate to compare verdicts in other cases. *Hill*, 815 F.3d at 670-71. But the verdict in Mr. Williams' case is similar enough to serve as a meaningful benchmark. *Id.* at 671.

---

[15] In rebuttal closing argument, Plaintiff's counsel told the jury, "They'll be high-fiving if you walk out of here giving a verdict of $10 or $20 million, I promise you, because that just means business as usual." Dkt. 733-5, at 11.

### Weight of the Evidence

The overwhelming evidence of liability weighs against finding that it was reasonably probable that Plaintiff's counsel's misconduct influenced the jury.  As the Court previously explained in denying CHC's Rule 50(b) motion, the weight of the evidence supporting the jury's verdict on liability was overwhelming.  Dkt. 748, at 3.  Under the Rule 50(b) standard, the Court was to have viewed the evidence in the light most favorable to Plaintiff.  But even viewing the evidence neutrally, the Court found the evidence was overwhelming.  *Id.*  The Court adopts its reasoning and analysis in that order for this motion but will nevertheless briefly address the weight of the evidence.

As to the systemic failures, a mountain of evidence was admitted showing CHC's deliberate indifference to its patients generally and to Ms. Young specifically.  The "treatment" of Mr. Williams, captured on horrific video recordings, exemplified CHC's "care" of the inmates.  And, as Chris Rogers (CHC's former Director of Nursing) admitted, "the whole system" was responsible for Mr. Williams' death.  Further, CHC's general deliberate indifference to its patients is captured in multiple studies and reports.  These included the Roemer report and findings by the National Commission on Correctional Health Care.  And Immigration and Customs Enforcement's report found that the clinical staff at the Tulsa County Jail (a.k.a. CHC) maintained a prevailing attitude of indifference.  This finding was supported by a variety of evidence, including CHC's staff's penchant for falsifying medical records.

66

Tragically, CHC's staff's prevailing attitude was visited upon Ms. Young.  Ms. Young was suffering from multiple serious medical conditions, including but not limited to her blood pressure and vomiting of blood.  The video recording of Ms. Young as she struggled to engage in the most basic activities—such as walking and breathing—evidenced her condition.  Ms. Young was in desperate need of emergent medical care, even to an untrained eye.  But Dr. Allen's testimony was powerful, as he walked through the video recording showing the medical conditions, concerns, and appropriate care that should have been provided.  Instead of being sent to the hospital for emergent care, Nurse Metcalf refused to send Ms. Young to the hospital.  And CHC's medical director never interceded because he wasn't involved in Ms. Young's treatment and care.  He arrived after she passed.  Nurse White's treatment of Ms. Young was borderline criminal.  Critically, the evidence established that this horrific treatment of Ms. Young was caused by CHC's various customs and policies of deliberate indifference.

CHC's continued focus on the subdural hematoma being unknown to CHC misunderstands the law and the facts of this case.  No doubt, CHC was unaware of the subdural hematoma.  But also without doubt, CHC knew of the myriad of other extremely serious medical events and conditions affecting Ms. Young, especially in her final days.  The video, the non-falsified medical records, and the Tulsa County Jail's records are telling in this regard.  And one of the alleged policies presented to the jury was that CHC maintained "[a] pattern of failures to send inmates with obvious and emergent needs to the hospital."  Dkt. 685.  The subdural hematoma

may have been unknown by CHC at the time, but the rest of her obvious, emergent medical needs were known.  But, per CHC's alleged policy, CHC failed to send Ms. Young to the hospital.  And, as Dr. Allen repeatedly testified, had Ms. Young been sent to the hospital, it is likely that Ms. Young would not have died from the subdural hematoma because it would have been discovered while she was in the care of the hospital.  Dkt. 683, at 10, 60, 68, 73, 81, 82.  Again, Dr. Allen's testimony was unrebutted and there was overwhelming evidence that CHC maintained a custom or practice of failing to send inmates in need of emergent care to the hospital.

### Cumulative Effect of Misconduct

The cumulative effect of Plaintiff's counsel's misconduct weighs in favor of finding that it is reasonably probable that the misconduct influenced the jury's verdict.  Plaintiff's counsel's misconduct in this case was not a one-off.  Plaintiff's counsel's misconduct was systemic.  Again, the misconduct was not a bug in the system; the misconduct was by design.

### Application of Four Factors

Three of the four factors weigh in favor of finding that it is reasonably probable that Plaintiff's counsel's misconduct influenced the jury's verdict.  The misconduct was pervasive; the curative attempts were insufficient to cleanse the jury's collective mind or to stop Mr. Smolen from continuing to engage in misconduct; and the cumulative effect of the misconduct over the course of nearly two weeks were significant.  Countering these factors was the overwhelming

evidence of liability.  This is not the first time the Court has noted the overwhelming nature of the evidence.  *See, e.g.*, Dkt. 748, at 3; Dkt. 726, at 1 ("[I]t would behoove Defendant to give considerable attention to the weight of the evidence factor, as that is a major—albeit not dispositive—issue as the Court currently sees things.").

Balancing these factors, in the Court's discretion, the Court denies the motion for a new trial.  Certainly, the conduct was pervasive, but the pervasive misconduct was less significant as to liability.  Overall, the misconduct's main effect was on the damages, particularly the punitive damages.

The Court possesses the discretion to deny a motion for new trial, but still grant a remittitur.  *Osterhout*, 10 F.4th at 992-93.  As to compensatory damages, the jury returned a large verdict, fairly valuing the harms caused to Ms. Young.  The verdict is relatively consistent with the compensatory damages verdict returned in Mr. Williams' case.  The jury was given the difficult task of valuing Ms. Young's damages resulting from the deliberate indifference of CHC.  In the Court's discretion, the jury reached a reasonable—albeit very large—verdict for compensatory damages.

But the astronomical punitive damage award is a different matter.  The Court is confident that Plaintiff's counsel's pervasive misconduct influenced the punitive damage award.  The punitive damage award in Mr. Williams' case was $250,000.  This is a tiny fraction of the punitive damage award in this case.  Granted, Ms. Young perished at the hands of CHC after Mr. Williams' slow motion

homicide.  Unfortunately, Mr. Williams' death apparently resulted in no discernable corrective action by CHC.  So, a substantially larger punitive damage award is appropriate.  But the punitive damage award must fair, reasonable, predictable, and proportionate.  *Payne*, 711 F.3d at 93.

Fully aware that "there is no such thing as a *correct* amount of punitive damages," *id.*, the Court grants CHC's request for a remittitur.  In its discretion, the Court reduces the punitive damage award to $7 million.

During its research for this motion, the Court located the decision in *Cadorna*, 245 F.R.D. 490.  This decision addresses the same issue, involving many of the same types of attorney misconduct.  Plaintiff's counsel made the trial a toxic environment, read from a document not in evidence, refused to comply with court orders even after being admonished, gave insincere apologies, made gratuitous comments while examining witnesses, and made inappropriate arguments in closing.  *Cadorna*, 245 F.R.D. at 492-95.  Not surprisingly, like this Court, poor Judge Blackburn found that counsel engaged in misconduct.  *Id*.  Judge Blackburn highlighted many of the same unprofessional behaviors that occurred in this case. There is much wisdom in Judge Blackburn's decision.  This wisdom includes, but is certainly not limited to, noting that curative measures are not necessarily effective. *Id*. at 495 ("The bench and bar are both aware that cautionary instructions are effective only up to a certain point.  After repeated exposure of a jury to prejudicial information, cautionary instructions will have little, if any, effect in eliminating the prejudicial harm." (cleaned up)).  And also relevant to this case, Judge Blackburn's

wisdom continued by giving no quarter to attorneys who engage in repeated misconduct but also seek refuge in the opponent's failure to object.  *Id.* ("Nor is it any answer to the overwhelming effect of such prejudicial conduct to argue . . . that defendant waived its right to complain by failing to object at every instance where objection was warranted.").  The distinction between *Cadorna* and this case is that the plaintiff in *Cadorna* did not have a strong case, so Judge Blackburn granted the motion for new trial.  *Id.* at 496.  Having analyzed Judge Blackburn's decision, the Court is confident in its decision.

## CONCLUSION

The most important task of a district judge in presiding over a jury trial is to preserve the integrity of the process to ensure—as best as possible—that the litigants receive a fair trial.  *Cardona*, 245 F.R.D. at 492; *see also* Fed. R. Evid. 103(d).  That task is not diminished even when one of the parties engages in conduct that results in death and the other party is represented by an attorney determined to engage in misconduct.  At trial, the Court did the best it could to ensure a fair trial.  But the Court was unprepared for Mr. Smolen's litigation strategy of infecting the trial at every turn with misconduct.  As the Court repeatedly stated during trial, Mr. Smolen's didn't need to engage in this type of behavior.  Ms. Young-Powell had a strong case and she had waited a decade to reach trial.  *Cardona*, 245 F.R.D. at 497 ("[I]nstead of letting the justice of plaintiff's case speak for itself, [plaintiff's counsel] chose to decry and debase the very mechanisms through which he sought relief."). But it became readily apparent that

Mr. Smolen's couldn't or wouldn't control his nature or his predetermined litigation strategy.  The result was a toxic trial, resulting in a verdict influenced by his misconduct.  That influence manifested itself in the $68 million punitive damage award—an award that can't stand.

After balancing the required factors, the Court denies the motion for new trial, but grants CHC's motion for remittitur as to the punitive damage award.  The punitive damage award of $68 million is reduced to $7 million.  Plaintiff has until March 26, 2024 to either accept the remittitur or seek a new trial.

As is plainly evident from these seventy plus pages, the main victim in this case is Ms. Young and her family, including Ms. Young-Powell.  The Court has deep sympathy for Ms. Young-Powell and her family for this result.  Again, she did nothing wrong.  But the facts and law lead the Court to this result.

Entered: 29th day of February, 2024

By: s/ Iain D. Johnston
Iain D. Johnston
U.S. District Judge